# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| NETCHOICE, *Plaintiff*, v. JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter, *Defendant*. | Civil Action No. _____ |

## COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NetChoice brings this civil action against Defendant for declaratory and injunctive relief and alleges as follows:

### INTRODUCTION

1. Tennessee joins a growing list of States attempting to unconstitutionally regulate minors' access to protected online speech—impairing adults' access along the way. The restrictions imposed by Tennessee House Bill 1891 (the "Act") violate bedrock principles of constitutional law and precedent from across the nation. As the U.S. Supreme Court has repeatedly held, "minors are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up; quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). And the government may not impede adults' access to speech in its efforts to regulate what it deems acceptable for minors. *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997). These principles apply with equal force online: Governments cannot "regulate ['social media'] free of the First Amendment's restraints." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2399 (2024).

2.     That is why courts across the country have enjoined similar state laws restricting minors' access to online speech. *Comput. & Commc'n Indus. Ass'n v. Paxton*, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ("*CCIA*") (enjoining law requiring filtering and monitoring of certain content-based categories of speech on minors' accounts); *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024) (enjoining age-assurance and parental-consent law); *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. July 1, 2024) (enjoining age-verification and parental-consent law); *NetChoice, LLC v. Yost*, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024) (enjoining parental-consent law); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) (enjoining age-verification and parental-consent law).

3.     This Court should join those courts and similarly enjoin Defendant's enforcement of this Act against NetChoice's members.

4.     The social media websites regulated by the Act allow both minors and adults to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—all "protected by the First Amendment" from government interference. *Griffin*, 2023 WL 5660155, at *5 (quoting *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017)).[1] The Act would fundamentally limit the expressive activity of users by placing multiple restrictions on minors and adults' ability to access covered websites and, in some cases, blocking access altogether.

5.     Accordingly, the Act—in whole and in part—is unlawful for multiple reasons.

6.     *First*, the Act's requirement that covered websites "verify the age[s] of [all] indi-vidual[s]" (both minors and adults) "who attempt[] to become account holders," § 47-18-

---

[1]  This Complaint refers to both "websites" and "internet applications," § 47-18-5702(9)(A), by the shorthand reference "websites." It refers to websites regulated by challenged provisions of the Act as "covered websites." Unless otherwise noted, statutory citations in this Motion refer to Title 47 of the Tennessee Code.

5703(a)(1), violates the First Amendment. *Fitch*, 2024 WL 3276409, at \*11-12 (enjoining age-verification requirement); *Griffin*, 2023 WL 5660155, at \*21 (same); *see Reyes*, 2024 WL 4135626, at \*16 n.169 (enjoining similar requirement). All individuals, minors and adults alike, must comply with this age-verification requirement, which would force them to hand over personal information or identification that many are unwilling or unable to provide as a precondition to accessing and engaging in protected speech. Such requirements chill speech, in violation of the First Amendment. *See, e.g.*, *Ashcroft*, 542 U.S. at 673; *Reno*, 521 U.S. at 882.

7. *Second*, the Act's requirement that a minor obtain parental consent as a prerequisite to becoming an account holder (and thus being able to access protected speech) on covered websites, § 47-18-5703(a)(2)(A), violates the First Amendment. *See Fitch*, 2024 WL 3276409, at \*12-13 (enjoining parental-consent requirement to access protected speech); *Yost*, 2024 WL 555904, \*14 (same); *Griffin*, 2023 WL 5660155, at \*21 (same); *see also Reyes*, 2024 WL 4135626, at \*13 & n.135 (enjoining parental-consent requirement for minors to speak to certain audiences). The Supreme Court has held that governments may not require minors to secure parental consent before accessing protected speech. *Brown*, 564 U.S. at 799.

8. Because these provisions both burden members' ability to disseminate—and users' ability to access—protected speech, they independently trigger strict scrutiny.

9. Moreover, these speech regulations also separately trigger strict scrutiny because they depend on the Act's content-based and speaker-based central coverage definition of "social media company." § 47-18-5702(8)-(9). That coverage definition excludes websites based on their content, such as "career development" websites or websites that provide "interactive gaming or educational entertainment." § 47-18-5702(2)(B), (9); *see Reyes*, 2024 WL 4135626, at \*9-11 (holding that law's central coverage definition was facially content-based); *Fitch*, 2024 WL

3276409, at *9 (similar); *Yost*, 2024 WL 555904, at *8 (similar). "Content-based laws" regulating speech "are presumptively unconstitutional and may be justified only if" they satisfy "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (citations omitted). Similarly, the coverage definition discriminates based on who is speaking—regulating covered websites but not others focused on "[o]nline shopping" or "career development," § 47-18-5702(9)(B)(iv)-(v), and singling out for favorable treatment websites that "consist[] primarily of content that . . . is preselected by the . . . website" while regulating websites that disseminate "content that is . . . generated by account holders," § 47-18-5702(9)(B)(iii)(*a*). Supreme Court precedent is "deeply skeptical" of laws "distinguishing among different speakers." *NIFLA v. Becerra*, 585 U.S. 755, 777-78 (2018) (cleaned up).

10.     None of the Act's provisions can satisfy the demanding requirements of strict scrutiny, nor any level of heightened scrutiny. They are not appropriately tailored to any substantial or compelling governmental interest.

11.     Finally, the Act should also be enjoined as its central "social media company" definition, § 47-18-5702(8), is unconstitutionally vague, leaving many websites uncertain about whether they must shoulder the Act's burdens.

