**UNITED STATES DISTRICT COURT**
**FOR THE MIDDLE DISTRICT OF TENNESSEE**
**NASHVILLE DIVISION**

| | |
|---|---|
| NETCHOICE,<br>*Plaintiff*,<br>v.<br>JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter,<br>*Defendant*. | Civil Action No. 3:24cv01191 |

**DECLARATION OF DENISE PAOLUCCI IN SUPPORT OF PLAINTIFF NETCHOICE'S MOTION FOR PRELIMINARY INJUNCTION**

I, Denise Paolucci, declare:

1. I am the co-owner of Dreamwidth Studios, LLC, which operates the website dreamwidth.org. I have co-owned and operated Dreamwidth since the site's inception and have worked in multiple roles for the website, including as the head of the Trust and Safety team, which handles reports of abuse and violations of policy on the site, and head of product development. I make this declaration from personal knowledge and a review of Dreamwidth's records kept in the ordinary course of business.

2. Dreamwidth is an open source social networking, content management, and personal publishing website, in operation since 2009.

3. Registering an account requires a user to choose a username, provide an email address, and explicitly agree to the provisions of our Terms of Service. Dreamwidth's registered users can: (1) create public profiles; (2) post content to their "Journal" and comment on others' posts; (3) create, join, and post content in "Communities" that function as Journals intended to focus on a specific discussion topic to which multiple users can contribute; (4) send direct messages to users in accordance with the privacy settings those users have chosen; (5) post and comment in shared community forums; and (6) construct, populate, and browse a feed that presents the user with aggregated content posted by other users they have chosen to follow. Dreamwidth operates according to a set of Guiding Principles and a Diversity Statement that encapsulate our business philosophy. *See* https://www.dreamwidth.org/legal/principles; https://www.dreamwidth.org/legal/diversity.

4. Dreamwidth provides a number of privacy, security, and content-control features, allowing our users a high degree of control over their own data and their own online experience.

Our users can choose who sees their content, restrict access to their content in multiple ways, and control the visibility of everything they post to the site.

5. ***Business model, data sharing, and data usage.*** Dreamwidth does not accept any form of advertising and does not engage in the sale, trade, or brokering of user data. Our revenue comes entirely from our "freemium" model, where approximately 20% of our users pay a fee to access extra services and fund the site for the approximately 80% of our active users who use the site on an unpaid basis. We do not accept payment to promote posts, change the order or priority of content, or target content or posts to a subset of users. In fact, we do not offer any algorithmic sorting or display of user timelines that adjusts the display of content based on a prediction that a particular user will be more or less interested in a particular piece of content, and we do not collect or store the data about user behavior that would allow us to make those predictions. Our Privacy Policy (https://www.dreamwidth.org/legal/privacy) and Guiding Principles promise users that we will collect the minimum amount of personally identifying data about them that is necessary in order to operate the service.

6. Dreamwidth.org has approximately 4 million registered accounts, and has approximately 2 million unique visitors annually. We operate on an extremely limited budget, and are staffed by myself and the company's other co-owner, two part-time employees, and approximately 200 volunteers.

7. Creating an account is necessary to use most of the website's speech-facilitating functionality and to view much of the content, although we do not require visitors to the site to create an account. Primarily, users must create an account to *post* content and to share their expression with an audience of their choosing. Viewing content is more mixed. For example, searching for individual posts that contain certain phrases or keywords is limited to registered users only.

But users have a lot of control over who sees and can interact with their content. In accordance with our principles regarding individual control over account settings and content, individual users can choose to restrict the visibility of their content only to specific users they have affirmatively granted access to the content, on a per-post basis. Users can choose to restrict the visibility of contact information on their profile only to registered users, to specific users they have affirmatively granted access to the contact information, or to no one at all. Users can choose who can comment on their posts, with the options being all site visitors (including those who do not have a site account), registered accounts only, specific users they have affirmatively granted access to comment to their posts, or no one at all. In addition to the public and private post settings, the owner of a Community can also choose to restrict posts only to members of the Community, and can also either allow any registered user to join the Community to see the content posted to it or only allow registered users they have affirmatively granted access to join the Community. Visitors to the site who have not created an account can read public posts made by specific users, access an aggregate feed of the most recent public posts made to the site, look up users who have indicated that they are interested in certain topics or keywords, or ask to be shown a random active account. The default settings for content visibility and access permissions—which apply unless a user overrides them for a particular post or for their account as a whole—are for posts to be visible to every site visitor, for registered users only to be able to comment in reply to a post, and for profile contact information to be visible only to registered users. The majority of our users use the ability to change post privacy settings in their account on a per-post basis and post a mixture of publicly available and visibility-restricted content. There is no single prevailing configuration for Community accounts: our users have found a wide range of settings beneficial depending on the purpose of the Community. In any use case, whether a Journal or a Community, visitors to the site who haven't

