# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
## NASHVILLE DIVISION

NETCHOICE,

*Plaintiff*,

v.

JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter,

*Defendant*.

Civil Action No. 3:24cv01191

## PLAINTIFF NETCHOICE'S
## MEMORANDUM IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

**Table of Contents**

Introduction......................................................................................................................... 1

Background .......................................................................................................................... 3

    A.  Factual background.................................................................................................. 3

        1.  NetChoice-member websites disseminate protected speech................................. 3

        2.  Parents have many tools to oversee how their children use the Internet. .............. 4

    B.  Tennessee House Bill 1891................................................................................... 4

Argument ............................................................................................................................. 9

  I.  NetChoice is likely to succeed on the merits of its claims that the Act's speech regulations violate the First Amendment. ....................................................................... 10

    A.  The Act's speech regulations trigger strict scrutiny. ................................................. 10

        1.  The Act's age-verification requirement for both minors and adults to access protected speech violates the First Amendment (§ 47-18-5703(a)(1)). ................ 11

        2.  The Act's parental-consent requirement for minors to access protected speech violates the First Amendment (§ 47-18-5703(a)(2)).............................................. 13

        3.  The Act's speech regulations apply only to a subset of Internet websites based on content and speaker, which independently triggers strict scrutiny for all the Act's speech regulations. .............................................................................. 15

    B.  The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny.............................................................................................................................. 18

        1.  The State lacks a sufficient governmental interest in restricting adults and minors' access to protected speech. ........................................................................ 18

        2.  The Act's speech regulations are not properly tailored. ...................................... 19

            a.  The Act's speech regulations are not the least restrictive means to accomplish any interest the State may assert.............................................. 20

            b.  The Act's coverage definition, and thus all speech regulations depending on it, are improperly tailored.................................................... 21

            c.  The age-verification and parental-consent provisions are independently improperly tailored. ................................................................................... 22

  II.  NetChoice is likely to succeed on the merits of its claim that the Act's central coverage definition of "social media company" is unconstitutionally vague (§ 47-18-5702(8))................................................................................................................................ 23

  III. NetChoice meets all the remaining factors for a preliminary injunction......................... 24

Conclusion ....................................................................................................................... 25

Case 3:24-cv-01191    Document 9    Filed 10/03/24    Page 2 of 31 PageID #: 101

# TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*ACLU v. Mukasey,*
534 F.3d 181 (3d Cir. 2008)................................................................12

*Ala. Ass'n of Realtors v. HHS,*
594 U.S. 758 (2021)................................................................25

*Ams. for Prosperity Found. v. Bonta,*
594 U.S. 595 (2021)................................................................18, 19, 20

*Ashcroft v. ACLU,*
542 U.S. 656 (2004)................................................................1, 2, 12, 19, 23

*Ashcroft v. Free Speech Coal.,*
535 U.S. 234 (2002)................................................................11

*Barr v. Am. Ass'n of Pol. Consultants, Inc.,*
591 U.S. 610 (2020)................................................................16

*Belle Maer Harbor v. Charter Twp. of Harrison,*
170 F.3d 553 (6th Cir. 1999) ................................................................23

*Brown v. Ent. Merchs. Ass'n,*
564 U.S. 786 (2011)................................................................ *passim*

*Citizens United v. FEC,*
558 U.S. 310 (2010)................................................................16

*Commonwealth v. Biden,*
57 F.4th 545 (6th Cir. 2023) ................................................................25

*Comput. & Commc'n Indus. Ass'n v. Paxton,*
2024 WL 4051786 (W.D. Tex. Aug. 30, 2024)................................................................ *passim*

*Daunt v. Benson,*
956 F.3d 396 (6th Cir. 2020) ................................................................9

*Dayton Area Visually Impaired Persons, Inc. v. Fisher,*
70 F.3d 1474 (6th Cir. 1995) ................................................................25

*Erznoznik v. City of Jacksonville,*
422 U.S. 205 (1975)................................................................9, 19

*FCC v. Fox Television Stations, Inc.*,
  567 U.S. 239 (2012)..................................................................................................23, 24

*FEC v. Cruz*,
  596 U.S. 289 (2022).......................................................................................................10

*Fischer v. Thomas*,
  78 F.4th 864 (6th Cir. 2023) ...........................................................................................9

*John Doe No. 1 v. Reed*,
  561 U.S. 186 (2010).......................................................................................................10

*Jones v. Caruso*,
  569 F.3d 258 (6th Cir. 2009) ...................................................................................24, 25

*Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*,
  460 U.S. 575 (1983).......................................................................................................17

*Moody v. NetChoice, LLC*,
  144 S. Ct. 2383 (2024).............................................................................................. *passim*

*Nat'l Inst. of Fam. & Life Advocs. v. Becerra*,
  585 U.S. 755 (2018).................................................................................................16, 17

*NetChoice, LLC v. Bonta*,
  113 F.4th 1101 (9th Cir. 2024) ......................................................................................20

*NetChoice, LLC v. Fitch*,
  2024 WL 3276409 (S.D. Miss. July 1, 2024) ..................................................... *passim*

*NetChoice, LLC v. Griffin*,
  2023 WL 5660155 (W.D. Ark. Aug. 31, 2023)................................................... *passim*

*NetChoice, LLC v. Reyes*,
  2024 WL 4135626 (D. Utah Sept. 10, 2024)...................................................... *passim*

*NetChoice, LLC v. Yost*,
  2024 WL 555904 (S.D. Ohio Feb. 12, 2024)..................................................... *passim*

*Nken v. Holder*,
  556 U.S. 418 (2009).......................................................................................................25

*Packingham v. North Carolina*,
  582 U.S. 98 (2017)................................................................................................. *passim*

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015).............................................................................................10, 15 16, 18

*Reno v. ACLU*,
521 U.S. 844 (1997) ................................................................................1, 2, 12, 22, 23

*Roman Catholic Diocese of Brooklyn v. Cuomo*,
592 U.S. 14 (2020) ...................................................................................................25

*Sable Commc'ns of Cal., Inc. v. FCC*,
492 U.S. 115 (1989) .................................................................................................10

*Sorrell v. IMS Health, Inc.*,
564 U.S. 552 (2011) .............................................................................................15, 21

*Turner Broad. Sys. v. FCC*,
512 U.S. 622 (1994) .................................................................................................17

*United States v. Playboy Ent. Grp.*,
529 U.S. 803 (2000) .............................................................................................19, 20

*United States v. Williams*,
553 U.S. 285 (2008) .................................................................................................23

*Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*,
455 U.S. 489 (1982) .............................................................................................23, 24

*Virginia v. Am. Booksellers Ass'n*,
484 U.S. 383 (1988) ...............................................................................................9, 22

*X Corp. v. Bonta*,
2024 WL 4033063 (9th Cir. Sept. 4, 2024) .......................................................6, 10

