# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| NETCHOICE, | |
| *Plaintiff*, | |
| v. | Civil Action No. 3:24-cv-01191 |
| JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter, | |
| *Defendant*. | |

## PLAINTIFF NETCHOICE'S REPLY IN SUPPORT OF
## <u>MOTION FOR PRELIMINARY INJUNCTION</u>

## Table of Contents

Argument ............................................................................................................................. 1

   I.   NetChoice is likely to succeed on the merits of its challenges to the Act. ......................... 1

      A.  NetChoice has standing to challenge the Act. ......................................................... 1

      B.  NetChoice's facial challenge is proper under *Moody*. ............................................ 6

      C.  The Act's speech regulations trigger strict scrutiny. ................................................ 7

      D.  The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny. ..................................................................................................................... 11

      E.  The Act is unconstitutionally vague. ...................................................................... 14

  II.  The equitable factors support a preliminary injunction. .................................................. 15

Conclusion ......................................................................................................................... 15

# Table of Authorities

**Cases**

*Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n,*
  389 F.3d 536 (6th Cir. 2004) ................................................................................1

*Ashcroft v. ACLU,*
  542 U.S. 656 (2004)....................................................................................6, 7, 12

*Belle Maer Harbor v. Charter Twp. of Harrison,*
  170 F.3d 553 (6th Cir. 1999) ..............................................................................14

*Boddie v. Am. Broad. Cos.,*
  881 F.2d 267 (6th Cir. 1989) ..............................................................................14

*Brown v. Ent. Merchs. Ass'n,*
  564 U.S. 786 (2011) ............................................................................... *passim*

*Carman v. Yellen,*
  112 F.4th 386 (6th Cir. 2024) ...............................................................................1

*City of L.A. v. Alameda Books, Inc.,*
  535 U.S. 425 (2002)......................................................................................10, 11

*Comput. & Commc'n Indus. Ass'n v. Paxton,*
  2024 WL 4051786 (W.D. Tex. Aug. 30, 2024).................................................2, 3

*Connection Distrib. Co. v. Holder,*
  557 F.3d 321 (6th Cir. 2009) ..............................................................................11

*Dallas v. Stanglin,*
  490 U.S. 19 (1989)..................................................................................................2

*Endres v. Ne. Ohio Med. Univ.,*
  938 F.3d 281 (6th Cir. 2019) ..............................................................................15

*FEC v. Cruz,*
  596 U.S. 289 (2022)................................................................................................7

*Fischer v. Thomas,*
  52 F.4th 303 (6th Cir. 2022) .................................................................................5

*Harris v. McRae,*
  448 U.S. 297 (1980)................................................................................................5

*John Doe No. 1 v. Reed*,
561 U.S. 186 (2010) ..................................................................................................5

*Jones v. Caruso*,
569 F.3d 258 (6th Cir. 2009) ...................................................................................15

*Kentucky v. Yellen*,
54 F.4th 325 (6th Cir. 2022) .......................................................................................1

*Kowalski v. Tesmer*,
543 U.S. 125 (2004) ...................................................................................................4

*L.W. v. Skrmetti*,
83 F.4th 460 (6th Cir.) ...............................................................................................2

*Meriwether v. Hartop*,
992 F.3d 492 (6th Cir. 2021) ...................................................................................14

*Moody v. NetChoice, LLC*,
144 S. Ct. 2383 (2024) ....................................................................................*passim*

*N.Y. State Nat. Org. for Women v. Pataki*,
261 F.3d 156 (2d Cir. 2001) ......................................................................................5

*NetChoice, LLC v. Fitch*,
2024 WL 3276409 (S.D. Miss. July 1, 2024) .................................................*passim*

*NetChoice, LLC v. Griffin*,
2023 WL 5660155 (W.D. Ark. Aug. 31, 2023) ...............................................*passim*

*NetChoice, LLC v. Reyes*,
2024 WL 4135626 (D. Utah Sept. 10, 2024) ...................................................*passim*

*NetChoice, LLC v. Yost*,
716 F. Supp. 3d 539 (S.D. Ohio 2024) ............................................................*passim*

*Packingham v. North Carolina*,
582 U.S. 98 (2017) ...................................................................................................13

*Minor I Doe ex rel. Parent I Doe v. Sch. Bd. for Santa Rosa Cnty.*,
264 F.R.D. 670 (N.D. Fla. 2010) ...............................................................................5

*Reno v. ACLU*,
521 U.S. 844 (1997) ........................................................................................6, 7, 10

*Sec'y of State of Md. v. Joseph H. Munson Co.*,
467 U.S. 947 (1984) ...................................................................................................9

iii

*Turner Broad. Sys. v. FCC*,
    512 U.S. 622 (1994).................................................................................................10

*United States v. Playboy Ent. Grp.*,
    529 U.S. 803 (2000).........................................................................................12, 13

*Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*,
    425 U.S. 748 (1976).................................................................................................3

