IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NETCHOICE,

    *Plaintiff*,

v.

JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter,

    *Defendant*.

Case No. 3:24-cv-01191

## DEFENDANT'S OPPOSITION TO PLAINTIFF'S
## MOTION FOR A TEMPORARY RESTRAINING ORDER

Though NetChoice calls its filing a "motion for a temporary restraining order and renewed motion for a preliminary injunction," Doc.48 at 1, Tennessee will treat it as a "TRO motion," Doc.51. Tennessee has already responded to NetChoice's motion for a preliminary injunction. *See* PI-Opp. (Doc.26). That motion, as NetChoice appreciates, remains "pending," TRO-Br. (Doc.49) at 3, 25; so there is nothing for NetChoice to "renew." And it would be improper for NetChoice to refile the same motion twice, perhaps planning to make new arguments and submit new evidence in its "renewed" reply that it omitted from its original preliminary-injunction motion. This Court should treat the parties' original filings as the relevant papers for purposes of the preliminary injunction (and any interlocutory appeal), *see* Docs.8-9, 26-31, 35, and it should strike or disregard anything new that NetChoice submits in reply to support its still-pending request for a preliminary injunction, *e.g.*, *FDIC v. Bulldog Truck & Equip. Sales*, 2014 WL 12623016, at *8 (N.D. Ga. Jan. 17) (sua sponte disregarding the second version of the same motion).

As for the TRO, NetChoice's motion fails for all the same reasons as its preliminary-injunction motion—plus a few more. NetChoice remains unlikely to succeed on the merits, especially after the Supreme Court's recent decision in *TikTok v. Garland* and the Sixth Circuit's recent stay in *Free Speech Coalition v. Skrmetti*. And NetChoice is even less able to prove irreparable harm in the timeframe that's

relevant for a TRO: from now until this Court decides the preliminary injunction. Tennessee's law has been in effect for nearly a month; none of NetChoice's members are complying with it; and the risk that Tennessee will bring an enforcement action against them in the next few weeks is speculative and not irreparable.

This Court should deny emergency interim relief. Instead of hastily freezing a law enacted by Tennessee's elected representatives to protect children from devastating harms, the Court should send this case to discovery and motions practice—both of which could be reasonably expedited to accommodate NetChoice's concerns.

## BACKGROUND

"[T]he internet in general and social media in particular pose grave risks to children." *M.H. ex rel. C.H. v. Omegle.com LLC*, 122 F.4th 1266, 1268 (11th Cir. 2024). Children now have nonstop access to the internet; and social-media platforms, owned by members of NetChoice, profit from this unprecedented access. These companies make money by forcing account holders, including children, to accept complex contracts that let the platform track them and sell their data. These companies also make money from advertisers, which requires a steady stream of eyeballs. Exploiting the fact that minors' brains are not fully developed, these companies hook children. Their platforms are thus havens for sexual predators, pornography, and cyberbullying. *See* PI-Opp.2-3, 13, 23. In a recent Senate hearing titled "Big Tech and the Online Child Sexual Exploitation Crisis," Meta's CEO acknowledged these well-known harms and apologized to the children who have suffered them on his companies' platforms. *Transcript*, Tech Policy Press (Jan. 31, 2024), perma.cc/Q4VX-WFYT; *accord Transcript*, Tech Policy Press (Jan. 7, 2025), perma.cc/DKA3-U2SJ (Zuckerberg admitting there's "a lot of legitimately bad stuff" on social media, including "child exploitation").

Tennessee, like several States and other countries, responded by passing a law that empowers parents. PI-Opp.2-3; *see, e.g.*, *Australia Passes Social Media Ban for Children Under 16*, Reuters (Nov. 29,

2024), perma.cc/Y4W6-AYUW. In substance, the Protecting Children from Social Media Act requires three main things: age verification, parental consent, and parental supervision. Tennessee passed the Act in May 2024 with an effective date of January 1, 2025. *See* PI-Opp.3-4.

