IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

NETCHOICE, )
 )
     Plaintiff, )
 )
 ) NO. 3:24-cv-01191
v. ) JUDGE RICHARDSON
 )
JONATHAN SKRMETTI, in his official )
capacity as the Tennessee Attorney )
General and Reporter, )
 )
     Defendant. )

**<u>ORDER</u>**

Pending before the Court is Plaintiff's motion for a temporary restraining order[1] (Doc. No. 48, "TRO Motion"), which was filed after Plaintiff's motion for a preliminary injunction (Doc. No. 8, "PI Motion"), which also remains pending.

Via the PI Motion, Plaintiff, the trade association NetChoice, seeks an order preliminarily prohibiting Defendant (and his agents and those acting in concert with him) from enforcing Tennessee House Bill 1891 ("the Act") with respect to Plaintiff members' websites that are within the scope of (i.e., covered by) the Act.[2] With the PI Motion still pending, Plaintiff (for apparent reasons and under circumstances explained below), filed the TRO Motion together with several exhibits (Doc. Nos. 48-1–48-5) and a supporting memorandum of law (Doc. No. 49). Defendant, the Attorney General and Reporter for the State of Tennessee, filed a response in opposition to the

---

[1] The Court generally uses herein the common abbreviation for temporary restraining order, i.e., "TRO."

[2] Via the Motion, Plaintiff sought to enjoin enforcement prior to the Act taking effect on January 1, 2025. This Court treats the Motion as seeking to enjoin Defendant from further enforcing the Act now that the Act has taken effect.

TRO Motion (Doc. No. 54), to which Plaintiff filed a Reply (Doc. No. 55). Thereafter, relevant to both the TRO Motion and the PI Motion, Plaintiff filed a notice of supplemental authority (Doc. No. 56), to which Defendant filed a response (Doc. No. 57).

The Court denies the TRO Motion, and leaves pending the PI Motion, for the reasons stated herein.

GENERAL[3] FACTUAL AND PROCEDURAL BACKGROUND[4]

A. Overview of the Case

This case concerns Plaintiff's legal challenge to Tennessee House Bill 1891 (the "Act"), a recently enacted statute imposing, with respect to social media platforms, both age-verification requirements and parental-consent requirements for minors. The Act was enacted on May 2, 2024 and took effect on January 1, 2025. According to its preamble, the Act relates to "protecting children from social media"; according to Defendant, the contemplated "protect[ion]" is protection from "harms includ[ing] mental-health problems (depression, anxiety, and self-harm), loss of sleep, academic declines, and increased risk of sexual exploitation." (Doc. No. 26 at 31). Plaintiff NetChoice, a trade association representing social media companies, has filed this action on behalf of its members, contending that the Act violates the First Amendment.

---

[3] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page ___ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

[4] The following facts, unless somehow qualified herein, are taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice. The Court notes that there are severe factual uncertainties and does its best to parse through them under the accelerated timelines that the Motion demands.

The Act contains requirements in two (and only two) sections of the Tennessee Code. In other words, in only two sections ("Operative Sections") does it contain provisions regarding what persons must do or refrain from doing (under particular circumstances); all other sections of the Act serve some purpose other than prescribing requirements.

The first of the Operative Sections contains what the title of the section calls "age requirements for use of social media platforms." Tenn. Code Ann. § 47-18-5703. The content of the statute outlines those requirements, stating in full as follows:

> (a)
>
>> (1) A social media company shall verify the age of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder.
>>
>> (2)
>>
>>> (A) If the individual is a minor, then the social media company must verify the express parental consent for the minor to become an account holder.
>>>
>>> (B) A social media company shall prohibit a minor from becoming an account holder unless the social media company has the express consent of the minor's parent to allow the minor to become an account holder.
>>
>> (3) Once age and parental consent, if applicable, have been verified to confirm that an individual may become an account holder, then the social media company is not required to reverify the individual's age and parental consent, unless parental consent is revoked.
>
> (b) A social media company shall allow a parent to revoke consent for a minor to become or continue as an account holder.
>
> (c) A social media company or third party shall not retain personally identifying information that was used to verify age or parental consent.

