IN THE UNITED STATES DISTRICT COURT FOR THE
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| NETCHOICE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | NO. 3:24-cv-01191 |
| v. | ) | JUDGE RICHARDSON |
| | ) | |
| JONATHAN SKRMETTI, in his official | ) | |
| capacity as the Tennessee Attorney | ) | |
| General and Reporter, | ) | |
| | ) | |
| Defendant. | | |

## MEMORANDUM OPINION

Pending before the Court is Plaintiff's motion for a preliminary injunction (Doc. No. 8, "Motion"), which is supported by a corresponding memorandum (Doc. No. 9, "Memorandum in Support of Motion"). In an earlier order (Doc. No. 58), the Court denied Plaintiff's motion for a temporary restraining order (Doc. No. 48, "TRO Motion"), which also purported to "renew" the request for a preliminary injunction.

Defendant, the Attorney General and Reporter for the State of Tennessee (sued in his official capacity only), filed a response to the Motion (Doc. No. 26, "Response") and declarations in support thereof. (Doc. Nos. 27–31). Plaintiff replied to the Response. (Doc. No. 35, "Reply").

Via the Motion, Plaintiff (the trade association NetChoice) seeks an order preliminarily prohibiting Defendant from enforcing Tennessee House Bill 1891 ("the Act") with respect to

Plaintiff's members' websites that are within the scope of the Act.[1] The Court will deny the Motion, via a separate order, for the reasons stated herein.

## GENERAL FACTUAL AND PROCEDURAL BACKGROUND[2]

A. Overview of the Case

This case concerns Plaintiff's legal challenge to Tennessee House Bill 1891 (the "Act"), codified at Tenn. Code Ann. § 47-18-5701 *et seq.*, legislation that was enacted on May 2, 2024 and took effect on January 1, 2025. According to its preamble, the Act relates to "protecting children from social media"; according to Defendant, the contemplated protection is protection from "harms includ[ing] mental-health problems (depression, anxiety, and self-harm), loss of sleep, academic declines, and increased risk of sexual exploitation." (Doc. No. 26 at 31).[3] Purportedly to provide such protection, the Act imposes on social media platforms the below-described age-verification requirement for all social media accounts, as well as the below-described parental-consent and supervision-option requirements for social media accounts of minors. Violations of these requirements (or other aspects of the Act) are enforceable via an enforcement action in which Defendant may seek injunctions and civil penalties, but not criminal

---

[1] Via the Motion, Plaintiff sought to enjoin enforcement prior to the Act taking effect on January 1, 2025. This Court treats the Motion now as seeking to enjoin Defendant from further enforcing the Act now that the Act has taken effect.

[2] The following facts, unless somehow qualified herein (as for example by "Plaintiff alleges that" or "Defendant asserts that"), are taken as true for purposes of the Motion (though not necessarily for any future purposes in this litigation), because they are either: (1) asserted and evidentially supported at least to some degree by one party and not rebutted by the other side; (2) otherwise not in genuine dispute; (3) asserted and evidentially supported by one side to such an extent, or in such a manner, that they are credited by this Court even if rebutted to some extent by the other side; or (4) subject to judicial notice.

[3] When citing to a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document.

sanctions. *See* Tenn. Code Ann. § 47-18-5705(a)(2) (cross-referencing the remedies available under § 47-18-108).

Plaintiff, a trade association of social media companies, filed this action on behalf of its members, contending primarily that the Act violates the First Amendment and secondarily that it violates the Due Process Clause of the Fourteenth Amendment.

The Act contains requirements in two (and only two) sections of the Tennessee Code. In other words, in only two sections ("Operative Sections") does it contain provisions prescribing what social media companies must do or refrain from doing (under particular circumstances).[4] All other sections of the Act serve some purpose other than prescribing requirements.

The first of the Operative Sections contains what the title of the section calls "[a]ge requirements for use of social media platforms." Tenn. Code Ann. § 47-18-5703. The content of the statute outlines those requirements, stating in full as follows:

> (a)
>
> > (1) A social media company shall verify the age of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder.
> >
> > (2)
> >
> > > (A) If the individual is a minor, then the social media company must verify the express parental consent for the minor to become an account holder.
> > >
> > > (B) A social media company shall prohibit a minor from becoming an account holder unless the social media company has the express consent of the minor's parent to allow the minor to become an account holder.
> > >
> > > (3) Once age and parental consent, if applicable, have been verified to confirm that an individual may become an account holder, then the social

---

[4] It is not lost on the Court that in requiring *social media companies* to verify a user's age, the Act is indirectly requiring *would-be account holders* to do something—namely, take whatever steps are necessary for social media companies to verify the respective account holders' age.

media company is not required to reverify the individual's age and parental consent, unless parental consent is revoked.

(b) A social media company shall allow a parent to revoke consent for a minor to become or continue as an account holder.

(c) A social media company or third party shall not retain personally identifying information that was used to verify age or parental consent.

*Id.*

A "social media company" is defined as a "[legal or natural] person that is an interactive computer service and that provides a social media platform[.]" Tenn. Code Ann. § 47-18-5702(8). In turn, "social media platform" is defined as a website or internet application that "(i) [a]llows a person to create an account; and (ii) [e]nables an account holder to communicate with other account holders and users through posts." Tenn. Code Ann. § 47-18-5702(9)(A). Exempted from that definition (even if it otherwise would apply),[5] however, are various specified electronic, internet, or online services (or applications, platforms, or websites), as well as "online shopping." Tenn. Code Ann. § 47-18-5702(9)(B). Additionally, "account holder" means "a person who has an account or profile to use a social media company's platform, with such account or profile having been created on or after January 1, 2025[.]" Tenn. Code Ann. § 47-18-5702(1). And "minor" means "an individual who is: (A) [k]nown or reasonably believed by a social media platform to be under eighteen (18) years of age; (B) [n]ot emancipated; and (C) [a] resident of this state." Tenn. Code Ann. § 47-18-5702(4).

---

[5] It appears to the undersigned that some of the kinds of things exempted from the definition of "social media platform" definitely or at least potentially would not come within the definition of the term to begin with and thus would not need to be excluded from the term. But either way—whether solely because it is excluded, or additionally because it does not fall within the definition of "social media platform" to begin with—any such service (or application, platform, or website) ultimately would fall outside the definition of "social media platform."

