# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| NETCHOICE,<br><br>*Plaintiff*,<br><br>v.<br><br>JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter,<br><br>*Defendant*. | Civil Action No. 3:24-cv-01191 |

## FIRST AMENDED COMPLAINT FOR DECLARATORY AND INJUNCTIVE RELIEF

NetChoice brings this civil action against Defendant for declaratory and injunctive relief and alleges as follows:

### INTRODUCTION

1.     The restrictions imposed by Tennessee House Bill 1891 (2024) (the "Act") violate bedrock principles of constitutional law and precedent from across the nation. As the U.S. Supreme Court has repeatedly held, "minors are entitled to a significant measure of First Amendment protection." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 794 (2011) (cleaned up; quoting *Erznoznik v. Jacksonville*, 422 U.S. 205, 212-13 (1975)). Likewise, the Supreme Court has held that age-verification requirements "necessarily" "burden" both adults' and minors' "right to access" speech that is protected for minors and adults alike. *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2316 (2025) ("*FSC*"). These principles apply with equal force online: Governments cannot "regulate ['social media'] free of the First Amendment's restraints." *Moody v. NetChoice, LLC*, 603 U.S. 707, 726-27 (2024).

2.     That is why courts across the country have enjoined similar state laws restricting minors' and adults' access to protected speech online. *See NetChoice v. Carr*, 2025 WL 1768621

(N.D. Ga. June 26, 2025); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, 2025 WL 1570007 (N.D. Fla. June 3, 2025); *NetChoice, LLC v. Yost*, 778 F. Supp. 3d 923 (S.D. Ohio 2025); *NetChoice, LLC v. Griffin*, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025); *NetChoice, LLC v. Bonta*, 770 F. Supp. 3d 1164 (N.D. Cal. 2025); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024).

3.　　This Court should join those courts and similarly enjoin Defendant's enforcement of this Act against NetChoice's members.

4.　　The "social media" websites regulated by the Act allow both minors and adults to "engage in a wide array of . . . activity on topics 'as diverse as human thought'"—all protected by the First Amendment from governmental interference. *Packingham v. North Carolina*, 582 U.S. 98, 105 (2017) (citation omitted).[1] As a result, they curate and disseminate a "staggering amount" of fully protected speech, across "billions of posts or videos." *Moody*, 603 U.S. at 719, 734. The Act would fundamentally limit the expressive activity of users and covered websites. It would place multiple restrictions on minors' and adults' ability to access protected speech on covered websites, if not block access altogether. In so doing, it would chill those websites' own speech.

5.　　Accordingly, the Act—in whole and in part—is unlawful for multiple reasons.

6.　　*First*, the Act's requirement that covered websites "verify the age[s] of [all] individual[s]" (both minors and adults) "who attempt[] to become [] account holder[s]," § 47-18-5703(a)(1), violates the First Amendment. *See Carr*, 2025 WL 1768621, at *13; *Griffin*, 2025 WL 978607, at *13; *Reyes*, 748 F. Supp. 3d at 1129-30 & n.169; *Bonta*, 770 F. Supp. 3d at 1201-03.

---

[1]　This Complaint refers to both "websites" and "internet applications," § 47-18-5702(9)(A), by the shorthand reference "websites." It refers to websites regulated by challenged provisions of the Act as "covered websites." Unless otherwise noted, statutory citations in this Complaint refer to Title 47 of the Tennessee Code.

All individuals, minors and adults alike, must comply with this age-verification requirement, which would force them to hand over personal information or identification that many are unwilling or unable to provide as a precondition to accessing and engaging in protected speech. The Supreme Court has held, however, that age-verification requirements "necessarily" "burden" both minors' and adults' "right to access" fully protected speech. *FSC*, 145 S. Ct. at 2316.

7. *Second*, the Act's requirement that a minor obtain parental consent as a prerequisite to becoming an account holder (and thus being able to access protected speech) on covered websites, § 47-18-5703(a)(2)(A), violates the First Amendment. *See Carr*, 2025 WL 1768621, at *13-14; *Uthmeier*, 2025 WL 1570007, at *15; *Yost*, 778 F. Supp. 3d at 954-55, 957; *Griffin*, 2025 WL 978607, at *8, *12-13; *Reyes*, 748 F. Supp. 3d at 1126 n.135, 1129-30. The Supreme Court has held that minors have the "right to speak or be spoken to without their parents' consent." *Brown*, 564 U.S. at 794-95 & n.3.

8. Because these provisions both burden members' ability to disseminate—and users' ability to access—protected speech, they independently trigger strict scrutiny.

9. Moreover, these speech regulations also separately trigger strict scrutiny because they depend on the Act's content-based and speaker-based central coverage definition of "social media company." § 47-18-5702(8)-(9). That coverage definition excludes websites based on their content, such as "career development" websites or websites that provide "interactive gaming or educational entertainment." § 47-18-5702(2)(B), (9); *see Carr*, 2025 WL 1768621, at *11; *Yost*, 716 F. Supp. 3d at 557-58; *Griffin*, 2025 WL 978607, at *8-9; *Reyes*, 748 F. Supp. 3d at 1123. "Content-based laws" regulating speech "are presumptively unconstitutional and may be justified only if" they satisfy "strict scrutiny." *Reed v. Town of Gilbert*, 576 U.S. 155, 163-64 (2015) (citations omitted). Similarly, the coverage definition discriminates based on who is speaking—

3

regulating covered websites but not others focused on "[o]nline shopping" or "career development," § 47-18-5702(9)(B)(iv)-(v), and singling out for favorable treatment websites that "consist[] primarily of content that . . . is preselected by the . . . website" while regulating websites that disseminate "content that is . . . generated by account holders," § 47-18-5702(9)(B)(iii)(*a*). Supreme Court precedent is "deeply skeptical" of laws "distinguishing among different speakers." *NIFLA v. Becerra*, 585 U.S. 755, 777-78 (2018) (cleaned up).

10.     None of the Act's provisions can satisfy the demanding requirements of strict scrutiny, nor any level of heightened scrutiny. They are not appropriately tailored to any substantial or compelling governmental interest.

11.     Finally, the Act should also be enjoined as its central "social media company" definition, § 47-18-5702(8), is unconstitutionally vague, leaving many websites uncertain about whether they must shoulder the Act's burdens.

12.     For these reasons and more, this Court should enjoin Defendant from enforcing the Act against Plaintiff's members and declare the Act unlawful.

## PARTIES & STANDING

13.     Plaintiff NetChoice is a District of Columbia nonprofit trade association for Internet companies.[2] NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while minimizing burdens that could prevent businesses from making the Internet more accessible and useful.

14.     NetChoice has standing to bring its challenges on at least two grounds.

15.     *First*, NetChoice has associational standing to challenge the Act, because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) challenging the

---

[2] NetChoice's members are listed at NetChoice, About Us, https://perma.cc/L3SL-RB9M.

