# UNITED STATES DISTRICT COURT
## FOR THE MIDDLE DISTRICT OF TENNESSEE
### NASHVILLE DIVISION

| | |
|---|---|
| NETCHOICE, | |
| *Plaintiff*, | |
| v. | Civil Action No. 3:24-cv-01191 |
| JONATHAN SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter, | |
| *Defendant*. | |

## PLAINTIFF NETCHOICE'S OPPOSITION TO
## <u>DEFENDANT'S PARTIAL MOTION TO DISMISS AMENDED COMPLAINT</u>

# Table of Contents

Table of Authorities .............................................................................................................. ii

Introduction ........................................................................................................................... 1

Background ............................................................................................................................ 3

Standard of Review .............................................................................................................. 4

Argument ............................................................................................................................... 5

    I.   NetChoice has standing to raise First Amendment claims challenging the Act's speech restrictions as applied to NetChoice's members' twelve regulated services. ......... 5

        A.  NetChoice's as-applied First Amendment claims, on behalf of its members' twelve regulated services, assert categorical arguments about the Act that do not depend on any factual differences among these twelve websites. ............................................... 5

        B.  NetChoice has standing to raise as-applied First Amendment claims to laws restricting access to, and dissemination of, protected speech on its regulated members' services. ...................................................................................................... 9

            1.  NetChoice's First Amendment claims to the Act's content-based speech restrictions as applied to NetChoice members' regulated services do not require individual members to participate as parties in this lawsuit. ..................... 9

            2.  NetChoice satisfies the jurisdictional requirements for associational standing because its regulated members would have standing to challenge the Act's speech restrictions and this challenge is germane to NetChoice's organizational purpose. ......................................................................................... 15

        C.  Defendant's contrary arguments rely on inapposite caselaw. ..................................... 17

    II.  NetChoice has stated a claim that the Act's central coverage definition is unconstitutionally vague. ...................................................................................................... 23

Conclusion ............................................................................................................................ 25

# Table of Authorities

**Cases**

*ACLU of Ohio, Inc. v. Taft*,
    385 F.3d 641 (6th Cir. 2004) .................................................................17

*Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*,
    389 F.3d 536 (6th Cir. 2004) ...................................4, 5, 10, 13, 15, 16

*Ams. for Prosperity Found. v. Bonta*,
    594 U.S. 595 (2021) ....................................................................1, 11

*Ashcroft v. Iqbal*,
    556 U.S. 662 (2009) ...........................................................................4

*Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*,
    627 F.3d 547 (5th Cir. 2010) .........................................................1, 10, 13

*Ass'n of Christian Schs. Int'l v. Stearns*,
    362 F. App'x 640 (9th Cir. 2010) ................................................21, 22, 23

*Baggett v. Bullitt*,
    377 U.S. 360 (1964) .........................................................................24

*Borrero v. United Healthcare of N.Y., Inc.*,
    610 F.3d 1296 (11th Cir. 2010) ................................................9, 10, 15

*Brown v. Ent. Merchs. Ass'n*,
    564 U.S. 786 (2011) ...................................................................1, 3, 8, 11

*Cal. Rifle & Pistol Ass'n, Inc. v. City of Glendale*,
    644 F. Supp. 3d 610 (C.D. Cal. 2022) .................................................14

*Coal. for Indep. Tech. Rsch. v. Abbott*,
    706 F. Supp. 3d 673 (W.D. Tex. 2023)................................................14

*Collins v. Yellen*,
    594 U.S. 220 (2021)..........................................................................16

*Comput. & Commc'ns Indus. Ass'n and NetChoice v. Paxton*,
    747 F. Supp. 3d 1011 (W.D. Tex. 2024).................................2, 10, 12, 13

*Comput. & Commc'ns Indus. Ass'n and NetChoice v. Uthmeier*,
    2025 WL 1570007 (N.D. Fla. June 3, 2025) ...........................2, 10, 12

*Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.,*
274 F.3d 377 (6th Cir. 2001) ................................................................................16

*Doe v. Byrd,*
2020 WL 1285428 (M.D. Tenn. Mar. 18, 2020) ....................................................4

*FEC v. Wis. Right To Life, Inc.,*
551 U.S. 449 (2007) ..............................................................................................12

*Free Speech Coal., Inc. v. Paxton,*
145 S. Ct. 2291 (2025) ..............................................................................2, 3, 11, 20

*Free Speech Coalition, Inc. v. Att'y Gen. of the United States,*
974 F.3d 408 (3d Cir. 2020) ..................................................................................20

*Grayned v. City of Rockford,*
408 U.S. 104 (1972) ..........................................................................................23, 24

*Harris v. McRae,*
448 U.S. 297 (1980) ..............................................................................................21

*Harris v. Mexican Specialty Foods, Inc.,*
564 F.3d 1301 (11th Cir. 2009) ............................................................................19

*Holder v. Humanitarian Law Project,*
561 U.S. 1 (2010) ..................................................................................................24

*Hunt v. Wash. State Apple Advert. Comm'n,*
432 U.S. 333 (1977) ............................................................................1, 5, 8, 15, 16

*John Doe No. 1 v. Reed,*
561 U.S. 186 (2010) ................................................................................................6

*Kaiser Aetna v. United States,*
444 U.S. 164 (1979) ..............................................................................................21

*Kolender v. Lawson,*
461 U.S. 352 (1983) ..............................................................................................24

*Lujan v. Defs. of Wildlife,*
504 U.S. 555 (1992) ..............................................................................................16

*McGlone v. Bell,*
681 F.3d 718 (6th Cir. 2012) ................................................................................16

*Moody v. NetChoice, LLC,*
603 U.S. 707 (2024) ............................................................................7, 8, 11, 18, 19

iii

*N.H. Motor Transp. Ass'n v. Rowe*,
  324 F. Supp. 2d 231 (D. Me. 2004) ...................................................................15

*N.Y.S. NOW v. Pataki*,
  261 F.3d 156 (2d Cir. 2001)...........................................................................22

*Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*,
  990 F. Supp. 245 (S.D.N.Y. 1997) .................................................................15

*Neighborhood Action Coal. v. City of Canton*,
  882 F.2d 1012 (6th Cir. 1989) ...........................................................1, 13, 14

*NetChoice v. Bonta*,
  761 F. Supp. 3d 1202 (N.D. Cal. 2024) .....................................................17, 18

*NetChoice, LLC v. Bonta*,
  Op., ECF 70, No. 25-146 (9th Cir. Sept. 9, 2025) .........................................17, 18

*NetChoice v. Carr*,
  2025 WL 1768621 (N.D. Ga. June 26, 2025) ....................................................19

*NetChoice, L.L.C. v. Fitch*,
  134 F.4th 799 (5th Cir. 2025) .......................................................................10

*NetChoice, LLC v. Griffin*,
  2025 WL 978607 (W.D. Ark. Mar. 31, 2025) ........................................2, 23, 25

*Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*,
  280 F.3d 278 (3d Cir. 2002).................................................................2, 10, 13, 15

*Packingham v. North Carolina*,
  582 U.S. 98 (2017).............................................................................3, 7, 11