12.     For these reasons and more, this Court should enjoin Defendant from enforcing the Act against Plaintiff's members and declare the Act unlawful.

## PARTIES & STANDING

13.     Plaintiff NetChoice is a District of Columbia nonprofit trade association for Internet companies.[2] NetChoice's mission is to promote online commerce and speech and to increase

---

[2] NetChoice's members are listed at NetChoice, About Us, https://perma.cc/AS4T-AKZJ.

consumer access and options via the Internet, while minimizing burdens that could prevent businesses from making the Internet more accessible and useful.

14.     NetChoice has standing to bring its challenges on at least two grounds.

15.     *First*, NetChoice has associational standing to challenge the Act, because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977); *Reyes*, 2024 WL 4135626, at *7; *CCIA*, 2024 WL 4051786, at *7-9; *Fitch*, 2024 WL 3276409, at *5-6; *Yost*, 2024 WL 555904, at *3-4; *Griffin*, 2023 WL 5660155, at *9.

16.     Based on the Act's definitions, § 47-18-5702, the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Dreamwidth; (2) Google, which owns and operates YouTube; (3) Meta, which owns and operates Facebook and Instagram; (4) Nextdoor; (5) Pinterest; (6) Snap Inc., which owns and operates Snapchat; and (7) X. Although the Act does not regulate all of Plaintiff's members, this Complaint refers to members with services that the Act regulates as "members."

17.     *Second*, NetChoice has standing to assert the First Amendment rights of members' current and prospective users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *CCIA*, 2024 WL 4051786, at *9; *Fitch*, 2024 WL 3276409, at *7; *Yost*, 2024 WL 555904, at *5-6; *Griffin*, 2023 WL 5660155, at *11-12.[3]

---

[3] Except where noted otherwise, this Complaint uses the term "user" to encompass both of what the Act refers to as "user[s]" and "account holder[s]." § 47-18-5702(1), (10). When discussing the Act's requirements, this Motion also uses "minor," "adult," "account holder," and "user" to refer only to Tennessee minors, adults, account holders, and users covered by the Act. Plaintiff and its members reserve the right to argue that their compliance obligations for "users" (under the Act) are different than their compliance obligations for "account holders," and are different from the burdens discussed in this Complaint.

18.     Defendant Jonathan Skrmetti is the Tennessee Attorney General & Reporter. Defendant is a Tennessee resident and is sued in his official capacity. The Act gives the Tennessee Attorney General & Reporter authority to enforce the Act. § 47-18-5705. Defendant has publicly pursued enforcement against some of NetChoice's members under other laws, advancing claims related to minors' online welfare. *See, e.g.*, *Tennessee v. Meta Platforms, Inc.*, No. 23-1364-IV (Tenn. Ch. Davidson Cnty.).

## JURISDICTION & VENUE

19.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

20.     This Court has personal jurisdiction over Defendant because he resides in and/or conducts a substantial proportion of his official business in Tennessee. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in, and the events giving rise to this civil action occurred in, Tennessee.

## BACKGROUND

21.     **NetChoice members' covered websites disseminate and facilitate speech protected by the First Amendment.** Social media websites such as Plaintiffs' members' covered services "engage[] in expression" through their "display" and "compil[ing] and curat[ing]" of protected "third-party speech" (text, audio, images, and video) "created by others." *Moody*, 144 S. Ct. at 2393, 2401, 2406. They "allow[] users"—both minors and adults—"to gain access to information[,] communicate with one another," and "engage in a wide array of protected First Amendment activity." *Packingham*, 582 U.S. at 105, 107.

22.     Minors—like adults—use NetChoice members' social media websites to engage in speech that is entitled to First Amendment protection from governmental interference. On these

6

websites, minors can "take positions on and engage with others in pursuit of the type of 'political, social, economic, educational, religious, and cultural' activities" protected by the First Amendment. *Fitch*, 2024 WL 3276409, at *10 (citation omitted); *see Yost*, 2024 WL 555904, at *7; *Griffin*, 2023 WL 5660155, at *5-6. For example, Dreamwidth allows users to share their writing, artwork, and innermost thoughts. "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about and advocate for the causes they care about, showcase their art or athletic talent, and hear from their local government officials. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows users to explore recipes, home decor, and more. Snapchat is designed to allow users to have digital conversations with friends and family in ways that replicate real-life interactions. On X (formerly Twitter), "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions. All of these websites allow their users to create accounts and communicate with other users through posts. § 47-18-5702(9).

23.     Like many other websites, NetChoice members require users to create an account before they can access some or all of the protected speech and functions available on their websites.

24.     **Existing options for parental control and oversight.** Parents have many existing choices to regulate whether and how their minor children use the Internet. *See Reyes*, 2024 WL 4135626, at *13 n.138; *Fitch*, 2024 WL 3276409, at *12; *Griffin*, 2023 WL 5660155, at *6-8.

25.     Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the Internet.

26.     Cellular and broadband Internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/JL7J-UKDF?type=image; AT&T, AT&T Secure Family, https://perma.cc/NG8R-RBDG; T-Mobile, Family Controls and Privacy, https://perma.cc/RLQ4-WVEM; Comcast Xfinity, Setting Up Parental Controls for Xfinity Internet, https://perma.cc/9PZK-4S98?type=image.