registered an account are only able to access a limited subset of the speech available on the site and are only able to contribute to a small subset of discussions happening on the site.

8. Dreamwidth does not deliberately target minors as an audience, and our intended audience is adults looking for a social media service that will respect their privacy. However, in order to ensure compliance with the Children's Online Privacy Protection Act (COPPA), we do collect a date of birth from all users at registration. When a user signs up for a Dreamwidth account, they must enter a username, an email address that can be verified through an automatic email link, a password, and a birthdate. The birthdate field displays a notice that "This information is required by law" and "You must enter your real birthdate". In accordance with COPPA, we have chosen not to create a system that will attempt to verify parental consent for children under the age of 13 to maintain an account on the service. Therefore, we do not accept registration from users whose birthdate provided at registration indicates they are under 13 years old.

9. Accounts owned by users whose birthdate indicates they are under the age of 18 have further restrictions placed on those accounts for the purposes of user safety, such as the inability to view any post or account that a user or Dreamwidth itself has marked as inappropriate for viewing by minors and restricted visibility in some search results.

10. Dreamwidth does not collect address or location data of our users at the time of account registration, login, or posting. We utilize a limited form of our network provider's geolocation service to block connections from certain countries that have been the source of elevated levels of network abuse, but we do not associate that geolocation data with specific accounts. And this geolocation and blocking happens before the connection even reaches us. Users are able to voluntarily provide their location information if they choose to do so in order to display it on their profile. Approximately 2,250 Dreamwidth users have chosen to voluntarily identify themselves as

residents of Tennessee, and at least five of those users have provided birthdates indicating they are under the age of 18 as of the date execution of this declaration. Because we do not store our upstream provider's geolocation data, associate it with individual user accounts, or perform geolocation on our users once their connection reaches our site, this figure does not count users who may be located in Tennessee but have not chosen to provide their location information. There is no way for us to identify how many additional users may be located in Tennessee but have chosen not to provide their location information.

11. Because we have users located in Tennessee and because we meet the definitions of "social media company" and "social media platform" as set forth in Tennessee House Bill 1891 ("the Act"), it is my understanding that Dreamwidth will be required to comply with the Act. We cannot comply with the Act without making significant, sweeping changes to the site that we do not have the resources to make and without collecting additional personally identifying data about each account that we do not currently collect. The changes the Act would require us to make to the software that runs our site would take months, if not years, of work at our current development capacity. The ongoing support burden the Act would impose upon us would also be impossible for us to meet at our current level of staffing, and we do not have the financial capabilities to add more staff.

12. ***Age Verification.*** To the best of my knowledge, there is no technology—much less any technology available to a site with Dreamwidth's limited resources—that can identify users who are under the age of 18. The only method that can determine a user's age to a sufficient degree of confidence is to require every user, no matter what age they claim to be, to upload government-issued identification, deanonymizing themselves and jeopardizing their privacy. There is no age-verification system that is not also a deanonymization and identity-verification system.

13. Because we do not perform geolocation on our users, we are unable to determine which of our users are located in Tennessee. To identify which of our users are located in Tennessee and whose age we must establish, we must either (a) begin performing and storing geolocation data lookups on every individual user account to determine which users' connections to the site originate from Tennessee, whom we must therefore presume to be residents of Tennessee who must undergo deanonymization and identity verification; (b) deanonymize and perform identity verification on all users, no matter where their connection originates; or (c) utilize our network provider's geolocation service to prevent *any* connection originating in the state of Tennessee from reaching our servers to avoid the potential that the person using that connection is under the age of 18.