**Statutes**

Tenn. Code § 47-18-108 ...................................................................................................8

Tenn. Code § 47-18-5702 ..................................................................................... *passim*

Tenn. Code § 47-18-5703 ..................................................................................... *passim*

Tenn. Code § 47-18-5704 ...............................................................................7, 8, 18

Tenn. Code § 47-18-5705 ...................................................................................................8

**Other Authorities**

*Posting*, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73 ...............................5

# Introduction

Tennessee has joined a group of States attempting to unconstitutionally restrict minors' access to protected online speech—impairing adults' access along the way. Tennessee House Bill 1891 ("Act") uses content-based and speaker-based coverage provisions to target disfavored covered websites.[1] The Act restricts users' access to, and engagement with, protected speech on those websites by requiring (1) age verification for *all* users, § 47-18-5703(a)(1); and (2) parental consent for minors, § 47-18-5703(a)(2), before permitting users to access and engage in protected speech. This violates the First Amendment under established Supreme Court precedent. This Court should follow the courts across the country that have unanimously barred enforcement of similar state laws and enjoin the Act before its January 1, 2025, effective date. *E.g.*, *NetChoice, LLC v. Reyes*, 2024 WL 4135626 (D. Utah Sept. 10, 2024); *Comput. & Commc'n Indus. Ass'n v. Paxton*, 2024 WL 4051786 (W.D. Tex. Aug. 30, 2024) ("*CCIA*"); *NetChoice, LLC v. Fitch*, 2024 WL 3276409 (S.D. Miss. July 1, 2024); *NetChoice, LLC v. Yost*, 2024 WL 555904 (S.D. Ohio Feb. 12, 2024); *NetChoice, LLC v. Griffin*, 2023 WL 5660155 (W.D. Ark. Aug. 31, 2023).

"Minors are entitled to a significant measure of First Amendment protection," and the government's power to protect children from harm "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (citation omitted). Furthermore, governmental efforts to regulate speech appropriate for minors cannot infringe or burden adult speech rights. *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997).

---

[1] This Motion refers to both "websites" and "internet applications," § 47-18-5702(9)(A), as "websites." It refers to websites regulated by the Act as "covered websites." Unless otherwise noted, statutory citations in this Motion refer to Title 47 of the Tennessee Code.

These principles apply with equal force online: governments cannot "regulate ['social media'] free of the First Amendment's restraints." *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2399 (2024) (citation omitted). On the Internet, all Americans can "gain access to information and communicate with one another on any subject that might come to mind." *Packingham v. North Carolina*, 582 U.S. 98, 99 (2017). That speech often takes place on Plaintiff NetChoice members' websites, which offer "capacity for communication of all kinds," *id.* at 105 (citation omitted), and where users "generate billions of 'posts' every day," *Yost*, 2024 WL 555904, at *1. These websites disseminate a "staggering amount" of protected speech, to adults and minors alike. *Moody*, 144 S. Ct. at 2395. Consequently, they allow their users to "engage in . . . First Amendment activity on topics as diverse as human thought." *Griffin*, 2023 WL 5660155, at *5 (cleaned up).

The Act stifles this protected speech in violation of the First Amendment. The Act's age-verification requirement (§ 47-18-5703(a)(1)) unconstitutionally restricts access to protected speech for both minors and adults. *See, e.g.*, *Ashcroft*, 542 U.S. at 667 (invalidating age-verification requirement); *Reno*, 521 U.S. at 882 (same); *Reyes*, 2024 WL 4135626, at *16 n.169 (same); *Fitch*, 2024 WL 3276409, at *11-12 (same); *Griffin*, 2023 WL 5660155, at *17 (same). And the Act's parental-consent requirement (§ 47-18-5703(a)(2)) unconstitutionally restricts minors' access to protected speech, because governments lack the "power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3 (emphasis omitted); *see Fitch*, 2024 WL 3276409, at *12-13 (rejecting parental-consent requirement); *Yost*, 2024 WL 555904, at *11-12 (same); *Griffin*, 2023 WL 5660155, at *17 (same); *see also Reyes*, 2024 WL 4135626, at *13 & n.135 (similar).

Worse yet, the Act imposes speech regulations on select websites by using a content-based, speaker-based, and vague coverage definition of "social media company." § 47-18-5702(8)-(9).

2

All of the Act's speech regulations are therefore subject to strict scrutiny for this independent reason, too. The Act's coverage also creates illogical results. YouTube must comply with the Act, but Hulu is exempted. § 47-18-5702(9)(B)(iii). Pinterest is covered, but it would not be if it forced users to restrict their discussions to "reviewing products offered for sale" online. § 47-18-5702(9)(B)(vii). All job seekers must jump through the Act's regulatory hoops on covered websites, but not on websites that "primarily provide[] career development opportunities." § 47-18-5702(9)(B)(v). The Act's central coverage definition is therefore not properly tailored, and in any event the State lacks a sufficient governmental interest to justify the Act's speech regulations.

Plaintiff respectfully requests that this Court preliminarily enjoin Defendant from enforcing the Act against its covered members' websites before the Act takes effect on January 1, 2025.

## Background

### A. Factual background

#### 1. NetChoice-member websites disseminate protected speech.

NetChoice is a leading Internet trade association. Cleland Decl. ¶ 3. Based on the Act's coverage definition, the Act regulates some websites operated by the following NetChoice members: (1) Dreamwidth; (2) Google (YouTube); (3) Meta (Facebook and Instagram); (4) Nextdoor; (5) Pinterest; (6) Snap Inc. (Snapchat); and (7) X. *See id.* ¶ 12. This Motion refers to members with services the Act regulates as, simply, "members."

These websites "engage[] in expression" by "display[ing]," "compil[ing,] and curat[ing]," protected "third-party speech" (text, audio, images, and video) "created by others." *Moody*, 144 S. Ct. at 2393, 2400-01; *see* Cleland Decl. ¶ 5.[2]

---

[2] Except where noted otherwise, this Motion uses the term "user" to encompass both of what the Act refers to as "user[s]" and "account holder[s]." § 47-18-5702(1), (10). When discussing the Act's requirements, this Motion also uses "minor," "adult," "account holder," and "user" to refer only to Tennessee minors, adults, account holders, and users covered by the Act.

On most of these members' services, like many other websites, users must have an account to access either some or all of the protected speech and functions on the service. Cleland Decl. ¶ 15; Pai Decl. ¶ 5; Paolucci Decl. ¶ 7. Creating accounts on these websites allows all users to access and engage in protected expression, education, civic engagement, and entertainment. Cleland Decl. ¶¶ 5, 15. Among other things, users read and engage with news, politics, sports, extracurriculars, educational opportunities, and career information. *Id.* ¶¶ 5-6; Pai Decl. ¶ 20.