*Virginia v. Am. Booksellers, Inc.*,
    484 U.S. 383 (1988).....................................................................................2, 3, 4, 8

*X Corp. v. Bonta*,
    116 F.4th 888 (9th Cir. 2024) ..................................................................................6

**Statutes**

Tenn. Code § 39-17-1003 ...............................................................................................13

Tenn. Code § 47-18-108 .................................................................................................15

Tenn. Code § 47-18-5702 ...................................................................................10, 14, 15

Tenn. Code § 47-18-5703 ..........................................................................................8, 15

Tenn. Code § 47-18-5704 ...............................................................................................15

**Other Authorities**

LinkedIn, User Agreement (Feb. 1, 2022), https://perma.cc/RS45-4ACB....................................9

Nickelodeon, Terms of Use (May 9, 2023), https://perma.cc/P4AY-949A ...................................9

Roblox, Terms of Use (Nov. 6, 2024) https://perma.cc/W58Q-E46R...........................................9

Yelp, Terms of Service (Feb. 22, 2024), https://perma.cc/QGQ8-JBKQ.......................................9

Tennessee House Bill 1891 ("Act") uses a content-based and speaker-based coverage definition to restrict access to protected speech on disfavored websites through parental-consent and age-verification requirements. Thus, the Act harms NetChoice's members and their users by restricting members' ability to disseminate protected speech. Defendant disregards the Supreme Court's recent decision recognizing NetChoice's members rights in *Moody v. NetChoice, LLC*, 144 S. Ct. 2383, 2399 (2024). And Defendant offers no reason this Court should not follow the decisions of five federal district courts across the country that have rejected all the arguments Defendant raises again here. *See* Mem. 1. Without an injunction, NetChoice members and their users will be irreparably harmed. This Court therefore should preliminarily enjoin the Act.

## Argument

### I. NetChoice is likely to succeed on the merits of its challenges to the Act.

#### A. NetChoice has standing to challenge the Act.

**1. NetChoice has associational standing.** NetChoice has standing "to sue on behalf of its members." *Am. Canoe Ass'n v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004). Defendant contests only one prong of associational standing: that NetChoice members "have standing to sue on their own." Resp. 6. He contends NetChoice "doesn't explain how the age-verification and parental-consent provisions implicate its *members'* right[s]." *Id.* This argument is central to Defendant's standing and merits arguments and is equally mistaken as to both.[1]

NetChoice has demonstrated—and all five district courts to have considered it have held—that NetChoice has associational standing to seek redress for its members' First Amendment

---

[1] Defendant does not dispute that covered members are "direct objects of the" Act, *Carman v. Yellen*, 112 F.4th 386, 408 (6th Cir. 2024), or that they face compliance costs under the threat of civil penalties, *Kentucky v. Yellen*, 54 F.4th 325, 342 (6th Cir. 2022). That is sufficient to support standing. *See, e.g., NetChoice, LLC v. Reyes*, 2024 WL 4135626, at *7 (D. Utah Sept. 10, 2024); *NetChoice, LLC v. Yost*, 716 F. Supp. 3d 539, 549 (S.D. Ohio 2024).

injuries. Mem. 9; Compl. ¶¶ 8, 15-16, 62, 88, 109, 122.[2] NetChoice members "engage[] in expression" through their "display" and "compiling and curating" of protected "third-party speech." *Moody*, 144 S. Ct. at 2393, 2401. The "speech [they] engage in when they make decisions about how to construct and operate their platforms . . . is protected speech." *Reyes*, 2024 WL 4135626, at *8. The Act burdens those rights by requiring members to (1) engage in age-verification before they can disseminate speech to anyone; and (2) secure parental consent before they can disseminate speech to minors. Thus, the Act directly burdens "who they can show [content] to." Resp. 7.

Defendant also suggests that speech disseminators themselves cannot challenge restrictions on their ability to disseminate speech or to represent the interests of their audiences. Resp. 6-7. But *Virginia v. American Booksellers, Inc.*, 484 U.S. 383, 388 n.3 (1988), and *Brown v. Entertainment Merchants Ass'n*, 564 U.S. 786, 789 (2011), hold otherwise. As Defendant admits in his response, those cases involved organizations representing "bookstores" and video game store "members," Resp. 8 n.1, challenging restrictions on those stores' "*own* right to distribute" and disseminate protected speech to their customers, Resp. 13. That is *exactly* what NetChoice is doing: raising the First Amendment rights of its covered members to disseminate protected speech to users.[3]

Defendant reads *Moody* too narrowly, incorrectly suggesting that covered websites' First

---

[2] *E.g.*, *Reyes*, 2024 WL 4135626, at *7; *Comput. & Commc'n Indus. Ass'n v. Paxton*, 2024 WL 4051786, at *8-9 (W.D. Tex. Aug. 30, 2024) ("*CCIA*"); *NetChoice, LLC v. Fitch*, 2024 WL 3276409, at *5-6 (S.D. Miss. July 1, 2024); *Yost*, 716 F. Supp. 3d at 549; *NetChoice, LLC v. Griffin*, 2023 WL 5660155, *9 (W.D. Ark. Aug. 31, 2023). Defendant encourages the Court to disregard this authority, citing *L.W. v. Skrmetti*, 83 F.4th 460 (6th Cir.), *cert. granted*, 144 S. Ct. 2679 (2024). But *L.W.* is inapposite—it involves bans on certain *medical treatments* for minors and not "free speech," for which "skeptical judicial review applies . . . from the start." *Id.* at 472.