Though NetChoice closely tracked and lobbied against the bill, it waited five months to file this lawsuit and seek a preliminary injunction. PI-Opp.4-5. NetChoice then asked this Court to rule by "December 31," just one day before the Act's effective date. Doc.8 at 1. That choice was suspect: NetChoice claimed that the Act's requirements would force it to spend unrecoverable money coming into compliance and would infringe First Amendment rights. PI-Br. (Doc.9) at 25. But by waiting so long to sue and seeking relief on the last possible day, NetChoice risked that its motion would either be denied or remain undecided when the Act took effect on January 1. Given NetChoice's nonchalance about that risk, Tennessee questioned whether NetChoice's members had already spent the money to comply with the Act's requirements (either voluntarily or because other States and countries already require the same protections). PI-Opp.21-22. Tennessee couldn't have predicted, though, that NetChoice's members were actually planning not to comply with Tennessee's law at all on January 1, even without a preliminary injunction.

NetChoice lost its game of chicken. As it turned out, Chief Judge Campbell had a potential conflict of interest (briefly owning stock of Meta, one of NetChoice's members). Doc.48 at 2-3. So he did not decide NetChoice's preliminary-injunction motion by January 1, and the Act went into effect. Since then, NetChoice has been forced to admit that its members are *not* complying with Tennessee's law. Doc.48 at 4. Still today—nearly a month after the effective date—none of NetChoice's members have adopted any form of age verification. *See* Doc.43 at 1-2 (citing, inter alia, *Are Social Media Platforms Complying with Tennessee's New Age Verification Law?*, WKRN (Jan. 1, 2025 7:44pm), perma.cc/5GLN-7BQA); *see also Intellicheck CEO: Parents, Platforms and Legislation Critical for Age Verification as TikTok Comes Back Online*, PYMNTS (Jan. 21, 2025), perma.cc/SDW7-99VM (former NetChoice member

TikTok, which is back online, does not require age verification either). But unlike many of the laws that NetChoice has challenged so far, Tennessee's law has no criminal penalties. PI-Opp.4, 21. So if companies violate it, only Tennessee's attorney general can investigate and potentially sue for civil penalties. §47-18-5705(a). Enforcement requires a separate legal proceeding. *See* §47-18-5705 (incorporating §47-18-108); §47-18-108(a)(1), (4). That proceeding generally cannot be filed until the entity gets notice, an opportunity to respond, and a chance to resolve the issue. *See* §47-18-108(a)(2)-(3); §47-18-5002(2). All of that takes time, and none of it has started against any entity.

NetChoice has never explained why it waited so long to challenge Tennessee's law. When Tennessee opposed the preliminary injunction on the ground that NetChoice's delay disproved irreparable harm, *see* PI-Opp.21-22, NetChoice said *nothing* in reply, *see* PI-Reply (Doc.35). When NetChoice moved on January 2 to "ascertain the status of its pending motion for a preliminary injunction," it asked this Court to consider "entering a temporary restraining order," Doc.42 at 1, 3, but never acknowledged its role in creating this false emergency. In its reply to *that* motion, NetChoice finally said the word "delay" and claimed that it had given Chief Judge Campbell enough time to rule. Doc.45 at 1. But NetChoice still never explained *why* it waited so long to sue and seek interim relief in the first place.

On January 16, NetChoice filed this "motion for temporary restraining order and renewed motion for preliminary injunction." Doc.48. NetChoice says this filing is "nearly identical" to what it filed in support of its preliminary-injunction motion. Doc.48 at 4. But in its cover motion (not in its brief) NetChoice adds a multi-page footnote where it finally tries to explain its timing. Per NetChoice, three other States passed similar laws with effective dates that were earlier than Tennessee's. *See* Doc.48 at 1-2 n.1. Still, NetChoice gives no reason why it couldn't challenge Tennessee's law soon after it passed, litigating this case alongside those other cases (where NetChoice's briefs and arguments

heavily overlap). And NetChoice admits that no other court has granted it a preliminary injunction *after* the law's effective date. *See id.*

## ARGUMENT

"The same standard generally applies to the issuance of temporary restraining orders and preliminary injunctions," *Tolson v. Washburn*, 2019 WL 1572931, at *6 (M.D. Tenn. Apr. 10) (Richardson, J.) (citing *Ne. Ohio Coal. for Homeless v. Blackwell*, 467 F.3d 999, 1009 (6th Cir. 2006)), so NetChoice shouldn't get a TRO for all the same reasons it shouldn't get a preliminary injunction, *see* PI-Opp.1, 5-25. But its case for a TRO is, if anything, weaker. Recent decisions from the Supreme Court and Sixth Circuit have rejected NetChoice's arguments and vindicated Tennessee's defenses. And recent events disprove NetChoice's irreparable harm, especially its ability to show harm between now and the time needed to resolve its preliminary-injunction motion.