*Id.*

Notably, a "social media company" is defined as a "[legal or natural] person that is an interactive computer service and that provides a social media platform[.]" Tenn. Code Ann. § 47-18-5702(8). In turn, "social media platform" is defined as a website or internet application that "(i) [a]llows a person to create an account; and (ii) [e]nables an account holder to communicate with other account holders and users through posts." Tenn. Code Ann. § 47-18-5702(9)(A). Exempted from that definition (even if it otherwise would apply),[5] however, are various specified electronic, internet, or online services (or applications, platforms, websites), as well as "online shopping." Tenn. Code Ann. § 47-18-5702(9)(B). Additionally, "account holder" means "a person who has an account or profile to use a social media company's platform, with such account or profile having been created on or after January 1, 2025[.]" Tenn. Code Ann. § 47-18-5702(1). And "minor" means "an individual who is: (A) [k]nown or reasonably believed by a social media platform to be under eighteen (18) years of age; (B) [n]ot emancipated; and (C) [a] resident of this state." Tenn. Code Ann. § 47-18-5702(4).

This section is properly viewed as imposing on each and every social media company three requirements, which the Court next summarizes in a paraphrasing that takes into account as necessary the above-referenced statutory definitions. The first requirement ("age-verification requirement") is that the social media company verify the age of each person who attempts to become an account holder. *See* Tenn. Code Ann. § 47-18-5703(a)(1). The second requirement ("parental-consent requirement") is that for any such person who is a minor, the social media

---

[5] It appears to the undersigned that some of the kinds of things exempted from the definition of "social media platform" would not necessarily—and would not, at least in some instances—come within the definition of the term to begin with and thus would not be excluded from the term. But either way—whether solely because it is excluded, or additionally because it did not fall within the definition of "social media platform" to begin with—any instances of such services (or applications, platforms, websites) ultimately would fall outside the definition of "social media platform."

company verify express parental consent for the minor to become an account holder. *See* Tenn. Code Ann. § 47-18-5703(a)(2)(A). And the third requirement is that, absent such parental consent for a would-be minor account holder, the social media company prohibit the minor from becoming an account-holder.[6]

The second of the Operative Sections, which immediately follows the first, contains requirements ("supervision-option-requirements")[7] related to what the title of the section calls "parental supervision." Tenn. Code Ann. § 47-18-5704. The content of the statute outlines those requirements, stating in full as follows:

> A social media company shall provide a minor account holder's parent with means for the parent to supervise the minor's account. Such means must include options for the parent to view privacy settings on the account, set daily time restrictions, and implement breaks during which the minor cannot access the account.

*Id.* In context, the requirements here are that with respect to accounts of minor account holders, the social media company provide the respective parents with "means" for "supervis[ing]" the minor's account—meaning, at a minimum, account-specific options including options for viewing privacy settings, setting daily time restrictions, and blocking the minor's access to the account at particular times. Notably, nothing in this section requires parents to exercise any of the options

---

[6] Defendant seems to conceive of the second and third requirements as being a single requirement that he calls "parental consent." (Doc. No. 26 at 4). Although this approach and terminology are certainly not absurd or disingenuous, it does ignore the fact that the Act imposes not merely a requirement to obtain parental consent, but also a different (albeit closely related) requirement (to prohibit the minor from becoming an account holder absent parental consent). To say that parental consent is required is not necessarily to say—expressly, in no uncertain terms, without qualification and with no exceptions—what happens if the required consent is not obtained. For what it is worth, presumably the drafters of the Act themselves felt that the third requirement was not fully and entirely encompassed within the second requirement; otherwise there would have been no need to include subparagraph (a)(2)(B), which contains what it is that the undersigned considers the third requirement.

[7] The section can reasonably be viewed either as imposing either a single requirement with certain sub-requirements for meeting that requirement or as imposing multiple requirements. Either way, the Court deems it appropriate to refer to the section as imposing requirement*s*, plural.

that they are required by this section to be provided by social media companies; by their terms, the supervision-option requirements are imposed only on the social media companies and are requirements only to make the "means" available for use at parents' *option*.

Defendant, who unsurprisingly is sued in his official capacity only, argues that the Act addresses a growing public health crisis, as outlined in studies linking excessive social media use to negative outcomes for minors such as anxiety, depression, and self-harm. Research cited by Defendant points to the role of algorithms in promoting addictive behaviors, the prevalence of cyberbullying, and the exposure of minors to harmful or exploitative content. (Response at 34). Further, Defendant claims that the requirements of the Act are necessary to fill gaps left by self-regulation in the tech industry, which has often been criticized for allegedly prioritizing profit over user safety.

Plaintiff argues that the legislation represents a sweeping overreach that imposes burdensome compliance costs on platforms while failing to account for less restrictive means to achieve the Act's objectives. It also contends that the Act's broad and ambiguous definitions could lead to inconsistent enforcement, leaving platforms uncertain about their obligations under the Act.