This section is properly viewed as imposing on each and every social media company three requirements, which the Court next summarizes in a paraphrasing that takes into account as necessary the above-referenced statutory definitions. The first requirement ("the age-verification requirement") is that the social media company verify the age of each person who attempts to become an account holder. *See* Tenn. Code Ann. § 47-18-5703(a)(1). The second requirement (the "parental-consent requirement") is that for any such person who is a minor, the social media company verify express parental consent for the minor to become an account holder. *See* Tenn. Code Ann. § 47-18-5703(a)(2)(A). And the third requirement—a conditional one—is that if such parental consent is lacking for a would-be minor account holder, the social media company prohibit the minor from becoming an account holder.[6]

The second of the Operative Sections, which immediately follows the first, contains requirements ("supervision-option requirements")[7] related to what the title of the section calls "parental supervision." Tenn. Code Ann. § 47-18-5704. The content of the statute outlines those requirements, stating in full as follows:

> A social media company shall provide a minor account holder's parent with means for the parent to supervise the minor's account. Such means must include options for the parent to view privacy settings on the account, set daily time restrictions, and implement breaks during which the minor cannot access the account.

---

[6] Defendant seems to conceive of the second and third requirements as being a single requirement that he calls "parental consent." (Doc. No. 26 at 12). Although this approach certainly is not absurd or disingenuous, it does ignore the fact that the Act imposes not merely a requirement to obtain parental consent, but also a different (albeit closely related) conditional requirement (i.e., to prohibit the minor from becoming an account holder, absent parental consent). To say that parental consent is required is not necessarily to say—expressly, in no uncertain terms, without qualification and with no exceptions—what happens if the required consent is *not* obtained. For what it is worth, presumably the drafters of the Act themselves felt that the third requirement was not fully and entirely encompassed within the second requirement; otherwise, they likely would have perceived no need to include subparagraph (a)(2)(B), which contains what it is that the undersigned considers to be the third requirement.

[7] This section can reasonably be viewed either as imposing a single requirement with certain sub-requirements for meeting that requirement or as imposing multiple requirements. The Court deems it appropriate to refer to the section as imposing requirement*s*, plural.

(*Id.*). In context, the requirements here are that with respect to accounts of minor account holders, the social media company provide the respective parents with "means" for "supervis[ing]" the minor's account—meaning, at a minimum, account-specific options including options for viewing privacy settings, setting daily time restrictions, and blocking the minor's access to the account at particular times. Notably, nothing in this section requires parents to exercise any of the options that this section requires social media companies to provide them with; by their terms, the supervision-option requirements are imposed only on the social media companies and are requirements only to make the "means" *available* to parents for use at parents' *option*.

Defendant identifies the State's interests as: (i) "protecting children," or, more specifically, "protect[ing] 'the physical and psychological well-being of minors[,]" (Doc. No. 26 at 21, 25)[8] (quoting *Sable Commc'ns of Cal., Inc. v. FCC*, 492 U.S. 115, 126 (1989)), or protecting "'children from health risks[,]'" (*id.* at 31) (quoting *L.W. v. Skrmetti*, 83 F.4th 460, 491 (6th Cir. 2023)); and (ii) "protecting parental authority." (*Id.* at 21). In an apparent effort to establish that the State both has compelling interests and has narrowly tailored the requirements of the Act to serve those interests, Defendant argues essentially that the Act addresses a growing public health crisis, as outlined in studies linking minors' excessive social media use to negative outcomes such as anxiety, depression, and self-harm. (*Id.* at 31). Research cited by Defendant points to the role of algorithms in promoting addictive behaviors, the prevalence of cyberbullying, and the exposure of minors to harmful or exploitative content. (*Id.* at 10). Further, Defendant claims that the requirements of the Act are necessary to fill gaps left by self-regulation in the tech industry, which has often been criticized for prioritizing profit over user safety.

---

[8] *See also* Doc. No. 54 at 7.

Plaintiff argues that the legislation represents a sweeping overreach that imposes burdensome compliance costs on platforms while failing to account for less restrictive means to achieve the interests (generally referred to herein as "the State's" interests) supposedly served by the Act.

Additionally, Plaintiff asserts that the Act imposes unconstitutional burdens on both minors' and adults' access to protected speech. It contends that the age-verification and parental-consent requirements violate the First Amendment by restricting, based on user identity and age, lawful access to content. Plaintiff highlights the downside to requiring age verification by adults, which is an intrusive measure that could deter adults from accessing speech that is lawful for adults (if not necessarily minors) to consume and engage in. Plaintiff further contends that the parental-consent requirement unduly restricts minors' access to constitutionally protected speech, effectively treating all minors (irrespective of how far under age 18 they may be) as if they lack the capacity to make decisions about their online activity.

Plaintiff also argues that the Act is unconstitutionally vague because (according to Plaintiff) its definitions and requirements fail to provide clear guidance to regulated entities, leaving those entities susceptible to arbitrary enforcement. For example, key terms in the Act are (according to Plaintiff) susceptible to disparate interpretations. This vagueness, Plaintiff argues, creates a chilling effect—due to fear of liability for noncompliance—on its members' willingness to host a broad range of (lawful) user-generated content.

B. <u>Procedural History</u>

Plaintiff initiated this action by filing the complaint (Doc. No. 1, "Complaint") on October 3, 2024. In the Complaint, Plaintiff made allegations consistent with the above-referenced arguments it later made in support of the TRO Motion and the instant Motion. Plaintiff alleged

that the Act in its entirety (or at least with respect to the two Operative Sections and various definitions pertinent to the Operative Sections) imposes burdens on speech in violation of the First Amendment, and also is void for vagueness under both the First Amendment and the Due Process Clause of the Fourteenth Amendment. Plaintiff requested declaratory and injunctive relief consistent with these alternative allegations.

On October 3, 2024, Plaintiff filed the Motion and Memorandum in Support of Motion, contending that immediate relief, or at least relief before the Act's then-impending effective date, was necessary to avoid irreparable harm to its members and their users. Plaintiff supported this contention with several declarations (Doc. Nos. 8-2—8-4) from industry experts and representatives of Plaintiff's member companies, which asserted the existence of various financial and operational burdens imposed by the Act as well as the Act's potential to undermine users' access to a diverse range of online content.

This case was initially assigned to Chief United States District Judge William L. Campbell, Jr., but was reassigned to the undersigned following a recusal by Judge Campbell on January 15, 2025. (Doc. No. 47). While Chief Judge Campbell was still presiding, the Act went into effect—on January 1, 2025—without any decision on the PI Motion and without Plaintiff having moved for a temporary restraining order ("TRO").

Then on January 17, 2025, two days after Judge Campbell's recusal and 16 days after the Act went into effect, Plaintiff filed the TRO Motion. On February 14, 2025, the Court denied the TRO Motion, (Doc. No. 58), for several reasons. The Court does not herein incorporate by reference any such reasoning—in part because one of those reasons (Plaintiff's lack of urgency in filing the TRO motion and in particular Plaintiff's failure to file it until weeks after the Act went into effect) does not apply to the PI Motion the way it applies to the instant Motion, and in part

because the applicability to the PI Motion of any other such reasons is best explained by the Court *ab initio* herein.