4

Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge, which can be resolved based on facts shared by all covered member websites. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977); *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025); *Carr*, 2025 WL 1768621, at *4-6; *Yost*, 716 F. Supp. 3d at 548-50; *Uthmeier*, 2025 WL 1570007, at *6-9; *Reyes*, 748 F. Supp. 3d at 1118-19; *Paxton*, 747 F. Supp. 3d at 1029-31.

16.     Based on the Act's definitions, § 47-18-5702, the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Automattic, which owns and operates Tumblr; (2) Discord; (3) Dreamwidth; (4) Meta, which owns and operates Facebook, Instagram and Threads; (5) Nextdoor; (6) Pinterest; (7) Reddit; (8) Snap Inc., which owns and operates Snapchat; (9) X; and (10) YouTube. Although the Act does not regulate all of Plaintiff's members, this Complaint refers to members with services that the Act regulates as "members."

17.     *Second*, NetChoice has standing to assert the First Amendment rights of members' current and prospective users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *Fitch*, 134 F.4th at 805-07; *Carr*, 2025 WL 1768621, at *6-7; *Yost*, 716 F. Supp. 3d at 550-51; *Uthmeier*, 2025 WL 1570007, at *9; *Paxton*, 747 F. Supp. 3d at 1031.[3]

18.     Defendant Jonathan Skrmetti is the Tennessee Attorney General & Reporter. Defendant is a Tennessee resident and is sued in his official capacity. The Act gives the Tennessee Attorney General & Reporter authority to enforce the Act. § 47-18-5705. Defendant has publicly

---

[3] Except where noted otherwise, this Complaint uses the term "user" to encompass both of what the Act refers to as "user[s]" and "account holder[s]." § 47-18-5702(1), (10). When discussing the Act's requirements, this Motion also uses "minor," "adult," "account holder," and "user" to refer only to Tennessee minors, adults, account holders, and users covered by the Act. Plaintiff and its members reserve the right to argue that their compliance obligations for "users" (under the Act) are different than their compliance obligations for "account holders," and are different from the burdens discussed in this Complaint.

pursued enforcement against some of NetChoice's members under other laws, advancing claims related to minors' online welfare. *See, e.g.*, *Tennessee v. Meta Platforms, Inc.*, No. 23-1364-IV (Tenn. Ch. Davidson Cnty.).

19.     Moreover, Defendant has not disavowed enforcement under the Act against any covered NetChoice member—including disavowing enforcement while this litigation is pending.

## JURISDICTION & VENUE

20.     This Court has subject-matter jurisdiction under 28 U.S.C. §§ 1331 and 1343(a). This Court has authority to grant legal and equitable relief under 42 U.S.C. § 1983, injunctive relief under 28 U.S.C. § 1651, and declaratory relief under 28 U.S.C. § 2201(a).

21.     This Court has personal jurisdiction over Defendant because he resides in and/or conducts a substantial proportion of his official business in Tennessee. Venue is proper in this District under 28 U.S.C. § 1391(b) because Defendant resides in, and the events giving rise to this civil action occurred in, Tennessee.

22.     Defendant has not contested personal jurisdiction or venue.

## BACKGROUND

23.     **NetChoice members' covered websites disseminate and facilitate speech protected by the First Amendment.** "[S]ocial media" websites such as Plaintiffs' members' covered services "engage[] in expression" through their "display" and "compiling and curating" of protected "third-party speech" (text, audio, images, and video) "created by others." *Moody*, 603 U.S. at 716, 728, 731.

24.     They "allow[] users"—both minors and adults—"to gain access to information[,] communicate with one another," and "engage in a wide array of protected First Amendment activity." *Packingham*, 582 U.S. at 105, 107.

6

25. The vast array of speech on these websites includes expression at the heart of the First Amendment's protections for art, literature, politics, religion, and "entertain[ment]." *See Joseph Burstyn, Inc. v. Wilson*, 343 U.S. 495, 501 (1952).

26. Accordingly, NetChoice's covered members disseminate speech on their websites to adult and minor users, who use these services to engage in a wide variety of speech protected by the First Amendment.

27. For example, Discord enables people to create communities around online gaming. Dreamwidth allows users to share their writing, artwork, and innermost thoughts. "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about and advocate for the causes they care about, showcase their art or athletic talent, and hear from their local government officials. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows users to explore recipes, home decor, and more. On Reddit, users have access to hundreds of thousands of communities, endless conversation, and authentic human connection—with user-created and user-led communities on all manners of subjects. Snapchat is designed to allow users to have digital conversations with friends and family in ways that replicate real-life interactions. Threads provides a creative space where users can express their ideas in conversation with others, such as elected officials. Tumblr is a microblogging service that allows its users to discuss any topic, formatted to emphasize multimedia. On X (formerly Twitter), "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

7

28.     Each of these covered member websites curates and disseminates content, and enables users to engage in vast amounts of fully protected speech.

29.     All of these covered member websites allow their users to create accounts and communicate with other users through posts. § 47-18-5702(9).

30.     Like many other websites, NetChoice members require users to create an account before they can access some or all of the protected speech and functions available on their websites.

31.     **Existing options for parental control and oversight.** "[P]arents may rightly decide to regulate their child's use of social media—including restricting the amount of time they spend on it, the content they may access, or even those they chat with. And many tools exist to help parents with this endeavor." *Griffin*, 2025 WL 978607, at *3-4 (collecting evidence); *see e.g.*, *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1121 (9th Cir. 2024); *Reyes*, 748 F. Supp. 3d at 1126 & n.138.

32.     There are resources that collect all of these parental tools in one place. *E.g.*, Internet Matters, Parental Control Guides, https://perma.cc/4M5U-TS8M.

33.     Parents decide whether and when to let their minor children use computers, tablets, smartphones, and other devices to access the Internet. *Griffin*, 2025 WL 978607, at *3.

34.     Cellular and broadband Internet providers offer families tools to block certain online services from certain devices. *See, e.g.*, Verizon, Verizon Smart Family, https://perma.cc/JL7J-UKDF?type=image; AT&T, AT&T Secure Family, https://perma.cc/NG8R-RBDG; T-Mobile, Family Controls and Privacy, https://perma.cc/RLQ4-WVEM; Comcast Xfinity, Setting Up Parental Controls for Xfinity Internet, https://perma.cc/9PZK-4S98?type=image.

35.     Internet browsers also allow parents to control what online services their children may access. *See, e.g.*, Mozilla, Block and Unblock Websites with Parental Controls on Firefox,

8

https://perma.cc/LTS6-SNXS. For example, some browsers offer a "kids mode" or allow parents to see what online services their children are accessing the most. *See* Google, Safety Center, https://perma.cc/4KBZ-ETGM; Microsoft, Learn More About Kids Mode in Microsoft Edge, https://perma.cc/49V7-4RNE. Parents can also use widely available third-party software and browser extensions to reinforce these tools. *See, e.g.*, Kim Key, *The Best Parental Control Software for 2025*, PCMag (Nov. 15, 2024), https://perma.cc/5URH-L6G5.