*Minor I Doe ex rel. Parent I Doe v. Sch. Bd. for Santa Rosa Cty.*,
  264 F.R.D. 670 (N.D. Fla. 2010) ................................................................22, 23

*People First of Ala. v. Merrill*,
  491 F. Supp. 3d 1076 (N.D. Ala. 2020).........................................................15

*Pietsch v. Ward Cnty.*,
  446 F. Supp. 3d 513 (D.N.D. 2020).............................................................15

*Reed v. Town of Gilbert*,
  576 U.S. 155 (2015)......................................................................................11

*Rent Stabilization Ass'n of N.Y.C. v. Dinkins*,
  5 F.3d 591 (2d Cir. 1993)..........................................................................21, 22

*Retired Chi. Police Ass'n v. City of Chi.*,
    7 F.3d 584 (7th Cir. 1993) .......................................................................13

*Singer v. United States*,
    38 F.3d 1216 (6th Cir. 1994) ......................................................................6

*Smith v. California*,
    361 U.S. 147 (1959)...................................................................................24

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*,
    535 U.S. 302 (2002)...................................................................................21

*Trump v. CASA*,
    145 S. Ct. 2540 (2025)...............................................................................14

*United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*,
    517 U.S. 544 (1996).............................................................................9, 13

*Vill. of Hoffman Ests. v. Flipside*,
    455 U.S. 489 (1982)...................................................................................24

*Virginia v. Am. Booksellers, Inc.*,
    484 U.S. 383 (1988).....................................................................................9

*Warth v. Seldin*,
    422 U.S. 490 (1975).............................................................................13, 14

**Statutory and Constitutional Provisions**

Cal. Health & Safety Code § 27000.5.............................................................18

Tenn. Code § 47-18-5702 ...........................................1, 2, 16, 18, 19, 23, 25

Tenn. Code § 47-18-5703 ..............................................................3, 11, 18, 19

Tenn. Code § 47-18-5704 ...............................................................................3

U.S. Const., amend. V.....................................................................................21

**Other Authorities**

Order, ECF 11, *NetChoice, LLC v. Bonta*,
    9th Cir. No. 25-00146 (Jan. 28, 2025)......................................................17

Pet. Br., *Packingham v. State of North Carolina*,
    2016 WL 7321777 (U.S. Dec. 15, 2016) .....................................................7

**Introduction**

This Court should deny Defendant's motion to prematurely dismiss NetChoice's (1) as-applied First Amendment challenges, on behalf of its regulated members' twelve services, to Tennessee House Bill 1891's speech restrictions ("Act"); and (2) facial vagueness challenge to the Act's central "social media company" coverage definition, § 47-18-5702(8).[1]

On the as-applied First Amendment claims, NetChoice's request for "declaratory and injunctive relief" does not "require[] individualized proof" from specific websites, so these as-applied claims are "properly resolved in a group context." *Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 344 (1977). The Sixth Circuit has said that "seek[ing] injunctive relief" does "not require participation by the individual members because any injunctive relief granted would inure to the benefit of all members of the association actually injured." *Neighborhood Action Coal. v. City of Canton*, 882 F.2d 1012, 1017 (6th Cir. 1989) (citation omitted). That is consistent with the law of other circuits. *E.g.*, *Ass'n of Am. Physicians & Surgeons, Inc. v. Texas Med. Bd.*, 627 F.3d 547, 551-52 (5th Cir. 2010) (collecting decisions from Third and Seventh Circuits).

Here "the pertinent facts in these cases are the same across the board," as the First Amendment arguments raised in this lawsuit do not depend on any factual distinctions among the twelve specifically identified NetChoice member websites covered by this Act. *Ams. for Prosperity Found. v. Bonta*, 594 U.S. 595, 618 (2021). Across the board for all these websites, (1) the Act is content-based; (2) governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*," *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 795 n.3 (2011); and (3) "submitting to age verification is a burden on the exercise of" the "right to access"

---

[1] This brief refers to both "websites" and "internet applications," § 47-18-5702(9)(A), as "websites." It refers to websites regulated by challenged provisions of the Act as "covered websites." Unless otherwise noted, statutory citations refer to Title 47 of the Tennessee Code.

1

speech fully protected for both adults and minors alike, *Free Speech Coal., Inc. v. Paxton*, 145 S. Ct. 2291, 2309 (2025) ("*FSC*"). No distinctions among these twelve websites, which all disseminate a staggering amount of fully protected speech, can override these First Amendment defects. Nor should this Court discard NetChoice's as-applied First Amendment claims at the motion-to-dismiss stage "before [NetChoice] is given the opportunity to establish" the Act's cross-cutting and necessarily fatal First Amendment defects. *Pa. Psychiatric Soc'y v. Green Spring Health Servs., Inc.*, 280 F.3d 278, 286 (3d Cir. 2002).

Consequently, NetChoice seeks an injunction pertaining only to these twelve websites, and ruling for NetChoice on its as-applied First Amendment claims would provide NetChoice complete relief. There is no basis for Defendant or this Court to fundamentally alter the nature of NetChoice's claims. Multiple other courts have held that NetChoice has standing to raise as-applied First Amendment challenges to similar state laws preventing minors' and adults' access to "social media" websites. *E.g.*, *Comput. & Commc'ns Indus. Ass'n and NetChoice v. Uthmeier*, 2025 WL 1570007, at *9 (N.D. Fla. June 3, 2025); *Comput. & Commc'ns Indus. Ass'n and NetChoice v. Paxton*, 747 F. Supp. 3d 1011, 1030 (W.D. Tex. 2024). This Court should too.

On the facial vagueness claims, the Act's "social media company," § 47-18-5702(8), coverage definition creates uncertainty for NetChoice's other members, who are unsure whether they meet the Act's coverage criteria or qualify for any of the Act's content-based exceptions. In fact, another court has permanently enjoined enforcement of a similar law with a similar coverage definition as facially vague. *NetChoice, LLC v. Griffin*, 2025 WL 978607, at *15 (W.D. Ark. Mar. 31, 2025).

NetChoice respectfully requests that this Court deny Defendant's motion to dismiss.

2

## Background

NetChoice has challenged the Act's speech regulations as unconstitutionally restricting both the dissemination of, and access to, fully protected online speech. *See* ECF 88.

The Act uses content-based and vague coverage provisions to target disfavored covered websites for restrictions on speech. *See id.* ¶¶ 80-107. The Act restricts users' access to, and engagement with, protected speech on those websites—by requiring (1) age verification for *all* users to create accounts, § 47-18-5703(a)(1); and (2) parental consent for minors to create accounts, § 47-18-5703(a)(2); *see* ECF 88 ¶¶ 61-70. As NetChoice has explained, "NetChoice members require users to create an account before they can access some or all of the protected speech and functions available on their websites." ECF 88 ¶ 30. And the Act also requires websites to provide parental-supervision tools. § 47-18-5704; *see* ECF 88 ¶¶ 71-72.