27.     Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox, https://perma.cc/LTS6-SNXS. For example, some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/4KBZ-ETGM; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/49V7-4RNE. Parents can also use widely available third-party software and browser extensions to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2023*, PCMag (Dec. 15, 2023), https://perma.cc/4DRX-ZX3A.

28.     Wireless routers often have settings allowing parents to block particular websites, filter content, monitor Internet usage, and control time spent on the Internet. *See, e.g.*, Netgear, Netgear Smart Parental Controls, https://perma.cc/DFE6-RH95; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/3QFB-3WYP.

29.     Device manufacturers allow parents to limit the time their children may spend on the device, curtail the applications that can be used, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/H5S5-4BV3; Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/9P23-ANWB; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/A3QJ-V7Y4; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/6AU9-JMA8.

8

30.     Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps In 2024, Tested By Our Editors*, CNN underscored (Mar. 11, 2024), https://perma.cc/D4CK-F8HS.

31.     In addition, NetChoice members provide parents with tools and options to help monitor their minor children's activities. Facebook offers supervision tools that parents and guardians can use to help support their teens. When supervision is set up on Facebook, a parent can see how much time their teen has spent on the Facebook app each day for the last week and their average daily time spent for the week; set scheduled breaks for their teen; see their teen's Facebook friends; see some of their teen's privacy settings and content preferences; and see the people and Pages their teen has blocked. *See, e.g.*, Meta, Supervision on Facebook, https://perma.cc/E5GS-DZKQ. Similarly, Snapchat's "Family Center" allows parents to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report abuse. *See* Snapchat Support, What is Family Center, https://perma.cc/2AUN-CKD6. Instagram currently offers supervision features for teens under 18 that allow parents and guardians to set time limits; set reminders to close the app; see the average amount of time their teen has spent on Instagram; see which accounts their teen is following and which accounts are following their teen, which accounts their teen is currently blocking, and their teen's account privacy, messaging, and sensitive content settings. *See, e.g.*, Instagram, Help Center, About Supervision on Instagram, https://perma.cc/7AD3-L8J2. Instagram recently announced that minors under 18 will automatically be placed into "Instagram Teen Accounts" which default to the strictest privacy settings and have limitations on who can contact minors, the content minors can see, and the time of day minors can receive notifications. *See, e.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sept. 17, 2024), https://perma.cc/8EQB-

D3DG. Minors under 16 will need a parent's permission to change any of these Instagram Teen Accounts settings to less strict settings. *Id.* Via Teen Accounts, parents will have added supervision features, including ways to get insights into who their minors are chatting with and seeing topics their minor is looking at. *Id.* YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen uploads a video or starts a livestream; (2) to gain insights into their teen's channel activity (such as uploads, comments, and subscriptions); and (3) an option to link accounts between a parent and teen. YouTube, My Family, https://perma.cc/4PQF-PQXY.

32.     All NetChoice members prohibit minors under 13 from accessing their main services, although some offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "Supervised Experience" on YouTube) for minors younger than 13 with parental consent. *See* YouTube for Families Help, Important Info for Parents About YouTube Kids, https://perma.cc/M386-KX4E; YouTube Help, What Is a Supervised Experience on YouTube, https://perma.cc/TY6N-MX6Z. These services allow parents to select content settings, set screen-time limits, and otherwise oversee their children's use of the services.

33.     **Covered websites' dedication to beneficial user experiences and user security.** NetChoice's members expend vast resources to improve their services and curate the content on their websites to best ensure that it is appropriate for users, especially with respect to minors. They restrict the publication of content they consider harmful, like violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. Conversely, many covered websites promote positive and age-appropriate content, such as content that encourages a healthy self-image.

# TENNESSEE HOUSE BILL 1891

34.     The Tennessee Legislature enacted House Bill 1891, which places multiple content- and speaker-based speech restrictions—including parental-consent and age-verification requirements—on certain websites and their users.

35.     The Act takes effect on January 1, 2025.

36.     **Content- and speaker-based central coverage definition of "social media company" (§ 47-18-5702(8)).** The Act's speech regulations apply to only a subset of Internet websites. The Act's coverage depends on a content-based and speaker-based set of definitions and exclusions. The Act regulates only "social media compan[ies]" providing "social media platform[s]." § 47-18-5702(8). These covered "actors" and "activities," *Moody*, 144 S. Ct. at 2398, include the members and services identified above in ¶ 16.

37.     The Act defines "[s]ocial media company" as "a person that is an interactive computer service and that provides a social media platform." § 47-18-5702(8); *see* § 47-18-5702(3) (defining "[i]nteractive computer service").

38.     In turn, a "social media platform" means "a website or internet application that":

> (i) Allows a person to create an account; and
> (ii) Enables an account holder to communicate with other account holders and users through posts[.]

§ 47-18-5702(9)(A). *Moody* applied full First Amendment protection to websites that work in exactly this way—to "allow users to upload content . . . to share with others" and allow those "viewing the content . . . [to] react to it, comment on it, or share it themselves." 144 S. Ct. at 2394-95.

39.     The Act defines "[p]ost" to mean "content that an account holder makes available on a social media platform for other account holders and users to consume." § 47-18-5702(7). This definition of "post" limits the Act's coverage to services that *publicly* disseminate speech on feeds, boards, forums, and similar webpages for multiple users to see, which accords with the common

11

understanding of the term. *See, e.g.*, *Posting*, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73 ("an electronic message or information that is put on a website in order to allow many people to see it"). A "post" on a "social media platform" therefore does not include "direct messaging" or "email." *Moody*, 144 S. Ct. at 2398; *see also* § 47-18-5702(9)(B)(ii) (expressly excluding "[a]n email service").