14. Because people can move at any time and can travel to states they don't reside in, a single deanonymization and identity verification at the time of account creation would be insufficient to comply with the Act. To protect against the possibility that someone under the age of 18 had moved to Tennessee after creating an account, or the possibility that someone under the age of 18 residing in Tennessee was creating an account while on vacation to another state or by using a location-concealing VPN service to enhance their online privacy, we would need to perform regular deanonymization and identity verification checks of all users. This would place a significant burden and chilling effect on the speech of every person who uses Dreamwidth's services, not only people under the age of 18 in Tennessee or even only on adult Tennessee residents.

15. Dreamwidth's users are extremely privacy-conscious. Our users frequently cite our business practices, our commitment to refrain from selling or sharing their personal data, and our refusal to even gather any data that is not directly necessary to provide our services as the reason they've chosen to use our website. For Tennessee to force us to begin collecting account-level

geolocation data alone, much less to perform deanonymization and identity verification on every account, would alienate our users, violate the promises we have made to them, and be contrary to our principles. We do not want to be forced to collect this data, and our users do not want to be forced to provide it to us.

16. Because of our strong commitment to privacy and anonymity, a large percentage of our userbase consists of marginalized people who experience heightened personal security concerns online. A nonexhaustive list of these groups include: (a) Russian or Chinese activists protesting their government's human rights abuses, who are comfortable using our site because we do not cooperate with their government's mandated censorship and do not require them to provide us personally identifying information that may be discoverable by their government; (b) disabled people who are looking for community or seeking to share information on their conditions, who are comfortable using our site because we do not require them to provide us personally identifying information that may be used against them by doctors, insurance companies, employers, etc., and because we employ significant effort to make sure the site is accessible to multiple conflicting disability access needs; (c) blind people who can use our site easily because of the significant effort we employ to ensure the site is one of the most screenreader-accessible products on the internet and because we minimize the steps it takes to create an account; (d) people of marginalized genders and sexualities, who are comfortable using our site because we don't accept advertising and therefore are not affected by companies who are more likely to treat LGBTQ content as age-inappropriate while heterosexual content is treated as acceptable. These groups and many others rely on our promise of privacy and anonymity to feel comfortable engaging in online speech. If Dreamwidth is forced to impose an age- or identity-verification requirement, it will have a significant chilling effect on these groups' willingness to engage in online speech. Our users frequently cite

our commitment to preserving and defending their ability to speak anonymously and our refusal to engage in data brokering practices as a primary reason they use Dreamwidth rather than any other service.

17. ***Compliance burdens.*** Dreamwidth does not have any full-time employees. In addition to myself and my co-owner, both of whom operate Dreamwidth in our spare time, we have two part-time employees. We depend on a pool of approximately 200 volunteers, all of whom donate their time to make programmatic improvements to the site, provide technical support on a peer-to-peer basis, and protect the community from spam and malicious traffic. We do not have the resources to add more employees: because we are funded only by the users who choose to pay us, not by advertising, our budget is severely constrained and we are unable to absorb additional expenses. We do not have the capacity to build identity-verification, parental-consent, or parental-supervision systems. Likewise, we both do not have the financial resources to engage a third-party service to do it on our behalf and also object to that practice because it inherently involves the transfer of user data to a third party, something that is against our Guiding Principles.

18. From my twenty-two year career in online Trust and Safety, both at Dreamwidth and at prior jobs, I know that confirming a parent-child relationship is significantly complicated, difficult to do accurately, and prone to multiple forms of "social engineering" attempts by unrelated third parties to coerce a site into disclosing protected user information or forcing users out of a community. For instance, because COPPA governs a website's ability to collect data on minors under the age of 13, a relatively common social engineering vector adopted by parties who maliciously wish to fool a website into closing a user's account is to write to the website and falsely claim the user is under the age of 13 and does not have parental consent to hold an account, even though the user is over the age of majority. Likewise, a relatively common social engineering

vector adopted by parties who maliciously wish to obtain nonpublic information about a user's account is to write to the website and falsely claim to be the user's parent, requesting access to nonpublic data about the account. The provisions of the Act codify these tactics into law, and will provide malicious third parties unrelated to a user the ability to presumptively challenge the age and identity of any user. This not only creates a "heckler's veto" over any speech that proves unpopular or socially disfavored, allowing anyone the ability to force us to deanonymize any user whose speech offends someone and force them to prove that they are an adult, but also will dramatically increase our support burden necessary to create and administer the system for these age challenges. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity. Because of that, the Act threatens our ability to continue operating.