### 2. Parents have many tools to oversee how their children use the Internet.

Parents can and do control their children's online experiences. Cleland Decl. ¶ 7. To start, parents control what *devices* minors can access—and when. *Id.* Not all devices are Internet-enabled. And devices come with many parental-control options, including the ability to lock or limit specific apps and features, restrict the device settings to limit content and downloads, limit access to only approved websites, and set overall or time-of-day usage limits. *Id.*

Parents also control the *networks* minors use. Wireless routers allow parents to manage which network a minor connects to and to set up rules defining which Internet websites minors can use (and at what times). *Id.* Many Internet service providers offer similar controls. *Id.*

Parents also control *software*. Web browsers offer parental controls. *Id.* And third-party parental control software is available for many devices. *Id.* In addition, many members have developed their own suite of parental controls and other protections for minors on their services. *E.g.*, *id.* ¶¶ 7-8; Paolucci Decl. ¶ 9. These controls supplement the resources that members spend crafting and enforcing "content moderation" policies that aim to prevent harmful or objectionable speech from reaching users. *E.g.*, Cleland Decl. ¶ 9; Pai Decl. ¶¶ 11-15. These members' efforts have been successful. Cleland Decl. ¶ 9; Pai Decl. ¶ 16.

### B. Tennessee House Bill 1891

The Act takes effect on January 1, 2025. *See* ECF 1 ¶ 35.

**1. Covered actors and activities. § 47-18-5702(8).** The Act's speech regulations apply to only a subset of Internet "actors" and "activities," *Moody*, 144 S. Ct. at 2398, discriminating based on content and speaker. In particular, the Act regulates only "social media compan[ies]" providing "social media platform[s]." § 47-18-5702(8). These "social media" websites "allow users to upload content . . . to share with others," and those "viewing the content can" "react to it, comment on it, or share it themselves." *Moody*, 144 S. Ct. at 2394-95. Such websites receive full First Amendment protection. *Id.*

The Act defines "[s]ocial media company" as "a person that is an interactive computer service and that provides a social media platform." § 47-18-5702(8).[3] In turn, a "social media platform" means "a website or internet application that": "(i) [a]llows a person to create an account; and (ii) [e]nables an account holder to communicate with other account holders and users through posts." § 47-18-5702(9)(A). So the Act covers websites offering social media "platform[] feeds" of "curated compilation[s]" of "third-party speech." *Moody*, 144 S. Ct. at 2399-2400. This is consistent with common usage of "social media." *See id.* at 2394; *Packingham*, 582 U.S. at 104-05.

The Act's use of the term "posts" in these definitions, § 47-18-5702(9)(A), limits its coverage to services that *publicly* disseminate speech on feeds, boards, forums, and similar webpages. The Act defines "[p]ost" to mean "content that an account holder makes available on a social media platform for other *account holders* and *users* to consume." § 47-18-5702(7) (emphases added). This accords with the common understanding of the term. *E.g.*, *Posting*, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73 ("an electronic message or information that is put on a website

---

[3] An "interactive computer service" is "an information service, as defined in 47 U.S.C. § 153, information system, or information access software that: (i) [p]rovides or enables access by multiple users to a computer server; and (ii) [p]rovides access to the internet" and "[i]ncludes an internet service, an internet system, a website, an internet application, and an internet portal." § 47-18-5702(3).

in order to allow many people to see it"). A "post" on a "social media platform" thus does not include "direct messaging" or "email." *Moody*, 144 S. Ct. at 2398; *see also* § 47-18-5702(9)(B)(ii) (excluding "email service[s]").

The Act also contains content-based exclusions from its coverage definition. The Act excludes "interactive gaming or educational entertainment" from the "content" of "post[s]" it covers. § 47-18-5702(2)(B). The Act also excludes websites with content such as "[o]nline shopping," "career development opportunities," "technical support," "reviewing products offered for sale," "commenting on . . . reviews posted by other users," and "like[s] or comment[s]" on "[p]eer-to-peer payment[s]." § 47-18-5702(9)(B)(iv)-(v), (vii)-(viii). And the Act excludes websites that "consist[] primarily of content . . . preselected by the . . . website." § 47-18-5702(9)(B)(iii)(*a*). Finally, the Act excludes from its coverage "broadband internet access service[s]," "email service[s]," and "cloud storage or cloud computing service[s]." § 47-18-5702(9)(B)(i), (ii), (vi).

In short, the exclusions from the Act's coverage make clear that the Act targets "social media" websites, so this Court "need not speculate" about any "hypothetical or imaginary cases." *X Corp. v. Bonta*, 2024 WL 4033063, at *6 (9th Cir. Sept. 4, 2024) (cleaned up). The Act's "social media company" and "social media platform" definitions cover the "social media" services that *Moody* held are entitled to full First Amendment protection. 144 S. Ct. at 2398. And the Act excludes services for which *Moody* questioned whether a different First Amendment analysis might apply when assessing the First Amendment implications of distinct laws that potentially regulate other Internet and website services. *Id.* (discussing email, online marketplace, ride-sharing, and peer-to-peer payment services). The Act's exclusion of "email service[s]," § 47-18-5702(9)(B)(ii), excludes "email," *Moody*, 144 S. Ct. at 2398. The Act's exclusion of "[o]nline shopping," § 47-18-5702(9)(B)(iv), excludes "online marketplace[s] like Etsy," *Moody*, 144 S. Ct. at 2398. The

Act's exclusion of "[p]eer-to-peer payment platforms," § 47-18-5702(9)(B)(viii), excludes "payment service[s] like Venmo," *Moody*, 144 S. Ct. at 2398. And the Act's exclusion of websites "consist[ing] primarily of content that is . . . preselected by the [website]," § 47-18-5702(9)(B)(iii)(*a*), excludes "ride-sharing service[s] like Uber," *Moody*, 144 S. Ct. at 2398.

**2. The Act's speech regulations.** The Act's speech regulations apply to covered "social media compan[ies]." §§ 47-18-5703(a)(1)-(2), 47-18-5704.

**Age verification. § 47-18-5703(a)(1).** The Act requires covered websites to "verify the age of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder." § 47-18-5703(a)(1). The Act does not define or explain how covered websites must verify the ages of individuals who attempt to become account holders.

The Act makes clear that age verification will require websites to collect "personally identifying information" by commanding that a "social media company or third party shall not retain personally identifying information that was used to verify age." § 47-18-5703(c).

**Parental consent. § 47-18-5703(a)(2).** The Act provides that upon verifying an individual's age, "[i]f the individual is a minor, then the social media company must verify the express parental consent for the minor to become an account holder." § 47-18-5703(a)(2)(A).[4] If the covered website does not have "the express consent of the minor's parent to allow the minor to become an account holder," then the "social media company shall prohibit a minor from becoming an account holder." § 47-18-5703(a)(2)(B).