[3] Defendant misconstrues NetChoice's position by arguing that NetChoice members have "no right to *associate* with unknown minors." Resp. 6 (emphasis added). It is blackletter law that "only in relatively narrow and well-defined circumstances may government bar *public dissemination* of protected materials to" minors. *Brown*, 564 U.S. at 794 (cleaned up; emphasis added). That is why courts have rejected other States' reliance on *Dallas v. Stanglin*, 490 U.S. 19 (1989), and similar arguments. *E.g.*, *Fitch*, 2024 WL 3276409, at *10; *Griffin*, 2023 WL 5660155, at *16.

Amendment rights are limited to just content moderation. Resp. 6-7. But *Moody* recognized that NetChoice members "engage[] in expression" through their "organizing," "presenting," and "display" of protected "third-party speech." 144 S. Ct. at 2393, 2402. And the Court analogized social media websites to "[t]raditional publishers," which similarly have the right to *disseminate* speech, in conjunction with their right to editorial discretion. *Id.* at 2393. "Whether government regulation applies to creating, distributing, or consuming speech makes no difference." *Brown*, 564 U.S. at 792 n.1. The Act's restriction on members' dissemination of expression therefore cannot be squared with members' First Amendment rights, including those recognized in *Moody*.

**2. NetChoice has standing to assert the rights of its members' users.** NetChoice also has standing to raise the First Amendment rights of its members' users. Compl. ¶ 17; Mem. 9. NetChoice members' rights and their users' rights are aligned in this case: "[W]here a speaker exists . . . the protection afforded is to the communication, to its source and to its recipients both." *Va. State Bd. of Pharmacy v. Va. Citizens Consumer Council, Inc.*, 425 U.S. 748, 756 (1976).

Defendant argues that NetChoice members cannot assert users' rights. Resp. 7-8. But in First Amendment cases, "litigants are permitted to challenge a statute" on behalf of others when "the statute's very existence may cause others not before the court to refrain from constitutionally protected speech." *Am. Booksellers*, 484 U.S. at 392-93 (cleaned up). Courts have repeatedly held that NetChoice may raise users' rights in comparable cases. *See* Mem. 9 n.7 (collecting cases). Indeed, the leading case recognizing the First Amendment protections for speech disseminated to minors was brought by a trade association. *See Brown*, 564 U.S. at 789.

Defendant never disputes that the Act injures users, conceding that users can "sue on their own." Resp. 8. Instead, Defendant argues that NetChoice "must assert [members'] own legal rights." Resp. 7. But NetChoice does assert its members' rights, as explained above. Therefore,

NetChoice has standing without any reliance on so-called "double stacking." Resp. 8.

Defendant further claims that NetChoice is attempting to raise the rights of a speculative class of people: "non-users who might later become users, but who won't want to verify their age or get parental consent." Resp. 7 (emphasis omitted). This argument has two flaws. *First*, NetChoice *can* assert the rights of prospective users, consistent with challenges to laws inhibiting the speech rights of prospective book and video game purchasers. *E.g.*, *Griffin*, 2023 WL 5660155, at *12 (NetChoice had standing to assert rights of "hypothetical *future* users of social media platforms"). Defendant relies on the Supreme Court's decision in *Kowalski v. Tesmer*, 543 U.S. 125, 129 (2004). Resp. 7. But as *Griffin* explained, *Kowalski* is "clearly distinguishable . . . because the contested issue there was Article III standing—not prudential standing" to raise the rights of members' users in addition to members' own rights. 2023 WL 5660155, at *12. *Second*, the standing inquiry is objective: the Court must consider whether the Act's "very existence *may cause others* not before the court to refrain from constitutionally protected speech." *Am. Booksellers Ass'n*, 484 U.S. at 392-93 (cleaned up; emphasis added); *see Yost*, 716 F. Supp. 3d at 551. The constitutional concern is putting users to the choice of whether to verify their age or get parental consent before accessing protected speech. That is why a bookstore challenging a book ban need not identify customers who would be unable to buy a book. *Am. Booksellers Ass'n*, 484 U.S. at 392-93.

Finally, Defendant speculates without support that NetChoice members have "'conflicts' of interest" with users. Resp. 8-9. But Defendant fails to come up with any rationale that would differentiate NetChoice's lawsuit from that brought by the trade association in *Brown*. Here, users want to (and do) access the protected speech disseminated on members' websites. Consequently, this argument has been rejected by courts many times over, which recognize that both websites and users share an interest in vindicating First Amendment speech rights. *See Fitch*, 2024 WL

3276409, at \*7; *Yost*, 716 F. Supp. 3d at 551; *Griffin*, 2023 WL 5660155, at \*12.