**I.    Recent decisions from the Supreme Court and Sixth Circuit make NetChoice even less likely to succeed on the merits.**

As Tennessee has explained, NetChoice has not met its burden of proving a likelihood of success on the merits, including a "substantial likelihood of standing." *Memphis A. Philip Randolph Inst. v. Hargett*, 978 F.3d 378, 389 (6th Cir. 2020); *see* PI-Opp.5-21. Two recent cases—*TikTok Inc. v. Garland*, 2025 WL 222571 (U.S. Jan. 17), and *Free Speech Coal. v. Skrmetti*, Doc.23 at 1, No. 24-6158 (6th Cir. Jan. 13, 2025), perma.cc/P7DQ-6AW7—confirm the Act's constitutionality.

*TikTok.* NetChoice argues that the Act directly burdens speech, that the Act is content-based, and that the Act fails strict and intermediate scrutiny. *See* TRO-Br.10-22. Tennessee responds that the Act doesn't burden speech, that the Act is at worst content-neutral, and that the Act passes any level of scrutiny. *See* PI-Opp.6-7, 9-14, 16-18. *TikTok* reinforces that NetChoice is likely wrong.

Start with content neutrality. When the government "supports the challenged provisions with a content-neutral justification," then the law is "content-neutral." *TikTok*, 2025 WL 222571, at *6. Here, Tennessee "regulates the covered social-media platforms because their 'special characteristics'

make minors particularly susceptible to sexual exploitation and other collateral harms." PI-Opp.18. That justification is content-neutral because it doesn't "referenc[e] the content of speech on [the covered platforms]" or "reflec[t] disagreement with the message such speech conveys." *TikTok*, 2025 WL 222571, at *6. NetChoice argues that the Act is not content-neutral because the "secondary-effects doctrine … applies only to physical zoning ordinances." PI-Reply 10 (cleaned up). That argument was already wrong under Sixth Circuit precedent, *see Connection Distrib. Co. v. Holder*, 557 F.3d 321, 328-29 (6th Cir. 2009) (en banc), and *TikTok* confirms that it's wrong everywhere. Not a case about zoning, *TikTok* relies on secondary-effects cases like *Ward v. Rock Against Racism*, 491 U.S. 781 (1989). *See* 2025 WL 222571, at *6.

Even if Tennessee's law regulated speech, moreover, it would be content-neutral for other reasons identified in *TikTok*. It does not "target particular speech based upon its content"; "regulate speech based on its function or purpose"; "impose a restriction, penalty, or burden by reason of content" on the platforms; or "facially regulate particular speech because of the topic discussed or the idea or message expressed." 2025 WL 222571, at *5 (cleaned up). Indeed, NetChoice's members "cannot avoid or mitigate the effects of the Act by altering their speech." *Id.* (cleaned up).

*TikTok* also undermines NetChoice's argument that the challenged Act is a speaker-based restriction, which NetChoice says triggers strict scrutiny. PI-Br.16-17. Even if the Act reflected a "speaker preference," it would not trigger strict scrutiny because any "differential treatment is justified by some special characteristic of the particular speaker being regulated." *TikTok*, 2025 WL 222571, at *6 (cleaned up). The covered platforms have "special characteristics … that justify this differential treatment," *id.*—namely, "mak[ing] minors particularly susceptible to sexual exploitation and other collateral harms," PI-Opp.18. "Speaker distinctions of this nature are not presumed invalid under the First Amendment." *TikTok*, 2025 WL 222571, at *6 (cleaned up).

6

*TikTok* also confirms that the Act would pass intermediate scrutiny. NetChoice argues that the Act is "underinclusive," TRO-Br.21-22, but "'the First Amendment imposes no freestanding underinclusiveness limitation,' and the Government 'need not address all aspects of a problem in one fell swoop.'" *TikTok*, 2025 WL 222571, at *7. There is no "doub[t]" that Tennessee is "actually pursuing [its] interest," *id.*, of protecting "the physical and psychological well-being of minors," PI-Opp.13. Tennessee "had good reason to single out [the covered platforms] for special treatment," *TikTok*, 2025 WL 222571, at *7, because they "pose the greatest threat to children," PI-Opp.17. And tailoring "is satisfied so long as the regulation promotes a substantial government interest that would be achieved less effectively absent the regulation and does not burden substantially more speech than is necessary to further that interest." *TikTok*, 2025 WL 222571, at *8 (cleaned up). NetChoice argues that content-filtering is a narrower alternative. TRO-Br.12, 20. But NetChoice's "proposed alternativ[e] ignore[s] the 'latitude' [courts must] afford the Government to design regulatory solutions." *TikTok*, 2025 WL 222571, at *8. NetChoice's proposed alternative is insufficient, faulty, and demonstrably ineffective. *See* PI-Opp.13-14; Allen Decl. (Doc.29) ¶¶47-60. Because the Act's approach is "not substantially broader than necessary" and Tennessee does not "ignore less restrictive approaches already proven effective," the Act would pass heightened scrutiny. *TikTok*, 2025 WL 222571, at *8.