Plaintiff asserts that the Act imposes unconstitutional burdens on both minors' and adults' access to protected speech. It contends that the age-verification and parental-consent requirements violate the First Amendment by restricting lawful access to content based on user identity and age. Plaintiff highlights what it sees as a potential downside to requiring age verification by adults, which could deter adults from accessing speech that is lawful for adults (if not necessarily minors) to consume and participate in. It further contends that the parental-consent requirement unduly restricts minors' access to constitutionally protected speech, effectively treating all minors

(irrespective of how far under age 18 they may be) as if they lack the capacity to make any decisions about their online activity.

Plaintiff also argues that the Act is unconstitutionally vague because (according to Plaintiff) its definitions and requirements fail to provide clear guidance to regulated entities, leaving those entities susceptible to arbitrary enforcement. For example, key terms in the Act such as "social media platform" and "interactive communication" are susceptible to disparate interpretations. This vagueness, Plaintiff argues, creates a chilling effect—due to fear of liability for noncompliance—on the willingness of its members to host a broad range of (lawful) user-generated content.

B. Procedural History

Plaintiff initiated this action by filing the complaint (Doc. No. 1) on October 3, 2024. In the Complaint, Plaintiff made allegations consistent with the above-referenced arguments it later made in support of the TRO and PI Motion. Plaintiff alleged that the Act in its entirety (or at least with respect to the two Operative Sections, as well as various definitions pertinent to the Operative Sections) violated the First Amendment, and also is void for vagueness under both the First Amendment and the Due Process Clause of the Fourteenth Amendment. Plaintiff requested declaratory and injunctive relief consistent with these alternative allegations.

On October 3, 2024, Plaintiff filed the PI Motion along with a memorandum in support (Doc. No. 9, "Memorandum"), contending that immediate relief, or at least relief before the Act's effective date nearly three months hence, was necessary to avoid irreparable harm to its members and their users. Plaintiff supported this contention with several declarations (Doc. Nos. 8-2—8-4) from industry experts and representatives of Plaintiff's member companies, which asserted the

existence of various financial and operational burdens imposed by the Act as well as the Act's potential to undermine users' access to a diverse range of online content.

This case was initially assigned to Chief United States District Judge William L. Campbell, Jr., but was reassigned to the undersigned following a recusal by Judge Campbell on January 15, 2025. (Doc. No. 47). While Judge Campbell was still presiding, the Act went into effect—on January 1, 2025—without any decision on the PI Motion and without Plaintiff having moved for a TRO.

True, the PI Motion did state (in bold letters, for what that is worth) that Plaintiff requested a PI no later than December 31, 2024. (Doc. No. 8 at 1). And Judge Campbell granted via margin order a joint motion for a scheduling order that stated—in its preamble, not its substantive/operative provisions—that Plaintiff sought a PI before "[t]he Act's effective date: January 1, 2025." (Doc. No. 23 at 1). But Judge Campbell was not required, even presumptively, to meet that timeframe, and he never indicated that he would.

And as the Act's effective date actually approached, Plaintiff did not signal a sense of urgency for the PI Motion to be decided before the Act's effective date—which would not be the equivalent of a motion for a TRO but would at a minimum be something to suggest that at least *Plaintiff* thought that the need for temporary injunctive relief was as time-sensitive as the TRO Motion suggests. The best Plaintiff mustered was a belated and rather muted signal—in a document not styled as a motion or even any request for relief, but rather as a "Notice of Supplemental Authority" wherein Plaintiff "respectfully request[ed] that this Court enjoin Defendant from enforcing the Act against NetChoice's regulated members before tomorrow, January 1, 2025." (Doc. No. 40 at 2). As was a matter of public record and notification per this Court's Administrative Order No. 102, the date of filing of that document, New Year's Eve, was

a court holiday after 12:00 p.m.[8] And a filing on a court holiday requesting relief before the following day (also a holiday) is not a serious indication that the filer truly believes that relief must be had before the following day.

The Act went into effective prior not only to the PI Motion being decided, but also prior to Plaintiff having filed a motion to ascertain the status of the PI Motion. True, Plaintiff did file such a motion (Doc. No. 42), which has remained pending until this very order, but not until January 2, 2025.