In resolving the instant Motion, the Court has considered, among other things, each of the following filings by Plaintiff, together with any attachments thereto (some of which are voluminous): the Motion, the Memorandum in Support of Motion, the Reply, "Plaintiff's Response to Defendant's [first] Notice of Supplemental Authority" (Doc. No. 37), "[Plaintiff's] Notice of Supplemental Authority" (Doc. No. 40), the TRO Motion, the memorandum in support of the TRO Motion (Doc No. 49), the reply in support of the TRO Motion (Doc. No. 55), Plaintiff's [second] Notice of Supplemental Authority" (Doc. No. 56), "Plaintiff's [third] Notice of Supplemental Authority" (Doc. No. 63), "Plaintiff's Response to Defendant's [second] Notice of Supplemental Authority" (Doc. No. 64), "Plaintiff's [fourth] Notice of Supplemental Authority" (Doc. No. 66), Plaintiff's [fifth] Notice of Supplemental Authority" (Doc. No. 68),"Plaintiff's [sixth] Notice of Supplemental Authority" (Doc. No. 75), and "Defendant's Response to Plaintiff's [sixth] Notice of Supplemental Authority" (Doc. No. 76).

Likewise, the Court has considered, among other things, each of the following filings by Defendant, together with any attachments thereto: the response in opposition to the TRO Motion (Doc. No. 26, "response to TRO Motion"), five declarations submitted in support of the response to TRO Motion (Doc. Nos. 27-31), "Defendant's Notice of Supplemental Authority" (Doc. No. 34), the Response, "Defendant's Response to Plaintiff's [first] Notice of Supplemental Authority" (Doc. No. 41), "Defendant's Response to Plaintiff's [second] Notice of Supplemental Authority" (Doc. No. 57), "Defendant's [second] Notice of Supplemental Authority" (Doc. No. 62), "Defendant's Response to Plaintiff's [third] Notice of supplemental Authority" (Doc. No 65),

"Defendant's Response to Plaintiff's [fourth] Notice of supplemental Authority" (Doc. No 67),

and "Defendant's [third] Notice of Supplemental Authority" (Doc. No. 69).[9]

The briefing has been extensive, continual, and, ultimately, more than adequate for each

party to have its say, and the Court decides the Motion without a hearing.

## LEGAL STANDARDS REGARDING PRELIMINARY INJUNCTIONS

A preliminary injunction is "an extraordinary and drastic remedy," one that should be

awarded only "upon a clear showing that the plaintiff is entitled to such relief." *Winter v. Nat. Res.*

*Def. Council, Inc.*, 555 U.S. 7, 22 (2008), A party seeking a preliminary injunction[10] must meet

four requirements.[11] The party must show a likelihood of success on the merits; irreparable harm

---

[9] There are actually various other filings each party has made in connection with the instant Motion, but the Court has now maximized the amount of time it can possibly justify spending on cataloguing herein the various filings made by the parties and considered by the Court.

[10] Notably, and is axiomatic, "[a] motion for temporary restraining order is considered under the same standard as a preliminary injunction." *G.S. v. Lee*, 558 F. Supp. 3d 601, 608 (W.D. Tenn. 2021). This means, among other things, that cases and statements regarding TROs often are plenarily or at least partially applicable to preliminary injunctions.

[11] Published Sixth Circuit case law stands unmistakably for the proposition that these four items are factors rather than requirements, except that irreparable harm is a requirement (and, if it exists and thus keeps the possibility of a TRO alive, thereafter becomes a factor to be balanced along with the other three factors). *See, e.g., D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019). Alas, this case law is inconsistent with other (including more recent) Sixth Circuit case law and with Supreme Court cases (including *Winter*) that describe these as all being requirements (i.e., things that *must* be established. *See, e.g.*, *id*. at 328, 329 (Nabaldian, J., concurring) (noting that "[*Winter*]'s language seems clear—a plaintiff *must* establish the factors" and questioning "whether the balancing analysis itself aligns with *Winter*.").

Notably, other courts have likewise treated the four items as requirements (prerequisites), rather than as factors. *E.g.*, *Southern Poverty Law Ctr. V. United States Dep't Homeland Sec.*, Civil Action No. 18-760 (CKK), 2020 WL 3265533, *10 (D.D.C. June 17, 2020); *Transatlantic, LLC v. Humana, Inc*., 8:13–CV–1925–T–17TBM, 2013 WL 3958361, *1 (M.D. Fla. Aug. 1, 2013).

The Court believes that it needs to choose between the two approaches—even if the substance or the outcome of the Motion does not turn on such choice—because the approach does dictate how a court goes about explaining its analysis and decision on a motion for preliminary injunction. And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors.

to the party in the absence of the injunction; that the balance of equities favors the party; and that the public interest favors an injunction. *E.g., id. at 20*; *Sisters for Life, Inc. v. Louisville-Jefferson Cnty.*, 56 F.4th 400, 403 (6th Cir. 2022).

Parties seeking a preliminary injunction may not merely rely on unsupported allegations, but rather must come forward with more than "scant evidence" to substantiate their allegations. *See, e.g.*, *Libertarian Party of Ohio v. Husted*, 751 F.3d 403, 417 (6th Cir. 2014); *Cameron v. Bouchard*, 815 F. App'x 978, 986 (6th Cir. 2020) (vacating preliminary injunction when plaintiffs made no evidentiary showing on some elements of their claim, but instead made mere allegations regarding the treatment of COVID-19 in prisons); *McNeilly v. Land*, 684 F.3d 611, 614 (6th Cir. 2012) (upholding denial of preliminary injunction when plaintiff made only a "small showing" of evidence); *United States v. Certain Land Situated in City of Detroit*, No. 95-1118, 1996 WL 26915, 1 n.1 (6th Cir. Jan. 23, 1996) (noting a lack of evidence to support speculative allegations); *Boulding v. Corr. Med. Servs.*, No. 1:06-CV-811, 2008 WL 2095390, at 1 (W.D. Mich. Feb. 11, 2008), *report and recommendation adopted*, No. 1:06-CV-811, 2008 WL 2095387 (W.D. Mich.