36.     Wireless routers often have settings allowing parents to block particular websites, filter content, monitor Internet usage, and control time spent on the Internet. *See, e.g.*, Netgear, Netgear Smart Parental Controls, https://perma.cc/DFE6-RH95; tp-link, How to Configure Parental Controls on the Wi-Fi Routers (Case 1), https://perma.cc/3QFB-3WYP.

37.     Device manufacturers allow parents to limit the time their children may spend on the device, curtail the applications that can be used, filter online content, and control privacy settings. *See* Apple, Use Parental Controls on Your Child's iPhone and iPad, https://perma.cc/H5S5-4BV3; Google Family Link, Help Keep Your Family Safer Online, https://perma.cc/9P23-ANWB; Microsoft, Getting Started with Microsoft Family Safety, https://perma.cc/A3QJ-V7Y4; Samsung, Parental Controls Available on Your Galaxy Phone or Tablet, https://perma.cc/6AU9-JMA8.

38.     Many third-party applications also allow parents to control and monitor their children's online activities. *See, e.g.*, Alyson Behr, *The Best Parental Control Apps in 2025, Tested by Our Editors*, CNN underscored (Jan. 2, 2025), https://perma.cc/N6XA-8NH6.

39.     In addition, NetChoice members provide parents with tools and options to help monitor their minor children's activities.

40.     Parents and guardians can use supervision tools on Facebook, Instagram, and Threads to set daily time limits for their teens or limit use during select days and hours; set

reminders to close the apps; see the average amount of time their teen has spent on Facebook, Instagram, and Threads over the last week and the total time spent on Facebook, Instagram, and Threads for each specific day over the last week; see who their teen follows and who follows their teen; see which accounts their teen is blocking; see when their teen reports someone and for what reason; approve or deny their teens' requests to change default safety and privacy settings to a less strict state; and see their teen's settings for account privacy, messaging, and sensitive content. Instagram, Help Center, Parental Supervision, https://tinyurl.com/3p9k2r4v; Facebook, Help Center, Safety Resources for Parents, Supervision on Facebook, https://tinyurl.com/nyavua6f; Instagram, Help Center, Supervision on Threads, https://tinyurl.com/3sej7r3d. Facebook, Instagram, and Threads also provide teens with tools to set their own time limits and set scheduled breaks. *See, e.g.*, Meta, Giving Teens and their Parents More Ways to Manage Their Time on Our Apps (June 27, 2023), https://perma.cc/HP5V-Y42F; Instagram, Help Center, Set Reminders to Take a Break on Threads, https://tinyurl.com/2h393yfn. Moreover, Meta has announced that minors will be placed into Facebook and Instagram "Teen Accounts," which default to the strictest privacy settings and have limitations on who can contact minors, the content minors can see, and the time of day minors can receive notifications. *E.g.*, Instagram, Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents (Sep. 17, 2024), https://perma.cc/4JW3-7HYL. Via Teen Accounts, parents will have added supervision features, including ways to "[g]et insights into who their teens are chatting with" and seeing "topics [their] teen is looking at." *Id.* Minors under 16 "need a parent's permission to change any of these [Teen Accounts] settings to be less strict." Meta, We're Introducing New Built-In Restrictions for Instagram Teen Accounts, and Expanding to Facebook and Messenger (April 8, 2025), https://tinyurl.com/nta8a7mn; Instagram,

Introducing Instagram Teen Accounts: Built-In Protections for Teens, Peace of Mind for Parents, *supra*.

41.     Pinterest is "running an experiment" on reminders during the school day that remind minor users that "open[] the Pinterest app during the school day" to put down their phones, "pause notifications, and focus on school." Pinterest, Help Center, Resources for Parents and Caregivers of Teens, https://perma.cc/4Y39-YPHN.

42.     Snapchat's "Family Center" allows parents to see which friends the teen has been recently communicating with on Snapchat, view their list of friends, restrict sensitive content, and report abuse. *See* Snapchat Support, What is Family Center, https://tinyurl.com/bdfpxaj4.

43.     YouTube offers a "supervised experience" for teens, allowing parents (1) to receive email notifications when a teen "uploads a video or starts a livestream"; (2) to gain "insights into [their teen's] channel activity" (such as uploads, comments, and subscriptions); and (3) an option to link accounts between a parent and teen. YouTube, Choices for Every Family, https://perma.cc/7WWF-VELD. YouTube also automatically turns on reminders for teens "to take a break while browsing or watching videos or YouTube Shorts" and reminders for "when it's time for them to stop watching YouTube and go to bed." YouTube Help, Tips and Resources for Parents of Teens on YouTube, https://perma.cc/46SC-H432.

44.     All NetChoice members prohibit minors under 13 from accessing their main services (which are the services regulated by the Act here), although some offer separate experiences for users under 13 geared for that age group. For example, YouTube offers two services (YouTube Kids and a "supervised experience" on YouTube) for minors younger than 13 with parental consent. *See* YouTube for Families Help, Understand Your Choices as a Family,

https://perma.cc/7YZ8-HHN3. These services allow parents to select content settings, set screen time limits, and otherwise oversee their children's use of the services. *Id.*

45.     **Covered websites' dedication to beneficial user experiences and user security.** NetChoice's members expend vast resources to improve their services and curate the content on their websites to "create a distinctive expressive offering," *Moody*, 603 U.S. at 711, and best ensure that their services are appropriate for users, especially with respect to minors. They restrict the publication of content they consider harmful, like violent and sexual content, bullying, harassment, and content that encourages body shaming or eating disorders. Conversely, many covered websites promote positive and age-appropriate content, such as content that encourages a healthy self-image.

## TENNESSEE HOUSE BILL 1891

46.     The Tennessee Legislature enacted House Bill 1891, which places multiple content- and speaker-based speech restrictions—including parental-consent and age-verification requirements—on certain websites and their users.

47.     The Act took effect on January 1, 2025.

48.     **Content-based and speaker-based central coverage definition of "social media company." § 47-18-5702(8).** The Act targets an identifiable set of disfavored internet websites under its "social media company" coverage definition, which defines the scope of covered websites and excludes numerous others from its burdens based on their "subject matter" and thus their "content." *Reed*, 576 U.S. at 163; *see Sorrell v. IMS Health Inc.*, 564 U.S. 552, 563-64 (2011).

49.     These covered "actors" and "activities," *Moody*, 603 U.S. at 724, include the members and services identified above in ¶ 16.

50. The Act defines "[s]ocial media company" as "a person that is an interactive computer service and that provides a social media platform." § 47-18-5702(8); *see* § 47-18-5702(3) (defining "[i]nteractive computer service").

51. In turn, a "social media platform" means "a website or internet application that":

(i) Allows a person to create an account; and
(ii) Enables an account holder to communicate with other account holders and users through posts[.]

§ 47-18-5702(9)(A).