Content-based regulations of speech trigger strict scrutiny and are "presumptively unconstitutional." *FSC*, 145 S. Ct. at 2302. Age verification and parental consent to access fully protected speech also independently trigger and fail strict scrutiny. *See* ECF 88 ¶¶ 2-7; *e.g.*, *FSC*, 145 S. Ct. at 2309 ("submitting to age verification is a burden on the exercise of" the "right to access" protected speech); *Packingham v. North Carolina*, 582 U.S. 98, 107 (2017) (First Amendment protects "access" to social media websites); *Brown*, 564 U.S. at 795 n.3 (governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*"); *see* ECF 88 ¶¶ 80-107, 118-42.

NetChoice has brought both "facial" and "as-applied" First Amendment challenges to the Act's speech restrictions. *See* ECF 88 ¶ 75. As explained in NetChoice's First Amended Complaint, "the Act is invalid to the extent it regulates 'social media' websites, including as applied to Plaintiffs' members' regulated services" identified by NetChoice: (1) Discord; (2) Dreamwidth;

(3) Facebook; (4) Instagram; (5) Nextdoor; (6) Pinterest; (7) Reddit; (8) Snapchat; (9) Threads; (10) Tumblr; (11) X; and (12) YouTube. *Id.* ¶¶ 12, 76.

And NetChoice has challenged the Act's central "social media company" coverage provisions as *facially* vague. *Id.* ¶¶ 78, 108-117. "Each First and Fourteenth Amendment challenge raises the rights of both NetChoice members and those who use or could prospectively use NetChoice members' websites." *Id.* ¶ 79.

Defendant's motion to dismiss challenges only NetChoice's as-applied First Amendment challenges (under Rule 12(b)(1)) and facial vagueness challenge (under 12(b)(6)). Mot.5.

## Standard of Review

The same standard of review applies to both Defendant's 12(b)(1) and 12(b)(6) motion: "[T]his Court must accept as true all material allegations contained in the complaint and liberally construe them in favor of the complaining party." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

Defendant's 12(b)(1) motion to dismiss (the as-applied First Amendment claims for lack of standing) is a "facial"—as compared to "factual"—attack on NetChoice's standing. *See* Mot.5-11. "A facial attack is a challenge to the sufficiency of the pleading itself, requiring the Court to take allegations in the complaint as true and construe those allegations in the light most favorable to the non-moving party." *Doe v. Byrd*, 2020 WL 1285428, at *3 (M.D. Tenn. Mar. 18, 2020) (citation omitted).

And Defendant's 12(b)(6) motion to dismiss (the facial vagueness claim), *see* Mot.12-15, likewise requires this Court to treat NetChoice's factual allegations as true. *Byrd*, 2020 WL 1285428, at *2.

4

**I.    NetChoice has standing to raise First Amendment claims challenging the Act's speech restrictions as applied to NetChoice's members' twelve regulated services.**

NetChoice meets all three elements of associational standing for both its facial and as-applied First Amendment challenges: "[1] its members would otherwise have standing to sue in their own right, [2] the interests at stake are germane to the organization's purpose, and [3] neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Canoe*, 389 F.3d at 540 (citation omitted); *accord Hunt*, 432 U.S. at 344.

Defendant incorrectly asserts that NetChoice's as-applied First Amendment claims brought on behalf of ten NetChoice members and their twelve regulated services violates the third, prudential prong of this standing test. *See* Mot.5-11. Specifically, Defendant argues that these as-applied claims demand detailed, service-specific inquiries that "require[] the participation of individual members." Mot.6 (citation omitted). Defendant does not contest the first two, jurisdictional prongs.

But Defendant's arguments misconstrue the nature of NetChoice's as-applied First Amendment claims. As a consequence, Defendant's associational-standing analysis is flawed. Moreover, Defendant relies on inapt precedent, while ignoring the on-point precedent supporting NetChoice's standing. At any rate, it would be premature to dismiss NetChoice's as-applied claims at the outset of this litigation.

**A.    NetChoice's as-applied First Amendment claims, on behalf of its members' twelve regulated services, assert categorical arguments about the Act that do not depend on any factual differences among these twelve websites.**

Before addressing NetChoice's associational standing to bring as-applied First Amendment claims on behalf of its regulated members, it is necessary to define what NetChoice's as-applied challenges entail in this lawsuit. NetChoice's First Amendment claims challenging the Act's speech restrictions as applied to its twelve regulated member websites rely on categorical

5

arguments about cross-cutting First Amendment flaws in the Act. These arguments are common to all regulated members, and thus do not rely on member-specific or fact-dependent arguments. As a result, these claims are unlike the kind of fact-intensive "as-applied" claims that Defendant envisions, which turn on the unique way a law applies to an individual regulated entity. And they therefore do not require the kind of member- and service-specific inquiries that Defendant argues would violate the third, prudential prong of associational standing.

The Supreme Court has held that litigants can choose to challenge specific applications of a law and rely on categorical arguments about those applications. The Court has approved of litigants challenging laws only "to the extent" identified by the plaintiff. *John Doe No. 1 v. Reed*, 561 U.S. 186, 194 (2010). In *Doe v. Reed*, that meant that litigants were permitted to challenge a State's public-records law "only to the extent it covers referendum petitions." *Id.* The litigants there needed only to "satisfy [the] standards for a facial challenge *to the extent of that reach*." *Id.* (emphasis added). So the plaintiffs were not limited to raising only a facial challenge to the *entire scope* of the challenged law. *See id.* And the litigants were permitted to make categorical arguments in service of their challenge.

Here, NetChoice's as-applied claims contend that the Act is unconstitutional "to the extent" it regulates NetChoice's identified members' services—and it seeks only an injunction preventing the Act's enforcement against those services. *See* ECF 88 p.33 (request for relief); Mot.6 (recognizing NetChoice only seeks injunctions for its regulated members). At the same time, NetChoice's First Amendment arguments categorically apply across all these twelve covered member websites, and they do not depend on any differences among these websites. As a result, the arguments raised in NetChoice's as-applied challenges do not vary depending on the specific circumstances of how this law is applied to different covered members. *Contra* Mot.8 (citing *Singer v. United States*, 38

6

F.3d 1216 (6th Cir. 1994), which considered a challenge to housing discrimination law as applied to the criminal defendant's cross burning).

The Supreme Court's social media cases demonstrate why factual differences among the twelve regulated services are of no material consequence to the legal analysis here. *Moody v. NetChoice, LLC*, 603 U.S. 707 (2024); *Packingham*, 582 U.S. at 108.

*Packingham* held unconstitutional, under the First Amendment, a law preventing convicted sex offenders from accessing "social networking" websites. 582 U.S. at 101. The petitioner in that case argued the law was unconstitutional, both facially and as applied to the petitioner. Pet. Br., *Packingham v. State of North Carolina*, 2016 WL 7321777, at *61 (U.S. Dec. 15, 2016). The Court held that the government may not broadly restrict "access to the world of ideas." *Packingham*, 582 U.S. at 108. Unsurprisingly, given the nature of that right, the Court did not suggest that the analysis between the facial and as-applied challenges should be different among distinct websites. It did not consider the differences among regulated websites as unique as "Facebook," "Twitter," "Amazon.com, Washingtonpost.com, and Webmd.com"— let alone suggest that the law could ever be constitutional as applied to such services based on any differences among them. *Id.* at 106. Nor did it remand for further fact-finding about particular websites, *id.*, which Defendant incorrectly contends will be necessary here. *Contra* Mot.8-9.