40. The Act also contains a long list of content-based exclusions from its coverage definition. First, the Act excludes "interactive gaming or educational entertainment" from the "content" of "post[s]" it covers. § 47-18-5702(2)(B).

41. Second, the Act's definition of "social media platform" also contains a litany of content-based and speaker-based exceptions. The Act's coverage definition "[d]oes not include:"

(i) A broadband internet access service . . . ;
(ii) An email service;
(iii) An internet service, internet application, or website:
    (a) That consists primarily of content that is not generated by account holders, but rather is preselected by the service, application, or website provider; and
    (b) For which interactive functionality is incidental to, directly related to, or dependent upon, the preselected content described in subdivision (9)(B)(iii)(*a*);
(iv) Online shopping, if the interaction with other account holders or users is predominantly limited to the ability to send, receive, request, or settle funds, comment on transactions, display goods for sale, engage as consumers about products and reviews, or post a wish list;
(v) An internet service, internet application, or website that primarily provides career development opportunities;
(vi) A cloud storage or cloud computing service;
(vii) An online service, application, or website in which interaction between users is predominately used for technical support, or limited to reviewing products offered for sale by electronic commerce or commenting on such reviews posted by other users; or
(viii) Peer-to-peer payment platforms, if the interaction with other users or account holders is generally limited to the ability to send, receive, or request funds and to like or comment on such transactions, or other functions that are focused on sending, receiving, requesting, or settling payments between users or account holders[.]

§ 47-18-5702(9)(B) (paragraph breaks adjusted).

42. Accordingly, the Act excludes services for which *Moody* questioned whether a different First Amendment analysis might apply when assessing the First Amendment implications

12

of distinct laws that may also regulate non-social media services. *See Moody*, 144 S. Ct. at 2398 (discussing email, online marketplace, ride-sharing, and peer-to-peer payment services). The Act's exclusion of "email service[s]," § 47-18-5702(9)(B)(ii), excludes "email," *Moody*, 144 S. Ct. at 2398. The Act's exclusion of "[o]nline shopping," § 47-18-5702(9)(B)(iv), excludes "online marketplace[s] like Etsy," *Moody*, 144 S. Ct. at 2398. The Act's exclusion of "[p]eer-to-peer payment platforms," § 47-18-5702(9)(B)(viii), excludes "payment service[s] like Venmo," *Moody*, 144 S. Ct. at 2398. And the Act's exclusion of websites "consist[ing] primarily of content that is . . . preselected by the [website]," § 47-18-5702(9)(B)(iii)(*a*), excludes "ride-sharing service[s] like Uber," *Moody*, 144 S. Ct. at 2398.

43.  Nothing in the Act defines key coverage terms, such as "primarily," "interactive functionality," "incidental to," "predominantly," and "generally." § 47-18-5702(9)(B)(iii)(*a*)-(*b*), (iv)-(v), (vii)-(viii).

44.  **Age-verification (§ 47-18-5703(a)(1)).** The Act requires covered websites to "verify the age of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder." § 47-18-5703(a)(1). The Act does not define or explain how covered websites must verify the ages of individuals who attempt to become account holders.

45.  The Act's age-verification requirement means that covered websites must verify every new account holder's age. But many people will not or cannot provide proof of age to gain access to the covered websites. That will deter people—both minors and adults—from accessing covered websites, thereby chilling their protected speech.

46.  Once an account holder's age has been verified, a covered social media company "is not required to reverify the individual's age . . . unless [the] parental consent" required for a minor to become an account holder "is revoked," § 47-18-5703(a)(3).

13

47.     The Act provides that a "social media company or third party shall not retain personally identifying information that was used to verify age." § 47-18-5703(c). Although this provision contemplates that "personally identifying information" is required to verify age, it does not define that term nor state to what extent a covered website can use such information to verify a user's age.

48.     **Parental consent (§ 47-18-5703(a)(2)).** The Act provides that, upon verifying an individual's age, "[i]f the individual is a minor, then the social media company must verify the express parental consent for the minor to become an account holder." § 47-18-5703(a)(2)(A).[4]

49.     If the covered "social media company" does not have "the express consent of the minor's parent to allow the minor to become an account holder," then the "social media company shall prohibit a minor from becoming an account holder." § 47-18-5703(a)(2)(B). Thus, the Act requires covered websites to obtain express parental consent as a precondition to access protected speech on covered websites.

50.     The Act does not define what is required to verify parental consent or what methods of parental consent are acceptable.

51.     The Act provides that "[a] social media company shall allow a parent to revoke consent for a minor to become or continue as an account holder." § 47-18-5703(b). And once parental consent has been verified, a social media company "is not required to reverify the individual's . . . parental consent, unless parental consent is revoked." § 47-18-5703(a)(3).

52.     The Act provides that a "social media company or third party shall not retain personally identifying information that was used to verify . . . parental consent." § 47-18-5703(c).

---

[4] The Act defines "[m]inor" as "an individual who is: (A) Known or reasonably believed by a social media platform to be under eighteen (18) years of age; (B) Not emancipated; and (C) A resident of this state." § 47-18-5702(4).

Although this provision contemplates that "personally identifying information" is required to verify parental consent, it does not define that term nor state to what extent a covered website can use such information to verify parental consent for a user to become an account holder.