19. From my twenty-two year career in online Trust and Safety, I know that familial relationships are often far more complicated than conventional wisdom believes, and identifying which person is a minor's parent or guardian with legal decision-making authority is often a complex task. For instance, if a minor has two divorced parents who disagree about whether their minor child should be permitted to hold an account on a website, the website must confirm the legal relationship between the parties and the minor involved, and determine which of the people at hand has the legal decision-making authority to provide sufficient parental consent. In a particularly contentious divorce, this can require a website to review divorce decrees, examine legal paperwork, and determine the authenticity and provenance of the documents supplied to them. Because someone who lives in Tennessee may have obtained their divorce from any one of the thousands of courts across the United States, or even from another country, before moving to Tennessee, this

would require us to become experts in authenticating and interpreting court documents from anywhere in the world to verify which parent has legal authority to provide parental consent. We do not have the capacity to perform this authentication, nor do we have the financial resources necessary to increase staffing to increase that capacity. For this reason, too, the Act threatens our ability to continue operating.

20. There is no national identity database that allows someone to verify a minor's identity, the legal relationship between a parent and a minor, or which parent has the authority to make binding decisions for a minor. There is no way to verify a user's identity beyond requiring the upload of government-issued identifying documents with corroborating photo or video confirmation, and many minors do not have photo ID. There is no way for a website to authenticate or verify that the documents uploaded for age- or identity-verification purposes belong to the person who is uploading them, that the person who controls the account is the same person who provided the identifying documents, or that the documents are legitimate and not a forgery. Disputes about the identity of an account holder, their age, or the legal relationship between them and the person claiming to be their parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common. The Act would only increase their number. We do not have the capacity to accept this additional support burden, nor do we have the financial resources necessary to increase staffing to increase that capacity.

21. We do not track the amount of time users spend on the site, as is seemingly required by Tennessee Code § 47-18-5704. Such tracking is a violation of our Guiding Principles. Even if we were willing to track our users' behavior to the extent of attempting to determine how long they spend viewing the site daily, which we are not, there is no feasible technical method available by which we can accurately track the amount of time users spend viewing our site. Because we

don't have a mobile application, we can't track how long someone has the mobile application in the foreground of their phone. Because our site has a considerable amount of long-form content that can take minutes or even hours to read—the maximum length of an entry that can be posted to our site is approximately the length of a commercially published novel—we cannot track whether someone has opened an entry and is actively reading it or whether they have stepped away from their computer (or even turned their computer off). There is no technical means for us to detect whether or not someone is actively present in front of a tab or window that contains an entry on the site without intrusive and privacy-invasive scripting that attempts to capture whether or not the user has pressed the "page down" button or used their scroll bar or scroll wheel in the last few minutes. This sort of scripting is not only intrusive and privacy-invasive, it is indiscriminate as to what it captures and would result in us receiving data about our users that far exceeds the promises we have made to them about what data we will not capture. The available scripting that captures this sort of data is also often detected as malware or spyware by antivirus software and is frequently blocked by browser extensions that protect a user's privacy. Not only would users receiving an alert that every page on our website contained malware or spyware result in reputational harm, but also the fact that such methods can be blocked by browser extensions that protect a user's privacy means the resulting data would still be inaccurate.