Once parental consent has been verified, a social media company "is not required to reverify the individual's . . . parental consent, unless parental consent is revoked." § 47-18-5703(a)(3).

---

[4] The Act defines "[m]inor" as "an individual who is: (A) [k]nown or reasonably believed by a social media platform to be under eighteen (18) years of age; (B) [n]ot emancipated; and (C) [a] resident of this state." § 47-18-5702(4).

But the Act requires that "[a] social media company shall allow a parent to revoke consent for a minor to become or continue as an account holder." § 47-18-5703(b). The Act also requires that a "social media company or third party shall not retain personally identifying information that was used to verify . . . parental consent." § 47-18-5703(c). But the Act does not state what information might be used to verify parental consent, nor how.

**Parental supervision. § 47-18-5704.** The Act requires a "social media company" to "provide a minor account holder's parent with means for the parent to supervise the minor's account," including "options for the parent to view privacy settings on the account, set daily time restrictions, and implement breaks during which the minor cannot access the account." § 47-18-5704.[5] These requirements will be costly to implement. Pai Decl. ¶ 37; Paolucci Decl. ¶¶ 21-26.

**3. Investigation, enforcement, and penalties. § 47-18-5705.** Defendant has investigative and enforcement authority over the Act. § 47-18-5705. If Defendant "believes that a social media company is engaged in, has engaged in, or is about to engage in an act or practice prohibited by" the Act and "that proceedings would be in the public interest," then Defendant may "[c]onduct an investigation" and "[b]ring an action" in court for violations of the Act under Tennessee's Consumer Protection Act. § 47-18-5705 (citing §§ 47-18-106, 47-18-108).

Defendant is entitled to seek penalties including a "civil penalty of not more than one thousand dollars ($1,000) for each violation," costs, expenses, and attorney's fees. § 47-18-108(b)(3) (incorporated into Act by § 47-18-5705). Furthermore, a court may revoke a license authorizing a person to engage in business in Tennessee for knowing and persistent violations and may issue "a civil penalty of not more than two thousand dollars ($2,000), recoverable by the state" for each "knowing violation" of an injunction issued by the court. § 47-18-108(b)(2), (c).

---

[5] Some NetChoice members already provide such options. *See supra* p.4.

**Argument**

NetChoice is entitled to a preliminary injunction because: "(1) [it is] likely to succeed on the merits, (2) [it is] likely to suffer irreparable harm without a preliminary injunction, (3) the balance of equities favor[s] an injunction, and (4) an injunction is in the public interest." *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023) (cleaned up).

NetChoice has associational standing to assert its members' rights and obtain relief remedying members' First Amendment and financial injuries. *E.g.*, *Daunt v. Benson*, 956 F.3d 396, 417 (6th Cir. 2020).[6] NetChoice also has standing to assert the First Amendment rights of its members' users—current and prospective. *E.g.*, *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988).[7] That includes the rights of minors. It is long settled that "the values protected by the First Amendment are no less applicable when government seeks to control the flow of information to minors." *Erznoznik v. City of Jacksonville*, 422 U.S. 205, 214 (1975).

For each of its claims, NetChoice raises both a facial challenge to the Act's provisions at issue and a challenge to these provisions as applied to the NetChoice members and services listed above that are covered by the Act. *See supra* p.3. For Plaintiff's First Amendment claims, the Act should "be struck down in its entirety" because its "unconstitutional applications substantially outweigh its constitutional ones . . . judged in relation to the statute's plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted). This facial First Amendment inquiry "first" asks what "actors" and "activities" are regulated by the Act. *Id.* at 2398. It "next" compares the Act's unconstitutional applications with any constitutional applications, asking whether the former "substantially outweigh" the latter. *Id.* at 2397-98.

---

[6] *See Reyes*, 2024 WL 4135626, at *7; *CCIA*, 2024 WL 4051786, at *8-9; *Fitch*, 2024 WL 3276409, at *5-6; *Yost*, 2024 WL 555904, at *3-5; *Griffin*, 2023 WL 5660155, at *9-10.
[7] *See CCIA*, 2024 WL 4051786, at *9; *Fitch*, 2024 WL 3276409, at *7; *Yost*, 2024 WL 555904, at *5-6; *Griffin*, 2023 WL 5660155, at *11-12.

That inquiry here is straightforward "from the face of the law" because all aspects of the Act's speech regulations, "in every application to a covered social media company, raise the same First Amendment issues," so the Court "need not 'speculate about "hypothetical" or "imaginary" cases.'" *X Corp.*, 2024 WL 4033063, at \*6 (citation omitted); *see Reyes*, 22024 WL 4135626, at \*9 n.92. At a minimum, the Act is invalid as applied to members' regulated services. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by plaintiff).

## I. NetChoice is likely to succeed on the merits of its claims that the Act's speech regulations violate the First Amendment.

The Act's age-verification, parental-consent, and parental-supervision provisions all independently trigger and fail First Amendment strict scrutiny.

### A. The Act's speech regulations trigger strict scrutiny.

Each of the Act's speech regulations triggers First Amendment strict scrutiny. "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted). Laws restricting access to protected speech or regulating speech based on content are subject to "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015); *see Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126-31 (1989).[8]

---

[8] Even if the Act's speech restrictions covered "direct messaging" in some form, *Moody*, 144 S. Ct. at 2398; *but see supra* p.6, the First Amendment analysis would be the same because the Act would erect barriers and hurdles for minors (and even adults) that wish to send messages directly to one-another. The First Amendment analysis presumes that restrictions on protected speech are unconstitutional. *Cruz*, 596 U.S. at 305. That is true whether the restrictions apply to curated social media feeds, *Moody*, 144 S. Ct. at 2398, or to individual-to-individual communications like direct messaging, *e.g.*, *Sable*, 492 U.S. at 126-31 (invalidating restriction on telephone messages). The laws in *Moody* sought to compel speech dissemination and override editorial rights. 144 S. Ct. at 2399. Here, however, the Act restricts websites' speech dissemination and users' ability to engage in speech.

10

The "basic principles of freedom of speech and the press, like the First Amendment's command, do not vary when a new and different medium for communication appears." *Brown*, 564 U.S. at 790 (cleaned up). Thus, "the First Amendment . . . does not go on leave when social media are involved." *Moody*, 144 S. Ct. at 2394. Covered websites "engage[ ] in expression" through their "display" and "compiling and curating" of protected "third-party speech." *Id.* at 2393, 2401. Put simply, the "speech social media companies engage in when they make decisions about how to construct and operate their platforms . . . is protected speech" under the First Amendment. *Reyes*, 2024 WL 4135626, at *8; *see Moody*, 144 S. Ct. at 2406 (websites' decisions about "which third-party content . . . [to] display, or how the display will be ordered or organized," are "expressive choices" that "receive First Amendment protection"). "To foreclose access to social media altogether is to prevent the user from engaging in the legitimate exercise of First Amendment rights," *Packingham*, 582 U.S. at 108, and "the First Amendment bars the government from dictating what we see or read or speak or hear," *Ashcroft v. Free Speech Coal.*, 535 U.S. 234, 245 (2002).