**3. NetChoice has standing to bring an as-applied challenge.** NetChoice has standing to bring both a facial and as-applied challenge to the Act. Although the Act is facially unconstitutional, Compl. ¶¶ 58-60; Mem. 9, the Court can also hold that the Act violates the First Amendment as applied to NetChoice's covered members, *see, e.g.*, *Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (holding plaintiffs likely to succeed in pre-enforcement as-applied First Amendment challenge where the challenged action chilled protected speech).[4]

Defendant erroneously contends that NetChoice lacks associational standing to bring an as-applied claim because that claim would require individualized inquiries into NetChoice members. Resp. 15. This is not a case where the as-applied claim arises from the application of a generally constitutional law to specific circumstances. Rather, NetChoice's claims involve application of a categorically *unconstitutional* law to its members for which the analysis is clear. In other words, the as-applied challenge here goes to the scope of relief. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (claim had "characteristics" of as-applied challenge where it did "not seek to strike the [law] in all its applications, but only to the extent it covers referendum petitions"). The as-applied scope is clear: The parental-consent and age-verification requirements applied to NetChoice's members restrict their First Amendment rights to disseminate protected speech to adults and minors. And unlike the cases Defendant cites (which are not free speech cases),[5] no

---

[4] A pre-enforcement, as-applied challenge is particularly appropriate here where Defendant has previously pursued enforcement against members. *See Fischer*, 52 F.4th at 307; Compl. ¶ 18.

[5] *See Harris v. McRae*, 448 U.S. 297, 321 (1980) (individual participation "essential" given the "diversity of view" of religious beliefs of organization's members); *N.Y. State Nat. Org. for Women v. Pataki*, 261 F.3d 156, 171 n.4 (2d Cir. 2001) (individual participation necessary "concerning . . . particular efforts to locate and inform each" member "); *Minor I Doe ex rel. Parent I Doe v. Sch. Bd. for Santa Rosa Cnty.*, 264 F.R.D. 670, 688 (N.D. Fla. 2010) (individual participation required given "fact-bound nature of" members' claims and fact that members' claims did not "involve[] a pure question of law").

individualized participation is needed to show the Act's application to covered websites.

**B.      NetChoice's facial challenge is proper under *Moody*.**

The *Moody* facial challenge analysis here is straightforward. Mem. 9. As an initial matter, the parties agree on the range of "actors" and "activities" regulated by the Act: services that publicly disseminate user posts through feeds, boards, forums, and similar webpages. *Moody*, 144 S. Ct. at 2398; *see* Mem. 5-6. Defendant does not dispute that the Act excludes email, online marketplaces, payment services, and ride-sharing services. Mem. 6-7; Resp. 20 ("overarching term 'social media platform'" is "commonly understood" (citation omitted)).

With that scope clear, all aspects of the Act's speech regulations, "in every application to a covered social media company, raise the same First Amendment issues," so the Court "need not 'speculate about "hypothetical" or "imaginary" cases.'" *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (citation omitted); *Reyes*, 2024 WL 4135626, at *9 n.92. For each covered website, the Act bars access to protected speech through its speech restrictions.

Defendant asserts that the inquiry should focus only on users who do not want to engage in age verification or parental consent. Resp. 10. That continues Defendant's mistaken assumption that only users have First Amendment rights. Members have First Amendment rights, too. *Supra* pp.2-3. And the Act's unlawful speech restrictions apply to *all* covered members and their users, because all users must clear those hurdles before accessing protected speech. The Supreme Court has repeatedly held that such restrictions on access to speech are improper. *See Brown*, 564 U.S. at 795-96; *Ashcroft v. ACLU*, 542 U.S. 656, 667 (2004); *Reno v. ACLU*, 521 U.S. 844, 882 (1997). Thus, on its face, "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 144 S. Ct. at 2397 (citation omitted).

The handful of purportedly lawful applications of the Act that Defendant raises (*e.g.*, pornography websites, none of which are members) do not change this fact. Resp. 10. That Defendant

6

can hypothesize about a couple of examples from other websites operated by other businesses does not render the Act facially constitutional under the unique First Amendment facial-challenge standard. It is sufficient that the Act unconstitutionally restricts access to protected speech in the overwhelming majority of cases. *Moody*, 144 S. Ct. at 2397. Equally, the First Amendment analysis does not depend on whether some users might "*support* age verification and parental consent." Resp. 11. The constitutionality of any law does not depend on whether certain citizens support the law's policy goals. Finally, Defendant's argument does not rebut the propriety of as-applied relief.