Finally, *TikTok* didn't decide whether the law challenged there even triggered First Amendment scrutiny, but the Court's decision suggests that Tennessee's law does not. The Act does not "itself directly regulat[e] protected expressive activity, or conduct with an expressive component." *Id.* at *4. It directly regulates only commercial activity: "barring certain contracts and requiring 'informed consent.'" PI-Opp.13; *see also* PI-Opp.6 ("mak[ing] companies get parents' permission before contracting with minors"). And it does not directly regulate individuals who want to be account holders. PI-Opp.11-12. So any burden on prospective account holders does not help NetChoice or its members. *See Mata Chorwadi, Inc. v. Boynton Beach*, 66 F.4th 1259, 1265 (11th Cir. 2023) ("The hotel owners

allege that the Code penalizes and chills hotel guests' speech. But on its face, the Code imposes penalties only on the owners …, so the hotel owners cannot rely on the overbreadth doctrine." (cleaned up)). At bottom, the Act's regulation of commercial activity is "different in kind from the regulations of non-expressive activity that [courts] have subjected to First Amendment scrutiny." *TikTok*, 2025 WL 222571, at *4.

*Free Speech Coalition.* The Sixth Circuit's recent stay in *Free Speech Coalition* similarly supports denying NetChoice emergency relief. NetChoice cannot possibly distinguish *Free Speech Coalition*: NetChoice insisted that the district court's reasoning in that case supported its challenge to the Act here. *See* Doc.40. That the Sixth Circuit deemed *that very reasoning* likely incorrect should be fatal for NetChoice. As Tennessee argued and the Sixth Circuit agreed, overbreadth claims are incredibly hard to prove at the preliminary-injunction stage. *Free Speech Coalition*, slip op. at 4-5. The plaintiff, not the defendant, has the heavy burden to show overbreadth. *Id.* at 5 (quoting *Connection*, 557 F.3d at 336). Showing it requires both an adequately developed record and a careful identification and weighing of all the law's constitutional and unconstitutional applications. *Id.* at 4-5. And courts should exercise their discretion to deny preliminary relief when the record or the plaintiff's arguments are lacking, especially since the Supreme Court's forthcoming decision in *Free Speech Coalition v. Paxton* will likely shed substantial light on the constitutional questions surrounding age verification and the internet. *Id.* at 7-8.

Because the plaintiff's arguments and record did not warrant coercive interim relief in *Free Speech Coalition*, NetChoice's arguments and record cannot warrant that relief here. NetChoice never grapples with the Act's many constitutional applications. *See* PI-Opp.10 (listing examples). It even concedes that the Act is constitutional for minors under 13. *See* PI-Reply 13 n.10. And *Free Speech Coalition* confirms that the Act is constitutional for "pornography" websites. Slip op. at 5. Several social-media platforms are pornographic, *see* PI-Opp.2, 10; and according to the district court in *Free*

*Speech Coalition*, even the major social-media websites are rife with pornography, Doc.41 n.* (citing 2024 WL 5248104, at *15-16). As for the supposedly unconstitutional applications of Tennessee's law, NetChoice impermissibly relies on "hypotheticals." *Free Speech Coalition*, slip op. at 5. It points to "hypothetical" adults, *id.*, who wouldn't create social-media accounts if they had to verify their age—with no record evidence comparing the burdens of age verification to the burdens that social-media companies *already* impose on account holders, or accounting for the Act's built-in privacy protections, PI-Opp.11-12. Because NetChoice submitted none of the required evidence, it has not carried "Plaintiff['s] burden of demonstrating substantial overbreadth relative to [the Act's] plainly legitimate sweep." *Free Speech Coalition*, slip op. at 5 (cleaned up).