The record is telling as to whether, at the time of Judge Campbell's recusal, which was 15 days after the Act went into effect, Plaintiff was of the view that it needed (temporary) injunctive relief immediately. What the record indicates is that Plaintiff was not concerned. In "Plaintiff NetChoice's Opposed Motion to Postpone Initial Case Management Conference" (Doc. No. 46), filed on January 14, 2024, Plaintiff stated, "The parties and the Court would benefit from further developments in the litigation before the initial case management conference. NetChoice's preliminary injunction motion is still pending. The resolution of that motion may bear on what the parties propose in the joint proposed case management order." (*Id.* at 1). The undersigned views this as objectively manifesting a subjective belief on the part of Plaintiff that resolution of that motion—i.e., that request for temporary injunctive relief—was not a matter of immediacy, but rather something that could wait. Notably, Plaintiff mentioned that "Chief Judge Campbell informed the parties last week about a potential disqualification issue." (*Id.*).

LEGAL STANDARD

---

[8] This, of course, does not mean that any individual judge would not be working after 12:00 p.m.; in fact, at least one worked long past that time that day. But it does reduce even further the low odds that Plaintiff's desired relief as of December 31 would become realized later that same day as requested that same day.

A TRO[9] is "an extraordinary and drastic remedy," *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 22 (2008), A party seeking a TRO[10] must meet four requirements.[11] The party must show a likelihood of success on the merits; irreparable harm in the absence of the injunction; that the balance of equities favors the party; and that the public interest favors an injunction. *Winter v. Nat. Res. Def. Council*, 555 U.S. 7, 20 (2008); *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022).

The decision to grant or deny a temporary restraining order falls within the discretion of a district court. See *Ohio Republican Party v. Brunner*, 543 F.3d 357, 361 (6th Cir. 2008). Regarding this discretion, the undersigned previously has written, in the context of a motion for a preliminary injunction:

> It is often stated that a district court has discretion to grant or deny preliminary injunctions. *See, e.g., Planet Aid v. City of St. Johns*, 782 F.3d 318, 323 (6th Cir. 2015). If that is the case, then it follows that the district court has the discretion to grant or deny a preliminary injunction even if the movant has shown (by satisfaction of the four requirements) that it is at least *eligible* for a preliminary injunction; otherwise, the district court's heralded discretion to deny a preliminary injunction would be illusory because it would have no discretion to deny a preliminary injunction to any movant that is eligible for one.

---

[10] The Court here cites case law framed in terms of a preliminary injunction even though the Court here is addressing only Plaintiff's request for a TRO. This is appropriate inasmuch as such case law is applicable to a request for a TRO as it is to a preliminary injunction because "[a] motion for temporary restraining order is considered under the same standard as a preliminary injunction." *G.S. v. Lee*, 558 F. Supp. 3d 601, 608 (W.D. Tenn. 2021). And regarding the remedy being "extraordinary and drastic," the language is, if anything, in some respects even more drastic given the extra level of time-sensitive emergency typically conveyed via a motion for TRO as compared to a motion for a preliminary injunction.

[11] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with more recent Sixth Circuit case law and with Supreme Court case law describing these as all being requirements. The Court believes that it is constrained to follow the latter line of cases.

*Doe v. Rausch*, No. 3:24-CV-01403, 2025 WL 57711, at *4 (M.D. Tenn. Jan. 9, 2025) (footnote omitted). And in the footnote omitted from the above quote, the undersigned explained:

> It only makes sense for the district court to have such discretion. After all, a preliminary injunction is an extraordinary remedy, one with a particular primary purpose (preserving the status quo). It stands to reason that a district court should have discretion in deciding whether—even if it can check the box on each of the four requirements—such an extraordinary remedy is unjustified by the circumstances as a whole and or would fail to preserve the status quo (and instead would change the status quo).

*Doe v. Rausch*, No. 3:24-CV-01403, 2025 WL 57711, at *4 (M.D. Tenn. Jan. 9, 2025).

<u>ANALYSIS</u>

It bears emphasizing why a TRO (or preliminary injunction) is deemed an extraordinary remedy subject to stringent requirements: the party receiving it is treated in some respects, for a period of time while the litigation is ongoing, as if it had prevailed on its claims even though it has not yet done so and could not possibly do so (if ever) until the litigation is concluded. It is no small thing for a party to be treated (even if only temporarily and for a limited purpose) as if it had ultimately prevailed on the merits of its claims when in fact it has not yet done so.

A court being asked to grant such an extraordinary remedy understandably might be reluctant to find the remedy warranted even if the four requirements are satisfied. These requirements—daunting though they are—are satisfied by mere *likelihood* of success on the merits, rather than actual success on the merits. And if they are established, they are established based on a record that is tentative and incomplete (often even more so in the case of a TRO than in the case of a PI). True, in past cases, their establishment very often seems to have been enough, by itself, to persuade the presiding judge to grant the requested relief. But some cases may be appropriate for denial of this extraordinary relief even if (or assuming arguendo) that the requirements have been satisfied.