---

First, explaining and applying the standard in terms of requirements is substantially more straightforward than the alternative—which is to explain that the four items are factors to be balanced, except that, well, that's only partially true because actually irreparable harm *is* a requirement (but also, if it exists, *then* a factor to be balanced along with the other factors) and likelihood of success (at least to some minimal extent) is also required. *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 326–27 (6th Cir. 2019) ("Thus, although the *extent* of an injury may be balanced against other factors, the *existence* of an irreparable injury is mandatory."); *S. Glazer's Distribs. of Ohio, LLC v. Great Lakes Brewing Co.*, 860 F.3d 844, 849 (6th Cir. 2017) (noting that it is reversible error for a district court to issue a preliminary injunction "where there is simply no likelihood of success on the merits (quoting *Winnett v. Caterpillar, Inc.*, 609 F.3d 404, 408 (6th Cir. 2010))). Second, it easier to articulate a conclusion as to whether requirements are satisfied (which is done in simple yes/no, or satisfied/unsatisfied, terms) than to articulate the outcome of some so-called "balancing" of (mismatched) factors. This is especially true given that case-specific balancing apparently is based in part on some inscrutable sliding scale of required likelihood of success on the merits that depends on the strength of the other three factors. *See, e.g., In re DeLorean Motor Co.*, 755 F.2d 1223, 1229 (6th Cir.1985) ("[T]he degree of likelihood of success required may depend on the strength of the other factors.").

May 15, 2008) ("Plaintiff did not marshal any evidence in support of his motion [for a preliminary injunction]. Plaintiff's unsupported allegations do not suffice." (citations omitted)). In deciding a motion for preliminary injunction, a court may consider the entire record, including affidavits and other hearsay evidence. *Sterling v. Deutsche Bank Nat'l Tr. Co.,* 368 F. Supp. 3d 723, 725 n.2 (S.D. N.Y. 2019); *J.S.R. by & through J.S.G. v. Sessions*, 330 F. Supp. 3d 731, 738 (D. Conn. 2018). In conducting the preliminary-injunction analysis, the Court is not limited to the four corners of the complaint but rather may rely on affidavits and hearsay materials which would not be admissible evidence for a permanent injunction, if the evidence is appropriate given the character and objectives of the injunctive proceeding. *Express Franchise Servs., L.P. v. Impact Outsourcing Sols., Inc.*, 244 F. Supp. 3d 1368, 1379 (N.D. Ga. 2017); *Action NC v. Strach*, 216 F. Supp. 3d 597, 629 (M.D.N.C. 2016) (explaining that district courts may look to, and indeed in appropriate circumstances rely on, hearsay or other inadmissible evidence when deciding whether a preliminary injunction is warranted).

<u>ANALYSIS</u>

The Court finds that Plaintiff has not met its burden of establishing all four requirements for a preliminary injunction. Specifically, Plaintiff has failed to demonstrate that it (or indeed anyone) will suffer irreparable harm[12] if the preliminary injunction is not granted.

A. <u>Legal Standards Regarding Irreparable Harm</u>

To satisfy the requirement of showing irreparable harm, Plaintiff must demonstrate that it faces an imminent injury that is concrete, certain, immediate, not speculative or theoretical, and

---

[12] In the preliminary-injunction context, courts seem to use the terms "harm" and "injury" interchangeably, and the Court does likewise herein.

incapable of being remedied by monetary damages.[13] *D.T. v. Sumner Cnty. Sch.*, 942 F.3d 324, 327 (6th Cir. 2019). There is a reason why this requirement exists: "If the plaintiff isn't facing imminent and irreparable injury, there's no need to grant relief *now* as opposed to at the end of the lawsuit." (*Id.* at 327.). This is important to keep in mind in a case like the instant one because it explains why a law, even if it likely violates the First Amendment—and thus likely would impose irreparable injury in the specific form of loss of First Amendment rights if enforced[14]—should not be preliminarily enjoined *unless* that (conditional) irreparable injury is imminent, which as discussed below is not automatically the case merely because the law is in effect. In short, even when the plaintiff alleges violations of the First Amendment, the plaintiff must show that the alleged resulting irreparable injury is imminent and non-speculative. *See Google, Inc. v. Hood*, 822 F.3d 212, 228 (5th Cir. 2016). "[I]nvocation of the First Amendment cannot substitute for the presence of an imminent, non-speculative irreparable injury."). *Hohe v. Casey*, 868 F.2d 69, 72–73 (3d Cir. 1989) ("[T]he assertion of First Amendment rights does not automatically require a

---

[13] It is important to distinguish this requirement (*irreparable harm* in the absence of a preliminary injunction) for *issuance of a preliminary injunction* from the requirement of *an injury-in-fact* for a plaintiff to have *standing* to bring a claim at all. *See D.T.*, 942 F.3d at 327. The description of irreparable harm is unmistakably similar to the description of injury-in-fact. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149 (2014) (explaining that to be an injury-in-fact, an injury must be "concrete and particularized" and "actual or imminent" rather than "conjectural" or 'hypothetical." (quoting *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560 (1992)); *id.* (an injury can suffice as an injury-in-fact if it is "certainly impending" or there is a 'substantial risk' that the harm will occur" (quoting *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 410, 414 n.5 (2013))).

So, circumstances supporting the satisfaction of the former requirement may also support the satisfaction of the latter requirement, and vice versa. But the requirements are substantially different in terms of their purpose (function) and at least a little different in terms of their substance.

[14] "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Bays v. City of Fairborn*, 668 F.3d 814, 825 (quoting *Elrod v. Burns*, 427 U.S. 347, 373, (1976)). "That's because damages don't remedy '[t]he loss of First Amendment freedoms.'" *Fischer v. Thomas*, 78 F.4th 864, 869 (6th Cir. 2023) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). But even harm in the form of loss of First Amendment rights must be "immediate" (a term that courts seem to use interchangeably with "imminent"). *See id.* at 868.

finding of irreparable injury."). And this principle applies not only to alleged injuries in the form of actual consequences—for example, fines or enjoinment of particular activities—from the (actual or threatened) enforcement of the law allegedly violating the First Amendment, but also alleged injuries in the form of the "chilling" of First Amendment rights (such as free speech) that occurs prior to and/or irrespective of any actual or threatened enforcement. *See Fischer*, 78 F.4th at 869; *Hohe v. Casey*, 868 F.2d at 73.

With these principles in mind, the Court will address in turn the irreparable injuries alleged by Plaintiff. The first is a loss of First Amendment freedoms of both its members and its members' users. The second is Plaintiff's members incurring unrecoverable costs to comply with the Act.

B. Preliminary Issues

But before addressing these alleged irreparable injuries, the Court addresses two issues. The first relates to whether the delay between the enactment of the Act (many months prior to its effective date of January 1, 2025) and the filing of the Motion militates against Plaintiffs' assertion of irreparable harm. As Defendant points out, Plaintiff waited nearly five months after the Act was enacted before filing this lawsuit. Defendant argues that this delay is inconsistent with any claim of urgent or irreparable injury and that courts have regularly found that undue delay undermines claims of irreparable harm. *See, e.g.*, *Miller for & on Behalf of N.L.R.B. v. Cal. Pac. Med. Ctr.*, 991 F.2d 536, 544 (9th Cir. 1993), *on reh'g,* 19 F.3d 449 (9th Cir. 1994).