52. The Act defines "[p]ost" to mean "content that an account holder makes available on a social media platform for other account holders and users to consume." § 47-18-5702(7). This definition of "post" limits the Act's coverage to services that *publicly* disseminate speech on feeds, boards, forums, and similar webpages for multiple users to see, which accords with the common understanding of the term. *See, e.g.*, Posting, Cambridge.org Dictionary, https://perma.cc/64Z7-AR73 ("an electronic message or information that is put on a website in order to allow many people to see it"). A "post" on a "social media platform" therefore does not include "direct messaging" or "email." *Moody*, 603 U.S. at 719, 724-25; *see also* § 47-18-5702(9)(B)(ii) (expressly excluding "[a]n email service").

53. In other words, the Act singles out the "kinds" of "social media" websites discussed by the Supreme Court in *Moody* and *Packingham*—namely, websites that enable their users to view and engage in protected speech. *Moody*, 603 U.S. at 718-19; *Packingham*, 582 U.S. at 104-05. *Moody* applied full First Amendment protection to websites that work in exactly this way: "allow[ing] users to upload content . . . to share with others" and allowing those "viewing the content" to "react to it, comment on it, or share it themselves." *Moody*, 603 U.S. at 719.

54.     Second, the Act's definition of "social media platform" also contains a litany of content-based and speaker-based exceptions. The Act's coverage definition "[d]oes not include:"

> (i) A broadband internet access service . . . ;
> (ii) An email service;
> (iii) An internet service, internet application, or website:
>> (a) That consists primarily of content that is not generated by account holders, but rather is preselected by the service, application, or website provider; and
>> (b) For which interactive functionality is incidental to, directly related to, or dependent upon, the preselected content described in subdivision (9)(B)(iii)(*a*);
> (iv) Online shopping, if the interaction with other account holders or users is predominantly limited to the ability to send, receive, request, or settle funds, comment on transactions, display goods for sale, engage as consumers about products and reviews, or post a wish list;
> (v) An internet service, internet application, or website that primarily provides career development opportunities;
> (vi) A cloud storage or cloud computing service;
> (vii) An online service, application, or website in which interaction between users is predominately used for technical support, or limited to reviewing products offered for sale by electronic commerce or commenting on such reviews posted by other users; or
> (viii) Peer-to-peer payment platforms, if the interaction with other users or account holders is generally limited to the ability to send, receive, or request funds and to like or comment on such transactions, or other functions that are focused on sending, receiving, requesting, or settling payments between users or account holders[.]

§ 47-18-5702(9)(B) (paragraph breaks adjusted).

55.     Accordingly, the Act excludes the "kinds of websites" beyond "social media" for which *Moody* questioned whether a different First Amendment editorial-discretion analysis might apply. *See* 603 U.S. at 718-19, 724-25 (discussing email, online marketplace, peer-to-peer payment, and ride-sharing services).

56.     The Act's exclusion of "email service[s]," § 47-18-5702(9)(B)(ii), excludes "email," *Moody*, 603 U.S. at 725.

57.     The Act's exclusion of "[o]nline shopping," § 47-18-5702(9)(B)(iv), excludes "online marketplace[s] like Etsy," *Moody*, 603 U.S. at 725.

58.     The Act's exclusion of "[p]eer-to-peer payment platforms," § 47-18-5702(9)(B)(viii), excludes "payment service[s] like Venmo," *Moody*, 603 U.S. at 725.

14

59.     And the Act's exclusion of websites "consist[ing] primarily of content that is . . . preselected by the [website]," § 47-18-5702(9)(B)(iii)(*a*), excludes "ride-sharing service[s] like Uber," *Moody*, 603 U.S. at 725.

60.     Nothing in the Act defines key coverage terms, such as "primarily," "interactive functionality," "incidental to," "predominantly," and "generally." § 47-18-5702(9)(B)(iii)(*a*)-(*b*), (iv)-(v), (vii)-(viii).

61.     **Age-verification. § 47-18-5703(a)(1).** The Act requires covered websites to "verify the age of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder." § 47-18-5703(a)(1). The Act does not define or explain how covered websites must verify the ages of individuals who attempt to become account holders.

62.     The Act's age-verification requirement means that covered websites must verify every new account holder's age. But many people will not or cannot provide proof of age to gain access to the covered websites. That will deter people—both minors and adults—from accessing covered websites, thereby chilling their protected speech.

63.     Once an account holder's age has been verified, a covered social media company "is not required to reverify the individual's age . . . unless [the] parental consent" required for a minor to become an account holder "is revoked," § 47-18-5703(a)(3).

64.     The Act provides that a "social media company or third party shall not retain personally identifying information that was used to verify age." § 47-18-5703(c). Although this provision contemplates that "personally identifying information" is required to verify age, it does not define that term nor state to what extent a covered website can use such information to verify a user's age.

65.     **Parental consent. § 47-18-5703(a)(2).** The Act provides that, upon verifying an individual's age, "[i]f the individual is a minor, then the social media company must verify the express parental consent for the minor to become an account holder." § 47-18-5703(a)(2)(A).[4]

66.     If the covered "social media company" does not have "the express consent of the minor's parent to allow the minor to become an account holder," then the "social media company shall prohibit a minor from becoming an account holder." § 47-18-5703(a)(2)(B). Thus, the Act requires covered websites to obtain express parental consent as a precondition to access protected speech on covered websites.

67.     The Act does not define what is required to verify parental consent or what methods of parental consent are acceptable.

68.     The Act provides that "[a] social media company shall allow a parent to revoke consent for a minor to become or continue as an account holder." § 47-18-5703(b). And once parental consent has been verified, a social media company "is not required to reverify the individual's . . . parental consent, unless parental consent is revoked." § 47-18-5703(a)(3).

69.     The Act provides that a "social media company or third party shall not retain personally identifying information that was used to verify . . . parental consent." § 47-18-5703(c). Although this provision contemplates that "personally identifying information" is required to verify parental consent, it does not define that term nor state to what extent a covered website can use such information to verify parental consent for a user to become an account holder.

70.     The Act does not account for the difficulty in verifying a parent-child relationship. These difficulties are compounded when, *e.g.*, families are nontraditional, families have

---

[4] The Act defines "[m]inor" as "an individual who is: (A) Known or reasonably believed by a social media platform to be under eighteen (18) years of age; (B) Not emancipated; and (C) A resident of this state." § 47-18-5702(4).

differences in surname or address, parents disagree about consent, minors are unsafe at home, parents do not have or are unwilling to electronically submit documentation, or parental rights have been terminated.

71. **Parental supervision. § 47-18-5704.** The Act requires a "social media company" to "provide a minor account holder's parent with means for the parent to supervise the minor's account." § 47-18-5704. These "means must include options for the parent to view privacy settings on the account, set daily time restrictions, and implement breaks during which the minor cannot access the account." *Id.*

72. Although parental supervision is "option[al]" for parents, the Act still burdens covered websites' protected speech (and minors' access to protected speech) by requiring them to implement specific "means" of parental supervision.