*Moody* demonstrates how courts can resolve First Amendment challenges to a law to the extent it applies to specific websites. Specifically, *Moody* relied on declarations from two NetChoice members (Meta and Google) to hold that the main curated feeds of "Facebook" and "YouTube" (and others like them) have a right to "present[] a curated compilation of speech originally created by others." 603 U.S. at 728. The Court itself said that NetChoice's arguments there were akin to as-applied challenges limited "to the curated feeds offered by the largest and most

7

paradigmatic social-media platforms—as if, say, each case presented an as-applied challenge brought by Facebook protesting its loss of control over the content of its News Feed." *Id.* at 718. And the Court *encouraged* litigants like NetChoice to bring as-applied claims focused on particular members or functions. *See, e.g.*, *id.* This is precisely what NetChoice has done here.

In fact, *Moody*'s discussion of the *facial* challenge there shows the distinctions between (1) claims pertaining to a law just to the extent it applies to specific websites versus (2) a facial challenge implicating all websites (potentially) covered by the law. For the latter facial challenge, *Moody* identified factual questions about whether the "laws might apply to, and differently affect, other kinds of websites and apps." *Id.* In contrast, claims challenging a law only to the extent it applies to specifically identified websites do not need to analyze this broader set of all other kinds of covered websites. *See id.*

Other Supreme Court cases are also illustrative. *Brown v. Entertainment Merchants Ass'n* held that the First Amendment prohibited a California law prohibiting minors from buying or renting "violent video games." 564 U.S. at 789, 805. That case was brought by associations "representing the video-game and software industries." *Id.* at 789. Associational standing was not even questioned in the case. Nor would it have been if the organizations argued that law was unconstitutional only to the extent it applied to their members (*e.g.*, specific video game stores or particular video game developers). Nothing about adjudicating that law's unconstitutional parental-consent requirement "require[d] the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343. That was true even though there were undoubtedly some differences among the plaintiff associations' members, including: differing business practices of video game stores and developers, diverse technical aspects of different video games (*e.g.*, graphics, subject matter, gameplay), and myriad other distinctions without any First Amendment difference.

Similarly, a booksellers' trade association has standing to bring First Amendment claims challenging a law requiring parental consent and age verification to the extent it applied to purchasing books or newspapers. *Cf. Virginia v. Am. Booksellers, Inc.*, 484 U.S. 383, 388 n.3 (1988). The court would not need "individualized" proof of each seller's "diverse" methods. *Id.* at 389 & n.4.

### B. NetChoice has standing to raise as-applied First Amendment claims to laws restricting access to, and dissemination of, protected speech on its regulated members' services.

With the nature of NetChoice's as-applied claim properly understood, NetChoice plainly has associational standing to raise as-applied claims on behalf of ten specific members operating twelve specific services. Tellingly, Defendant cites no case holding that associations are categorically prohibited from asserting as-applied claims on behalf of specific members. That is because the nature of the claim and relief are what matters—not how a claim is styled (*i.e.*, facial versus as-applied). The nature of NetChoice's claims here permit NetChoice to raise as-applied First Amendment claims on behalf of ten specific members.

### 1. NetChoice's First Amendment claims to the Act's content-based speech restrictions as applied to NetChoice members' regulated services do not require individual members to participate as parties in this lawsuit.

NetChoice satisfies the "prudential" (*i.e.*, *non*-jurisdictional) prong of associational standing: whether "the claim asserted []or the relief requested requires the participation of individual members in the lawsuit." *United Food & Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 544, 546, 553 (1996) (citation omitted); *see* Mot.5 (recognizing third prong is "prudential"). This prong "focus[es] on . . . matters of administrative convenience and efficiency." *United Food*, 517 U.S. at 557. So associations can still satisfy this prong even if some amount of discovery from association members is warranted. The question is whether either the claim or requested relief "would require *excessive participation* by individual members." *Borrero v. United Healthcare of*

9

*N.Y., Inc.*, 610 F.3d 1296, 1306 (11th Cir. 2010) (emphasis added); *accord Pa. Psychiatric Soc'y*, 280 F.3d at 284-87 (rejecting argument that "some individual participation" is grounds for dismissal where "the heart of [a] complaint" for injunctive relief "involves systemic" issues). In any event, this Court should not dismiss NetChoice's as-applied claims prematurely "before [NetChoice] is given the opportunity to establish the alleged violations without significant individual participation." *Pa. Psychiatric Soc'y*, 280 F.3d at 286.

   **a.** Start with the "claim asserted." *Am. Canoe*, 389 F.3d at 540. NetChoice raises First Amendment claims challenging restrictions on accessing and disseminating fully protected speech. These First Amendment claims require little, if any, factual development. "Proving the illegality of the" Act's speech restrictions *may* "require[] some evidence from members, but once proved as to some, the violations would be proved as to all." *Ass'n of Am. Physicians*, 627 F.3d at 552. As other courts have held in similar NetChoice challenges, the "participation of individual members is not necessary to answer the legal questions raised by either Plaintiff['s] facial or as applied challenges here." *Uthmeier*, 2025 WL 1570007, at *9; *Paxton*, 747 F. Supp. 3d at 1030. To the extent that this case requires information from members, the "case c[an] be proved by sample testimony" or even publicly available information. *Borrero*, 610 F.3d at 1306.

   NetChoice's First Amendment claims raise legal arguments for which the few relevant facts are common among all twelve services at issue. Specifically, each of those services allows users to receive and engage in undisputedly staggering amounts of fully protected speech.

   This Court can resolve NetChoice's as-applied claims without the participation of individual members as parties, because the Act "imposes relatively uniform requirements" on each of the twelve services. *Paxton*, 747 F. Supp. 3d at 1031. That is especially true from the perspective of members' *users*, whose rights NetChoice can also raise. *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799,

805-07 (5th Cir. 2025). The Act uses a content-based set of coverage provisions to burden and restrict "access" to these twelve "social media" websites, which the Supreme Court has held that people have a First Amendment right to access free from governmental restraint. *Packingham*, 582 U.S. at 107. The Act requires age verification for *all* users (adults and minors) to create accounts. § 47-18-5703(a)(1). "[S]ubmitting to age verification is a burden on the exercise of" the "right to access" protected speech. *FSC*, 145 S. Ct. at 2309. And the Act requires parental consent for minors to create accounts to access and engage in protected speech. § 47-18-5703(a)(2). But governments lack the "power to prevent children from hearing or saying anything *without their parents' prior consent*," *Brown*, 564 U.S. at 795 n.3; *see* ECF 88 ¶¶ 80-107, 118-42.