53. The Act does not account for the difficulty in verifying a parent-child relationship. *Griffin*, 2023 WL 5660155, at *4 ("[T]he biggest challenge . . . with parental consent is actually establishing . . . the parental relationship."); *see Fitch*, 2024 WL 3276409, at *13. These difficulties are compounded when, *e.g.*, families are nontraditional, families have differences in surname or address, parents disagree about consent, minors are unsafe at home, parents do not have or are unwilling to electronically submit documentation, or parental rights have been terminated.

54. **Parental supervision (§ 47-18-5704).** The Act requires a "social media company" to "provide a minor account holder's parent with means for the parent to supervise the minor's account." § 47-18-5704. These "means must include options for the parent to view privacy settings on the account, set daily time restrictions, and implement breaks during which the minor cannot access the account." *Id.*

55. Although parental supervision is "option[al]" for parents, the Act still burdens covered websites' protected speech (and minors' access to protected speech) by requiring them to implement specific "means" of parental supervision.

56. **The Act's enforcement provisions (§ 47-18-5705).** The Act gives the Tennessee Attorney General & Reporter authority to enforce the Act. Specifically, it provides that "[i]f the attorney general and reporter believes that a social media company is engaged in, has engaged in, or is about to engage in an act or practice prohibited by [the Act] and that proceedings would be in the public interest, then the attorney general and reporter may" conduct an investigation or bring

15

an action in court for violations of the Act under Tennessee's Consumer Protection Act. § 47-18-5705 (citing §§ 47-18-106, 47-18-108).

57. The Act provides that in an action under the Tennessee Consumer Protection Act, "the attorney general and reporter may recover the penalties and other relief authorized under § 47-18-108." § 47-18-5705(a)(2). Those penalties include a "civil penalty of not more than one thousand dollars ($1,000) for each violation," costs, expenses, and attorney's fees. § 47-18-108(b)(3). Furthermore, in such an action, a court may revoke a license authorizing a person to engage in business in Tennessee for knowing and persistent violations and may issue "a civil penalty of not more than two thousand dollars ($2,000), recoverable by the state for each violation," for any "knowing violation" of an injunction issued by the court. § 47-18-108(b)(2), (c).

## CLAIMS

58. Plaintiff raises both (1) a facial challenge to the Act's provisions challenged in this lawsuit; and (2) a challenge to these provisions as applied to the members and services identified in ¶ 16.

59. For all First Amendment claims, the facial challenge standard asks whether "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted). At a minimum, the Act is invalid to the extent it regulates "social media" websites, including as applied to Plaintiffs' members' regulated services identified in ¶ 16. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff).

60. The First Amendment facial challenge here is straightforward "from the face of the law" because all aspects of the Act's speech-restricting provisions, "in every application to a covered social media company, raise the same First Amendment issues," so the Court "need not 'speculate about "hypothetical" or "imaginary" cases.'" *X Corp. v. Bonta*, 2024 WL 4033063, at *6

16

(9th Cir. Sept. 4, 2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)); *CCIA*, 2024 WL 4051786, at *15 (facial challenge proper because state law "raises the same First Amendment issues in every application to a covered business" (quoting *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1116 (9th Cir. 2024) (affirming preliminary injunction of law requiring websites to issue reports opining on potential harms to minors); (internal quotation marks omitted))); *Reyes*, 2024 WL 4135626, at *9 n.92 (noting that First Amendment facial challenge "questions are easily answered" where "[t]here is no dispute about who and what the Act regulates" or "how the First Amendment applies to *different* websites or regulatory requirements" (internal citation omitted)).

61.     Similarly, for Plaintiff's First and Fourteenth Amendment vagueness claims, the court must "determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982)); *see Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). Here, a facial vagueness challenge is proper because "there is no reason to believe one social media company is better suited than another to understand [the Act's] vague terms." *CCIA*, 2024 WL 4051786, at *9.

62.     Each First and Fourteenth Amendment challenge raises the rights of both NetChoice members and those who use or could prospectively use NetChoice members' websites.

### COUNT I
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE
### STATES BY THE FOURTEENTH AMENDMENT
### (ALL SPEECH REGULATIONS DEPENDING ON THE
### CENTRAL COVERAGE PROVISIONS – § 47-18-5702(2), (7)-(9))

63.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

17

64.     As incorporated against the States by the Fourteenth Amendment, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. The First Amendment protects "publish[ing]," *Reno*, 521 U.S. at 852-53; "disseminat[ing]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023); and "creating, distributing, [and] consuming" protected speech. *Brown*, 564 U.S. at 792 n.1. And those rights apply to "social-media platforms." *Moody*, 144 S. Ct. at 2394. The "speech social media companies engage in when they make decisions about how to construct and operate their platforms . . . is protected speech" under the First Amendment. *Reyes*, 2024 WL 4135626, at *8.

65.     "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

66.     The State cannot demonstrate that the Act's restrictions and burdens on speech satisfy any form of heightened First Amendment scrutiny because the Act's central coverage provisions are unconstitutionally content-based and speaker-based. The "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) (citation omitted). The State cannot articulate a sufficient governmental interest supporting the Act, and—even if it could—the Act is not properly tailored to satisfy any form of First Amendment scrutiny.

67.     **The Act triggers strict scrutiny.** The Act triggers strict scrutiny because its provisions defining which "social media compan[ies]" are covered, § 47-18-5702(2), (7)-(9), are content-based and speaker-based.