22. Similarly, Tennessee Code § 47-18-5704 seemingly requires us to build a system by which one account (the presumed parent) could assume control over another account (their presumed child). We do not have any form of linked account structure or any way to delegate control over one account to another account. Building such a system would require significant engineering work, which we don't have the capacity to perform. In addition to the engineering

work it would require, any change that touches logging in to the website, setting or changing privacy or security settings, or setting or changing the visibility of information to another account—as this type of control-delegation system inherently would—requires a thorough and detailed security audit. Our login and account code has been thoroughly hardened and security-tested over the past 25 years, by Dreamwidth Studios, by the company that developed the code before us (LiveJournal), and by dozens of volunteer security experts who have donated their time and effort throughout the years. Any changes must be done carefully, slowly, and with a great deal of peer review to ensure that the underlying logic is sound, the implementation code is bug-free, and there is no way for anyone who visits the website or attempts to log into an account to engage in privilege escalation. That is a type of security issue in which an attacker can utilize browser features, cross-site scripting, session hijacking, malformed HTML requests, or any one of dozens of other attack vectors to obtain a level of control over an account to which they are not entitled. The level of expertise, security knowledge, and familiarity required to perform such a security audit is not common.

23. I am aware of the level of engineering and security difficulty such a system would involve because for fifteen years our users who have multiple accounts with us—for instance, so that they can post their writings on wildly disparate topics to separate accounts so that people who are interested in one aspect of their lives but not another can subscribe only to the material they want to read—have been asking us to implement a way for them to link together multiple accounts and manage or post to one of their sub-accounts while logged into another of their accounts. We have begun mapping out the programming and security changes such a system would require multiple times, and each time concluded that the project would be too complicated for us to handle at our current level of staffing and capacity and that it would carry too much risk to our users and the

security of their accounts. Involving a second individual (i.e., the presumed parent) in the system would only complicate the issue even further and require even more significant work.

24. Because of the frequency with which I have witnessed people falsely claim to be a user's parent in order to attempt to gain control over the account, we must also assume that any system by which a second individual could assert control or claim over an account would also add a significant ongoing support burden for handling disputes over whether two accounts should be linked and complaints that two accounts were linked in error. We do not have the capacity to absorb that additional support burden.

25. Similarly, Tennessee Code § 47-18-5704 also seemingly requires us to allow a presumed parent to use their delegated control to "implement breaks during which the minor cannot access the account." The technical problems with tracking the daily elapsed time a user spends on the website pale next to the technical problems with accurately determining what time it actually is (and therefore, whether or not the time would fall into the time restrictions a parent had set). Accurately determining the current time in a networked, global computing environment is so notoriously difficult that a crowdsourced list contains over 100 items contributed by programmers around the world of exceptions, issues, problems, special cases that must be accounted for, and sources of potential bugs in a time determination system. The time reported by a user's device can never be trusted as an accurate representation of the time in the location they currently reside in: anyone can change the time zone settings in their device's configuration or manually set their device's clock to a different time. This time reset can happen even without the device's owner's consent or knowledge: one of the first signs of a device's hardware beginning to fail is the system clock being reset to January 1, 1970, also known as the "Unix epoch" or the date which almost all modern computers use as a reference point for elapsed time. Detecting those discrepancies between

the actual time in a user's location and the time reported by the user's system clock would require significant engineering effort that we don't have the capacity for, and even if we had the budget to hire outside contractors to implement such a system for us—which we do not—it is extremely difficult to find contractors who are willing to work on datetime systems (or who are willing to do so for a price we can afford) because of how unpleasant, tedious, and complex it is.

26. Because of the uncertainty and vagueness of the Act, the lack of useful definitions for many of its provisions, the impossibility of determining to any degree of certainty which users are residents of Tennessee without collecting additional personal data we do not currently collect, the impossibility of determining which users are under the age of 18 without deanonymizing and forcibly identifying every user of our site, and the severe degree of technical difficulty inherent in implementing the provisions of the Act, the Act will force us to err on the side of caution; require us to restrict access to the site beyond the restrictions we wish to place; require us to spend money far in excess of our available budget attempting to comply with the Act's burdensome and expensive dictates; require us to force our users to provide us significantly more personally identifying data than we want to collect or they want us to have; generally require us to place significant burdens on the speech, conduct, and anonymity of both adults and minors; and jeopardize our ability to continue offering the service at all.

*                    *                    *

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

Executed this 30 day of September, 2024, in Baltimore, MD.

Denise Paolucci
Co-Owner, Dreamwidth Studios, LLC