1. **The Act's age-verification requirement for both minors and adults to access protected speech violates the First Amendment (§ 47-18-5703(a)(1)).**

The Act violates the First Amendment by requiring *all* new users—both minors and adults—to "verify the[ir] age[s]" to become "account holder[s]" and access protected speech on covered websites. § 47-18-5703(a)(1).

In particular, under the Act's age-verification requirement, users would need to provide documentation that displays "personally identifying information," § 47-18-5703(c), before engaging in core protected speech, such as discussing their faith on a forum dedicated to religion; discussing their hobbies on other forums; sharing their creative writing on Dreamwidth; "shar[ing] vacation photos . . . with their friends and neighbors" on Facebook and Instagram; looking for work around the neighborhood on Nextdoor; learning how to solve math problems or master

11

chemistry on YouTube; "petition[ing] their elected representatives" on X; and otherwise creating or receiving protected speech on covered websites. *Packingham*, 582 U.S. at 104-05.

The First Amendment does not tolerate this burden to access protected speech. The Act's age-verification requirement unlawfully bars access to speech entirely for those unwilling or unable to provide the requisite documentation. *See, e.g.*, *Reno*, 521 U.S. at 856. The Supreme Court has held that governments cannot require adults or minors to provide personal information or documentation—such as "indentif[ication]" or "credit card information"—to access protected speech. *Ashcroft*, 542 U.S. at 667; *see Reno*, 521 U.S. at 882. Yet under the Act, covered websites must place *all* content behind an age-verification system. § 47-18-5703(a)(1). That is much broader than the age-verification law held unconstitutional in *Ashcroft*, which regulated "sexually explicit materials on the Internet." 542 U.S. at 659. The Act's age-verification provision is therefore unconstitutional. *See id.* at 667-68 (private actors' voluntary "[b]locking and filtering software is an alternative that is less restrictive than [age-verification]").

Just last year, *Griffin* invalidated a similar online age-verification requirement, concluding that "[i]t is likely that many adults" and minors "who otherwise would be interested in becoming account holders . . . will be deterred—and their speech chilled—as a result of the age-verification requirements." 2023 WL 5660155, at *17. Those who are willing to comply with these requirements must "forgo the anonymity otherwise available on the internet" as the price of admission. *Id.* (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *ACLU v. Mukasey*, 534 F.3d 181, 197 (3d Cir. 2008) ("relinquish their anonymity to access protected speech"). Other courts since *Griffin* have applied the same principles to reach the same conclusion. *Fitch*, 2024 WL 3276409, at *11-12 (enjoining age-verification requirement); *see also Reyes*, 2024 WL 4135626, at *16 n.169 (enjoining age-"assurance" requirement).

12

Here too, the Act's age-verification requirement would impose an impermissible hurdle for all users to access and exchange protected speech. The record reflects that even asking for users' ages can deter them from creating accounts—let alone asking for identification or documentation. *See* Pai Decl. ¶¶ 22-28; Paolucci Decl. ¶¶ 12-16.

### 2. The Act's parental-consent requirement for minors to access protected speech violates the First Amendment (§ 47-18-5703(a)(2)).

The Act also violates the First Amendment by requiring minors to secure "express parental consent" to "become an account holder," and thus engage in and access the full range of protected speech on covered websites. § 47-18-5703(a)(2); *see Yost*, 2024 WL 555904, at *12 ("[L]aws that require parental consent for children to access constitutionally protected, non-obscene content, are subject to strict scrutiny.").

Minors have a First Amendment "right to speak or be spoken to," and "the state" lacks the "power to prevent children from hearing or saying anything without their parents' prior consent." *Brown*, 564 U.S. at 795 n.3 (emphasis omitted). *Brown* invalidated a law prohibiting the sale or rental of "violent video games" to minors, but allowing minors to play such games with parental consent. *Id.* at 802. The Court noted that any other result would allow governments to require parental consent for, say, "political rall[ies]" or "religious" services. *Id.* at 795 n.3. The Court rejected that proposition. *Id.* Furthermore, the "absence of any historical warrant or compelling justification for such [a] restriction[] . . . renders [it] invalid." *Id.* The country lacks a "longstanding tradition . . . of specially restricting children's access to" protected speech. *Id.* at 795. And governments may not rely on the "unprecedented and mistaken" strategy of "creat[ing] new categories of unprotected speech" specifically for minors. *Id.* at 792, 794. Without "historical warrant," the Act's requirement for parental-consent is "invalid" under any standard of heightened First Amendment scrutiny. *Id.* at 795 n.3.

13

Following *Brown*, courts have rejected parental-consent requirements for minors to access and disseminate protected speech, including on websites operated by NetChoice's members. *Yost* rejected Ohio's parental-consent requirement to access a broad range of social media websites. *See* 2024 WL 555904, at *11-12. *Griffin* rejected Arkansas's parental-consent requirement to access "social media platforms." 2023 WL 5660155, at *17. *Fitch* rejected Mississippi's parental-consent requirement to access a "broad range of covered [social media] websites." 2024 WL 3276409, at *12-13. And *Reyes* rejected Utah's parental-consent requirement for minors to speak to certain audiences on "social media service[s]." 2024 WL 4135626, at *13 & n.135.

The Act's materially identical parental-consent requirement should be rejected for the same reasons. It would impose a substantial hurdle between minors and "vast quantities of constitutionally protected speech." *Griffin*, 2023 WL 5660155, at *17. Minors who wish to discuss their religious or political views on covered websites could not do so unless their parents establish that they approve, *i.e.*, the Act improperly "impose[s] governmental authority" on which minors can access protected speech, "subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. That problem is exacerbated because the Act does not account for the difficulty in verifying a parent-child relationship for purposes of processing parental consent. In short, there will be cases in which a lack of parental *consent* does not reflect a lack of parental *approval*. When enjoining a similar parental-consent requirement, *Griffin* credited the *State's* expert testimony that "the biggest challenge you have with parental consent is actually establishing . . . the parental relationship." 2023 WL 5660155, at *4; *see also Fitch*, 2024 WL 3276409, at *13 (similar). The record here evinces the same problem: "Disputes about . . . the person claiming to be [a] parent are complex, time-consuming, costly to investigate and resolve, and unfortunately common." Paolucci Decl. ¶ 20.