### C. The Act's speech regulations trigger strict scrutiny.

The Act's age-verification, parental-consent, and parental-supervision provisions trigger First Amendment strict scrutiny. Mem. 10. Therefore, it is Defendant's "burden" to "prov[e]" the Act's "constitutionality." *FEC v. Cruz*, 596 U.S. 289, 305 (2022). Defendant fails to do that.

**1. Age verification.** The Act's age verification provision triggers strict scrutiny. Mem. 10-18. Defendant argues that NetChoice "has not proven that age verification would stop an objectively reasonable adult from using social media for protected speech" because "[m]ost adults support age verification." Resp. 11. Defendant's argument is both factually unsupported and legally incorrect. *First*, it is *Defendant's* burden to prove the constitutionality of age-verification. *See Cruz*, 596 U.S. at 305. *Second*, Defendant ignores binding precedent, holding that the government cannot require publishers to mandate users provide "identif[ication]" to access speech—even unprotected obscenity for minors. *Ashcroft*, 542 U.S. at 667; *Reno*, 521 U.S. at 882; *see Reyes*, 2024 WL 4135626, at *16 n.169; *Fitch*, 2024 WL 3276409, at *11-12; *Griffin*, 2023 WL 5660155, at *17.[6] *Third*, Defendant ignores the record evidence demonstrating the speech-chilling effects of simple age *declaration*, let alone age *verification*. *See, e.g.*, Mem. 13 (collecting record evidence).

---

[6] And like the plaintiffs in *Ashcroft* and *Reno*, NetChoice is vindicating its members "own First Amendment right[s]." Resp. 12 n.2.

Defendant's own declaration shows that age verification—in whatever form it takes—would require some form of personal-identification materials, raising the same speech-chilling concerns at issue in *Ashcroft* and *Reno*. *See* Allen Decl. ¶¶ 27-29 ("drivers' licenses, passports, electoral rolls, credit reports, cellphone-network records, banking, credit-card records," military "DD Form 214" papers, "facial images, voiceprints, or other personalized evidence").[7] Moreover, that the Act prohibits covered websites from "retain[ing] personally identifying information," § 47-18-5703(c), does not change the fact that such information must be provided in the first place.

**2. Parental consent.** The Act's parental-consent requirement burdens minors' First Amendment rights and triggers strict scrutiny. Mem. 13-15. Defendant argues that "[p]arents can regulate their children's access to social media," but that is not what the Act does. Resp. 12. Rather, the Act "impose[s] *governmental* authority," "subject only to a parental veto." *Brown*, 564 U.S. at 795 n.3. In any event, the Supreme Court has held that minors have a First Amendment "right to speak or be spoken to," and "the state" lacks the "power to prevent children from hearing or saying anything *without their parents' prior consent*." *Id.* Thus, the question is not whether minors "have a constitutional right to sneak" around "their parents," Resp. 12, but whether the *government* may restrict their access to speech. Parents can require their children to get their permission before doing anything and can oversee them using the various tools available to parents. Mem. 4. But the *government* cannot demand covered websites to affirmatively seek out parental consent before disseminating speech to minors any more than it could demand the same of book or video game stores. *See Brown*, 564 U.S. at 795 n.3; *Am. Booksellers*, 484 U.S. at 392-93.

---

[7] Defendant's declarant Tony Allen has provided declarations in other litigation, where those courts found his assertions unpersuasive. *See Reyes*, 2024 WL 4135626, at *13 ("generally indicates other methods exist to advance the goal of protecting children on the internet, including parental controls" (cleaned up; quoting Allen declaration)); *Griffin*, 2023 WL 5660155, at *21.

**3. Regulation of speech—not mere conduct.** Defendant claims that the Act does "not implicate the First Amendment for minors in the first place," contending that "[b]y barring certain contracts . . . the Act regulates conduct, not speech." Resp. 12-13. This argument was correctly rejected by *Yost*, 716 F. Supp. 3d at 552. Most covered members' websites require users to create an account to access either some or all of the protected speech on the service. Cleland Decl. ¶ 15; Pai Decl. ¶ 5; Paolucci Decl. ¶ 7. Thus, by restricting account creation, the Act burdens covered websites' ability to disseminate protected speech to their users and users' ability to access that speech. In other words, like the law in *Brown*, the Act is a "direct imposition of . . . burdens on the dissemination of particular kinds of speech." Resp. 13 (citation omitted).

A "law prohibiting minors from contracting to access [] a plethora of protected speech can[not] be reduced to a regulation of commercial conduct." *Yost*, 716 F. Supp. 3d at 552; *see Sec'y of State of Md. v. Joseph H. Munson Co.*, 467 U.S. 947, 967 n.16 (1984) (regulating contracts for charities was not "economic regulation"). For example, the law in *Brown* "restrict[ed]" speech by regulating the "sale or rental" of video games. 564 U.S. at 789, 799. California would not have prevailed if it purported to regulate "contracts" for the purchase or rental of video games.