*Free Speech Coalition* and many other recent cases reinforce that preliminary injunctions against state laws based on overbreadth are supposed to be drastic and unusual. *See* Doc.34 (discussing *Moody v. NetChoice, LLC*, 144 S.Ct. 2383 (2024), and the Fifth Circuit's decision on remand). Many plaintiffs allege that statutes are unconstitutional, but those claims are normally and better decided after discovery, on a nonemergency basis. So too here.

**II.     NetChoice cannot prove the irreparable harm needed for a TRO.**

As Tennessee has also explained, NetChoice has not made the necessary showings on the equitable factors. *See* PI-Opp.22-23. NetChoice's preliminary-injunction motion could be denied solely for lack of irreparable harm, PI-Opp.21-22, and that defect is even more glaring for NetChoice's still-more-belated request for a TRO. NetChoice cannot justify the "extraordinary and drastic remedy" of emergency coercive relief here. *S. Glazer's Distribs. of Ohio v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017).

Though NetChoice waited five months to seek a preliminary injunction, it didn't seek a TRO until *after* Tennessee's law took effect. The "purpose" of a TRO is "preserving the status quo to give a court time to determine whether a preliminary injunction is warranted." *A&W X-Press, Inc. v. FCA*

*US, LLC*, 2022 WL 2759872, at *3 (6th Cir. July 14). But granting a TRO now would disrupt the status quo, since the Act is in effect and has been for nearly a month. And it makes little sense to grant a TRO to buy time to consider a preliminary injunction, since the preliminary-injunction motion has been pending for longer, the Act's effective date has already passed, and the arguments and evidence in support of NetChoice's TRO are "identical" to the arguments and evidence supporting its preliminary injunction, Doc.48 at 4.

For similar reasons, NetChoice cannot show irreparable harm in the timeframe that's relevant to a TRO. Preliminary injunctions and TROs perform "different functions." *Hoechst Diafoil Co. v. Nan Ya Plastics Corp.*, 174 F.3d 411, 422 (4th Cir. 1999). While "a preliminary injunction preserves the status quo pending a final trial on the merits," TROs "preserve the status quo only until a preliminary injunction hearing can be held." *Id.* So movants cannot get a TRO unless they prove harms "so immediate and irreparable that they will occur in the period between [now] and a future preliminary-injunction hearing." *Shenzhen Root Tech. v. Chiaro Tech.*, 2023 WL 3937394, at *3 (W.D. Wash. May 17). NetChoice cannot make *that* showing. It doesn't even try, instead rehashing the same theories of irreparable harm from its preliminary-injunction motion. Those theories also remain unpersuasive (and are now disproven).

**Compliance & Constitutional Theories**: Before the Act went into effect, NetChoice said it needed relief before January 1 because complying with the Act's requirements would cost it money and chill free speech. But January 1 arrived, and it's now clear that NetChoice's members are *not* complying with the Act's requirements. The Act is not costing them anything because they aren't doing anything. And the Act is not chilling anyone's speech because they haven't implemented its threshold age-verification requirement. Dreamwidth has not spent its entire "'budget'"; it's still up and running. *Cf.* TRO-Br.25. And though NextDoor tweaked its terms to say that Tennessee minors cannot create accounts, TRO-Br.25, that self-inflicted harm is not traceable to the Act. The Act requires

age verification, which NextDoor still hasn't implemented. Doc.43 at 1-2; Doc.48 at 4. And the Act leaves NextDoor free to "curate and disseminate speech to minors in Tennessee," Doc.48 at 3, since minors can be existing account holders, NextDoor can let them visit without creating accounts, and NextDoor can let them create accounts with parental consent and supervision, *see* PI-Opp.12-13.