This is such a case. The record in this case, discussed above, suggests that even as late as January 14, Plaintiff's own attitude was that—however nice temporary relief might have been prior to January 1, and, failing that, however nice such relief might be prior to a reasonably prompt decision on the PI Motion—such relief can await a reasonably prompt decision thereafter on the PI Motion. Under such circumstances, the Court declines to respond to the new purported urgency for an earlier decision. Plaintiff explains the new urgency as follows:

> When the court took no action by January 1, 2025, NetChoice was forced to ascertain the status of the case, ECF 42, wait for a status conference, ECF 44, and wait for recusal and reassignment, ECF 47. NetChoice had no reason to expect that it would learn a week after the Act's effective date that the judge might recuse and the case would be reassigned. By that time, the changed facts necessitated a TRO request.

(Doc. No. 55 at 6).[12] The Court cannot accept this purported justification. At its heart, it simply does not explain why, if temporary relief was essential in advance of whatever time it might take after January 15 for the PI motion to be decided, that became clear only after Judge Campbell's recusal on January 15. On January 15, and even prior to recusal that day, Plaintiff was still on an uncertain timetable as to any temporary injunctive relief, and the recusal did not make that situation objectively any worse.

To the extent that Plaintiff and its counsel's decisions prior to reassignment concerning a potential TRO motion were driven by a certain sense of decorum, tact, patience, etc., that is laudable. It strikes the undersigned that in this respect, counsel displayed professionalism and decency. But the fact remains that the mere ability that the Plaintiff's side was able to choose this commendable approach is starkly inconsistent with the notion that Plaintiff, lest it suffer

---

[12] To the extent that Plaintiff is disappointed by the lack of earlier action of the Court, the undersigned certainly understands and does not begrudge that, especially since Plaintiff is not gratuitous in complaining about this. The undersigned will resist the urge to comment on the extent to which the heavy caseloads for all of the Court's judges pose great risks to even reasonable expectation of parties as to when even time-sensitive decisions might be issued.

irreparable injury, had to have temporary injunctive relief: (a) before the Act became effective on January 1, 2025; or (b) before January 15, 2025; or even (c) before some as yet unknown date (provided it not be *too* far in the future) when the PI Motion would eventually be decided to potentially afford Plaintiff meaningful injunctive relief prior to the ultimate conclusion of the case. In short, the choices made on the Plaintiff's side —laudable and understandable though they may be—are not consistent with the notion that Plaintiff requires a TRO now, rather than in the relatively near future (and perhaps, depending on the ultimate length of this litigation, long prior to when its requested preliminary injunction will have run its course).

There is a second, supplemental reason for the Court to decline in its discretion to grant the requested TRO. As noted, although preserving the status quo (until a hearing on a motion for preliminary injunction can be held) is not *a requirement for* a TRO, it is *the purpose of* a TRO. And where a proposed TRO would not serve the purpose of a TRO, a court well might in its discretion properly decline to issue the proposed TRO even if (or assuming arguendo) the requirements for one are satisfied. Such is the case here.

Unlike in some cases, where the "status quo" can be in the eye of the beholder, there is no objectively reasonable doubt as to what the status quo is here. The status quo is that the Act is fully in effect. And this was the status quo for weeks before the TRO Motion was even filed. It is readily apparent that the requested relief would not preserve the status quo but rather would change it 180 degrees. So the Court is dissuaded from issuing the requested TRO for this additional reason as well.

The Court will forgo addressing other possible reasons for denying the TRO Motion irrespective of whether the PI Motion proves meritorious. Instead it will direct its continuing resources in this case towards the still-pending PI Motion.

<u>CONCLUSION</u>

The TRO Motion (Doc. No. 48) is DENIED, for the reasons set forth herein.

The motion to ascertain status of the PI Motion (Doc No. 42) is GRANTED via the following statement of status. The Court intends—consistent with its remarks above—to resolve the PI Motion soon, and it notes its view that nothing in the Court's rationale herein is probative of whether the PI Motion should be granted. Although the Court cannot be precise as to the time of the issuance of its decision, it can use the useful metaphor that the PI Motion is very much on the front burner rather than the back burner of Chambers.[13]

IT IS SO ORDERED.

*Eli Richardson*
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

---

13 Despite the significance that it has placed on the fact that the relief requested by TRO Motion would change rather than preserve the status quo, the Court in deciding the PI Motion will keep in mind that that fact is nowhere near dispositive on the question of whether a preliminary injunction should be entered.