But the Court does not believe that this delay in filing suit is probative of whether Plaintiff's members would suffer irreparable injury absent a preliminary injunction. Plaintiff asked for a preliminary injunction to be entered as of December 31, 2024, but moved for a preliminary injunction much earlier, on October 3, 2024, nearly three months before the Act went into effect

and on the very day that Plaintiff filed the instant action in this Court.[15] Therefore, the Court assesses the requirement of irreparable harm without treating the timing of the Motion as undermining Plaintiff's claim that the requirement is satisfied.[16]

The second issue relates to whether Plaintiff, to satisfy the requirement of irreparable injury, may rely on irreparable harm to anyone other than Plaintiff (or Plaintiff's members).[17] Plaintiff asserts irreparable injury not only to its members, but also to its members' users.[18] (Doc. No. 35 at 20). Naturally, that raises the question: may a movant for a preliminary injunction establish the required irreparable injury based on the irreparable injury of someone *other than* the movant? Regarding that question, Defendant asserts that "Even if [relying on the injury of others] were acceptable for 'standing,' the 'irreparable harm' needed to get a preliminary injunction

---

[15] The Court recognizes that ideally, a decision on Plaintiff's request for a preliminary injunction would have been rendered substantially earlier than it has been, but that possibility was extinguished by several circumstances, including the recusal of the originally assigned district and the undersigned's docket, which has been heavy not just generally but in terms of matters that—like the instant Motion—are time-sensitive and pressing. On the other hand, the Court can say that it did not hurt to see whether guiding case law (be it binding or merely persuasive) had been issued in the interim. As it turns out, the Court has not found that any intervening case law brought to its attention (via the parties' numerous respective notices of supplemental authority) was materially helpful to the resolution of the Motion, which turns solely on the requirement of irreparable harm. But some such supplemental authority potentially could prove persuasive in the Court's view as this litigation goes forward.

[16] By contrast, in previously denying Plaintiff's request for a TRO, the Court *did* hold the timing of that request against Plaintiff. (Doc. No. 58). But the request for a TRO is distinguishable from the request for a preliminary injunction in that: (i) it was made three-and-a half months after the request for a preliminary injunction was made, and only after the Act went into effect; and (ii) a TRO is a matter of greater urgency than a preliminary injunction and thus should be pursued with greater urgency than a request for a preliminary injunction.

[17] The Court is content to accept for present purposes that Plaintiff may rely on an irreparable injury to any of Plaintiff's members to the same extent that Plaintiff may rely on an injury to itself. Irreparable injury to any of Plaintiff's members' users (or potential users), is another matter; the question is whether Plaintiff may rely on an irreparable injury to such (actual or potential) users.

[18] In this context, "user" could refer to a mere *potential* user of a member's social media platform, as well as *actual* users of a member's social media platform.

requires an imminent violation of the movant's *own* rights. (Doc. No. 26 at 30). In support, Defendant provides the following string citation:

> *Moore v. Consol. Edison Co. of N.Y.*, 409 F.3d 506, 511 (2d Cir. 2005); accord *Nutrition Distribution v. Enhanced Athlete*, 2017 WL 5467252, at *2 (E.D. Cal. Nov. 14) ("'harms alleged against third parties are not relevant to the irreparable harm prong'"); *Corral v. Cuyahoga Cnty.*, 2024 WL 4475458, at *2 (N.D. Ohio Sept. 17) (same for "constitutional" harms).

(*Id.*). The first of these cases actually does not support Defendant's assertion; *Moore* appears to say not that a preliminary injunction *requires in every case* an imminent violation of the movant's own rights, but rather only that the specific alleged injury to someone other than the movant in that particular case was *insufficient in that case*. *See Moore*, 409 F.3d at 511 ("[T]he alleged harm to third parties did not provide plaintiff a basis for a preliminary injunction in this case."). But the other two cases do support Defendant's assertion. *Nutrition Distribution* says exactly what Defendant says it says, and *Corral* states, "A temporary restraining order should not be granted if substantial harm will be caused [only] to others." *Corral*, 2024 WL 4475458, at *2. On its own, the Court has found other cases that support Defendant's position. *See Gala v. Kavanagh*, No. 23CV1543NRMRER, 2023 WL 2356025, at *3 (E.D.N.Y. Mar. 2, 2023) ("[A] plaintiff seeking a preliminary injunction must establish . . . that *he* is likely to suffer irreparable harm in the absence of preliminary relief." (quoting *Winter*, 555 U.S. at 20) (emphasis added by *Gala*)), *reconsideration denied*, No. 23CV1543NRMRER, 2023 WL 2349580 (E.D.N.Y. Mar. 3, 2023); *Nationwide Paging Corp. v. Reg'l Commc'ns, Inc.*, No. CV-92-5097 (CPS), 1992 WL 355598, at *3 (E.D.N.Y. Nov. 19, 1992) ("Plaintiffs' primary effort in demonstrating irreparable injury is to point to the consequences for its customers of being deprived of paging services. . . . [T]his showing of irreparable injury to others fail to meet the requirement that plaintiffs demonstrate irreparable injury to them, not to others . . . ." (citing *Weitzman v. Stein,* 897 F.2d 653, 568 (2d

Cir.1990)). *Great Lakes Higher Edu. Corp. v. Cavazos,* 698 F. Supp. 1464, 1475 (W.D. Wisc. 1988) (stating that the burden to demonstrate irreparable harm "is not satisfied by harm to a third party" (citing *Am. Dairy Queen Corp. v. Brown-Port Co.,* 621 F.2d 255, 259 n.4 (7th Cir. 1980)). And for its part, *Am. Dairy Queen Corp.* explicitly adopted the same rule, at least with respect to persons other than the movant who (like the users of the social media platforms of Plaintiff's members) are not parties to the case. *See Am. Dairy Queen Corp.* 621 F.2d at 259 n.4 (expressly holding that "'the no adequate remedy at law/irreparable injury' prerequisite is not satisfied by the harm that may befall a nonparty.").[19]

In the Court's view, Plaintiff does not address Defendant's argument. True, Plaintiff does assert that it has *standing* to bring claims asserting the rights of its members' users. But that is not the same thing as asserting that Plaintiff can assert *irreparable injury* based on harms to its members' users. Stepping into the void left by Plaintiff, the Court on its own found some authority that runs counter to Defendant's assertion that irreparable harm to someone other than the movant is to be disregarded in the preliminary-injunction analysis. *See Eubanks v. Wilkinson*, No. CIV.A. C82-0360-L(A), 1988 WL 167265, at *2 (W.D. Ky. Dec. 8, 1988) ("Irreparable harm to those non-parties is a valid consideration in determining whether to grant equitable relief." (citing *Planned Parenthood Affiliates v. Rhodes*, 477 F. Supp. 529, 540 n.11 (S.D. Ohio 1979))). But it appears that the weight of authority is on Defendant's side, and there is a reasonable basis for the rule (even if the basis is rarely if ever articulated).[20] Therefore, particularly in the absence of any specific

---

[19] Leading up to that express statement of its holding, the court implied that "injunctive relief can[not] be based on actual or potential injury to . . . a nonparty to the suit" and that "injunctive relief [is inappropriate] to prevent other than irreparable harm to itself." 621 F.2d at 258.