73. **The Act's enforcement provisions. § 47-18-5705.** The Act gives the Tennessee Attorney General & Reporter authority to enforce the Act. Specifically, it provides that "[i]f the attorney general and reporter believes that a social media company is engaged in, has engaged in, or is about to engage in an act or practice prohibited by [the Act] and that proceedings would be in the public interest, then the attorney general and reporter may" conduct an investigation or bring an action in court for violations of the Act under Tennessee's Consumer Protection Act. § 47-18-5705 (citing §§ 47-18-106, 47-18-108).

74. The Act provides that in an action under the Tennessee Consumer Protection Act, "the attorney general and reporter may recover the penalties and other relief authorized under § 47-18-108." § 47-18-5705(a)(2). Those penalties include a "civil penalty of not more than one thousand dollars ($1,000) for each violation," costs, expenses, and attorney's fees. § 47-18-108(b)(3). Furthermore, in such an action, a court may revoke a license authorizing a person to engage in

17

business in Tennessee for knowing and persistent violations and may issue "a civil penalty of not more than two thousand dollars ($2,000), recoverable by the state for each violation," for any "knowing violation" of an injunction issued by the court. § 47-18-108(b)(2), (c).

## CLAIMS

75.     Plaintiff raises both (1) a facial challenge to the Act's provisions challenged in this lawsuit; and (2) a challenge to these provisions as applied to the members and services identified in ¶ 16.

76.     For all First Amendment claims, the facial challenge standard asks whether "a substantial number of [the Act's] applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Moody*, 603 U.S. at 723 (citation omitted). At a minimum, the Act is invalid to the extent it regulates "social media" websites, including as applied to Plaintiffs' members' regulated services identified in ¶ 16. *See John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010) (analyzing First Amendment challenge "to the extent of [the] reach" defined by Plaintiff). In other words, the Act's speech restrictions are unconstitutional to the extent that they restrict fully protected speech—or otherwise regulate based on content—on NetChoice's regulated member's websites.

77.     The First Amendment facial challenge here is straightforward "from the face of the law" because all aspects of the Act's speech-restricting provisions, "in every application to a covered social media company, raise the same First Amendment issues," so the Court "need not 'speculate about "hypothetical" or "imaginary" cases.'" *X Corp. v. Bonta*, 116 F.4th 888, 899 (9th Cir. 2024) (quoting *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 450 (2008)); *see Carr*, 2025 WL 1768621, at *8 ("[B]ecause the Act raises the same First Amendment issues in each application, the 'full range of [the Act's] applications' are those 'constitutionally impermissible' ones." (citation omitted)); *Uthmeier*, 2025 WL 1570007, at *15 ("The law by definition applies

18

to websites that serve as forums for First Amendment speech, and imposes the same onerous restriction with respect to each." (citation omitted)); *Paxton*, 747 F. Supp. 3d at 1038 (state law "raises the same First Amendment issues 'in every application to a covered business'" (quoting *Bonta*, 113 F.4th at 1116 (internal quotation marks omitted))); *Reyes*, 748 F. Supp. 3d at 1121 n.92 (noting that First Amendment facial challenge "questions are easily answered" where "[t]here is no dispute about who and what the Act regulates" or "how the First Amendment applies to *different* websites or regulatory requirements" (emphasis in original) (internal citation omitted)). At the very least, the Act's speech restrictions are unconstitutional to an extent that would substantially outweigh any constitutional applications.

78.     Similarly, for Plaintiff's First and Fourteenth Amendment vagueness claims, the court must "determine whether the enactment reaches a substantial amount of constitutionally protected conduct." *Belle Maer Harbor v. Charter Twp. of Harrison*, 170 F.3d 553, 557 (6th Cir. 1999) (quoting *Vill. of Hoffman Ests. v. Flipside, Hoffman Ests., Inc.*, 455 U.S. 489, 494 (1982)); *see Kolender v. Lawson*, 461 U.S. 352, 358 n.8 (1983). Here, a facial vagueness challenge is proper because "there is no reason to believe one social media company is better suited than another to understand [the Act's] vague terms." *Paxton*, 747 F. Supp. 3d at 1031.

79.     Each First and Fourteenth Amendment challenge raises the rights of both NetChoice members and those who use or could prospectively use NetChoice members' websites.

## COUNT I
## 42 U.S.C. § 1983
## VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT
## (ALL SPEECH REGULATIONS DEPENDING ON THE
## CENTRAL COVERAGE PROVISIONS – § 47-18-5702(2), (7)-(9))

80.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

19

81.     As incorporated against the States by the Fourteenth Amendment, the First Amendment's Free Speech and Free Press Clauses provide that governments "shall make no Law . . . abridging the Freedom of Speech, or of the Press." U.S. Const. amend. I. The First Amendment protects "publish[ing]," *Reno v. ACLU*, 521 U.S. 844, 852-53 (1997); "disseminat[ing]," *303 Creative LLC v. Elenis*, 600 U.S. 570, 594 (2023); and "creating, distributing, [and] consuming" protected speech. *Brown*, 564 U.S. at 792 n.1. And those rights apply to "social-media platforms." *Moody*, 603 U.S. at 719.

82.     "When the Government restricts speech, the Government bears the burden of proving the constitutionality of its actions." *FEC v. Cruz*, 596 U.S. 289, 305 (2022) (citation omitted).

83.     The State cannot demonstrate that the Act's restrictions and burdens on speech satisfy any form of heightened First Amendment scrutiny because the Act's central coverage provisions are unconstitutionally content-based and speaker-based. The "Government's content-based burdens must satisfy the same rigorous scrutiny as its content-based bans." *Sorrell*, 564 U.S. at 566 (citation omitted). "[F]or fully protected speech, 'the distinction between bans and burdens makes no difference to the level of scrutiny.'" *FSC*, 145 S. Ct. at 2315 n.12 (emphasis omitted) (citation omitted).

84.     The State cannot articulate a sufficient governmental interest supporting the Act, and—even if it could—the Act is not properly tailored to satisfy any form of First Amendment scrutiny.

85.     **The Act triggers strict scrutiny.** The Act triggers strict scrutiny because its provisions defining which "social media compan[ies]" are covered, § 47-18-5702(2), (7)-(9), are content-based and speaker-based.

86.     The First Amendment's "most basic" principle is that "government has no power to restrict expression because of its message, its ideas, its subject matter, or its content." *Brown*, 564 U.S. at 790-91 (citation omitted). A law "is facially content based . . . if it applies to particular speech because of the topic discussed or the idea or message expressed." *City of Austin v. Reagan Nat'l Advert. of Austin, LLC*, 596 U.S. 61, 69 (2022) (internal quotation marks and citation omitted). Government cannot use "subtler forms of discrimination that achieve identical results based on function or purpose." *Id.* at 74. "Content-based laws . . . are presumptively unconstitutional." *Reed*, 576 U.S. at 163 (citations omitted).