Resolving these claims requires this Court only to construe the Act's requirements and judge them against binding First Amendment precedent. The "pertinent" facts to the First Amendment analysis "are the same across the board" for the twelve services at issue. *Ams. for Prosperity*, 594 U.S. at 618. All NetChoice covered members' services disseminate a "staggering" amount of fully protected speech, across "billions of posts or videos." *Moody*, 603 U.S. at 719, 734. They are the kinds of social media websites that the Supreme Court has held people have a right to "access" free from governmental restraint. *Packingham*, 582 U.S. at 107. Both age verification and parental consent burden access to protected speech, triggering strict scrutiny. *FSC*, 145 S. Ct. at 2309; *Brown*, 564 U.S. at 795 n.3. And content-based regulations of speech must satisfy strict scrutiny. *Reed v. Town of Gilbert*, 576 U.S. 155, 163 (2015).

Defendant asserts that NetChoice's as-applied claims require a "fact-intensive" inquiry. Mot.9 (citation omitted). But Defendant does not explain why the facts he claims he needs to develop are "pertinent" facts to the First Amendment analysis here. *Ams. for Prosperity*, 594 U.S. at 618. More generally, the Supreme Court has held that First Amendment claims should "entail

minimal if any discovery to allow parties to resolve disputes quickly without chilling speech through the threat of burdensome litigation." *FEC v. Wis. Right To Life, Inc.*, 551 U.S. 449, 469 (2007) (controlling plurality op. of Roberts, C.J.).

Two decisions by other district courts in cases brought by NetChoice challenging similar laws illustrate the point.

The Western District of Texas concluded that NetChoice has associational standing to bring as-applied First Amendment challenges. *Paxton*, 747 F. Supp. 3d at 1030. There, NetChoice challenged (among other things) requirements for "social media" websites to monitor for and censor content-based and viewpoint-based categories of speech on their services, using precise technological means identified by the State. *Id.* at 1023-24.

And in response to similar arguments made by Defendant here, *Paxton* concluded—unlike the laws at issue in *Moody*—that the Texas law's "constitutionality does not seriously turn on Plaintiffs' members' particular activities. As is the case here, the parties' briefing and discovery will likely provide sufficient information to make individualized inquiries where needed." *Id.* at 1030. And the "law's overbroad tailoring d[id] not vary between covered" websites—which is also true here. *Id.* at 1031. So NetChoice's similar categorical arguments in that case required little (if any) member participation, which could be accomplished through normal discovery.

Similarly, in the context of a law prohibiting "social media" access for minors younger than 14 and requiring parental consent for 14- and 15-year-olds, *Uthmeier* concluded that the "questions this Court must answer—whether the challenged law implicates the First Amendment, whether it is content based or content neutral, and whether it is narrowly tailored to further a significant government interest—can all be answered without reference to the intricacies of each individual platform's operation." 2025 WL 1570007, at *9.

Defendant's motion dismisses these on-point cases without discussion. *See* Mot.12. Defendant does not even give this Court a reason to distinguish *Uthmeier*'s holding on NetChoice's standing. And it dismisses *Paxton* as involving dissimilar statutory requirements—even though the court rejected the same kinds of standing arguments that Defendant makes here.

**b.** The "relief requested" in this case does not require the participation of NetChoice's members as parties either. *Am. Canoe*, 389 F.3d at 540.

NetChoice asks only for declaratory and injunctive relief. ECF 88 at p.33. The Sixth Circuit has recognized that "seek[ing] injunctive relief" does "not require participation by the individual members because any injunctive relief granted would inure to the benefit of all members of the association actually injured." *Neighborhood Action*, 882 F.2d at 1017. And NetChoice "can prove its case with a sampling of evidence from its members." *Ass'n of Am. Physicians*, 627 F.3d at 551-52; *Pa. Psychiatric Soc'y*, 280 F.3d at 286; *Retired Chi. Police Ass'n v. City of Chi.*, 7 F.3d 584, 601-02, 608 (7th Cir. 1993).

Unsurprisingly, therefore, "courts regularly allow membership organizations and trade associations to bring suit on behalf of their members when they seek to enjoin enforcement of a statute or regulation, rather than damages." *Paxton*, 747 F. Supp. 3d at 1030 (citing *United Food*, 517 U.S. at 553-54); *see Warth v. Seldin*, 422 U.S. 490, 515 (1975) ("whether an association has standing to invoke the court's remedial powers on behalf of its members depends in substantial measure on the nature of the relief sought").

This case does not involve the kind of individualized relief that would require the participation of NetChoice's regulated members as parties. For instance, this case does not involve "claims for compensatory damages," which "would require evaluating separately the individual

circumstances of each member." *Neighborhood Action*, 882 F.2d at 1017 (discussing *Warth*, 422 U.S. at 515).

Defendant responds that "if an association could get an injunction that protects only some of its nonparty members, that kind of individualized relief lacks the efficiencies of associational standing and thus violates *Hunt*'s third, prudential prong." Mot.7 (citation omitted). But here, NetChoice's as-applied claims seek declaratory and injunctive relief for only twelve specific *regulated* members covered by this Act. *See* ECF 88 p.33. Defendant does not explain how NetChoice's requested injunctions benefiting NetChoice members' regulated services are permissible for NetChoice's facial challenge but would reduce "efficiencies" for NetChoice's as-applied challenge. Nor does he explain how NetChoice's ten members alternatively bringing claims on behalf of their own twelve regulated services would be more efficient.

At bottom, NetChoice's request for injunctions for its members' twelve regulated services would ensure the "injunctions" here would not "be 'broader than necessary' by covering nonparties or plaintiffs who lack their own standing and meritorious claim." Mot.9 (quoting *Trump v. CASA*, 145 S. Ct. 2540, 2562-63 (2025)).

**c.** Permitting NetChoice to raise as-applied claims on behalf of its regulated members here would be consistent with the decisions of other courts in different contexts. Contrary to Defendant's suggestions, courts often permit organizations to raise "as-applied" constitutional challenges on behalf of their members. *See, e.g.*, *Coal. for Indep. Tech. Rsch. v. Abbott*, 706 F. Supp. 3d 673, 686 (W.D. Tex. 2023) ("Plaintiff has brought a challenge to Texas's TikTok ban [for all public employees] *as applied to public university faculty*, who are both academics and public employees." (emphasis added)); *Cal. Rifle & Pistol Ass'n, Inc. v. City of Glendale*, 644 F. Supp. 3d 610, 615-16 (C.D. Cal. 2022) (permitting organization's as-applied Second Amendment claim on behalf of

members); *People First of Ala. v. Merrill*, 491 F. Supp. 3d 1076, 1134 (N.D. Ala. 2020) (permitting as-applied challenges on behalf of organization members to voting regulations); *Pietsch v. Ward Cnty.*, 446 F. Supp. 3d 513, 530 (D.N.D. 2020), *aff'd*, 991 F.3d 907 (8th Cir. 2021) (permitting organization to bring as-applied procedural due process claim on behalf of members); *N.H. Motor Transp. Ass'n v. Rowe*, 324 F. Supp. 2d 231, 235 (D. Me. 2004) (permitting as-applied preemption claim on behalf of organization's members); *Nat'l Ass'n of Coll. Bookstores, Inc. v. Cambridge Univ. Press*, 990 F. Supp. 245, 250 (S.D.N.Y. 1997) ("association-wide facts sufficient to prove an element of the plaintiffs' claim could be shown").