68.     The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*,

564 U.S. at 790-91 (citation omitted). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (internal quotation marks and citation omitted). Government cannot use "subtler forms of discrimination that achieve identical results based on function or purpose." *Id.* at 74. "Content-based laws . . . are presumptively unconstitutional." *Reed*, 576 U.S. at 163 (citations omitted).

69.     The Act is a content-based law. For instance, the Act excludes a host of websites based on the subject matter presented on the particular website, including "[o]nline shopping," "career development opportunities," "technical support," "reviewing products offered for sale," "commenting on . . . reviews posted by other users," and "like[s]" or "comment[s]" on "[p]eer-to-peer payment platform[]" transactions. § 47-18-5702(9)(B)(iv)-(v), (vii)-(viii). Likewise, the Act excludes "interactive gaming" and "educational entertainment" from the definition "content" covered by the Act. § 47-18-5702(2)(B). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny); *see also Reyes*, 2024 WL 4135626, at *10; *Fitch*, 2024 WL 3276409, at *9; *Yost*, 2024 WL 555904, at *11.

70.     In addition, the Act only regulates websites that "[e]nable[] an account holder to communicate with other account holders and users through posts" but excludes websites that "consist[] primarily of content . . . preselected by the . . . website." § 47-18-5702(9)(A)(ii), (B)(iii)(*a*). That is, websites where "interactive functionality" between users is limited to content "preselected by the . . . website" are exempted from the Act's reach, but websites where the entire purpose is the "interactive functionality" between users and the "posts" they "generate[]" are covered. § 47-

18-5702(9)(A)(ii), (B)(iii)(*a*)-(*b*). That is a content-based distinction between websites. *See, e.g.*, *Reyes*, 2024 WL 4135626, at *10 n.105.

71.     The Act's central coverage definition is also speaker-based, as it discriminates based on who is disseminating speech—regulating covered websites but not others focused on "[o]nline shopping," "career development," "technical support," "reviewing products offered for sale," "interactive gaming," or "educational entertainment." § 47-18-5702(2)(B), (9)(B)(iv)-(v), (vii). "[L]aws that single out [a subset of speakers], or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (cleaned up). Supreme Court precedent is "deeply skeptical" of laws "distinguishing among different speakers." *NIFLA*, 585 U.S. at 777-78.

72.     The Act's central coverage definition is also speaker-based because it singles out for favorable treatment websites that "consist[] primarily of content that . . . is preselected by the . . . website" while burdening websites that disseminate "content that is . . . generated by account holders," § 47-18-5702(2)(B)(iii)(*a*), even if those websites also post or create their own content (as many websites do).

73.     Because the Act's central coverage definition is both content-based and speaker-based, so too is each provision of the Act restricting speech that relies on this definition. *See Reyes*, 2024 WL 4135626, at *8 (finding "persuasive" the argument that "the entire Act facially violates the First Amendment because the Act's operative [speech-restricting] provisions each rely on the Central Coverage Definition") (citation omitted)).

74.     The Act's age-verification requirement, § 47-18-5703(a)(1), regulates and burdens speech by requiring adults and minors to provide personal information to access protected speech.

75. The Act's parental-consent requirement, § 47-18-5703(a)(2), regulates and burdens speech by requiring minors to obtain parental consent to access protected speech.

76. The Act's parental-supervision requirement, § 47-18-5704, regulates speech by imposing legal duties on covered websites for disseminating speech of a certain type of content.

77. Therefore, because each of these provisions of the Act is a "[g]overnment regulation of speech," *Reed*, 576 U.S. at 163, and relies on the Act's content-based and speaker-based central coverage definition, each provision triggers strict scrutiny.

78. **All of the Act's speech regulations fail strict scrutiny.** Under strict scrutiny, the State must demonstrate that the Act is "the least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (citation omitted). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799. Further, under the First Amendment, Defendant has the burden to "specifically identify" how the Act addresses an "actual problem in need of solving." *Id.* (citation omitted); *Reyes*, 2024 WL 4135626, at *12 (same) (citations omitted). Moreover, Defendant must demonstrate that there is a problem in need of governmental solution, as compared to private, family solutions, and that any such governmental solution is one that has the least possible restrictive effect on speech.

79. The State cannot meet its burden here because the Act does not serve any compelling government interest. *See, e.g.*, *Reyes*, 2024 WL 4135626, at *12.

80. Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (cleaned up).

21

81.     Moreover, parents have a wealth of choices to help oversee their minor children online, and those choices provide families more flexibility than the State's one-size-fits-all mandate. The Supreme Court has repeatedly endorsed similar parental controls over governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000).

82.     The State has not "specifically identif[ied]" how the Act's scope responds to "an actual problem in need of solving" by government mandate. *Brown*, 564 U.S. at 799 (cleaned up). Nor has it demonstrated why the Legislature ignored the viable alternatives available to parents. *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 2024 WL 4135626, at *13.

83.     The Act is also not properly or narrowly tailored to any articulated interest. It "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Reyes*, 2024 WL 4135626, at *16 n.170; *see Fitch*, 2024 WL 3276409, at *14 (similar); *Yost*, 2024 WL 555904, at *13 (similar).

84.     The Act is overinclusive because it regulates all manner of protected speech, including political and religious speech that lies at the very heart of the First Amendment.