These difficulties are compounded when, for example, families are nontraditional (*e.g.*, foster families), families have different surnames or addresses, parents disagree about consent, minors are unsafe at home, or parental rights are terminated. *See* Cleland Decl. ¶ 15; Paolucci Decl. ¶¶ 19-20. Facing liability, covered websites are likely to "err on the side of caution and require detailed proof of the parental relationship." *Griffin*, 2023 WL 5660155, at *15. Thus, "parents and guardians who otherwise would have freely given consent . . . will be dissuaded by the red tape" and the loss of their own anonymity. *Id.* Those obstacles will drive them to "refuse consent—which will unnecessarily burden minors' access to constitutionally protected speech." *Id.*

> **3.** **The Act's speech regulations apply only to a subset of Internet websites based on content and speaker, which independently triggers strict scrutiny for all the Act's speech regulations.**

The Act's speech regulations also trigger strict scrutiny because the Act's coverage definition of "social media company" is content-based and speaker-based. § 47-18-5702(8).

*Content-based distinctions.* The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). "Content-based laws—those that target speech based on its communicative content—are presumptively unconstitutional and may be justified only if the government" satisfies "strict scrutiny." *Reed*, 576 U.S. at 163-64.

The Act's central coverage definition is facially content-based, rendering all of the Act's operative provisions content-based and thus subject to strict scrutiny as well. *Sorrell v. IMS Health, Inc.*, 564 U.S. 552, 566 (2011) ("[C]ontent-based burdens must satisfy the same rigorous scrutiny as [] content-based bans." (citation omitted)). Specifically, the Act selects covered websites for regulation based on the "subject matter" disseminated and thus their "content." *Reed*, 576 U.S. at 163. For example, the Act excludes websites to the extent their users are "post[ing]" about "interactive gaming" and "educational entertainment." § 47-18-5702(2)(B). Further, the Act excludes

many websites because of their content—such as "[o]nline shopping," "career development opportunities," "technical support," "reviewing products offered for sale," "commenting on . . . reviews posted by other users," and "like[s]" or "comment[s]" on "[p]eer-to-peer payment platform[ ]" transactions. § 47-18-5702(9)(B)(iv)-(v), (vii)-(viii). The Act also exempts websites that "consist[ ] primarily of content that . . . is preselected by the . . . website" while burdening websites that disseminate "content that is . . . generated by account holders." § 47-18-5702(9)(B)(iii)(*a*).

"That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions for speech regulations trigger strict scrutiny); *see Reyes*, 2024 WL 4135626, at *10; *Fitch*, 2024 WL 3276409, at *9; *Yost*, 2024 WL 555904, at *11. Under the Act, websites that focus on state-preferred topics—such as "interactive gaming" and "educational entertainment," § 47-18-5702(2)(B)—may serve minors without regulation. And users can access those websites without state-imposed hurdles. But covered websites like those operated by NetChoice members are subjected to onerous regulations based on the content on their services. So are their users. Although a 17-year-old may freely discuss local tutoring opportunities on a website "primarily" devoted to "career development opportunities," § 47-18-5702(9)(B)(v), she cannot discuss that same issue on Nextdoor without parental consent. The Act's burdens are quintessentially content-based, so they are "presumptively unconstitutional." *Reed*, 576 U.S. at 163-64.

*Speaker-based.* The Supreme Court is also "deeply skeptical of laws that distinguish among different speakers, allowing speech by some but not others." *Nat'l Inst. of Fam. & Life Advocs. v. Becerra*, 585 U.S. 755, 777-78 (2018) ("*NIFLA*") (cleaned up). Laws that "distinguish[ ] among different speakers" are "all too often simply a means to control content." *Citizens United v. FEC*, 558 U.S. 310, 340 (2010). Speaker-based laws "present serious First Amendment concerns" when

16

they "discriminate . . . among different speakers within a single medium" or "f[a]ll upon only a small number" of speakers. *Turner Broad. Sys. v. FCC*, 512 U.S. 622, 659 (1994). "[L]aws that single out" certain subsets of speakers "are always subject to at least some degree of heightened First Amendment scrutiny." *Id.* at 640-41 (citation omitted).

Here, the Act "covers a curiously narrow subset of speakers." *NIFLA*, 585 U.S. at 777. It regulates "social media" websites but not "[o]nline shopping," "career development," "technical support," "interactive gaming," or "educational entertainment" websites. § 47-18-5702(2)(B), (9)(B)(iv)-(v); *see Minneapolis Star & Trib. Co. v. Minn. Comm'r of Revenue*, 460 U.S. 575, 591 (1983) (rejecting law that "target[ed] a small group of newspapers"). The Act also favors "provider-generated content over user-generated content." *CCIA*, 2024 WL 4051786, at *10. It exempts websites that "consist[] primarily of content that . . . is preselected by the . . . website" while burdening websites that disseminate "content that is . . . generated by account holders," § 47-18-5702(9)(B)(iii)(*a*), even if those websites also post or create their own content (as many websites do). Thus, while minors can freely access websites like Buzzfeed or Huffington Post to view an article about posts from a particular politician on X, they cannot access those same posts on X without jumping through the Act's age-verification and parental-consent restrictions.

Because the Act's central coverage definition is both content-based and speaker-based, so too is each provision of the Act regulating speech that relies on this definition. *See Reyes*, 2024 WL 4135626, at *8 ("the entire Act facially violates the First Amendment because the Act's operative [speech-restricting] provisions each rely on the Central Coverage Definition"). The Act's age-verification requirement, § 47-18-5703(a)(1), relies on this definition to select which websites adults and minors must provide personal information to access. The Act's parental-consent requirement, § 47-18-5703(a)(2), relies on this definition to select which websites minors must

obtain parental consent to access. And the Act's parental-supervision requirement, § 47-18-5704, is a "[g]overnment regulation of speech" that imposes legal duties on covered websites for disseminating speech of a certain type of "content." *Reed*, 576 U.S. at 163. For this reason too, each of these provisions thus triggers strict scrutiny, and none can satisfy it.

### B. The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny.

Because the Act triggers strict scrutiny, Defendant must demonstrate that the State has "[1] adopt[ed] the least restrictive means of [2] achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (2021) ("*AFP*") (citation omitted). Neither the Act nor any of its individual provisions can satisfy this standard. Nor can it satisfy any form of heightened scrutiny, as it is not "narrowly tailored to serve a significant governmental interest." *Packingham*, 582 U.S. at 105-06 (citation omitted).

#### 1. The State lacks a sufficient governmental interest in restricting adults and minors' access to protected speech.

To have any chance of satisfying First Amendment scrutiny by restricting speech, the State must "specifically identify an actual problem in need of solving." *Brown*, 564 U.S. at 799 (cleaned up). "[A]mbiguous proof will not suffice." *Id.* at 800. Nor will a government's mere "predictive judgment[s]" about harm. *Id.* at 799; *see Reyes*, 2024 WL 4135626, at *12. Moreover, the problem identified must be in need of a *governmental* solution, as opposed to a *private* one.