Tellingly, the Act does not regulate all online terms of service agreements. These agreements are ubiquitous and are often used as threshold requirements to protected speech online. That is true for websites that do not meet the Act's coverage requirements,[8] and websites explicitly exempted from the Act.[9] The prevalence of these contracts both belies Defendant's justification and shows that the Act is wholly underinclusive as a regulation of contract.

---

[8] *See, e.g.*, Nickelodeon, Terms of Use (May 9, 2023), https://perma.cc/P4AY-949A; Roblox, Terms of Use (Nov. 6, 2024) https://perma.cc/W58Q-E46R.

[9] *See, e.g.*, Yelp, Terms of Service (Feb. 22, 2024), https://perma.cc/QGQ8-JBKQ; LinkedIn, User Agreement (Feb. 1, 2022), https://perma.cc/RS45-4ACB.

9

**4. Content-based and speaker-based coverage definition.** The Act's coverage definition of "social media company," § 47-18-5702(8), is content-based and speaker-based, triggering strict scrutiny. Mem. 15-18. Defendant does not dispute that the Act excludes websites based on their content or who is speaking, such as websites for "[o]nline shopping" or "career development opportunities," among others. § 47-18-5702(9)(B)(iv)-(v); Mem. 15-16. In fact, one of Defendant's declarations asserts that regulation of these websites is necessary, in part, because of the *content* on members' websites. *E.g.*, Kaliebe Decl. ¶¶ 120-27.

Rather, Defendant cites *Turner Broadcasting Systems v. FCC*, 512 U.S. 622, 660 (1994), to suggest that the Act simply "applies to one medium (or a subset thereof) but not others." Resp. 18 (citation omitted). *Turner* is inapposite. *First*, Turner involved only a speaker-based distinction. 512 U.S. at 661. Here, however, this Act also contains facially *content*-based distinctions. *Cf. id.* at 643-44; *Moody*, 144 S. Ct. at 2408 n.10 (distinguishing *Turner*); *Reyes*, 2024 WL 4135626, at *11 n.112 (same); *Fitch*, 2024 WL 3276409, at *9 (same). *Second*, *Turner*'s speaker-based distinctions between cable operators and other analogous video-delivery systems were justified by the unique physical infrastructure of the cable industry. 512 U.S. at 661. There are no such "special justifications" here or on the Internet, as the Supreme Court subsequently clarified. *Reno*, 521 U.S. at 868-69; *see Moody*, 144 S. Ct. at 2403.

Defendant also invokes the "secondary-effects" doctrine. Resp. 17-19. But that doctrine applies only to physical "zoning ordinance[s]." *City of L.A. v. Alameda Books, Inc.*, 535 U.S. 425, 445 (2002) (controlling op. of Kennedy, J., concurring in the judgment). And the Supreme Court in *Reno* held that restrictions on access to online speech are not analogous to zoning ordinances regulating physical property. 521 U.S. at 867-68. It has been the law for more than a generation that States cannot "cyberzon[e]" the Internet by imposing "restriction[s] on speech." *Id.* In

addition, States "may not regulate the secondary effects of speech by suppressing the speech itself." *Alameda*, 535 U.S. at 445 (Kennedy, J., concurring in the judgment). Similarly, "statutes that single out speech for special treatment because of the effect its content will have on its audience amount to content-based restrictions subject to strict scrutiny." *Connection Distrib. Co. v. Holder*, 557 F.3d 321, 328 (6th Cir. 2009). Yet the Act does just that.

### D. The Act fails strict scrutiny and any other form of heightened First Amendment scrutiny.

Applying strict scrutiny, Defendant has failed to show that the Act is narrowly tailored to further a compelling governmental interest. Mem. 18-23.

**1.** Defendant fails to show a sufficient governmental interest in restricting adults and minors' access to protected speech. Defendant claims that the Act's speech restrictions "protect 'the physical and psychological well-being of minors,'" and that "there is a 'direct causal link' between social media and harms to minors." Resp. 13 (citations omitted). But far from showing a "causal link," Defendant presents only "ambiguous proof." *Brown*, 564 U.S. at 799-800.

Even the materials in Defendant's one-sided submission reflect as much. For instance, the Surgeon General's Report highlights multiple potential "benefits of social media use among children and adolescents." ECF 30-14 at 6; *see Reyes*, 2024 WL 4135626, at *12 (noting Surgeon General's Report's "nuanced view" of social media). And Dr. Kaliebe's declaration admits: "some reviews have found small, mixed, or no clear overall effects." Kaliebe Decl. ¶ 70.

Additionally, "[n]early all of the research" cited by Defendant "is based on correlation, not evidence of causation." *Brown*, 564 U.S. at 800 (citation omitted); *see Reyes*, 2024 WL 4135626, at *13 (noting same problem in similar evidence). The Surgeon General's Report notes: "[m]ore research is needed to fully understand the impact of social media," and "[m]ost prior research to date has been correlational." ECF 30-14 at 4, 11. And Dr. Kaliebe's own conclusions are supported

by only speculative assertions and evidence of correlation. Kaliebe Decl. ¶¶ 67, 72, 78, 87-88; 109, 117, 123, 154 ("appears"; "meta-correlation"; "connection"; "linked to"; "associated with"; "seem to"; "could be"; "positive associations"; "correlates"; "well-documented associations"; "[c]orrelational studies"). Further afield, Kaliebe often cites the purported effects of other technology left unregulated by the Act, like smartphones. *E.g.*, *id.* ¶ 144. This inconclusive evidence is not enough to satisfy heightened First Amendment scrutiny. *Brown*, 564 U.S. at 799.