None of these harms were ever irreparable anyway. NetChoice's constitutional claims likely fail. PI-Opp.5-21. NetChoice has also never explained how the Act harms *its members'* free-speech rights, PI-Opp.6-7, 16, and NetChoice cannot get extraordinary relief based on constitutional harms to third-party adults and children that it doesn't directly "represen[t]" and that aren't directly regulated by the Act, *Tenn. Conf. of the NAACP v. Lee*, 105 F.4th 888, 898 (6th Cir. 2024); *see* PI-Opp.7-9. Its members' compliance costs, moreover, are not irreparable because financial harms can be recovered via money damages. NetChoice repeats the fiction that "sovereign immunity" makes those damages unrecoverable. TRO-Br.25. But it knows that its members could seek damages by suing Tennessee officials in their personal capacities. PI-Opp.21. While the members would have to overcome qualified immunity, NetChoice thinks they can, since it says the merits of their constitutional claims are "clear." PI-Reply 5. And a *possibly* meritorious defense of *qualified* immunity, as opposed to an *obviously* meritorious defense of *sovereign* immunity, does not transform a monetary loss into the kind of irreparable harm that warrants interim relief. *See Border Area Mental Health Servs., Inc. v. Squier*, 2013 WL 12140453, at \*7 (D.N.M. July 25); *Kennedy v. Bd. of Cnty. Commissioners of Santa Fe Cnty.*, 2023 WL 8827729, at \*5-6 (D.N.M. Dec. 21); *cf. Tenn. NAACP*, 105 F.4th at 898 (doubting, in a case against a Tennessee official, that "the extra time and money incurred" to comply with state law could be "irreparable" (citing *Sampson v. Murray*, 415 U.S. 61, 90 (1974))).

NetChoice is choosing noncompliance for a reason, one that's related to its delay in bringing this case. As Tennessee explained, NetChoice's members didn't need relief before December 31 because they've likely spent the time and resources to comply with the Act's reforms already. PI-Opp.21-

22. If its members started complying with Tennessee's law now that it's in effect, then their actions would prove how quickly and easily these reforms can be implemented (and how many need no implementation because the companies were doing them already, *see* PI-Opp.16, 21). Further, Tennessee has explained how commonsense reforms like age verification would not deter objectively reasonable adults from creating social-media accounts. *See* PI-Opp.11-12, 22. Compliance by NetChoice's members would again prove Tennessee right, as the companies would have empirical proof that the Act's reforms did not decrease the number of new accounts, the number of visitors to their sites, and the like. This Court should not credit theories of irreparable harm about what would happen *if* NetChoice's members complied with Tennessee's laws, when those members are actively refusing compliance so that the reality of those harms cannot be proven or disproven.

If NetChoice has another explanation for its five-month delay, then it hasn't provided it—not even in its brand-new, pages-long footnote in its cover motion. Though the point of NetChoice's footnote is unclear, NetChoice seems to be suggesting that it waited five months to sue because its lawyers were busy litigating similar cases in four other States. *See* Doc.48 at 1-2 n.1. If that's NetChoice's excuse, then it has no excuse. NetChoice is a "sophisticated claimant" and "experienced litigator" with vast resources and a large legal team. *Cummings v. John Morrell & Co.*, 36 F.3d 499, 507 (6th Cir. 1994). By Tennessee's count, NetChoice is represented—in the age-verification cases alone—by 27 lawyers and 8 law firms. Not to mention its members span all the major social-media companies, who have billions of dollars, large in-house legal teams, and access to nearly all the nation's largest law firms. NetChoice is capable of handling multiple cases and briefs at once. *See Litigation Center*, NetChoice (last accessed Jan. 23, 2025), netchoice.org/litigation/. And NetChoice admits that all these state age-verification laws are "similar," TRO-Br.1, meaning it can (and does) reuse many of the same pleadings, arguments, and briefs. *See NetChoice Cases*, NetChoice (last accessed Jan. 23, 2025), netchoice.org/category/netchoice-cases/. Here, NetChoice can apparently draft a brief in 11 business

days, *see* Doc.48 at 2, or even two business days, Doc.51; and it told Chief Judge Campbell that he needed only 26 business days (over the holidays) to draft an opinion granting a preliminary injunction, *see* Doc.45 at 1.

NetChoice has no justification for waiting 105 business days after the Act passed to challenge it. Its five-month delay prejudiced the State by forcing it to retain experts, collect evidence, and prepare its defense on an artificially compressed basis. Such unexplained delays defeat interim relief. *Tenn. NAACP*, 105 F.4th at 898; *e.g.*, *Corizon, LLC v. Wainwright*, 2020 WL 6323134, *7-11 (M.D. Tenn. Oct. 28) (Richardson, J.) (three months); *Bos. Parent Coal. for Acad. Excellence v. Sch. Comm. of Bos.*, 996 F.3d 37, 50 (1st Cir. 2021) (four months); *Wreal, LLC v. Amazon.com*, 840 F.3d 1244, 1248 (11th Cir. 2016) (five months).