[20] Specifically, the law reasonably could refuse to countenance any claim of *immediate and irreparable injury* asserted by anyone other than the (legal or natural) person supposedly facing such injury. It is one thing for a party to assert *standing* to seek *ordinary relief* based on someone else's injury (or, to use the

opposition from Plaintiff on this precise point, the Court adopts Defendant's view, i.e., that irreparable injury to a non-party[21] cannot satisfy the irreparable-injury requirement for a preliminary injunction.[22] Thus, the Court will not treat irreparable harm to Plaintiff's members' users as "irreparable harm" sufficient to satisfy the irreparable-harm requirement for a preliminary injunction.

### C. Alleged Irreparable Harm in the Form of Loss of First Amendment Freedoms

As noted above, Plaintiff is required to establish that it or its members will suffer actual and imminent harm from the Act absent a preliminary injunction. And as further indicated above, the requirement of *imminent* harm exists to prevent the occurrence of something that is unjustifiable: the awarding of (albeit only temporary) injunctive relief prior to the end of the litigation—based *on an incomplete record and incomplete argumentation*—when such relief is not

---

precise terms of standing doctrine, someone else's injury-in-fact). It is quite another for a party to seek *extraordinary relief* based on someone else's alleged immediate and irreparable injury. Courts reasonably could require that a plea for the extraordinary remedy of a preliminary injunction) that is based on alleged extraordinarily dire circumstances (the *imminent* prospect of *irreparable* harm) come directly from the person supposedly facing such dire circumstances.

[21] The Court need not address herein the question of whether irreparable injury to a *party* other than the movant (as opposed to a non-party) can satisfy the irreparable-injury requirement. It would seem that this question rarely arises, since presumably when a claim can be made that a particular party will suffer irreparable injury absent a preliminary injunction, that party either will be the one filing the motion for a preliminary injunction or at least will join in the motion.

[22] To be clear, the rule the Court adopts here does not mean that, if and when considering the third and fourth requirements, the Court cannot consider the effect on third parties of the potential grant of a preliminary injunction. The Seventh Circuit noted as much in *Am. Dairy Queen Corp.*:

> Our holding today is a limited one: the "no adequate remedy at law/irreparable injury" prerequisite is not satisfied by the harm that may befall a nonparty. We do not suggest that consideration of the effects upon nonparties of the grant or denial of injunctive relief is inappropriate. A district court sitting in the role traditionally occupied by a court of equity retains discretion to consider, as appropriate, all factors bearing on the public interest or on nonparties.

*Am. Dairy Queen Corp.*, 621 F.2d at 259. By their very nature, the third and fourth requirements contemplate consideration of the effects (positive or negative) that would be visited on third parties were a preliminary injunction to be issued.

necessary. Accordingly, the Court—to the benefit of Plaintiff, if anything—herein treats the requirement of imminency of injury as a requirement of injury prior to the termination of this litigation, rather than a requirement of injury tomorrow or next month, for example.

The existence and basis for the requirement of imminent harm has particular application in the context of the instant kind of challenge, a so-called "pre-enforcement" challenge to a statute. The Sixth Circuit recently explained, with respect to the requirement for standing of injury-in-fact:

> Although a plaintiff need not expose itself to actual arrest or prosecution to bring a pre-enforcement challenge to a statute, *see Driehaus*, 573 U.S. at 158, 134 S. Ct. 2334, "mere allegations of a 'subjective chill' on protected speech are insufficient to establish an injury-in-fact." *McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (quoting *Berry v. Schmitt*, 688 F.3d 290, 296 (6th Cir. 2012)). Beyond chilled speech—which Plaintiffs have plainly alleged here—several factors inform our analysis of whether a threat of enforcement is sufficiently credible to support a claim for pre-enforcement prospective relief:
>
> > (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."
>
> *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021) (quoting *McKay*, 823 F.3d at 869). "These *McKay* factors are not exhaustive, nor must each be established." *Id.*; *see also Fischer v. Thomas*, 52 F.4th 303, 307 (6th Cir. 2022) (noting that the *McKay* factors are not "a laundry list"). At bottom, our inquiry distills to whether "surrounding factual circumstances" plausibly suggest a credible fear of enforcement. *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir. 2022).

*Christian Healthcare Centers, Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024). As indicated, the discussion here relates to the requirement (for standing) of injury-in-fact, and not the requirement (for a preliminary injunction) of irreparable injury. As indicated above in a footnote, the description of an injury-in-fact is not identical to the description of irreparable injury. Yet the descriptions are similar, and the Court believes that the factors identified above are instructive in

determining whether an alleged injury is not "speculative or theoretical" but rather "certain and immediate," *D.T.*, 942 F.3d at 327, as required to constitute an irreparable injury.

Application of these four factors suggests that the subjective chilling of First Amendment freedoms does not amount to an irreparable injury. As to the first two factors, the record reflects no history of past enforcement against, or enforcement warning letters sent to, Plaintiff's members. As to the third factor, the Court does not perceive any attribute of the Act that makes its enforcement relatively easy or likely. As for the fourth factor, although it is true that the record does not reflect Defendant disavowing enforcement of the Act until the conclusion of this litigation, it also does not reflect Defendant *refusing* to disavow enforcement of the Act until the conclusion of this litigation. On balance, then, none of the four factors suggests that Plaintiff's members—even if they were subjectively chilled by the Act in the exercise of their First Amendment Freedoms—are objectively facing an imminent, non-speculative injury from the Act as required for a finding of irreparable injury.

The Court separately discerns from *D.T.* that the alleged harm here is not "certain and immediate." In *D.T.*, the plaintiffs were parents previously convicted of truancy who sued to enjoin the state from charging them with truancy again if they decided to remove their student-child from a state-approved private school in the future. The Court explained:

> To merit a preliminary injunction, an injury "must be both certain and immediate," not "speculative or theoretical." D.T.'s parents say they are injured because: *if* D.T. regresses at his new private school, and *if* they choose to disenroll him, and *if* they choose not to enroll him in another state-approved school, the state *may* choose to prosecute them for truancy again. The district court said it well: "there's a lot of ifs in there." And all those "ifs" rule out the "certain and immediate" harm needed for a preliminary injunction.