87.     The Act is a content-based law. For instance, the Act excludes a host of websites based on the subject matter presented on the particular website, including "[o]nline shopping," "career development opportunities," "technical support," "reviewing products offered for sale," "commenting on . . . reviews posted by other users," and "like[s]" or "comment[s]" on "[p]eer-to-peer payment platform[]" transactions. § 47-18-5702(9)(B)(iv)-(v), (vii)-(viii). Likewise, the Act excludes "interactive gaming" and "educational entertainment" from the definition "content" covered by the Act. § 47-18-5702(2)(B). "That is about as content-based as it gets." *Barr v. Am. Ass'n of Pol. Consultants, Inc.*, 591 U.S. 610, 619 (2020) (controlling plurality op.) (content-based exceptions trigger strict scrutiny); *see Carr*, 2025 WL 1768621, at *11; *Yost*, 716 F. Supp. 3d at 557-58; *Griffin*, 2025 WL 978607, at *8-9; *Reyes*, 748 F. Supp. 3d at 1123.

88.     In addition, the Act only regulates websites that "[e]nable[] an account holder to communicate with other account holders and users through posts" but excludes websites that "consist[] primarily of content . . . preselected by the . . . website." § 47-18-5702(9)(A)(ii), (B)(iii)(*a*). That is, websites where the "interactive functionality" between users is limited to content "preselected by the . . . website" are exempted from the Act's reach, but websites where the entire purpose

is the "interactive functionality" between users and the "posts" they "generate[]" are covered. § 47-18-5702(9)(A)(ii), (B)(iii)(*a*)-(*b*). That is a content-based distinction between websites. *See, e.g.*, *Paxton*, 747 F. Supp. 3d at 1037-38; *Griffin*, 2025 WL 978607, at *9; *Reyes*, 748 F. Supp. 3d at 1122.

89.     The Act's central coverage definition is also content-based because it singles out for favorable treatment websites that "consist[] primarily of content that . . . is preselected by the . . . website" while burdening websites that disseminate "content that is generated by account holders," § 47-18-5702(9)(B)(iii)(*a*), even if those websites also post or create their own content (as many websites do). *Students Engaged in Advancing Tex. v. Paxton*, 765 F. Supp. 3d 575, 592 (W.D. Tex. 2025) ("The elevation of . . . provider-generated content over user-generated content is a content-based regulation.").

90.     The Act's central coverage definition is also speaker-based, as it discriminates based on who is disseminating speech—regulating covered websites but not others focused on "[o]nline shopping," "career development," "technical support," "reviewing products offered for sale," "interactive gaming," or "educational entertainment." § 47-18-5702(2)(B), (9)(B)(iv)-(v), (vii). "[L]aws that single out [a subset of speakers], or certain elements thereof, for special treatment pose a particular danger of abuse by the State, and so are always subject to at least some degree of heightened First Amendment scrutiny." *Turner Broad. Sys., Inc. v. FCC*, 512 U.S. 622, 640-41 (1994) (cleaned up). Supreme Court precedent is "deeply skeptical" of laws "distinguishing among different speakers." *NIFLA*, 585 U.S. at 777-78.

91.     Because the Act's central coverage definition is both content-based and speaker-based, so too is each provision of the Act restricting speech that relies on this definition. *See Reyes*, 748 F. Supp. 3d at 1120 (finding "persuasive" the argument that "the entire Act facially

violates the First Amendment because the Act's operative [speech-restricting] provisions each rely on the Central Coverage Definition" (citation omitted)).

92. "[I]f a statute's gateway coverage definition is content-based, the statute as a whole is subject to strict scrutiny because the coverage definition applies in all applications of the statute." *Bonta*, 770 F. Supp. 3d at 1191.

93. The Act's age-verification requirement, § 47-18-5703(a)(1), regulates and burdens speech by requiring adults and minors to provide personal information to access protected speech.

94. The Act's parental-consent requirement, § 47-18-5703(a)(2), regulates and burdens speech by requiring minors to obtain parental consent to access protected speech.

95. The Act's parental-supervision requirement, § 47-18-5704, regulates speech by imposing legal duties on covered websites for disseminating speech of a certain type of content.

96. Therefore, because each of these provisions of the Act is a "[g]overnment regulation of speech," *Reed*, 576 U.S. at 163, and relies on the Act's content-based and speaker-based central coverage definition, each provision triggers strict scrutiny.

97. **All of the Act's speech regulations fail strict scrutiny.** Under strict scrutiny, the State must demonstrate that the Act is "the least restrictive means of achieving a compelling state interest." *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 607 (citation omitted). Strict scrutiny demands that "the curtailment of free speech must be actually necessary to the solution." *Brown*, 564 U.S. at 799. Further, under the First Amendment, Defendant has the burden to "specifically identify" how the Act addresses an "actual problem in need of solving." *Id.* (citation omitted); *Reyes*, 748 F. Supp. 3d at 1124 (same) (citations omitted). Moreover, Defendant must demonstrate that there is a problem in need of a *governmental* solution, as compared to private, family solutions,

and that any such governmental solution is one that has the least possible restrictive effect on speech.

98. The State cannot meet its burden here because the Act does not serve any compelling government interest. *See, e.g.*, *Reyes*, 748 F. Supp. 3d at 1124-25.

99. Although "a State possesses legitimate power to protect children from harm," "that does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794 (cleaned up).

100. Moreover, parents have a wealth of choices to help oversee their minor children online, and those choices provide families more flexibility than the State's one-size-fits-all mandate. The Supreme Court has repeatedly endorsed similar parental controls over governmental intervention. *See, e.g.*, *United States v. Playboy Ent. Grp., Inc.*, 529 U.S. 803, 826 (2000).

101. The State has not "specifically identif[ied]" how the Act's scope responds to "an actual problem in need of solving" by government mandate. *Brown*, 564 U.S. at 799 (cleaned up). Nor has it demonstrated why the Legislature ignored the viable alternatives available to parents. *See, e.g.*, *Bonta*, 113 F.4th at 1121; *Reyes*, 748 F. Supp. 3d at 1127.

102. The Act is also not properly or narrowly tailored to any articulated interest. It "is either underinclusive or overinclusive, or both, for all the purported government interests at stake." *Yost*, 716 F. Supp. 3d at 560.

103. The Act is overinclusive because it regulates all manner of protected speech, including political and religious speech that lies at the very heart of the First Amendment.

104. The Act's one-size-fits-all approach of treating all minors at every development stage alike—from websites' youngest users to seventeen-year-olds—is also vastly overbroad. *See Am. Booksellers Ass'n*, 484 U.S. at 396.