*       *       *

In sum, neither NetChoice's claims nor the relief NetChoice has requested require the participation of individual members as parties. In all events, it would be "premature" to dismiss NetChoice's claims "at the pleadings stage" based on Defendant's arguments. *Borrero*, 610 F.3d at 1306 n.3. Instead, "should the actual litigation . . . involve excessive individual participation, the district court retains discretion to consider the associations' standing at that later time." *Id.* The Third Circuit—which Defendant relies on extensively—has cautioned that a lawsuit "should not be dismissed before it is given the opportunity to establish the alleged violations without significant individual participation." *Pa. Psychiatric Soc'y*, 280 F.3d at 286.

### 2. NetChoice satisfies the jurisdictional requirements for associational standing because its regulated members would have standing to challenge the Act's speech restrictions and this challenge is germane to NetChoice's organizational purpose.

Otherwise, Defendant does not contest NetChoice's associational standing under the first two, jurisdictional prongs of the associational-standing analysis. Nor could he.

First, NetChoice's "members would otherwise have standing to sue in their own right." *Am. Canoe*, 389 F.3d at 540 (citation omitted); *accord Hunt*, 432 U.S. at 344.

15

In general, the "object" of a governmental restriction (like a regulated party) has standing to challenge that restriction. *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 561 (1992). Here, NetChoice has pleaded, "[b]ased on the Act's definitions, § 47-18-5702, the Act regulates, at a minimum, services offered by the following NetChoice members: (1) Automattic, which owns and operates Tumblr; (2) Discord; (3) Dreamwidth; (4) Meta, which owns and operates Facebook, Instagram and Threads; (5) Nextdoor; (6) Pinterest; (7) Reddit; (8) Snap Inc., which owns and operates Snapchat; (9) X; and (10) YouTube." ECF 88 ¶ 16. Defendant has never refuted that *any* identified NetChoice member is regulated by the Act—let alone *all* of them. To the contrary, Defendant seems to agree that at least some NetChoice members must comply with the Act's speech restrictions. *See* ECF 43 at 2 ("As for NetChoice's other members, NetChoice is silent. It thus concedes what's become public: That these members have not come into compliance with Tennessee's law.").

Plus, NetChoice's members face two additional injuries further qualifying as Article III injuries for standing. "A mere threat to First Amendment interests is a legally cognizable injury." *Deja Vu of Nashville, Inc. v. Metro. Gov't of Nashville & Davidson Cnty.*, 274 F.3d 377, 399 (6th Cir. 2001); *see McGlone v. Bell*, 681 F.3d 718, 729 (6th Cir. 2012). In addition, regulated members would need to expend unrecoverable funds to comply with the Act. And a "pocketbook injury is a prototypical form of injury in fact." *Collins v. Yellen*, 594 U.S. 220, 243 (2021).

Second, challenging the Act on behalf of its members is "germane to [NetChoice's] purpose." *Am. Canoe*, 389 F.3d at 540; *accord Hunt*, 432 U.S. at 344. "NetChoice's mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while minimizing burdens that could prevent businesses from making the Internet more accessible and useful." ECF 88 ¶ 13. The Act imposes restrictions on access to and dissemination of online

speech, so challenging the Act's speech restrictions is germane to NetChoice's purpose. *E.g.*, *ACLU of Ohio, Inc. v. Taft*, 385 F.3d 641, 646 (6th Cir. 2004).

### C.    Defendant's contrary arguments rely on inapposite caselaw.

Defendant's arguments rely on inapposite caselaw, concerning dissimilar claims outside the First Amendment context or different kinds of as-applied challenges—or both.

**1.** Three cases Defendant highlights deserve particular attention.

*NetChoice v. Bonta*'s associational-standing analysis is both distinguishable and wrongly decided. *Contra* Mot.2, 8 (citing district court's decision, 761 F. Supp. 3d 1202 (N.D. Cal. 2024)).[2] Notably, neither the *Bonta* district court nor the Ninth Circuit held that NetChoice *categorically* lacks standing to bring as-applied claims on behalf of its members. Indeed, the district court noted that for at least one of NetChoice's claims, "the Court sees no meaningful difference between the facial analysis and as-applied analysis." *Bonta*, 761 F. Supp. 3d at 1230. And the Ninth Circuit evaluated NetChoice's "as-applied challenge[s] to the Act's requirement that minors' accounts operate with certain default settings"—even sustaining one of NetChoice's as-applied claims. *NetChoice, LLC v. Bonta*, Op. at 19, 23, ECF 70, No. 25-146 (9th Cir. Sept. 9, 2025) ("*Bonta* Op.").

The portion of the district court decision that Defendants cited concerned NetChoice's as-applied challenges to a provision of California law requiring parental consent for minors to view *only personalized feeds* on "social media" websites. *Bonta*, 761 F. Supp. 3d at 1230. So the California law did not facially restrict threshold access to the regulated services. (The Act here, by contrast, does. *See supra* p.3.) Furthermore, that California law is limited only to websites that

---

[2] The Ninth Circuit issued its decision the same day this brief was filed, and after Defendant filed his opening brief. The Ninth Circuit largely adopted the district court's analysis, so this brief will address both—distinguishing the decisions where necessary.

have such feeds: "that offer[] users or provide[] users with an addictive feed as a significant part of the service provided by that internet website." Cal. Health & Safety Code § 27000.5(b)(1).

To begin, *Bonta* is distinguishable because the Tennessee Act here does not purport to regulate only personalized feeds—or only websites with personalized feeds. Instead, the Act imposes broad restrictions on threshold access to regulated websites. § 47-18-5703(a)(1)-(a)(2). And the Act's coverage provisions here are not limited to websites with personalized feeds. *Cf.* § 47-18-5702(9)(A) ("a website . . . that": "(i) [a]llows a person to create an account; and (ii) [e]nables an account holder to communicate with other account holders and users through posts").

In concluding that NetChoice lacked associational standing to bring as-applied claims to the regulations of personalized feeds, *Bonta* also committed two primary errors directly linked to that law's restrictions on only personalized feeds: (1) the First Amendment merits analysis; and (2) how the First Amendment merits analysis affects NetChoice's associational standing.

*Bonta* misapplied *Moody*, which held that social media websites engage in First Amendment protected expression when they present "personalized" "feeds." *Moody*, 603 U.S. at 734. That is why *Moody* stated, in multiple ways, that the First Amendment protects websites when they disseminate "personalized," "customized," "curated," or "individualized" "feeds" to their users as part of a "larger offering" of protected expression. *Id.* at 718, 734, 738, 744. Yet *Bonta* wrongly concluded that "whether an algorithmic feed is expressive"—and "the nature of a First Amendment claim related to algorithmic speech"—"requires review of *each* member's algorithm and how it functions" and is 'fact intensive' and will 'surely vary' from 'platform to platform.'" *Bonta* Op. at 17. *Moody* could not have been clearer that "personalized" feeds, including the main feeds of "Facebook" and "YouTube," are fully protected by the First Amendment. 603 U.S. at 734. And that includes when these feeds engage in "prioritization of content" and "implement [their

editorial] standards" through "algorithms." *Id.* at 734-35. The State has no power to "correct the mix of speech that the major social-media platforms present," including when social media web-sites choose to disseminate personalized feeds of fully protected speech. *Id.* at 740.