85.     The Act's one-size-fits-all approach of treating all minors at every development stage alike—from websites' youngest users to seventeen-year-olds—is also vastly overbroad. *See Reno*, 521 U.S. at 866; *Am. Booksellers Ass'n*, 484 U.S. at 396.

86.     The Act is simultaneously underinclusive, because it includes myriad exemptions, some of which result in allowing access to the exact same speech on a smaller or different website. For instance, a 16-year-old can exchange content with other users from around the world while gaming on Roblox ("interactive gaming") but cannot share the same content with individuals on Instagram without parental consent; she can network with colleagues and potential employers on

LinkedIn but cannot network with those same individuals on X without parental consent. These exemptions undermine any contention that the State is addressing a "serious social problem." *Brown*, 564 U.S. at 802; *Griffin*, 2023 WL 5660155, at *19 (holding that state law regulating some websites but exempting "interactive gaming websites and platform[s]" which "predators commonly use to communicate with children" was "not narrowly tailored"). In fact, the Act peculiarly seems to regulate websites that are most likely to offer parental controls and engage in content moderation, *see supra* ¶¶ 31-33, while leaving unregulated many websites that lack such oversight.

87.     The Act's central coverage definition is integral to each of the Act's operative speech regulations. It cannot be severed. Without this central definition, no other provision in the Act could operate. Thus, all of the Act's speech regulations are invalid.

88.     Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

### COUNT II
### 42 U.S.C. § 1983
### VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS
### (ALL SPEECH REGULATIONS DEPENDING ON THE
### CENTRAL COVERAGE DEFINITION – § 47-18-5702(2), (7)-(9))

89.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

90.     The Act's central coverage definition of "social media company," § 47-18-5702(8), is unconstitutionally vague, and it violates principles of free speech and due process.

91.     "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations, Inc.*, 567 U.S. 239, 253 (2012). And a law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304

(2008). The constitutional standard for vagueness is heightened for speech restrictions under the First Amendment. *Fox*, 567 U.S. at 253-54.

92.     The Act's central coverage definition fails to provide necessary notice. The central coverage definition's exclusions inconsistently use different terms to describe the scope of content on exempted websites. For example, it does not define "primarily," "incidental to," "predominantly," and "generally." § 47-18-5702(9)(B)(iii)(*a*)-(*b*), (iv)-(v), (vii)-(viii). That means that websites do not know what it means to "consist[] primarily of content that is not generated by account holders" or "primarily provide[] career development opportunities." § 47-18-5702(9)(B)(iii)(*a*), (v). LinkedIn, for example, is arguably a professional development website; yet LinkedIn also allows account holders to use the website for many other purposes, such as advocacy, advertising, or simply social interaction. It is not clear how much of LinkedIn's content must be related to career development opportunities for LinkedIn to be considered exempt from the Act.

93.     More critically, the Act uses other overlapping words to describe the scope of content on covered websites. For example, how does (1) the use of "*predominately*" in the exception for a "website in which interaction between users is predominately used for technical support" or (2) "generally" in the statutory exception for interactions on peer-to-peer payment platforms that are "*generally* limited to the ability to send, receive, or request funds and to like or comment on such transactions," § 47-18-5702(9)(B)(vii)-(viii) (emphases added), differ from (3) the use of "primarily" in the other exceptions, § 47-18-5702(9)(B)(iii)(*a*), (v)?

94.     Moreover, the Act excludes websites where the "interactive functionality is incidental to . . . preselected content." § 47-18-5702(9)(B)(iii)(*b*). The use of terms like "primarily," "predominantly," "generally," and "incidental to" without definition renders the Act unconstitutionally vague. *See Fitch*, 2024 WL3276409, at *15 (holding that the terms "primarily" and

24

"incidental to" in central coverage definition were "overly indefinite, leaving it open for potential arbitrary and discriminatory enforcement").

95.     Many websites, including NetChoice members, will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin*, 2023 WL 5660155, at *13. Therefore, the Act "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements. Such ambiguity renders a law unconstitutional." *Id.*; *Fox*, 567 U.S. at 253.

96.     Because of this vagueness, the Act's central coverage definition violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

97.     The Act's central coverage definition is integral to each of the Act's operative speech regulations. It cannot be severed. Without this central definition, no other provision in the Act could operate. Thus, all of the Act's speech regulations are invalid.

98.     Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment and Due Process rights and will irreparably harm Plaintiff, its members, and Internet users.

### COUNT III
### 42 U.S.C. § 1983
### VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
### (AGE VERIFICATION – § 47-18-5703(a)(1))

99.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

100.     The Act's age-verification requirement, § 47-18-5703(a)(1), is unconstitutional and cannot satisfy any form of First Amendment scrutiny.

101.     Governments cannot require people to provide identification or personal information to access protected speech. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 874.

102. These principles apply equally to minors, as age-verification to access websites "obviously burden[] minors' First Amendment Rights." *Griffin*, 2023 WL 5660155, at \*17 (discussing *Brown*, 564 U.S. at 794-95).

103. "Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and 'discourages users from accessing the regulated sites.'" *Id.* (quoting *Reno*, 521 U.S. at 856); *see Fitch*, 2024 WL 3276409, at \*12 (holding that age-verification requirement "burdens adults' First Amendment rights, and that alone makes it overinclusive"). So too for minors. Those who are not deterred must "forgo the anonymity otherwise available on the internet" as the state-imposed price of admission. *Griffin*, 2023 WL 5660155, at \*17 (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3rd Cir. 2008) ("relinquish the anonymity to access protected speech").