The Supreme Court has already rejected many interests Defendant may assert. At bottom, the State lacks a sufficient governmental interest in regulating access to protected speech.

*Preventing harm to minors.* Although the "State possesses legitimate power to protect children from harm, . . . that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (citation omitted). And the government may not

"protect the young from ideas or images that a legislative body thinks unsuitable." *Erznoznik*, 422 U.S. at 213.

Here, parents have a wealth of means available to oversee and control their minor children's online activity, including device-level, browser-level, and network-level tools. *See supra* p.4; *see also Reyes*, 2024 WL 4135626, at \*13 & n. 138. And NetChoice members also engage in their own content moderation and provide their own app-level tools to parents. *See supra* p.4. Those are precisely the kinds of private, parental tools that the Supreme Court has repeatedly endorsed as less restrictive means over governmental intervention. *See, e.g.*, *Ashcroft*, 542 U.S. at 667; *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 826 (2000). Whatever "modest gap in concerned parents' control" those tools leave open (if any), filling it "can hardly be a compelling state interest." *Brown*, 564 U.S. at 803. The "government does not have a compelling interest in each marginal percentage point by which its goals are advanced." *Id.* at 803 n.9.

*Parental authority.* The Supreme Court has rejected a governmental interest "in aid of parental authority" to restrict minors' access to protected speech. *Id.* at 802. The Court in *Brown* "note[d]" its "doubts that punishing third parties for conveying protected speech to children *just in case* their parents disapprove of that speech is a proper governmental means of aiding parental authority." *Id.* As the Court explained, accepting that argument "would largely vitiate the rule that 'only in relatively narrow and well-defined circumstances may government bar public dissemination of protected materials to [minors].'" *Id.* (quoting *Erznoznik*, 422 U.S. at 212-13); *see, e.g.*, *Yost*, 2024 WL 555904, at \*13. This case presents no such circumstances.

### 2.      The Act's speech regulations are not properly tailored.

Even if the Act served a compelling governmental interest, its speech regulations are not narrowly tailored, let alone the "least restrictive means" of pursuing any such interest. *AFP*, 594 U.S. at 607 (citation omitted). Rather, the Act is both "seriously underinclusive" and "seriously

overinclusive." *Brown*, 564 U.S. at 805. The "overbreadth in achieving one goal is not cured by the underbreadth in achieving the other." *Id.* Because the Act's "requirements are overbroad, overly restrictive, and underinclusive, they are properly enjoined on their face." *CCIA*, 2024 WL 4051786, at *16.

### a. The Act's speech regulations are not the least restrictive means to accomplish any interest the State may assert.

Neither age verification nor parental consent is the "least restrictive" way to accomplish any goals that the State might assert. *AFP*, 594 U.S. at 607 (citation omitted).

Parents already have many options to oversee their children online. *Supra* p.4. Tennessee could easily provide "parents the information needed to engage in active supervision" over children's Internet access by using those options. *Playboy*, 529 U.S. at 826; *see, e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Reyes*, 2024 WL 4135626, at *14; *Fitch*, 2024 WL 3276409, at *11; *Yost*, 2024 WL 555904, at *13. That would require only publicizing the diverse supervisory technologies that are already widely available. For example, the State could "encourage the use of filters" that private companies already make available "by parents to protect minors." *Griffin*, 2023 WL 5660155, at *21 (cleaned up); *see* Cleland Decl. ¶ 7. The State here ignored these less restrictive options. "It is no response that [these tools] require[] a consumer to take action, or may be inconvenient, or may not go perfectly every time." *Playboy*, 529 U.S. at 824. "[I]f a less restrictive means is available for the Government to achieve its goals, the Government must use it." *Id.* at 815.

Furthermore, members' existing self-regulation is extensive—the voluntary efforts encompassing content moderation, parental controls, and other tools. *See supra* p.4. The Supreme Court has held that "voluntary," industry-led self-regulatory efforts are less restrictive means than government intervention. *Brown*, 564 U.S. at 803 (crediting video game industry's self-regulation).

20

### b. The Act's coverage definition, and thus all speech regulations depending on it, are improperly tailored.

Several tailoring flaws pervade all of the Act's speech regulations.

The Act's central coverage definition is vastly overinclusive. It targets many websites that disseminate a broad range of protected speech. *See, e.g.*, *Reyes*, 2024 WL 4135626, at \*16. The Act does not purport to identify or limit itself to websites that are particularly harmful to minors or even particularly likely to be accessed by minors. *E.g.*, Pai Decl. ¶¶ 17-21; Paolucci Decl. ¶ 8. And for the websites it regulates, the Act restricts users' access to *all* speech on those websites, including core protected speech.

The Act's coverage is also "seriously underinclusive." *Brown*, 564 U.S. at 805. The Act's central coverage definition and its many exclusions create pervasive gaps in the regulatory regime the State is attempting to create. *Sorrell*, 564 U.S. at 573 (governmental regulation requires "coherent policy"); *see, e.g.*, *Reyes*, 2024 WL 4135626, at \*15; *CCIA*, 2024 WL 4051786, at \*16. If the State is attempting to provide parents greater control over their minor children's online activity or prevent minors' exposure to purported harmful content, it makes no sense to limit coverage to websites that do not qualify for one of numerous ill-defined statutory exceptions, such as "interactive gaming." § 47-18-5702(2)(B), (9)(B); *see Griffin*, 2023 WL 5660155, at \*18. To the extent the State is attempting to regulate particular interactions by minors it deems harmful, that too will be ineffective. For example, the Act restricts minor users from exchanging content with individuals on Instagram without parental consent but not from exchanging that same content while gaming on Roblox. § 47-18-5702(2)(B). The Act restricts users from networking with individuals on X without verifying their age but not from networking with those same individuals on LinkedIn. § 47-18-5702(9)(B)(v). Examples abound for all the Act's other exceptions.

### c. The age-verification and parental-consent provisions are independently improperly tailored.

Beyond the foregoing general problems, the age-verification and parental-consent provisions have additional, unique tailoring flaws.

*Parental consent (§ 47-18-5703(a)(2))*. The parental-consent requirement is not properly tailored. *See Yost*, 2024 WL 555904, at *13; *Griffin*, 2023 WL 5660155, at *18-21. To begin, the Act does "do[es] not enforce *parental* authority"; it "impose[s] *governmental* authority, subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3; *see also Fitch*, 2024 WL 3276409, at *11; *Yost*, 2024 WL 555904, at *12-13; *Griffin*, 2023 WL 5660155, at *18. Like other parental-consent laws to engage in protected speech, the Act's requirement is also underinclusive. If covered websites are genuinely "dangerous," it does "not make sense to" allow minors to access them so "long as one parent . . . says it's OK." *Griffin*, 2023 WL 5660155, at *18 (cleaned up); *see Fitch*, 2024 WL 3276409, at *13; *Yost*, 2024 WL 555904, at *13. Muzzling speech dissemination to minors on certain covered websites that minors are otherwise free to experience elsewhere "is not how one addresses a serious social problem." *Brown*, 564 U.S. at 802. Likewise, it makes no sense to require parental content only for *new* account holders while allowing minors who are *existing* account holders to access the same content on the same covered websites without consent.