Defendant also claims that the Act's speech restrictions "further Tennessee's interest in protecting parental authority." Resp. 13. The Supreme Court has rejected such a governmental interest in speech restrictions. *Brown*, 564 U.S. at 803. Here, Defendant has not shown "that 'the Act's restrictions meet a substantial need of parents who wish to restrict their children's access to' social media services and 'cannot do so' otherwise." *Reyes*, 2024 WL 4135626, at *13 (quoting *Brown*, 564 U.S. at 803). Defendant recognizes that, with the existing tools available to them, "[p]arents can regulate their children's access to social media." Resp. 12.; *id.* at 17 ("parents might supervise [their children] (parents can do that anyway)"). "Filling the remaining modest gap in concerned parents' control can hardly be a compelling state interest." *Brown*, 564 U.S. at 803.

**2.** Defendant fails to show the Act is narrowly tailored. Defendant faults NetChoice for identifying "only one narrower alternative." Resp. 13. This ignores that it is *Defendant's* burden to prove narrow tailoring. Regardless, NetChoice highlighted multiple options, including content moderation and parental controls available to parents. *See* Mem. 4. In any event, one alternative is sufficient. *United States v. Playboy Ent. Grp.*, 529 U.S. 803, 815 (2000) ("[I]f a less restrictive means is available . . . , the Government must use it."). Defendant acknowledges the wealth of existing parental tools, but claims they are "less effective than" the Act. Resp. 13 (citation omitted). Less-restrictive alternatives, however, need not be "perfect." *Ashcroft*, 542 U.S. at 668-69;

*Playboy*, 529 U.S. at 824 ("it is no response" that a less restrictive alternative "may not go perfectly every time"). There is no guarantee of the Act's effectiveness either. Dr. Kaliebe says minors evade existing tools, but under his reasoning, minors also could evade the Act too. Kaliebe Decl. ¶ 166.

Defendant argues the Act is not over- and under-inclusive because it had to be tailored this way to work. Resp. 14 (age verification "must cover adults," 18 is "age of majority," and making law "retroactive" would be difficult and possibly unlawful). That fails to meet the "demanding standard" of strict scrutiny. *Brown*, 564 U.S. at 799. The over-inclusiveness of the Act results in the Act burdening more speech than necessary. And its "[u]nderinclusiveness raises serious doubts about whether the government is in fact pursuing the interest it invokes, rather than disfavoring a particular speaker or viewpoint." *Id.* at 802.

Defendant also has no response to the point that if covered websites are genuinely as "dangerous" as Defendant claims, it does "not make sense to" allow minors to access them so "long as one parent . . . says it's OK." *Griffin*, 2023 WL 5660155, at *18 (cleaned up); *see Brown*, 564 U.S. at 802; *Fitch*, 2024 WL 3276409, at *13; *Yost*, 716 F. Supp. 3d at 559-60.[10]

Defendant's emphasis on potential "predators," Resp. 2, is foreclosed by *Packingham v. North Carolina*, 582 U.S. 98, 108 (2017). *Packingham* held that the First Amendment prohibits governments from barring convicted predators from "social media." *Id.* Instead, States must use narrower means like "prohibit[ing] a sex offender from engaging in conduct that often presages a sexual crime." *Id.* at 107. Tennessee already has such laws. Tenn. Code § 39-17-1003. Of course, covered members also have policies they enforce to keep predators off their services. Mem. 4.

---

[10] Defendant raises (Resp. 14) the specter of NetChoice's arguments "apply[ing] to" the federal Children's Online Privacy Protection Act, but that is an entirely different privacy statute dealing with younger minors and does not categorically bar access to protected speech. The Court's ruling would have no effect on COPPA.

13

Relatedly, Defendant neglects the Act's coverage. If the State is concerned about predators, it is not clear why the Act excludes "interactive gaming" and "encrypted messaging apps"—which Defendant's declarants say may be used by predators. ECF 27 ¶¶ 21, 23; *see Griffin*, 2023 WL 5660155, at *19 (exemptions for gaming and messaging services raise tailoring concerns).

### E.  The Act is unconstitutionally vague.

The Act's central coverage definition of "social media compan[ies]," § 47-18-5702(8), is unconstitutionally vague. Mem. 23-24. The Act fails to define the key terms identifying a website's "primar[y]," "incidental," "predominant[ ]," or "general[ ]" functions § 47-18-5702(9)(B)(iii)(*a*)-(*b*), (iv)-(v), (vii)-(viii). In response, Defendant provides no clarity to these terms.