**Enforcement Theory**: NetChoice's only remaining theory of irreparable harm is the supposed risk of "enforcement" by Tennessee's attorney general and "potentia[l]" civil "penalties," TRO-Br.25; Doc.48 at 3. Even if enforcement were irreparable, the risk that one of NetChoice's members will face that harm between now and a decision on the preliminary injunction—the time period relevant to a TRO—is zero. As explained, enforcement would require a separate legal proceeding that could be brought only after the target got notice, an opportunity to respond, and a chance to resolve the issue. *See* §47-18-5705 (incorporating §47-18-108); §47-18-108(a)(1)-(4); §47-18-5002(2). Tennessee has not even begun starting that process yet for any social-media company. So this "hypothetical threat of prosecution is not an 'immediate,' 'irreparable' injury that warrants the 'extraordinary remedy' of a preliminary injunction," let alone a TRO. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019); *accord Memphis*, 978 F.3d at 391 ("To merit a preliminary injunction, an injury must be both certain and immediate, not speculative or theoretical." (cleaned up)).

Nor was this speculative risk of enforcement ever irreparable. *See MetroBanc v. Fed. Home Loan Bank Bd.*, 666 F. Supp. 981, 984-85 (E.D. Mich. 1987). True, a credible threat of enforcement helps

13

Case 3:24-cv-01191    Document 54    Filed 01/23/25    Page 13 of 15 PageID #: 1972

prove that a plaintiff has standing to bring a preenforcement challenge. *Cf.* Doc.45 at 1-2. But a "prospective injury that is sufficient to establish standing … does not necessarily satisfy the more demanding burden of demonstrating irreparable injury." *Cal. Ass'n of Priv. Postsecondary Sch. v. DeVos*, 344 F. Supp. 3d 158, 170 (D.D.C. 2018); *accord Ctr. for Food Safety v. Vilsack*, 636 F.3d 1166, 1171 n.6 (9th Cir. 2011) ("plaintiff may establish standing to seek injunctive relief yet fail to show the likelihood of irreparable harm necessary to obtain it"); *Salix v. U.S. Forest Serv.*, 944 F. Supp. 2d 984, 1002 (D. Mont. 2013) ("'Establishing injury-in-fact for the purposes of standing is less demanding than demonstrating irreparable harm to obtain injunctive relief.'"). "If every plaintiff with Article III standing was permitted to circumvent the showing of irreparable harm for injunctive relief, the irreparable harm requirement would be meaningless." *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 2024 WL 3912946, at *7 (E.D. Ky. Aug. 22). And "if the mere threat of prosecution were allowed to constitute irreparable harm," "courts' exercise of their equitable jurisdiction would not be extraordinary, but instead quite ordinary." *Trump v. United States*, 2022 WL 4366684, at *8 (11th Cir. Sept. 21) (cleaned up). The risk of enforcement here is not irreparable because, even if NetChoice could prove that one of its members will be imminently investigated, noticed, unable to reach a resolution, and sued, that member could raise the same constitutional arguments that NetChoice is raising here as a defense in the "enforcement proceedings." *MetroBanc*, 666 F. Supp. at 985.

## CONCLUSION

For all these reasons, this Court should exercise its discretion to deny NetChoice's motion.

Date: January 23, 2025

JONATHAN SKRMETTI
Attorney General and Reporter

Matthew D. Janssen, BPR No. 35451
Brian Phelps, BPR No. 40705
Sr. Assistant Attorneys General/
Managing Attorneys
OFFICE OF THE ATTORNEY GENERAL
CONSUMER PROTECTION DIVISION
UBS Building, 20th Floor
315 Deaderick Street
Nashville, TN 37243
(615) 741-1671
matthew.janssen@ag.tn.gov
brian.phelps@ag.tn.gov

Respectfully submitted,

/s/ *Cameron T. Norris*
Thomas R. McCarthy*
Cameron T. Norris, BPR No. 33467
Thomas S. Vaseliou*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Suite 700
Arlington, VA 22209
(703) 243-9423
cam@consovoymccarthy.com

Adam K. Mortara, BPR No. 40089
LAWFAIR LLC
40 Burton Hills Blvd., Ste. 200
Nashville, TN 37215
(773) 750-7154

*admitted pro hac vice*

*Attorneys for Defendant*

## CERTIFICATE OF SERVICE

On January 23, 2025, I e-filed this document with the Court, which automatically emailed everyone requiring notice.

/s/ *Cameron T. Norris*