*D.T.*, 942 F.3d at 327 (6th Cir. 2019) (citations omitted). The instant case may not have three "ifs" as did *D.T.* but it does seem to have two. As background, enforcement of the Act is not automatic

but requires a separate legal proceeding initiated by Defendant. Tenn. Code § 47-18-5705(a). So Plaintiff's members would be subject to enforcement of the Act prior to the conclusion of litigation only *if* Defendant makes a policy decision to enforce the Act prior to the termination of the instant litigation while the Act's constitutionality is in question (despite the attendant risks of so doing), and *if* Defendant then actually institutes a legal proceeding against one or more of Plaintiff's members while this litigation is proceeding.

The record does not indicate a certainty (or even a likelihood), as opposed to a *possibility*, that either contingency will come to pass. The Act has now been in effect since January 1 of this year and yet the record does not reflect that an enforcement action has been instituted or even threatened. To the contrary, as recently as the newest filing on this docket as of date, Defendant reminds the Court that enforcement of the Act is "speculative at this stage and not irreparable." (Doc. No. 76 at 2). These sorts of uncertain contingencies are precisely the kinds of things that, according to *D.T.*, indicate that harm in the form of an enforcement action is insufficiently certain and immediate to ensue in the absence of a preliminary injunction. The Court can certainly appreciate that (and why) Plaintiff's members may have some apprehension over some potential enforcement action at some point in the future, but that is insufficient. *See Braidwood Mgmt., Inc. v. Equal Emp. Opportunity Comm'n*, 70 F.4th 914, 926 (5th Cir. 2023) ("Moreover, a general fear of prosecution 'cannot substitute for the presence of an imminent, non-speculative irreparable injury.'" (quoting *Google, Inc.*, 822 F.3d at 228).

It is true that the record does not *affirmatively reflect* an absence of prior enforcement actions or threats to enforce the Act or an absence of intent on Defendant's part to affirmatively enforce the Act pending the outcome of this litigation. But consistent with the notion that the burden falls upon the movant seeking a preliminary injunction, courts have not always required

such an affirmative reflection, as long as there was an absence of any indication of prior enforcement actions or threats of enforcement.[23] *See Conchatta, Inc. v. Evanko*, 83 F. App'x 437, 442–43 (3d Cir. 2003); *AK Indus. Hemp Ass'n, Inc. v. Alaska Dep't of Nat. Res.*, No. 3:23-CV-00253-SLG, 2023 WL 7339862, at *2 (D. Alaska Nov. 7, 2023) (finding no irreparable injury where "[p]laintiffs have not provided any evidence that law enforcement authorities have 'communicated a specific warning or threat to initiate proceedings' to Plaintiffs in the immediate future"); *Empower Texans, Inc. v. Nodolf*, 306 F. Supp. 3d 961, 967–68 (W.D. Tex. 2018) (finding an absence of irreparable injury where "no party offered evidence of past enforcement of the statute against political organizations in Texas, and Plaintiff cannot show that Defendants took any action beyond reviewing the complaint").

Likewise, courts have declined to find that a threat of enforcement of a statute implicitly exists merely because the statute is on the books and the plaintiff conceivably could violate it. *E.g.*, *Wilson v. Off. of Violent Sex Offender Mgmt.*, 584 F. App'x 210, 212 (5th Cir. 2014).

And as noted above, the mere assertion of a chilling effect does not suffice to establish irreparable injury. To be sure, a chilling effect, resulting in "self-censorship; [is] a harm that can be realized even without an actual prosecution." *Virginia v. Am. Booksellers Ass'n,* 484 U.S. 383, 392 (1988). But that does not mean that self-censorship constitutes an irreparable injury merely because the plaintiff says it does; for example, a plaintiff's "self-censorship must arise from a fear of prosecution that is not imaginary or wholly speculative." *Carmouche*, 449 F.3d at 660. [24]

---

[23] In other words, even if there is not an *affirmative reflection of an absence* of actual or threatened enforcement, it is enough if there is an *absence of an affirmative reflection* of actual or threatened enforcement.

[24] Plaintiff's assertion of a chilling effect on Plaintiff's members nearly fails for an additional reason: the lack of any evidence that any of Plaintiff's members have complied with the Act, as would be necessary to credibly claim a chilling effect from the Act (since a company can hardly claim to be chilled—i.e.,

As for any assertion of a chilling effect on Plaintiff's members' users, the Court has held above that injury to non-parties, such as Plaintiff's members, is to be disregarded for purposes of the instant analysis. And in any event, the Court does not see how any such user could be suffering the effects of chilling. That is, the Court does not see why Plaintiff's member's users would be self-censoring rather than choosing to use or not use Plaintiff's members social-media platforms without giving any thought themselves to what the Act says; in other words, although the user's First Amendment freedoms could be curtailed by Plaintiff's members' compliance with the Act, there is no reason to believe that such freedoms would be curtailed by any *self*-censorship by users.

D. <u>Alleged Irreparable Harm in the Form of Unrecoverable Compliance Costs</u>

Plaintiff asserts that the Act imposes burdensome compliance costs that only magnify the other harms felt by Plaintiff and its members. (Doc. No. 9 at 30). Defendant, however, argues that compliance costs should have already been incurred.

Plaintiff responds that such costs are unrecoverable because Tennessee officials are immune from damages claims, meaning that Plaintiff's members have no avenue to recoup compliance expenses. (Doc. No. 35 at 20). Defendant, however, counters that the mere inability to recover costs does not transform those costs into irreparable harm, particularly where the harm alleged is not existential to Plaintiff's business operations. Here is what the Sixth Circuit said in a case involving a challenge to then-President Biden's executive order requiring that federal contractors and subcontractors (and their applicable employees) be fully vaccinated against COVID-19 unless legally entitled to an accommodation:

---

intimidated into censoring— by a statute that it flaunts). But the assertion actually does not fail on this particular basis, because there is evidence that at least one of Plaintiff's members has complied with the Act at least in part. (Doc. No. 72 at 1-2) (citing a declaration that one of Plaintiff's members, Nextdoor, has actually begun complying with the requirements of the Act by preventing persons under 18 from becoming account holders).

> We recognize that some of our sister circuits have held that compliance costs do not qualify as irreparable harm because they commonly result from new government regulation. *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980); *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976). Maybe so. But in our view, the peculiarity and size of a harm affects its weight in the equitable balance, not whether it should enter the calculus at all.

*Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023).[25] This statement requires some unpacking. The first thing to note is that the court (contrary to this Court and the cases on which this Court relies, as cited above) was treating the preliminary-injunction standard as involving *factors*; under this approach, as explained above in the footnote, irreparable harm is not *just* a requirement but also a factor that (if it exists at all) is balanced against the other factors considering the nature and extent of the irreparable harm. Understanding this is crucial to understanding what the court was saying in *Biden*. The court was *not* denying that compliance costs fail to qualify as irreparable harm; indeed, the court expressly *declined to dispute* (albeit without expressing affirming) that compliance costs fail to so qualify. So what was the court saying?