24

105.    The Act is simultaneously underinclusive, because it includes myriad exemptions, some of which result in allowing access to the exact same speech on a smaller or different website. For instance, a 16-year-old can exchange content with other users from around the world while gaming on Roblox ("interactive gaming") but cannot share the same content with individuals on Instagram without parental consent; she can network with colleagues and potential employers on LinkedIn but cannot network with those same individuals on X without parental consent. These exemptions undermine any contention that the State is addressing a "serious social problem." *Brown*, 564 U.S. at 802. In fact, the Act peculiarly seems to regulate websites that are most likely to offer parental controls and engage in content moderation, while leaving unregulated many web-sites that lack such oversight.

106.    The Act's central coverage definition is integral to each of the Act's operative speech regulations. It cannot be severed. Without this central definition, no other provision in the Act could operate. Thus, all of the Act's speech regulations are invalid.

107.    Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT II**
**42 U.S.C. § 1983**
**VOID FOR VAGUENESS UNDER THE FIRST AND FOURTEENTH AMENDMENTS**
**(ALL SPEECH REGULATIONS DEPENDING ON THE**
**CENTRAL COVERAGE DEFINITION – § 47-18-5702(2), (7)-(9))**

108.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

109.    The Act's central coverage definition of "social media company," § 47-18-5702(8), is unconstitutionally vague, and it violates principles of free speech and due process.

110.    "A fundamental principle in our legal system is that laws which regulate persons or entities must give fair notice of conduct that is forbidden or required." *FCC v. Fox TV Stations,*

*Inc.*, 567 U.S. 239, 253 (2012). And a law is unconstitutionally vague if it "fails to provide a person of ordinary intelligence fair notice of what is prohibited, or is so standardless that it authorizes or encourages seriously discriminatory enforcement." *United States v. Williams*, 553 U.S. 285, 304 (2008). The constitutional standard for vagueness is heightened for speech restrictions under the First Amendment. *Fox*, 567 U.S. at 253-54.

111.　The Act's central coverage definition fails to provide necessary notice. The central coverage definition's exclusions inconsistently use different terms to describe the scope of content on exempted websites. For example, it does not define "primarily," "incidental to," "predominantly," and "generally." § 47-18-5702(9)(B)(iii)(*a*)-(*b*), (iv)-(v), (vii)-(viii); *see Griffin*, 2025 WL 978607, at *15 (concluding similar coverage definition was unconstitutionally vague). That means that websites do not know what it means to "consist[] primarily of content that is not generated by account holders" or "primarily provide[] career development opportunities." § 47-18-5702(9)(B)(iii)(*a*), (v). LinkedIn, for example, is arguably a professional development website; yet LinkedIn also allows account holders to use the website for many other purposes, such as advocacy, advertising, or simply social interaction. It is not clear how much of LinkedIn's content must be related to career development opportunities for LinkedIn to be considered exempt from the Act.

112.　More critically, the Act uses other overlapping words to describe the scope of content on covered websites. For example, how does (1) the use of "*predominately*" in the exception for a "website in which interaction between users is predominately used for technical support" or (2) "generally" in the statutory exception for interactions on peer-to-peer payment platforms that are "*generally* limited to the ability to send, receive, or request funds and to like or comment on such transactions," § 47-18-5702(9)(B)(vii)-(viii) (emphases added), differ from (3) the use of "primarily" in the other exceptions, § 47-18-5702(9)(B)(iii)(*a*), (v)?

113.    Moreover, the Act excludes websites where the "interactive functionality is incidental to . . . preselected content." § 47-18-5702(9)(B)(iii)(*b*). The use of terms like "primarily," "predominantly," "generally," and "incidental to" without definition renders the Act unconstitutionally vague.

114.    Many websites, including NetChoice members, will have no way of knowing what these "term[s]" mean, even though they are "critical to determining which entities fall within [the Act]'s scope." *Griffin*, 2025 WL 978607, at *15. Therefore, the Act "leav[es] companies to choose between risking unpredictable and arbitrary enforcement . . . and trying to implement the Act's costly . . . requirements. Such ambiguity renders a law unconstitutional." *Id.*; *Fox*, 567 U.S. at 253.

115.    Because of this vagueness, the Act's central coverage definition violates the First Amendment and the Due Process Clause of the Fourteenth Amendment.

116.    The Act's central coverage definition is integral to each of the Act's operative speech regulations. It cannot be severed. Without this central definition, no other provision in the Act could operate. Thus, all of the Act's speech regulations are invalid.

117.    Unless declared invalid and enjoined, the Act will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment and Due Process rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT III**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE STATES BY THE FOURTEENTH AMENDMENT**
**(AGE VERIFICATION – § 47-18-5703(a)(1))**

118.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

119.    The Act's age-verification requirement, § 47-18-5703(a)(1), independently triggers, and cannot satisfy, any form of heightened First Amendment scrutiny.

27

120.    Multiple courts have preliminarily or permanently enjoined enforcement of similar age-verification requirements to create accounts on "social media" websites. *Carr*, 2025 WL 1768621, at *13; *Griffin*, 2025 WL 978607, at *13; *Reyes*, 748 F. Supp. 3d at 1129 n.169; *see Bonta*, 770 F. Supp. 3d at 1201-03 (age "estimation").

121.    Age-verification requirements "necessarily" "burden" both adults' and minors' "right to access" fully protected speech. *FSC*, 145 S. Ct. at 2316.

122.    "Requiring adult users to produce state-approved documentation to prove their age and/or submit to biometric age-verification testing imposes significant burdens on adult access to constitutionally protected speech and 'discourages users from accessing the regulated sites.'" *Griffin*, 2025 WL 978607, at *8 (alterations adopted) (quoting *Reno*, 521 U.S. at 856). So too for minors. Those who are not deterred must "forgo the anonymity otherwise available on the internet" as the state-imposed price of admission. *Id.* (quoting *Am. Booksellers Found. v. Dean*, 342 F.3d 96, 99 (2d Cir. 2003)); *see ACLU v. Mukasey*, 534 F.3d 181, 197 (3rd Cir. 2008) ("relinquish the anonymity to access protected speech").

123.    The age-verification provision triggers strict scrutiny because it relies on the Act's central coverage definition.

124.    The age-verification provision also independently triggers strict scrutiny because it "direct[ly] target[s] . . . fully protected speech." *FSC*, 145 S. Ct. at 2311 (citation omitted).

125.    The State cannot demonstrate what purported problem this provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

126.    The age-verification requirement is also not properly tailored. For example, the Act is underinclusive because it requires age verification before adults and minors can access content

on certain disfavored websites while allowing adults and minors to access the same content on other websites without such verification.

127. The Act's age-verification requirement is integral to the entire Act. Without this provision, no other provision in the Act could operate. The age-verification provision is not severable and thus the entire Act is invalid.

128. Unless declared invalid and enjoined, the Act's age-verification provision, § 47-18-5703(a)(1), will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

**COUNT IV**
**42 U.S.C. § 1983**
**VIOLATION OF THE FIRST AMENDMENT, AS INCORPORATED AGAINST THE**
**STATES BY THE FOURTEENTH AMENDMENT**
**(PARENTAL CONSENT– § 47-18-5703(a)(2))**

129. Plaintiff incorporates all prior paragraphs as though fully set forth herein.

130. The Act's parental-consent requirement, § 47-18-5703(a)(2), independently triggers, and cannot satisfy, any form of heightened First Amendment scrutiny.