This erroneous merits analysis, regarding the "personalized" feeds regulated by the Cali-fornia law, infected *Bonta*'s associational-standing analysis. The Ninth Circuit concluded that it "was thus *reasonable* for the district court to conclude that, as a *prudential matter*, NetChoice had not established associational standing without more information about members' algorithms and feeds." *Bonta* Op. at 19 (emphases added). As explained above at p.10, the fact that *some* discovery from members might be appropriate to illustrate the application of the law—or even necessary to define the scope of relief—does not defeat associational standing. In any event, *Bonta* illustrates that the prudential nature of the associational-standing analysis precludes any hardline rule pre-venting organizations from raising as-applied First Amendment challenges on behalf of their reg-ulated members—as *Bonta* itself addressed multiple other as-applied claims raised by NetChoice, beyond California's personalized-feed provision. *See Bonta* Op. at 19-27.

Second, *NetChoice v. Carr* misunderstood the nature of NetChoice's as-applied First Amendment claims. 2025 WL 1768621, at *7 (N.D. Ga. June 26, 2025). It concluded that "[a]n as-applied challenge 'necessarily requires the development of a factual record for the court to con-sider,' which does not exist in the pre-enforcement context." *Id.* (quoting *Harris v. Mexican Spe-cialty Foods, Inc.*, 564 F.3d 1301, 1308 (11th Cir. 2009)). Tellingly, the *Harris* case cited by *Carr* discussed an "as-applied excessiveness challenge" to a federal law's statutory-damages require-ment that *Harris* concluded was "not ripe for adjudication." 564 F.3d at 1307. That *Harris* as-applied challenge, therefore, depended on the specific *money damages* that the litigant there could face. *Id.* at 1309. It is unlike the "as-applied" challenges here regarding, for example, the First

Amendment rights to access and disseminate fully protected speech free from government restraint, which turn on categorical arguments and seek only declaratory and injunctive relief. *See supra* p.13 (citing Sixth Circuit precedent).

Third, *Free Speech Coalition, Inc. v. Attorney General of the United States*, is also inapposite. 974 F.3d 408 (3d Cir. 2020); *contra* Mot.7-8. The case considered altogether distinguishable restrictions "requir[ing] producers of pornography to verify the age and identity *of each person portrayed*, to keep records of the age verification, and to label each depiction with the location where law enforcement may obtain those records." *Id.* at 413. The law considered by the Third Circuit applied to the *production* of pornography and "ensur[ed] that producers of sexually explicit depictions 'confirm' performers are not children." *Id.* at 423. This case does not involve pornography websites. In general, pornography is a unique category of speech the Supreme Court has recognized as implicating different First Amendment doctrines because it is simultaneously protected for adults and unprotected for minors. *See FSC*, 145 S. Ct. at 2310. And the government plainly can "protect[] children from sexual exploitation by pornographers" by prohibiting the creation of child sex abuse material. *Free Speech Coal.*, 974 F.3d at 429. In any event, the as-applied claims in that case were brought on behalf of "about 800 members who engage in producing and distributing sexually explicit depictions, ranging from directors, producers, writers, cameramen, and lighting technicians, to sellers of sexually explicit depictions farther down the stream of commerce." *Id.* at 422 (cleaned up). The law at issue there would necessarily affect different groups of members in different ways that were material to precisely whether and how the First Amendment applied. Such a broad set of hundreds of disparate as-applied claims is far different from the as-applied claims at issue here relying on categorical arguments on behalf of twelve similarly situated websites. *See supra* Part I.A.

**2.** The other cases cited by Defendant fare no better. These cases involved different doctrines or particular claims that necessarily require ad hoc, individualized inquiries.

For instance, First Amendment free-exercise claims often depend on the interaction between an otherwise-valid law and the unique religious practices of particular individuals or groups. *Cf.* Mot.6 (citing *Harris v. McRae*, 448 U.S. 297, 321 (1980); *Ass'n of Christian Schs. Int'l v. Stearns*, 362 F. App'x 640, 644 (9th Cir. 2010)). As the Supreme Court has said, "it is necessary in a free exercise case for one to show the coercive effect of the enactment as it operates against him in the practice of his religion," so a free-exercise claim "is one that ordinarily requires individual participation." *Harris*, 448 U.S. at 321 (cleaned up). In *Harris* in particular, the plaintiffs themselves said that "the permissibility, advisability and/or necessity of abortion according to circumstance is a matter about which there is diversity of view within . . . our membership." *Id.* So the law in *Harris* did not even necessarily affect the free exercise of all members—let alone affect them in similar ways.

Takings claims can be similar. *Cf.* Mot.6 (citing *Rent Stabilization Ass'n of N.Y.C. v. Dinkins*, 5 F.3d 591, 598 (2d Cir. 1993)). A successful takings claim requires showing that there has been (1) a "taking" (2) *without* payment of "just compensation." U.S. Const., amend. V. Both inquiries can be individualized, especially when "regulatory" takings are at issue, as in the *Rent Stabilization* case cited by Defendants: The Supreme Court's "regulatory takings jurisprudence . . . is characterized by essentially *ad hoc, factual inquiries*, designed to allow careful examination and *weighing of all the relevant circumstances*." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 322 (2002) (emphasis added) (cleaned up); *Kaiser Aetna v. United States*, 444 U.S. 164, 175 (1979) ("essentially ad hoc, factual inquiries" looking at "several factors—such as the economic impact of the regulation, its interference with reasonable investment

backed expectations, and the character of the governmental action"). *Rent Stabilization* involved a regulatory takings argument that the Second Circuit concluded entailed "an ad hoc factual inquiry for each landlord who alleges that he has suffered a taking," evaluating: "the landlord's particular return based on a host of individualized financial data" and "the reasons for any failure to obtain an adequate return, because the Constitution certainly cannot be read to guarantee a profit to an inefficient or incompetent landlord." 5 F.3d at 596.

Due-process claims like those referenced by Defendant can likewise implicate member-specific inquiries. *Contra* Mot.6 (citing *N.Y.S. NOW v. Pataki*, 261 F.3d 156, 171-72 nn.4-5 (2d Cir. 2001)). *N.Y.S. Now*, cited by Defendant, considered as-applied due-process challenges to the notice provided to individual claimants under state law, which the court concluded "would plainly require examination of facts specific to each claimant concerning whether the Division's particular efforts to locate and inform each of them that they were at risk for a [dismissal of their claims] comported with the strictures of due process." 261 F.3d at 171 n.4. As the court explained, whether notice is constitutionally adequate requires the court to determine whether notice is "reasonably calculated, under all the circumstances, to apprise interested parties of the pendency of the action and afford them an opportunity to present their objections." *Id.* at 171 (cleaned up). Such notice would necessarily vary among the government's specific efforts to find and tell members of the organization about the dismissal risks.