104. The age-verification provision triggers strict scrutiny because it relies on the Act's central coverage definition.

105. The age-verification provision also independently triggers strict scrutiny.

106. The State cannot demonstrate what purported problem this provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

107. The age-verification requirement is also not properly tailored. For example, the Act is underinclusive because it requires age verification before adults and minors can access content on certain disfavored websites while allowing adults and minors to access the same content on other websites without such verification.

108.    The Act's age-verification requirement is integral to the entire Act. Without this provision, no other provision in the Act could operate. The age-verification provision is not severable and thus the entire Act is invalid.

109.    Unless declared invalid and enjoined, the Act's age-verification provision, § 47-18-5703(a)(1), will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT IV**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(PARENTAL CONSENT– § 47-18-5703(a)(2))**

110.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

111.    The Act's parental-consent requirement, § 47-18-5703(a)(2), is unconstitutional and cannot satisfy any form of First Amendment scrutiny.

112.    Minors have robust First Amendment rights, and websites that publish and disseminate protected speech have the right to publish and disseminate that speech to minors absent governmental restraint. Although States have power to protect minors, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

113.    The Act requires covered websites and minor users to secure parental consent before allowing minor users to create or maintain an account and, therefore, before they can access protected speech. § 47-18-5703(a)(2). If a covered website cannot obtain express parental consent for a minor user, it must "prohibit [the] minor from becoming an account holder," barring access to protected speech. § 47-18-5703(a)(2)(B). But the Supreme Court has held that laws requiring parental consent for minors to access protected speech are unconstitutional. *Brown*, 564 U.S. at 795 & n.3, 804-05.

114.    These First Amendment protections should apply with equal force to the covered websites here, which the Supreme Court has repeatedly recognized disseminate and facilitate a broad range of protected speech. *Moody*, 144 S. Ct. at 2393, 2399, 2401; *Packingham*, 582 U.S. at 105. That, in part, is why courts have held that parental-consent requirements for minors to use "social media" websites violate the First Amendment. *Fitch*, 2024 WL 3276409, at *13; *Yost*, 2024 WL 555904, at *12; *Griffin*, 2023 WL 5660155, at *18.

115.    The parental-consent requirement triggers strict scrutiny because it relies on the Act's central coverage definition.

116.    The parental-consent requirement also independently triggers strict scrutiny. *Yost*, 2024 WL 555904, at *12.

117.    The State cannot demonstrate what purported problem the parental-consent provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

118.    The parental-consent requirement is also not properly tailored.

119.    For example, the Act is underinclusive because it still allows minors to be exposed to the alleged risks or harms the State claims the Act was created to address so long as they have a single parent's consent. *Brown*, 564 U.S. at 802.

120.    Similarly, the Act is underinclusive because it requires parental consent for minors to access content on certain disfavored websites while allowing minors to access the same content on other websites without such consent.

121.    Likewise, the Act is underinclusive because it requires parental consent only for minors who are new account holders on certain disfavored websites while allowing minors who

are already account holders to access the same content on the same disfavored websites without such consent.

122. Unless declared invalid and enjoined, the Act's parental-consent requirement, § 47-18-5703(a)(2), will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

## COUNT V
## EQUITABLE RELIEF

123. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

124. The Act, §§ 47-18-5701 to 5706—both as a whole and individual challenged provisions of the Act—violate federal law and deprive Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

125. This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members.

## COUNT VI
## 42 U.S.C. § 1983 AND 28 U.S.C. § 2201
## DECLARATORY RELIEF

126. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

127. The Act violates the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprives Plaintiff, its covered members, and Internet users of enforceable rights. The Act is unlawful and unenforceable because the entire Act relies on an unconstitutional central coverage definition of covered "social media compan[ies]." § 47-18-5702(8).

29

128.    Sections 47-18-5702(2), (7)-(9); 47-18-5703; and 47-18-5704 of the Act are unlawful and unenforceable, together and separately, because they violate the First Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

129.    Sections 47-18-5702(2), (7)-(9); 47-18-5703; and 47-18-5704 of the Act are unlawful and unenforceable because they are unconstitutionally vague in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

130.    The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

131.    With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

132.    This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

133.    This Court can and should exercise its equitable power to enter a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful.

**PRAYER FOR RELIEF**

Plaintiff requests an order and judgment:

a.  declaring that Tennessee House Bill 1891 is unlawful;

b.  declaring that Tennessee House Bill 1891 violates the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment;

c.  declaring that Tennessee House Bill 1891 is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution;

d.  declaring that §§ 47-18-5702(2), (7)-(9); 47-18-5703; and 47-18-5704 violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment;

30

e.  declaring that §§ 47-18-5702(2), (7)-(9); 47-18-5703; and 47-18-5704 are void for vagueness in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution;

f.  enjoining Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Plaintiff or its members;

g.  entering judgment in favor of Plaintiff;

h.  awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

i.  awarding Plaintiff all other such relief as the Court deems proper and just.

31

Dated: October 3, 2024

Respectfully submitted,

*/s/ Junaid Odubeko*
Junaid Odubeko (Bar No. 023809)
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway Suite 2400
Nashville, TN 37203
(615) 244-2582
jodubeko@bradley.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon Grammel*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com
**pro hac vice forthcoming**

*Attorneys for Plaintiff NetChoice*