Furthermore, the Act fails to "take into account juveniles' differing ages and levels of maturity." *Am. Booksellers*, 484 U.S. at 396. The Act's one-size-fits-all approach requires express parental consent for all minors at every developmental stage—from websites' youngest users to 17-year-olds. *Id.*; *see Reno*, 521 U.S. at 865-66.

*Age verification (§ 47-18-5703(a)(1))*. The age-verification requirement is a means to effectuate the Act's other age-based restrictions, like the parental-consent requirement. Because those other provisions are unconstitutional, age verification serves no governmental interest

whatsoever. *See, e.g.*, *Griffin*, 2023 WL 5660155, at \*21 ("Age-gating social media platforms for adults and minors does not appear to be an effective approach when, in reality, it is the content on particular platforms that is driving the State's true concerns.").

Furthermore, the age-verification requirement is overinclusive as to any governmental interest that focuses only on minors. All users, *adults* included, must undergo age verification to access a broad range of protected speech on a broad range of websites. For adults to engage with or access political, religious, artistic, and other protected speech on covered websites, they must verify their ages. Whatever the statutory method, impeding adults' access to protected speech in an effort to regulate minors' access to speech is enough to render the Act insufficiently tailored. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882.

## II. NetChoice is likely to succeed on the merits of its claim that the Act's central coverage definition of "social media company" is unconstitutionally vague (§ 47-18-5702(8)).

The Act should also be enjoined because its central coverage definition that distinguishes among different kinds of "social media compan[ies]" is also unconstitutionally vague. § 47-18-5702(8).[9] The Constitution requires that laws "give fair notice of conduct that is forbidden or required." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012). Laws cannot be "so standardless that [they] authorize[] or encourage[] seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008) (citation omitted).

A law that implicates First Amendment freedoms is unconstitutionally vague if it "reaches a substantial amount of constitutionally protected conduct." *Belle Maer Harbor v. Charter Twp. of*

---

[9] The vagueness issues go to *how much* protected speech the Act reaches—not *whether* the Act reaches protected speech. Thus, the Act's vagueness does not affect the facial-challenge analysis. *See supra* pp.9-10. In all events, governments cannot impose vague laws and then leverage that vagueness to hinder First Amendment challenges. *See Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 n.6 (1982) ("the vagueness of a law affects overbreadth analysis").

23

*Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) (citation omitted). This First Amendment vagueness standard is different from and "more stringent" than the ordinary vagueness standard. *Hoffman Ests.*, 455 U.S. at 499; *see Fox*, 567 U.S. at 253-54.

Determining whether the Act applies often depends on identifying a website's "primar[y]," "incidental," "predominant[]," or "general[]" functions. § 47-18-5702(9)(B)(iii)(*a*)-(*b*), (iv)-(v), (vii)-(viii). But the Act does not define any of those vague terms. That means that websites do not know what it means to "*primarily* provide[] career development opportunities." § 47-18-5702(9)(B)(v) (emphasis added). Nor do websites know when "interactive functionality is *incidental* to . . . preselected content." § 47-18-5702(9)(B)(iii)(*b*) (emphasis added).

*Griffin* considered a law relying on similar terms, concluding that it was unconstitutionally vague. 2023 WL 5660155, at *14. Both there and here "predominant or exclusive function" was undefined, even though that statutory phrase is "critical to determining which entities fall within [the law]'s scope." *Id.* at *13-14. Consequently the Act leaves "companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements." *Id.* at *13; Cleland Decl. ¶¶ 14, 17. This "ambiguity renders a law unconstitutional." *Griffin*, 2023 WL 5660155, at *13; *see also Fitch*, 2024 WL3276409, at *15 ("primarily" and "incidental to" in coverage definition were "overly indefinite, leaving it open for potential arbitrary and discriminatory enforcement").

## III.  NetChoice meets all the remaining factors for a preliminary injunction.

When a party seeks a preliminary injunction on the basis of a First Amendment violation, "the likelihood of success on the merits often will be the determinative factor." *Jones v. Caruso*, 569 F.3d 258, 265 (6th Cir. 2009) (cleaned up). NetChoice meets the remaining factors as well.

The Act will cause Plaintiff and its members irreparable harm. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."

24

*Roman Catholic Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (citation omitted). The Act's chilling effects on speech harm both websites and users. And the Act's monetary penalties for noncompliance—$1,000 per violation—only magnify these harms. *See supra* p.8.

Furthermore, the Act requires covered websites to shoulder steep compliance costs "with no guarantee of eventual recovery." *Ala. Ass'n of Realtors v. HHS*, 594 U.S. 758, 765 (2021). Each website must adopt age-verification, parental-consent, and parental-supervision systems—at great expense. Pai Decl. ¶¶ 34-37; Paolucci Decl. ¶ 17. One member has stated that that the Act's compliance burdens are "far in excess of our available budget." Paolucci Decl. ¶ 26; *see id.* ¶¶ 11, 17-18. Another member has stated that it would bar users under 18 if the Act goes into effect. Pai Decl. ¶ 37. And sovereign immunity would prevent later recovery of those expenses from the government even if NetChoice prevails. *See Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).

The final two factors—"harm to the opposing party and . . . the public interest"—"merge" in lawsuits against the government. *Nken v. Holder*, 556 U.S. 418, 435 (2009). Absent injunction, the Act's requirements will restrict minors and adults' access to protected speech. And as the Sixth Circuit has repeatedly recognized, "it is always in the public interest to prevent the violation of a party's constitutional rights." *Jones*, 569 F.3d at 278 (citation omitted); *see, e.g.*, *Dayton Area Visually Impaired Persons, Inc. v. Fisher*, 70 F.3d 1474, 1490 (6th Cir. 1995) ("[T]he public as a whole has a significant interest in ensuring . . . protection of First Amendment liberties.").

**Conclusion**

NetChoice requests that this Court preliminarily enjoin Defendant from enforcing the Act against its covered members' websites before the Act takes effect on January 1, 2025.

25

Dated: October 3, 2024                    Respectfully submitted,

*/s/ Junaid Odubeko*
Junaid Odubeko (Bar No. 023809)
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway Suite 2400
Nashville, TN 37203
(615) 244-2582
jodubeko@bradley.com

Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
Shannon Grammel*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com
***pro hac vice forthcoming**

*Attorneys for Plaintiff NetChoice*

26