Defendant argues that NetChoice cannot bring a vagueness claim, citing cases involving as-applied challenges. Resp. 19.[11] But NetChoice brings a facial vagueness claim, which is appropriate where a law "reaches a substantial amount of constitutionally protected conduct." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) (citation omitted). And "[s]tricter standards are required where a statute has a potentially inhibiting effect on speech." *Boddie v. Am. Broad. Cos.*, 881 F.2d 267, 270 (6th Cir. 1989) (cleaned up). This is why NetChoice need not show the Act is vague "in all of its applications." Resp. 20 (citation omitted).

Defendant dismisses cases holding that terms similar to those used in the Act are vague. *E.g.*, *Fitch*, 2024 WL 3276409, at *15; *Griffin*, 2023 WL 5660155, at *13. Defendant ignores the overlap in vague terms from other statutes, *see* Mem. 24, by stating that those cases involve "arguments, evidence, and statutory terms not present here," Resp. 21. Defendant also suggests that the Act is permissibly vague because it does not involve criminal penalties. Resp. 20. But the Act's significant civil penalties of $1,000 per violation of its *speech regulations* have the same chilling

---

[11] *See Meriwether v. Hartop*, 992 F.3d 492, 517 (6th Cir. 2021) ("unconstitutionally vague *as applied* to him" (emphasis added)).

effect as analogous criminal fines. § 47-18-108(b)(3).

## II.    The equitable factors support a preliminary injunction.

If not enjoined, the Act will irreparably harm NetChoice's members. Mem. 24-25. First, NetChoice members and their users face First Amendment harms. *See id.* Second, NetChoice members will incur unrecoverable compliance costs for which qualified immunity would likely bar recovery. *E.g.*, *Endres v. Ne. Ohio Med. Univ.*, 938 F.3d 281, 302 (6th Cir. 2019) (citation omitted). And Defendant's speculation that members should have already incurred their compliance costs, Resp. 21-22, is unsupported, ignores the costs of maintaining the systems, and fails to rebut record evidence to the contrary, Pai Decl. ¶¶ 34-37; Paolucci Decl. ¶¶ 17, 26.

The balance of the equities supports a preliminary injunction because it will maintain the status quo ante. Although Defendant characterizes First Amendment rights as "annoyance[s]," Resp. 23, the Sixth Circuit has held "it is always in the public interest to prevent the violation of . . . constitutional rights." *Jones v. Caruso*, 569 F.3d 258, 278 (6th Cir. 2009) (citation omitted).

As for Defendant's argument that a preliminary injunction should be properly tailored, Resp. 24, NetChoice requests that the preliminary injunction apply only to its members with services that are covered by the Act. The Court should enjoin each of the Act's speech restrictions, §§ 47-18-5702(2), (7)-(9); 47-18-5703; 47-18-5704, and if it enjoins enforcement based on the Act's central coverage definition, the other provisions of the Act are not severable. *Contra* Resp. 25. Any other holding would worsen the First Amendment harms by restricting more speech.

### Conclusion

NetChoice requests that this Court preliminarily enjoin Defendant from enforcing the Act against its covered members' websites before the Act takes effect on January 1, 2025.

Dated: November 19, 2024                    Respectfully submitted,

                                            */s/ Junaid Odubeko*
                                            Junaid Odubeko (Bar No. 023809)
                                            BRADLEY ARANT BOULT CUMMINGS LLP
                                            1221 Broadway Suite 2400
                                            Nashville, TN 37203
                                            (615) 244-2582
                                            jodubeko@bradley.com

                                            Steven P. Lehotsky*
                                            Scott A. Keller*
                                            Jeremy Evan Maltz*
                                            LEHOTSKY KELLER COHN LLP
                                            200 Massachusetts Avenue, NW, Suite 700
                                            Washington, DC 20001
                                            (512) 693-8350
                                            steve@lkcfirm.com
                                            scott@lkcfirm.com
                                            jeremy@lkcfirm.com

                                            Jared B. Magnuson*
                                            LEHOTSKY KELLER COHN LLP
                                            3280 Peachtree Road NE
                                            Atlanta, GA 30305
                                            (512) 693-8350
                                            jared@lkcfirm.com

                                            Joshua P. Morrow*
                                            LEHOTSKY KELLER COHN LLP
                                            408 W. 11th Street, 5th Floor
                                            Austin, TX 78701
                                            (512) 693-8350
                                            josh@lkcfirm.com

                                            *admitted *pro hac vice*


                                            *Attorneys for Plaintiff NetChoice*

<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that a true and correct copy of the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon the following on this the 19th day of November 2024.

Thomas McCarthy
Cameron T. Norris
Thomas S. Vaseliou
Consovoy McCarthy PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA  22209

Adam K. Mortara
Lawfair LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN  37215

*/s/ Junaid Odubeko*
Junaid Odubeko

17