To answer that question, one must back up to earlier in *Biden*, where the court found that *something other than compliance costs* constituted irreparable harm, namely, the plaintiff's "loss of new or renewed contracts due to the imposition of the contractor mandate" being challenged by the plaintiff. *Biden*, 57 F.4th at 556. In context then, it is apparent what the court was saying: if

---

[25] Notably, both *Freedom Holding, Inc.* and *A.O. Smith Corp.* expressly made their holdings applicable specifically to *unrecoverable* compliance costs. *Harris* arguably suggests the same thing.

> Here, as the district court noted, many of the complained of costs should already have been incurred prior to the hearing on the preliminary injunction if the member hospitals hoped to be in compliance with the regulations by September 1, 1979, the day the regulations became effective. In addition, the district court properly concluded that some of the complained of harm to the AHA could be remedied by the court should the AHA succeed at the final hearing on the merits. We further believe that the district court acted within its discretion in concluding that any remaining injury was unduly speculative or too insubstantial to constitute threatened irreparable harm.

*Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980).

irreparable injury does exist, such that (under the court's chosen approach, i.e., balancing of factors) "the extent of [the] injury must be balanced against other factors," *D.T. v. Sumner Cnty. Sch.*, 942 F.3d at 327, then the court should consider *the full extent* of the injury or injuries to the plaintiffs from the conduct complained of—including any injury that may *not* be "irreparable." This reading of *Biden* is entirely consistent with the precise wording of *D.T.*—a case that also involved the "balancing of factors" approach—which contemplates a distinction between the (required) *irreparable injury* and *some other* injury and suggests that *an* injury can be considered in the balancing even if it is not an *irreparable* injury. (*See id.*). ("Thus, although the extent of *an* injury may be balanced against other factors, the existence of *an irreparable injury* is mandatory.") (emphasis).

All of which is to say that the Sixth Circuit in *Biden* declined to disagree with multiple other circuits that have held that (at least in the particular circumstances there involved) compliance costs (including *unrecoverable* compliance costs) fail to qualify as irreparable harm because compliance costs "commonly result from new government regulation." *Biden*, 57 F.4th 545, 556. The quoted rationale is sound. Compliance costs are—by definition— costly, to a greater or lesser extent, and sometimes they result from unconstitutional laws or regulations. But neither of these realities means that compliance costs necessarily are irreparable injuries. Instead, compliance costs are quite ordinary and are routinely borne (even if only reluctantly) by business entities as a natural (if unwelcome) cost of doing business. *See A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527–28 (3d Cir. 1976) ("Any time a corporation complies with a government regulation that requires corporation action, it spends money and loses profits; yet it could hardly be contended that proof of such an injury, alone, would satisfy the requisite for a preliminary injunction."). Even assuming that compliance costs can constitute irreparable harm under particular circumstances,

Plaintiff would need to show that such circumstances are present here. But Plaintiff has not done so; it has done little to show that the compliance costs in this case are (even if unrecoverable) not mere "ordinary compliance costs[, which] are typically insufficient to constitute irreparable harm." *Freedom Holdings, Inc.*, 408 F.3d at 115. For example, Plaintiff has not shown that a preliminary injunction would save any of its members a material amount of costs that it had not already borne prior to the law going into effect; still less has it shown that such compliance costs affect the existence or the liquidity of any member.

In summary, unrecoverable compliance costs may represent a harm—perhaps even a substantial one—but that does not mean that such harm is irreparable for purposes of the preliminary-injunction analysis, and the Court is unpersuaded that Plaintiff has shown that the harm is irreparable in this case.

<u>CONCLUSION</u>

"A preliminary injunction is an extraordinary remedy which should be granted only if the movant carries his or her burden of proving that the circumstances clearly demand it." *Overstreet v. Lexington-Fayette Urb. Cnty. Gov't*, 305 F.3d 566, 573 (6th Cir. 2002) (citing *Leary*, 228 F.3d at 739). It bears emphasizing why a preliminary injunction is deemed an extraordinary remedy subject to stringent requirements: the party receiving it is treated, while the litigation is ongoing, in some respects as if it had ultimately prevailed on its claims even though it has not yet done so and could not possibly do so until the litigation is concluded. It is no small thing for a party to be treated (even if only temporarily and for a limited purpose) as if it had ultimately prevailed on the merits of its claims when in fact it has not yet done so. *See Doughtie & Co. v. Rutherford Cnty.*, No. 3-13-0209, 2013 WL 3995277, at *1 (M.D. Tenn. Aug. 5, 2013) ("Essentially, [the p]laintiff is asking the Court to order, on the 'front end' of this action, the relief it ultimately seeks in this

lawsuit. The Court finds that [the p]laintiff has failed to show the need for this extraordinary relief.").

On the instant record, in the view of the Court, Plaintiff has not met the heavy burden required to obtain such extraordinary relief. Specifically, the Court concludes that Plaintiff has not established that absent a preliminary injunction, irreparable injury (as properly understood) would befall it or its members—or for that matter any non-parties, such as users of Plaintiff's members' social media platforms, whose allegedly irreparable injuries the Court declines to consider anyway. This conclusion is dispositive here because "a district court is 'well within its province' when it denies a preliminary injunction based solely on the lack of an irreparable injury." *D.T.*, 942 F.3d at 327 (quoting *S. Milk Sales, Inc. v. Martin*, 924 F.2d 98, 103 (6th Cir. 1991)). And none of this is changed by the fact that Plaintiff's claims (i) ultimately could prove meritorious, and (ii) assert violations of the First Amendment, however important First-Amendment rights may be.

None of this is to take any position on the merits of Plaintiff's claims. Rather, it is to say that even if the claims ultimately are meritorious, Plaintiff has not shown a present need to be treated, pending the outcome of this litigation, as if its claims have been adjudicated as meritorious. The Court fully understands why Plaintiff would *prefer* to be treated this way, but Plaintiff—having failed to show that irreparable injury would follow in the absence of a preliminary injunction—has not shown *a need* to be treated this way

Accordingly, Plaintiff's Motion (Doc. No. 8) will be DENIED. Should circumstances change—for example, if Defendant threatens or institutes enforcement actions pending the outcome of this litigation—the calculus could change regarding irreparable injury. And in that case, Plaintiff may file another motion for preliminary injunction.

An appropriate accompanying order will be entered.

IT IS SO ORDERED.

_Eli Richardson_
ELI RICHARDSON
UNITED STATES DISTRICT JUDGE