131. Minors have robust First Amendment rights, and websites that publish and disseminate protected speech have the right to publish and disseminate that speech to minors absent governmental restraint. Although States have power to protect minors, that power "does not include a free-floating power to restrict the ideas to which children may be exposed." *Brown*, 564 U.S. at 794.

132. The Act requires covered websites and minor users to secure parental consent before allowing minor users to create or maintain an account and, therefore, before they can access protected speech. § 47-18-5703(a)(2). If a covered website cannot obtain express parental consent for a minor user, it must "prohibit [the] minor from becoming an account holder." § 47-18-5703(a)(2)(B). The Act therefore serves as a "complete bar" on minors' access to "websites integral

to the fabric of our modern society and culture"—and those websites' ability to disseminate speech to minors—absent parental pre-approval. *Packingham*, 582 U.S. at 109. But the Supreme Court has held that laws requiring parental consent for minors to access protected speech are unconstitutional. *Brown*, 564 U.S. at 795 & n.3, 804-05.

133.   These First Amendment protections should apply with equal force to the covered websites here, which the Supreme Court has repeatedly recognized disseminate and facilitate a broad range of fully protected speech for minors and adults alike. *See Moody*, 603 U.S. at 734; *Packingham*, 582 U.S. at 105.

134.   That, in part, is why courts have held that parental-consent requirements for minors to use "social media" websites violate the First Amendment. *Carr*, 2025 WL 1768621, at *13-14; *Uthmeier*, 2025 WL 1570007, at*15; *Yost*, 778 F. Supp. 3d at 954-55, 957; *Griffin*, 2025 WL 978607, at *8, *12-13; *Reyes*, 748 F. Supp. 3d at 1126 n.135, 1129-30.

135.   The parental-consent requirement triggers strict scrutiny because it relies on the Act's central coverage definition.

136.   The parental-consent requirement also independently triggers strict scrutiny. *Yost*, 778 F. Supp. 3d at 955.

137.   The State cannot demonstrate what purported problem the parental-consent provision responds to, how the provision is necessary to solve the problem, or why the existing and plentiful choices of private tools available to parents are insufficient to address any purported problem.

138.   The parental-consent requirement is also not properly tailored.

139.    For example, the Act is underinclusive because it still allows minors to be exposed to the alleged risks or harms the State claims the Act was created to address so long as they have a single parent's consent. *Brown*, 564 U.S. at 802.

140.    Similarly, the Act is underinclusive because it requires parental consent for minors to access content on certain disfavored websites while allowing minors to access the same content on other websites without such consent.

141.    Likewise, the Act is underinclusive because it requires parental consent only for minors who are new account holders on certain disfavored websites while allowing minors who are already account holders to access the same content on the same disfavored websites without such consent.

142.    Unless declared invalid and enjoined, the Act's parental-consent requirement, § 47-18-5703(a)(2), will unlawfully deprive Plaintiff's members and Internet users of their fundamental First Amendment rights and will irreparably harm Plaintiff, its members, and Internet users.

## COUNT V
## EQUITABLE RELIEF

143.    Plaintiff incorporates all prior paragraphs as though fully set forth herein.

144.    The Act, §§ 47-18-5701 to 5706—both as a whole and individual challenged provisions of the Act—violate federal law and deprive Plaintiff, its members, and its members' users of enforceable federal rights. Federal courts have the power to enjoin unlawful actions by state officials. *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015).

145.    This Court can and should exercise its equitable power to enter an injunction prohibiting Defendant from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members.

**COUNT VI**
**42 U.S.C. § 1983 AND 28 U.S.C. § 2201**
**DECLARATORY RELIEF**

146.     Plaintiff incorporates all prior paragraphs as though fully set forth herein.

147.     The Act violates the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprives Plaintiff, its covered members, and Internet users of enforceable rights. The Act is unlawful and unenforceable because the entire Act relies on an unconstitutional central coverage definition of covered "social media compan[ies]." § 47-18-5702(8).

148.     Sections 47-18-5702(2), (7)-(9); 47-18-5703; and 47-18-5704 of the Act are unlawful and unenforceable, together and separately, because they violate the First Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

149.     Sections 47-18-5702(2), (7)-(9); 47-18-5703; and 47-18-5704 of the Act are unlawful and unenforceable because they are unconstitutionally vague in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution and thereby deprive Plaintiff, its covered members, and Internet users of enforceable rights.

150.     The unlawful portions of the Act are not severable from the rest of the Act. The entire Act is therefore unlawful and unenforceable.

151.     With exceptions not relevant here, in any "case of actual controversy within [their] jurisdiction," federal courts have the power to "declare the rights and other legal relations of any interested party seeking such declaration." 28 U.S.C. § 2201(a).

152.     This Court can and should exercise its equitable power to enter a declaration that the entire Act is unconstitutional and otherwise unlawful.

32

153.     This Court can and should exercise its equitable power to enter a declaration that each of the Act's challenged provisions is unconstitutional and otherwise unlawful.

## PRAYER FOR RELIEF

Plaintiff requests an order and judgment:

a.   declaring that Tennessee House Bill 1891 (2024) is unlawful;

b.   declaring that Tennessee House Bill 1891 (2024) violates the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment, both facially and as applied to NetChoice's regulated members' services, including those identified in ¶ 16;

c.   declaring that Tennessee House Bill 1891 (2024) is void for vagueness under the First Amendment and the Due Process Clause of the Fourteenth Amendment to the Constitution;

d.   declaring that §§ 47-18-5702(2), (7)-(9); 47-18-5703; and 47-18-5704 violate the First Amendment to the Constitution, as incorporated by the Fourteenth Amendment, both facially and as applied to NetChoice's regulated members' services, including those identified in ¶ 16;

e.   declaring that §§ 47-18-5702(2), (7)-(9); 47-18-5703; and 47-18-5704 are void for vagueness in violation the First Amendment and Due Process Clause of the Fourteenth Amendment to the Constitution;

f.   enjoining Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Plaintiff or its members;

g.   entering judgment in favor of Plaintiff;

h.   awarding Plaintiff its attorneys' fees and costs incurred in bringing this action, including attorneys' fees and costs under 42 U.S.C. § 1988(b) for successful 42 U.S.C. § 1983 claims against state officials; and

i.   awarding Plaintiff all other such relief as the Court deems proper and just.

Dated: August 13, 2023

Respectfully submitted,

Junaid Odubeko (Bar No. 023809)

BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway Suite 2400
Nashville, TN 37203
(615) 244-2582
jodubeko@bradley.com

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW,
 Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com
shannon@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

*Admitted pro hac vice*

*Attorneys for Plaintiff NetChoice*