And the particular kinds of free-speech claims relied on by Defendant are the exceptions to the general rule that categorical First Amendment arguments challenging speech restrictions can be resolved in a group context. *Contra* Mot.6. For example, *Ass'n of Christian Schools* involved as-applied First Amendment claims about the University of California's "review and approval of high school courses in order to qualify applicants for" admission. 362 F. App'x at 643. The Ninth

Circuit concluded that whether any individual course was unconstitutionally rejected "require[d] 'individualized proof'" about the courses that were rejected. *Id.* at 644 (citation omitted). In other words, whether the government violated the First Amendment depended on the specific facts about particular courses and the schools that offered them. Similarly, *Minor I Doe ex rel. Parent I Doe v. School Board for Santa Rosa County*, considered as-applied challenges to a consent decree that limited particular religious activities on school property. 264 F.R.D. 670, 673-74 (N.D. Fla. 2010). But the extent to which that consent decree affected people of different faiths and practices was highly individualized: "the nature of any claim that the consent decree in fact chills private First Amendment free speech rights is highly dependent on a showing of individual and particularized factual circumstances that are not common to all of [the association's] members or shared in equal degree among them." *Id.* at 688. Here, by contrast, the Act's speech restrictions impose uniform burdens on the twelve services at issue—and those services' users.

## II. NetChoice has stated a claim that the Act's central coverage definition is unconstitutionally vague.

NetChoice has stated a claim that Act's central coverage definition of "social media company," § 47-18-5702(8), is unconstitutionally vague under First Amendment and due process principles. *See* ECF 88 ¶¶ 108-117.[3] Multiple courts have held that similar coverage provisions are likely unconstitutional, and at least one court has conclusively found similarly exception-riddled definitions to be unconstitutionally vague. *See Griffin*, 2025 WL 978607, at *15 (granting NetChoice permanent injunction on similar vagueness challenge).

"It is a basic principle of due process that an enactment is void for vagueness if its prohibitions are not clearly defined." *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972). Vague

---

[3] NetChoice does *not* bring an as-applied vagueness challenge. *See* ECF 88 ¶ 78; *contra* Mot.9-10.

laws offend at least two baseline values: first, that persons should have a "reasonable opportunity to know what is prohibited" so they can "steer between lawful and unlawful conduct," and second, that "laws must provide explicit standards for those who apply them" to prevent "arbitrary and discriminatory" enforcement. *Id.* (footnotes omitted).

Defendant primarily contends that a facial vagueness challenge is unavailable here because the law concededly applies to some of NetChoice's members. Mot.12. Not so. As the Supreme Court has repeatedly held, a facial vagueness challenge asks only whether an "enactment reaches a *substantial amount* of constitutionally protected conduct." *Vill. of Hoffman Ests. v. Flipside*, 455 U.S. 489, 494 (1982) (emphasis added); *Smith v. California*, 361 U.S. 147, 151 (1959) ("[S]tricter standards of permissible statutory vagueness may be applied to a statute having a potentially inhibiting effect on speech."). Accordingly, the Court stated in *Kolender v. Lawson* that the notion that a law must be "vague in all of its possible applications" for a facial vagueness challenge to succeed was an "inaccurate" "description of [the Court's] holdings." 461 U.S. 352, 359 n.8 (1983). That broad understanding of the availability of facial vagueness challenges is especially salient here, where the law "abut[s] upon sensitive areas of basic First Amendment freedoms"; in these cases, the government must "'steer far wider of the unlawful zone' than if the boundaries of the forbidden areas were clearly marked." *Baggett v. Bullitt*, 377 U.S. 360, 372 (1964) (citation omitted). *Holder v. Humanitarian Law Project*, 561 U.S. 1 (2010) (cited at Mot.12), is not to the contrary. There, the Court determined that the parties could not demonstrate that they intended to engage in the conduct about which the statute's proscription was vague—and, thus, they could not maintain a facial challenge. *See id.* at 20. Here, by contrast, the question is about the universe of those to whom the law applies—a universe that may (or may not) include other NetChoice members.

24

Defendant's arguments about the Act's specific vague terms fare no better. Here, determining whether the Act's speech restrictions apply to a website often depends on identifying a website's "primar[y]," "incidental," "predominant[]," or "general[]" functions. § 47-18-5702(9)(B)(iii)(*a*)-(*b*), (iv)-(v), (vii)-(viii). But the Act does not define any of those vague terms. That means that websites do not know what it means to "*primarily* provide[] career development opportunities." § 47-18-5702(9)(B)(v) (emphasis added). Nor do websites know when "interactive functionality is *incidental* to . . . preselected content." § 47-18-5702(9)(B)(iii)(*b*) (emphasis added).

Accordingly, NetChoice can bring facial vagueness claims. True, NetChoice has some members with services that are covered. *See supra* pp.3-4. But NetChoice's other members—or members' other services—lack guidance about whether they must shoulder the Act's burdens. So the fact that NetChoice can identify some covered members does not mean that it cannot argue the Act is facially vague. *Contra* Mot.12.

On the merits, *Griffin* considered a law relying on similar terms, concluding that it was unconstitutionally vague. 2025 WL 978607, at *15. Both there and here "predominant or exclusive function" was undefined, even though that statutory phrase is "critical to determining which entities fall within [the law]'s scope." *Id.* "Worse," the Act is "ambiguous as to whose 'primary purpose' is being considered—the user in creating the account or the company in making the forum available." *Id.* at *16. Consequently the Act leaves "companies [to] choose between risking unpredictable and arbitrary enforcement . . . and implementing the Act's costly . . . requirements." *Id.* This "ambiguity renders a law unconstitutional." *Id.*

## Conclusion

NetChoice respectfully requests this Court deny Defendant's motion to dismiss.

Dated: September 9, 2025

Junaid Odubeko (Bar No. 023809)
BRADLEY ARANT BOULT CUMMINGS LLP
1221 Broadway Suite 2400
Nashville, TN 37203
(615) 244-2582
jodubeko@bradley.com

Joshua P. Morrow*
LEHOTSKY KELLER COHN LLP
408 W. 11th Street, 5th Floor
Austin, TX 78701
(512) 693-8350
josh@lkcfirm.com

Jared B. Magnuson*
LEHOTSKY KELLER COHN LLP
3280 Peachtree Road NE
Atlanta, GA 30305
(512) 693-8350
jared@lkcfirm.com

Respectfully submitted,

*/s/ Steven P. Lehotsky*
Steven P. Lehotsky*
Scott A. Keller*
Jeremy Evan Maltz*
LEHOTSKY KELLER COHN LLP
200 Massachusetts Avenue, NW, Suite 700
Washington, DC 20001
(512) 693-8350
steve@lkcfirm.com
scott@lkcfirm.com
jeremy@lkcfirm.com

*admitted *pro hac vice*

*Attorneys for Plaintiff NetChoice*

26

**CERTIFICATE OF SERVICE**

I hereby certify that on September 9, 2025, a true and correct copy of the foregoing was filed electronically via the Court's CM/ECF system, causing electronic service upon all counsel of record in this case.

*/s/ Jeremy Evan Maltz*
Jeremy Evan Maltz