**UNITED STATES COURT OF APPEALS**
FOR THE SIXTH CIRCUIT

Kelly L. Stephens
Clerk

100 EAST FIFTH STREET, ROOM 540
POTTER STEWART U.S. COURTHOUSE
CINCINNATI, OHIO 45202-3988

Tel. (513) 564-7000
www.ca6.uscourts.gov

Filed: August 28, 2026

Ms. Madeline Clark
Office of the Attorney General
Of Tennessee
P.O. Box 20207
Nashville, TN 37202-0207

Mr. Kevin A. Golembiewski
Berney & Sang
1628 JFK Boulevard
Suite 1000 8 Penn Center
Philadelphia, PA 19103

Mr. Aaron David Mackey
Electronic Frontier Foundation
815 Eddy Street
Suite 312
San Francisco, CA 94109

Mr. James R. Marsh
Marsh Law Firm
31 Hudson Yards
11th Floor
New York, NY 10001

Mr. Thomas Ryan McCarthy
Consovoy McCarthy
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209

Mr. Joshua Paul Morrow
Lehotsky Cohn
7500 Rialto Boulevard
Suite 1-250
Austin, TX 78735

Ms. Erin Murphy
Clement & Murphy
706 Duke Street
Alexandria, VA 22314

Mr. Cameron Thomas Norris
Consovoy McCarthy
1600 Wilson Boulevard
Suite 700
Arlington, VA 22209

Mr. James Y. Xi
Clement & Murphy
706 Duke Street
Alexandria, VA 22314

Re: Case No. 25-5660, *NetChoice, LLC v. Jonathan Skrmetti*
Originating Case No. 3:24-cv-01191

Dear Counsel,

The court today announced its decision in the above-styled case.

Enclosed is a copy of the court's published opinion together with the judgment which has been entered in conformity with Rule 36, Federal Rules of Appellate Procedure.

Yours very truly,

Kelly L. Stephens, Clerk

Cathryn Lovely
Deputy Clerk

cc: Ms. Vicki R Kinkade

Enclosures

Mandate to issue.

RECOMMENDED FOR PUBLICATION
Pursuant to Sixth Circuit I.O.P. 32.1(b)

File Name: 26a0250p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

NETCHOICE, LLC,
*Plaintiff-Appellant*,

*v*.

JONATHAN THOMAS SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter,
*Defendant-Appellee*.

No. 25-5660

Appeal from the United States District Court for the Middle District of Tennessee at Nashville.
No. 3:24-cv-01191—Eli J. Richardson, District Judge.

Argued: February 4, 2026

Decided and Filed: August 28, 2026

Before: BATCHELDER, CLAY, and RITZ, Circuit Judges.

## COUNSEL

**ARGUED:** Erin E. Murphy, CLEMENT & MURPHY, PLLC, Alexandria, Virginia, for Appellant. J. Matthew Rice, OFFICE OF THE TENNESSEE ATTORNEY GENERAL & REPORTER, Nashville, Tennessee, for Appellee. **ON BRIEF:** Scott A. Keller, LEHOTSKY KELLER COHN LLP, Washington, D.C., Joshua P. Morrow, LEHOTSKY KELLER COHN LLP, Austin, Texas, for Appellant. J. Matthew Rice, Matthew D. Cloutier, OFFICE OF THE TENNESSEE ATTORNEY GENERAL & REPORTER, Nashville, Tennessee, Thomas McCarthy, Cameron T. Norris, CONSOVOY MCCARTHY, PLLC, Arlington, Virginia, for Appellee. Aaron Mackey, ELECTRONIC FRONTIER FOUNDATION, San Francisco, California, Kevin A. Golembiewski, OFFICE OF THE FLORIDA ATTORNEY GENERAL, Tallahassee, Florida, James R. Marsh, MARSH LAW FIRM PLLC, New York, New York, for Amici Curiae.

BATCHELDER, J., delivered the opinion of the court in which RITZ, J., concurred. CLAY, J. (pp. 22–31), delivered a separate dissenting opinion.

---

**OPINION**

---

ALICE M. BATCHELDER, Circuit Judge. Plaintiff NetChoice, LLC, a trade association of internet companies, sought a preliminarily injunction barring Defendant Tennessee Attorney General and Reporter Jonathan Skrmetti's enforcement of Tennessee's Protecting Children from Social Media Act ("The Act"), Tenn. Code §§ 47-18-5701–5706. At its core, The Act requires social-media companies to verify the ages of their prospective account holders and, if a prospective account holder is a minor, obtain parental consent before allowing the minor to become an account holder. *Id.* § 47-18-5703(a). According to NetChoice, its members now face unrecoverable statutory-compliance costs and stand to have their and their users' freedom of speech abridged by Skrmetti's enforcement of The Act.

The district court denied NetChoice's motion for a preliminary injunction, finding that NetChoice had not shown irreparable harm to its members at this juncture. *NetChoice v. Skrmetti*, No. 3:24-CV-01191, 2025 WL 1710228, at *14–15 (M.D. Tenn. June 18, 2025). In particular, the district court deemed NetChoice's members' alleged loss of First Amendment freedoms insufficiently imminent and certain. *Id.* at *9–12. And the court dismissed outright NetChoice's assertion of irreparable harm from unrecoverable statutory-compliance costs. *Id.* at *12–14. Having found an absence of this dispositive factor, the district court denied the motion without considering the other preliminary-injunction factors. *Id.* at *14–15.

We cannot agree with the district court's survey of NetChoice's claimed irreparable harm. The kinds of harm asserted by NetChoice meet our threshold requirement of irreparability. *See Commonwealth v. Biden*, 57 F.4th 545, 556 (6th Cir. 2023) (unrecoverable compliance costs); *Roman Cath. Diocese of Brooklyn v. Cuomo*, 592 U.S. 14, 19 (2020) (loss of First Amendment freedoms). And while the asserted "injury 'must be both certain and immediate,' not 'speculative or theoretical,'" *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 327 (6th Cir. 2019) (citation omitted), it need not be already underway before a movant may seek preliminary relief, particularly when the alleged harm takes the form of deterred or chilled speech. Here, the Act's enforcement mechanism, combined with Skrmetti's statements made in

the course of this litigation, indicate that NetChoice's alleged harm—if arising from an actual violation of its members' rights—is "likely, not remediable at final judgment, and immediate." *Fischer v. Thomas* ("*Fischer II*"), 78 F.4th 864, 868 (6th Cir. 2023). The district court's assessment to the contrary was an abuse of discretion.

But a facial (or, in the case of the alleged First Amendment harm, theoretical) showing of irreparable harm is not the end of the road. Unrecoverable compliance costs may satisfy a threshold finding of irreparable harm, but "the peculiarity and size of a harm affects its weight in the equitable balance . . . ." *Biden*, 57 F.4th at 556 (citations omitted). And irreparable harm can arise from the loss of First Amendment freedoms only insofar as those First Amendment freedoms were actually lost. In other words, this latter form of irreparable harm is intimately bound up with the movant's showing on the first preliminary-injunction factor: likelihood of success on the merits. *See Connection Distrib. Co. v. Reno*, 154 F.3d 281, 288 (6th Cir. 1998). Further, NetChoice must address the remaining factors (the balance of the equities and the public interest), and the court must still "weigh the strength of the four factors against one another." *D.T.*, 942 F.3d at 326. Finally, any remedy to which NetChoice is entitled must be "tailored to redress [its] particular injury." *See Ohio v. Becerra*, 87 F.4th 759, 784 (6th Cir. 2023) (quoting *Gill v. Whitford*, 585 U.S. 48, 73 (2018)). But the district court did not reach these steps. Because the first consideration of a challenge to a novel statute is normally not the province of this court, *see Fair Hous. Ctr. of Metro. Detroit v. Singh Senior Living, LLC*, 124 F.4th 990, 993 (6th Cir. 2025), we **VACATE** the district court's order denying NetChoice's motion for a preliminary injunction and **REMAND** for further consideration of that motion consistent with this decision.

## I.

### A. Social Media and Minors

The State of Tennessee is one of many states concerned about its minor residents' wellbeing as social media becomes an ever more pervasive part of those minors' lives.[1]

[1] *See, e.g.*, *NetChoice, LLC v. Fitch*, 606 U.S. ---, 145 S. Ct. 2658 (2025) (Mississippi); *NetChoice, LLC v. Yost*, 180 F.4th 268 (6th Cir. 2026) (Ohio); *Comput. & Commc'ns Indus. Ass'n v. Uthmeier*, No. 25-11881, 2025

According to Attorney General Skrmetti, "children's constant access to social media has fueled a crisis." Appellee Skrmetti's Br. at 1. He asserts that minors' use of social media has "displaced [their] . . . in-person socializing, schoolwork, sleep, sports, reading, and other hobbies"; "warped [their] social development"; "allow[ed] for lurking, bullying, and anonymous hostilities"; "reduc[ed] kids' attention spans"; "produced 'a dramatic increase in teen mental illness'"; "catalyzed youth suicides"; and become "a powerful tool [for sexual predators] to lure, groom, sextort, and otherwise victimize kids." *Id.* at 5–8 (citations omitted). Skrmetti's briefing before this court contends that some or all of these troubling trends are confirmed by "[m]ountains of research." *Id.* at 6 (citation omitted).

NetChoice challenges the quality of Skrmetti's evidence. *See* Appellant NetChoice's Reply Br. at 28. For example, it argues that "[m]ost prior research to date" on the effects of social media "has been correlational," *id.* (quoting Surgeon General Report, R. 30-14, PageID 452, 459), and characterizes one of the key pieces of Skrmetti's evidence as "supported by only speculative assertions," *id.* (citing Kristopher E. Kaliebe Decl., R. 28, PageID 235–39, 243, 245, 253). Alternatively, NetChoice argues that, even if Skrmetti's cited sources do establish that certain social media websites are harmful, the sources should be understood to demonstrate harm only for the specific websites actually evaluated in each source and not for the "significant fraction" of regulated websites which have not been specifically addressed. *Id.*

### B. The Protecting Children from Social Media Act

In response to what they saw as significant harm to the state's minor citizens, Tennessee's elected representatives passed and its Governor signed The Act. *See* Tenn. Code. §§ 47-18-5701–5706. The Act applies to "social media compan[ies]," defined as "interactive computer service[s] . . . that provide[] a social media platform": a "website or internet

---

WL 3458571 (11th Cir. Nov. 25, 2025) (Florida); *NetChoice, LLC v. Bonta* (*Bonta II*), 170 F.4th 744, (9th Cir. 2026) (California); *Comput. & Commc'ns Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011 (W.D. Tex. 2024) (Texas); *NetChoice, LLC v. Reyes*, 748 F. Supp. 3d 1105 (D. Utah 2024) (Utah); *NetChoice, LLC v. Griffin*, No. 5:23-CV-5105, 2025 WL 978607 (W.D. Ark. Mar. 31, 2025) (Arkansas); *NetChoice v. Skrmetti*, No. 3:24-CV-01191, 2025 WL 1710228 (M.D. Tenn. June 18, 2025) (Tennessee); *NetChoice v. Carr*, 789 F. Supp. 3d 1200 (N.D. Ga. 2025) (Georgia); *NetChoice v. Weiser*, 808 F. Supp. 3d 1223 (D. Colo. 2025) (Colorado); *NetChoice v. Brown*, No. CV RDB-25-0322, 2025 WL 3267786 (D. Md. Nov. 24, 2025) (Maryland); *NetChoice v. Murrill*, 812 F. Supp. 3d 594 (M.D. La. 2025) (Louisiana); *NetChoice, v. Jones*, 822 F. Supp. 3d 656 (E.D. Va. 2026) (Virginia); *NetChoice v. Hilgers*, --- F. Supp. 3d ----, No. 4:26-CV-3149, 2026 WL 1850018 (D. Neb. June 27, 2026) (Nebraska).

application" that "[a]llows a person to create an account" and "[e]nables an account holder to communicate with other account holders and users through posts." *Id.* § 47-18-5702(8)–(9). "Post[s]" are defined as "content that an account holder makes available on a social media platform for other account holders and users to consume." *Id.* § 47-18-5702(7). "Content" is defined in turn as "text, image, or video" but "[d]oes not include interactive gaming or educational entertainment." *Id.* § 47-18-5702(2). The Act excludes from the definition of "[s]ocial media platform" certain entities, including broadband-internet providers and email platforms. *Id.* § 47-18-5702(9).

At the core of The Act is an age-verification requirement aimed at securing parental consent for minors—unemancipated Tennesseans who are "[k]nown or reasonably believed by a social media platform to be under eighteen (18) years of age," *id.* § 47-18-5702(4)—to create social media accounts. "A social media company shall verify the age of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder." *Id.* § 47-18-5703(a)(1). "If the individual is a minor, then the social media company must verify the express parental consent for the minor to become an account holder," and the "social media company shall prohibit a minor from becoming an account holder" without that consent. *Id.* § 47-18-5703(a)(2). "Parent," as defined by The Act, means a "parent, guardian, or person who has custody of, or person who has caregiving authority over, the minor." *Id.* § 47-18-5702(5). Parental consent may be revoked. *Id.* § 47-18-5703(b). The statute forbids social media companies and third parties from "retain[ing] personally identifying information that was used to verify age or parental consent." *Id.* § 47-18-5703(c).

The Act also requires social media companies to "provide a minor account holder's parent with means for the parent to supervise the minor's account." *Id.* § 47-18-5704. Those means must include at minimum "options for the parent to view privacy settings on the account, set daily time restrictions, and implement breaks during which the minor cannot access the account." *Id.* Waivers and limitations of the protections and requirements of The Act are prohibited as void, notwithstanding any contract or choice of law provision. *Id.* § 47-18-5706.

Skrmetti, as Tennessee Attorney General and Reporter, has enforcement authority under The Act against any social media company which he "believes . . . is engaged in, has engaged in,

or is about to engage in an act or practice prohibited by [The Act]," so long as he believes "that proceedings would be in the public interest." § 47-18-5705(a). The Act authorizes him ("supplementary to all other powers and remedies otherwise provided by law") to conduct an investigation, bring a legal action against the social media company, and recover penalties and other relief, all in accordance with certain investigation and enforcement provisions of Tennessee's Consumer Protection Act. *Id.* § 47-18-5705 (incorporating *id.* § 47-18-106 (investigation protocols), § 47-18-108 (enforcement protocols)). The potential penalties are not insignificant. Should Skrmetti succeed in an enforcement action, a court may enjoin the social media company's "unlawful" activities, require a form of restitution against harmed persons, temporarily or permanently revoke the company's business-operating license, levy civil penalties up to $1,000 per violation, and award to the State reasonable costs and expenses—including attorney's fees—of both the investigation and the enforcement action. *Id.* § 47-18-108(a)–(b). Subsequent knowing violations of a previous injunction carry a civil penalty up to $2,000 per violation. *Id.* § 47-18-108(c).

**C. NetChoice's Challenge**

NetChoice, a trade association of internet companies, brought this suit on October 3, 2024, to stop enforcement of The Act. NetChoice's members operate several websites that NetChoice claims are "social media websites" as defined by The Act: Automattic's Tumblr; Discord; Dreamwidth; Meta's Facebook, Instagram, and Threads; Nextdoor; Pinterest; Reddit; Snap Inc.'s Snapchat; X; and Google's YouTube. Appellant NetChoice's Br. at 6–7, 7 n.2 (citation modified). NetChoice represents that its "members' websites publish, disseminate, display, compile, create, curate, and distribute a wide range of valuable and protected expression." Decl. of NetChoice Gen. Couns. Bartlett Cleland, R. 8-2, PageID 61.

Seeking declaratory and injunctive relief under 28 U.S.C. § 2201 and 42 U.S.C. § 1983, NetChoice's complaint argues that The Act abridges the freedom of speech enshrined in the First Amendment and applied against the states by the Fourteenth Amendment to the United States Constitution. NetChoice also invokes the "void for vagueness" doctrine, arguing that The Act's coverage provision is incompatible with due process. At the same time as their filing of the complaint, NetChoice moved for a preliminary injunction of Skrmetti's enforcement of The Act.

The Act went into effect on January 1, 2025, at which point NetChoice's motion remained pending. After the judge assigned to the case recused himself, NetChoice renewed its motion for a preliminary injunction on January 16, and this time supplemented it with a motion for a temporary restraining order ("TRO"). The newly assigned judge denied NetChoice's TRO and preliminary-injunction motions on February 14 and June 18, respectively. *See Skrmetti*, 2025 WL 1710228, at *1, *5. NetChoice appeals from the latter denial.

## II.

"Four factors determine when a court should grant a preliminary injunction: (1) whether the party moving for the injunction is facing immediate, irreparable harm, (2) the likelihood that the movant will succeed on the merits, (3) the balance of the equities, and (4) the public interest." *D.T.*, 942 F.3d at 326 (citing *Benisek v. Lamone*, 585 U.S. 155, 158 (2018) (per curiam)). "We review a district court's decision to deny a preliminary injunction under an abuse-of-discretion standard. But that can be misleading. While we apply deferential review to a district court's fact findings and its ultimate judgment about whether to grant the preliminary injunction, we treat a mistake of law as an abuse of discretion." *PCC Airfoils, LLC v. Daugherty*, 176 F.4th 509, 512 (6th Cir. 2026) (citations omitted). In effect, "we review the law de novo, the facts for clear error, and the district court's remedial decision for an abuse of discretion." *U.S. Sportsmen's All. Found. v. Ctrs. for Disease Control & Prevention*, 167 F.4th 813, 818 (6th Cir. 2026) (citation omitted).

In its decision, the district court identified an apparent tension between "[p]ublished Sixth Circuit case law [that] stands unmistakably for the proposition that these four items are factors rather than requirements," *Skrmetti*, 2025 WL 1710228, at *5 n.11 (citing *D.T.*, 942 F.3d at 326–27), and other cases that "describe these as all being requirements," *id.* (citing *D.T.*, 942 F.3d at 328–29 (Nalbandian, J., concurring)). Judge Nalbandian's concurrence in *D.T.* expounds upon this point, contrasting this court's usual refrain that "these are factors to be balanced, not prerequisites to be met," *D.T.*, 942 F.3d at 328 (citation modified), with the Supreme Court's articulation of the preliminary-injunction inquiry: "A plaintiff seeking a preliminary injunction *must* establish that he is likely to succeed on the merits, that he is likely to suffer irreparable harm in the absence of preliminary relief, that the balance of equities tips in his favor,

and that an injunction is in the public interest," *id.* (quoting *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008)). Judge Nalbandian concludes his concurrence by acknowledging "our prevailing caselaw" favoring the balancing approach but "question[ing] whether the balancing analysis itself aligns with *Winter*." *Id.* at 329.

The district court took a different approach: "The Court believes that it needs to choose between the two approaches . . . . And the Court believes that it should follow the latter line of cases, i.e., those that treat the standard as involving requirements rather than factors." *Skrmetti*, 2025 WL 1710228, at *5 n.11. Perhaps this is the correct reading of *Winter*, or perhaps this Circuit's cases applying *Winter* have the correct view. *See, e.g.*, *PCC Airfoils*, 176 F.4th at 513 ("A strong showing as to one factor may 'outweigh[ ]' a weaker showing as to another factor." (quoting *Winter*, 555 U.S. at 23–24)). But "vertical *stare decisis* is absolute." *Ramos v. Louisiana*, 590 U.S. 83, 124 n.5 (2020) (Kavanaugh, J., concurring in part). Nor can we overrule this court's prior holdings applying *Winter*; only the Supreme Court or this court sitting *en banc* may do so. *Wright v. Spaulding*, 939 F.3d 695, 700 (6th Cir. 2019). And our current standard is clear: "[t]he preliminary injunction factors do not represent a list of 'prerequisites to be met,'" and only when a movant utterly fails to satisfy one of the first two factors—likelihood of success on the merits or irreparable harm—can we say that the preliminary injunction is unwarranted without consideration of the other factors or without balancing of the four in light of one another. *PCC Airfoils*, 176 F.4th at 513 (citation omitted).

The district court correctly held that it is generally "'well within its province' when it denies a preliminary injunction based solely on the lack of an irreparable injury." *Skrmetti*, 2025 WL 1710228, at *14 (quoting *D.T.*, 942 F.3d at 327). But, for the reasons laid out below, its assessment of NetChoice's irreparable injury resulted in an abuse of discretion. Because our decision today encompasses only that factor, the district court must assess and weigh the remaining factors on remand.

Irreparable harm is an "indispensable" part of a successful motion for a preliminary injunction. *D.T.*, 942 F.3d at 327. In assessing this factor, we "ask[] whether, without an injunction, a plaintiff will likely suffer harm *before* final judgment that cannot be remedied at final judgment." *Fischer II*, 78 F.4th at 868. In other words, NetChoice "must show harm that is

likely, not remediable at final judgment, and immediate." *Id.*; *see also D.T.*, 942 F.3d at 327 ("To merit a preliminary injunction, an injury 'must be both certain and immediate,' not 'speculative or theoretical.'" (citation omitted)). If NetChoice fails this test, then "there's no need to grant relief *now* as opposed to at the end of the lawsuit." *D.T.*, 942 F.3d at 327.

NetChoice advances two forms of irreparable harm that its members will suffer because of Skrmetti's enforcement of The Act: unrecoverable statutory-compliance costs and loss of First Amendment liberties. We address each in turn.

**A. Statutory Compliance Costs**

"[C]omplying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Biden*, 57 F.4th at 556 (quoting *Thunder Basin Coal Co. v. Reich*, 510 U.S. 200, 220–21 (1994) (Scalia, J., concurring in part)). This court has repeatedly recognized that unrecoverable compliance costs are sufficient to satisfy our baseline expectation of irreparable harm. *See e.g.*, *id.* at 555–56; *Tennessee v. Dep't of Educ.*, 104 F.4th 577, 613 (6th Cir. 2024) (motion for a preliminary injunction); *Kentucky v. EPA*, No. 23-3216, 2023 WL 11871967, at *4 (6th Cir. July 25, 2023) (order) (motion to stay enforcement pending appeal); *In re MCP No. 185*, No. 24-7000, 2024 WL 3650468, at *4 (6th Cir. Aug. 1, 2024) (order) (motion to stay a final rule pending review). "We recognize that some of our sister circuits have held that compliance costs do not qualify as irreparable harm because they commonly result from new government regulation." *Biden*, 57 F.4th at 556 (citing *Freedom Holdings, Inc. v. Spitzer*, 408 F.3d 112, 115 (2d Cir. 2005); *Am. Hosp. Ass'n v. Harris*, 625 F.2d 1328, 1331 (7th Cir. 1980); *A.O. Smith Corp. v. FTC*, 530 F.2d 515, 527 (3d Cir. 1976)). "But in our view, the peculiarity and size of a harm affects its weight in the equitable balance, not whether it should enter the calculus at all." *Id.* (citing *Nat'l Fed'n of Indep. Bus. v. Dep't of Lab., Occupational Safety & Health Admin.*, 595 U.S. 109, 120 (2022); *Thunder Basin*, 510 U.S. at 220–21 (Scalia, J., concurring in part)).

This makes sense. Preliminary injunctions help prevent Pyrrhic victories. If a plaintiff is forced into costly compliance for which there is no recourse at the end of its successful litigation, then that litigation is, at least in part, in vain. Here, NetChoice alleges that at least two of its

members—Nextdoor and Dreamwidth—face such costs. *See* Decl. of Nextdoor Head of Customer Experience Gautham Pai, R. 8-3, PageID 81–83 (alleging that, among other effects of The Act, the estimated cost of identifying a potential user's identity would "dwarf" Nextdoor's average quarterly revenue per user); Decl. of Dreamwidth Co-Owner Denise Paolucci, R. 8-4, PageID 89, 92, 98 (alleging that compliance with The Act will require additional staffing or third-party support for which Dreamwidth does not have the financial capacity). And NetChoice contends that, should it prevail on the merits of its case, its members would not be able to recover compliance costs from Tennessee "because the State has sovereign immunity." Appellant NetChoice's Br. at 29. We see no reason why these harms should not "weigh[] in the equitable balance." *Biden*, 57 F.4th at 556.

The district court erroneously interpreted *Biden* as "declin[ing] to disagree with multiple other circuits that have held that (at least in the particular circumstances there involved) compliance costs (including *unrecoverable* compliance costs) fail to qualify as irreparable harm because compliance costs 'commonly result from new government regulation.'" *Skrmetti*, 2025 WL 1710228, at *14 (citation omitted). In other words, the district court read *Biden* as affirming the out-of-circuit decisions in *Freedom Holdings*, *American Hospital Association*, and *A.O. Smith*, and requiring NetChoice to show some other "particular circumstances" beyond the imposition of "mere 'ordinary compliance costs.'" *Id.* (quoting *Freedom Holdings*, 408 F.3d at 115). But this is not what we said in *Biden*. We acknowledged the Second, Third, and Seventh Circuit's prior cases addressing irreparable harm but explicitly disagreed with those decisions: "But in our view, the peculiarity and size of a harm affects its weight in the equitable balance, *not whether it should enter the calculus at all*." *Biden*, 57 F.4th at 556 (emphasis added).

Nor was *Biden* invoking *non*-irreparable harm in this holding. *Contra Skrmetti*, 2025 WL 1710228, at *13. The context of *Biden*'s holding reveals that the "harm" there means irreparable harm: The preceding sentences discuss other circuit's treatment of unrecoverable compliance costs as "*irreparable* harm," and the citations that follow refer to the Supreme Court's consideration of the same. *See Biden* 57 F.4th at 556 (emphasis added). In sum, NetChoice's alleged compliance costs—even if common and small—are irreparable and enter the preliminary-injunction balance.

Skrmetti offers a few reasons why we should not credit NetChoice's unrecoverable compliance costs as irreparable harm. None of them demonstrates a lack of irreparable harm, at least not a complete lack. First, Skrmetti argues that "NetChoice cannot prove compliance costs for *non*-compliant social-media companies." Appellee Skrmetti's Br. at 30. But our irreparable-harm inquiry asks whether the harm "is likely, not remediable at final judgment, and immediate," *Fischer II*, 78 F.4th at 868, not whether it has already occurred. As is often the case in a pre-enforcement challenge, the party seeking a preliminary injunction faces unrecoverable compliance costs *or* the penalty of noncompliance. In this pre-enforcement-challenge posture, it makes little sense to expect NetChoice actually to incur unrecoverable compliance costs before we credit those costs as irreparable harm.

Second, Skrmetti posits that "[a] vague statement from '[o]ne member' hardly qualifies as a clear showing that 'each NetChoice covered member' would face 'great expense.'" Appellee Skrmetti's Br. at 30 (quoting Appellant NetChoice's Br. at 29). This point is well taken, to an extent. As we recognized in *Biden*, "the peculiarity and size of a harm affects its weight in the equitable balance." 57 F.4th at 556. But this does not mean that NetChoice fails to demonstrate *any* irreparable harm. *See PCC Airfoils*, 176 F.4th at 514 ("Instead of creating a heightened standard of evidentiary proof for each factor individually, the 'clear showing' phrase clarifies that, on balance, the four preliminary injunction factors must clearly weigh in the plaintiff's favor to qualify for injunctive relief."). As we see it, NetChoice provides sufficient evidence that at least two of its members, Nextdoor and Dreamwidth, will likely incur unrecoverable compliance costs, perhaps even significant costs. Nextdoor provides an actual cost estimate. And while Dreamwidth's assertion is less defined, it is not speculative, particularly since "complying with a regulation later held invalid almost *always* produces the irreparable harm of nonrecoverable compliance costs." *Biden*, 57 F.4th at 556 (citation modified). For these members, the district court should have considered their compliance costs as irreparable harm in the equitable balance, but only insofar as the harm's proven weight warranted. *See, e.g.*, *In re MCP No. 185*, 2024 WL 3650468, at *4 (acknowledging the government's estimation that the stay-petitioners' compliance costs were "small relative to the rule's overall benefits," but still determining a stay was warranted because the petitioners were likely to succeed on the merits).

Third, Skrmetti contends that NetChoice's members should have already incurred the at-issue costs in compliance with other statutes. In particular, Skrmetti points to Nextdoor's and Dreamwidth's terms of service, in which they ostensibly require parental consent for potential users under the age of 13 (or forbid those potential users outright) pursuant to the Federal Trade Commission's (FTC) Children's Online Privacy Protection Rule (COPPA). But COPPA differs markedly from The Act. The Act requires covered social media companies to "verify the age" of potential account holders. Tenn. Code § 47-18-5703(a)(1). COPPA makes it "unlawful for any operator of a website or online service *directed to children*, or any operator *that has actual knowledge that it is collecting or maintaining personal information from a child*, to collect personal information from a child in a manner that violates the regulations prescribed" by the rule. 16 C.F.R. § 312.3 (emphasis added); *see also id.* § 312.2 (creating further exceptions for "mixed audience website[s]," which need only determine whether their visitors are under the age of 13 using means "reasonably calculated, in light of available technology," to accomplish that end). The FTC admits that COPPA will not "prevent children from lying about their age to register for general audience sites or online services whose terms of service prohibit their participation." *Complying with COPPA: Frequently Asked Questions*, FED. TRADE COMM'N (last modified Jan. 2025), https://www.ftc.gov/business-guidance/resources/complying-coppa-frequently-asked-questions (last visited Aug. 26, 2026). Since we see daylight between Nextdoor's and Dreamwidth's presumed compliance under COPPA and their expected compliance under The Act, alleged compliance with the former does not eliminate the cost of complying with the latter.

Finally, Skrmetti argues that the alleged compliance costs are not actually unrecoverable because NetChoice can sue Tennessee's officials for damages under 42 U.S.C § 1983. According to Skrmetti, this traps NetChoice in a catch-22: NetChoice's damages are unrecoverable only if Tennessee's officials are entitled to qualified immunity, which in turn requires "that no 'clearly established' law prohibits enforcement of [T]he Act." Appellee Skrmetti's Br. at 31 (quoting *Pearson v. Callahan*, 555 U.S. 223, 232 (2009)). *And* NetChoice must prove that it is likely to succeed on the merits, which, in Skrmetti's view, requires a "clear showing" of that likelihood. *Id.* (quoting *Enchant Christmas Light Maze & Mkt. Ltd. v. Glowco, LLC*, 958 F.3d 532, 539 (6th Cir. 2020)).

This argument fails for two reasons. First, as we recently clarified in *PCC Airfoils*, the "clear showing" requirement applies to the overall balance of the four preliminary-injunction factors; it does not "creat[e] a heightened standard of evidentiary proof for each factor individually." 176 F.4th at 514.

Second, the clearly-established-law and likelihood-of-success inquiries speak to altogether different issues. "Put simply, qualified immunity protects 'all but the plainly incompetent or those who knowingly violate the law.'" *Mullenix v. Luna*, 577 U.S. 7, 12 (2015) (quoting *Malley v. Briggs,* 475 U.S. 335, 341 (1986)). Our focus in the qualified-immunity analysis is notice. "Look[ing] to the decisions of the Supreme Court, and then to the case law of this circuit," we ask whether a constitutional right was "clearly established *at the time of the infringement*" such that "a reasonable official would understand that what he is doing violates that right." *Gragg v. Ky. Cabinet for Workforce Dev.*, 289 F.3d 958, 964 (6th Cir. 2002) (citation modified). On the other hand, a court assessing a preliminary-injunction movant's likelihood of success on the merits need not limit itself to enjoining activity that is apparently unlawful "in the light of pre-existing law." *See id*. (citation omitted). To the extent these qualitatively different analyses can be stacked against one another, likelihood of success is a *lower* threshold than actual success, *see Dutton v. Shaffer*, 171 F.4th 858, 879 (6th Cir. 2026), which is in turn a lower threshold than proving clearly established law.

Skrmetti also misplaces his reliance on *L. W. by & through Williams v. Skrmetti*, 83 F.4th 460 (6th Cir. 2023), *aff'd sub nom. United States v. Skrmetti*, 605 U.S. 495 (2025). There, we held that the plaintiff sought to "[c]onstitutionaliz[e] new areas of American life," "not something [that] federal courts should do lightly." *Id.* at 471. Here, there is nothing particularly groundbreaking about NetChoice's constitutional arguments against The Act. Applying established constitutional rights to new facts does not "extend the constitutional guarantees to new territory" as contemplated by *L.W. See id.* The question is whether NetChoice can demonstrate a likelihood of success or even actual success on the merits without creating a sea change in constitutional law (at least on the magnitude of recognizing new constitutional rights) on the one hand or overcoming Tennessee officials' qualified immunity on the other. Without judging the merits of NetChoice's case, we think there is ample ground between these posts. At

the very least, the district court must first consider those merits arguments before making such a determination.

In sum, the district court abused its discretion when it discredited outright assertions of irreparable harm from unrecoverable compliance costs made by at least two NetChoice members. These costs "weigh[] in the equitable balance" to the extent that their proven weight deserves. *See Biden*, 57 F.4th at 556. On remand, the district court should also consider whether unrecoverable compliance costs may sustain an injunction only for the members that actually allege them. *See Becerra*, 87 F.4th at 783–84 (limiting preliminary injunctive relief to the "only plaintiff . . . that provided the requisite facts and affidavits" to demonstrate irreparable harm); *see also Gill*, 585 U.S. at 73 ("A plaintiff's remedy must be tailored to redress the plaintiff's particular injury." (citation omitted)).

**B. Freedom of Speech**

NetChoice also maintains that its members face irreparable harm from The Act's foreseeable abridgement of their freedom of speech. "The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury." *Roman Cath. Diocese*, 592 U.S. at 19 (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976) (plurality opinion)). Still, the First Amendment is not an irreparable-harm talisman; the alleged harm must still be "likely, not remediable at final judgment, and immediate," *Fischer II*, 78 F.4th at 868, though, as a rule, a restriction on the present or imminent exercise of one's rights satisfies the second requirement, *cf. id.* at 868–69 (finding no irreparable harm arising from the prosecution of past speech because damages would be sufficient recompense for an erroneous prosecution and because there was no chance that the prosecution would chill the future exercise of the right during the course of the litigation); *Hess v. Oakland Cnty.*, 174 F.4th 981, 995–96 (6th Cir. 2026) (similar). So long as the plaintiff's loss of First Amendment freedoms is "'both certain and immediate,' not 'speculative or theoretical,'" *D.T.*, 942 F.3d at 327 (citation omitted), we presume irreparable harm.

In assessing the certainty and immediacy of the loss of a plaintiff's freedom of speech, we generally ask whether the plaintiff wants to speak "'*now*' rather than at some unknown future

date" "well into the future." *Defending Educ. v. Olentangy Loc. Sch. Dist. Bd. of Educ.*, 158 F.4th 732, 760–61 (6th Cir. 2025) (citation omitted); *see also Fischer II*, 78 F.4th at 868 (finding no immediate harm from a campaign-speech restriction when there was no looming election). We also consider whether the purported restriction actually hampers the plaintiff's speech. *See Moms for Liberty - Wilson Cnty., Tennessee v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 516 (6th Cir. 2025) (finding no irreparable harm from two purported speech restrictions that were "no longer operative" and for which the plaintiffs had "offer[ed] no evidence indicating that either might be reinstituted and applied in the future"). But we do so keeping in mind that a restriction may violate the freedom of speech through actual enforcement *and* its chilling effect. *See Hess*, 175 F.4th at 995–96.

The district court held that NetChoice's purported First Amendment harms did not qualify as irreparable harm because Skrmetti's enforcement of The Act—and by extension the chilling effect of its potential enforcement—was insufficiently certain and immediate. *Skrmetti*, 2025 WL 1710228, at *9–12. In reaching this conclusion, the court looked for guidance from our caselaw addressing Article III standing in the context of a pre-enforcement statutory challenge. *See id.* at *10. In that comparable inquiry, we determine whether the plaintiff faces a "credible threat of enforcement" by asking whether the plaintiff alleges "chill[ed] speech" and considering four factors:

> (1) Does the relevant prosecuting entity have a prior history of enforcing the challenged provision against the plaintiffs or others? (2) Has that entity sent warning letters to the plaintiffs regarding their conduct? (3) Does the challenged regulatory regime make enforcement easier or more likely? and (4) Did the prosecuting entity refuse to disavow enforcement of the challenged provision against the plaintiffs?

*Fischer v. Thomas* ("*Fischer I*"), 52 F.4th 303, 307; *see also McKay v. Federspiel*, 823 F.3d 862, 868–69 (6th Cir. 2016) (consolidating these factors). Our cases have held that "[t]hese *McKay* factors are not exhaustive, nor must each be established." *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826, 848 (6th Cir. 2024) (citation omitted); *see also Fischer I*, 52 F.4th at 307 ("This isn't a laundry list.") "At bottom, our inquiry distills to whether 'surrounding factual circumstances' plausibly suggest a credible fear of enforcement." *Nessel*, 117 F.4th at 848 (quoting *Universal Life Church Monastery Storehouse v. Nabors*, 35 F.4th 1021, 1034 (6th Cir.

2022)). After applying these principles to NetChoice's case, the district court held that enforcement was too remote a possibility to sustain a preliminary injunction on that basis.

Contrary to NetChoice's characterization of this analysis as an "erroneous importation of the '*McKay* factors' for standing into the irreparable-harm analysis," Appellant NetChoice's Reply Br. at 9, we do not fault the district court's consideration of these principles, at least as a matter of guidance. While the injury-in-fact requirement for standing and the irreparable-harm requirement for a preliminary injunction are distinct concepts, the two are related in the sense that both require an injury to the plaintiff. And even if there is a difference between the level of requisite injury necessary to satisfy Article III and the level of "harm" required by the irreparable-harm injunction factor, the two are likely quite close in First Amendment cases, particularly since *any* true loss of First Amendment freedom "unquestionably constitutes irreparable injury." *See Roman Cath. Diocese*, 592 U.S. at 19 (citation omitted). At the very least, the injury-in-fact threshold sets the floor, since without it, NetChoice could not sue at the outset. *Trump v. Hawaii*, 585 U.S. 667, 697 (2018) ("[W]e have an obligation to assure ourselves of jurisdiction under Article III.").

That said, the "*McKay* factors are not exhaustive, nor must each be established." *Nessel*, 117 F.4th at 848 (citation omitted). Nor are they all helpful in this case. The district court determined that the first factor—history of past enforcement against the plaintiffs or others—disfavored NetChoice. *Skrmetti*, 2025 WL 1710228, at *10. We question how much weight this factor should receive where, as here, the statute had only been in effect for a short while prior to the district court's preliminary-injunction decision and had only ever existed under the shadow of pre-enforcement litigation. In other words, the presence of this factor would certainly help NetChoice's case, but its absence is far from dispositive.

The district court likewise counted the second factor against NetChoice, correctly finding that NetChoice had not presented evidence of Skrmetti's having sent formal warning letters to its members. *Id.* But our caselaw applying this factor forbids us from "elevat[ing] form over substance." *Yoder v. Bowen*, 146 F.4th 516, 525 (6th Cir. 2025) (quoting *Boone Cnty. Republican Party Exec. Comm. v. Wallace*, 132 F.4th 406, 417 (6th Cir. 2025)), *cert. denied,* No. 25-923, 2026 WL 1780109 (U.S. June 22, 2026). Skrmetti has affirmatively taken the position

that NetChoice's members "have *not* come into compliance with Tennessee's law." Skrmetti Resp. to Mot. To Ascertain Status, R. 43, PageID 1856. This is at least as threatening as the "publicly issued guidance" that we credited as satisfying the warning-letter factor in *Yoder*. 146 F.4th at 525. Beyond just "'address[ing] the central issue of' [NetChoice's members'] intended conduct," *see id.*, Skrmetti's filing designates NetChoice's members by name (or at least by association with NetChoice) and directly addresses their allegedly offending conduct. R. 43, PageID 1855–56. The district court's counting of this factor against NetChoice involved an error of law and thus was an abuse of discretion.

We find no error in the district court's assessment of the third factor—whether "the challenged regulatory regime make[s] enforcement easier or more likely[,]" *Fischer I*, 52 F.4th at 307—as not favoring NetChoice. *See Skrmetti*, 2025 WL 1710228, at *10. But the district court erred in its assessment of the fourth factor: "Did the prosecuting entity refuse to disavow enforcement of the challenged provision against the plaintiffs?" *Fischer I*, 52 F.4th at 307. The crux of that decision was either an erroneous legal conclusion or an erroneous treatment of a mixed question of law and fact that "require[d the] court[] to expound on the law" rather than "immerse[]" itself "in case-specific factual issues." *See New London Tobacco Mkt., Inc. v. Ky. Fuel Corp.*, 44 F.4th 393, 407 (6th Cir. 2022). In either situation, we apply a de novo standard of review. *Id.*

The district court determined that, "although it is true that the record does not reflect [Skrmetti's] disavowing enforcement of [T]he Act until the conclusion of this litigation, it also does not reflect [Skrmetti's] *refusing* to disavow enforcement of [T]he Act until the conclusion of this litigation." *Skrmetti*, 2025 WL 1710228, at *10. True, NetChoice does not point to a part of the record in which, having been presented with a question on his intention to enforce The Act against a particular company, Skrmetti explicitly refused to stay enforcement against it. But the Supreme Court instructs us to "make 'commonsense inferences' when assessing Article III standing," *First Choice Women's Res. Ctrs., Inc. v. Davenport*, 608 U.S. ____, 146 S. Ct. 1114, 1125 (2026) (quoting *Diamond Alternative Energy, LLC v. Env't Prot. Agency*, 606 U.S. 100, 116 (2025)), and by extension we apply that principle here. NetChoice requested that Skrmetti stay enforcement of the Act against its members pending the district court's preliminary-

injunction decision. R. 42, PageID 1850–51. In his response, Skrmetti stated that he "w[ould] not agree to 'stay enforcement' of this valid statute passed by Tennessee's elected representatives." R. 43, PageID 1856 (citation omitted); *see also Nabors*, 35 F.4th at 1035 (finding fourth factor in favor of plaintiffs where state district attorneys "took no meaningful steps—like submitting an affidavit forswearing prosecution—to mitigate plaintiffs' fears" of enforcement). And while Skrmetti later represented that NetChoice's members faced "zero" risk of harm from enforcement prior to a decision on the preliminary injunction, that period (which was really only "relevant to [NetChoice's] TRO") has now passed. *See* R. 54, PageID 1972. Skrmetti also stresses that he "disavows any intention of skipping [The Act's] notice period for NetChoice's identified members," Appellee Skrmetti's Br. at 20, which begs the question of why Skrmetti would need to disavow this action if he had no intention to enforce The Act against those members. The logical reading of the record and Skrmetti's somewhat evasive position is that he has refused to disavow enforcement, including against NetChoice's members.

The district court also distinguished the attenuated likelihood of enforcement analyzed in *D.T.* with NetChoice's members' likelihood of facing the brunt of The Act in this case. *Skrmetti*, 2025 WL 1710228, at *11. But this too required an overly narrow reading of our precedents. In *D.T.*, the plaintiffs argued that "they [we]re injured because: *if* D.T. regresses at his new private school, and *if* they choose to disenroll him, and *if* they choose not to enroll him in another state-approved school, the state *may* choose to prosecute them for truancy again." *D.T.*, 942 F.3d at 327. As the district court in that case put it: "there's a lot of ifs in there." *Id.* (citation omitted). But NetChoice's case bears no resemblance to that level of attenuation. The district court here could identify only two "ifs":

> [NetChoice's] members would be subject to enforcement of [T]he Act prior to the conclusion of litigation only *if* [Skrmetti] makes a policy decision to enforce the Act prior to the termination of the instant litigation while [T]he Act's constitutionality is in question (despite the attendant risks of so doing), and *if* [Skrmetti] then actually institutes a legal proceeding against one or more of [NetChoice's] members while this litigation is proceeding.

*Skrmetti*, 2025 WL 1710228, at *11. And the district court essentially split one contingency into two. Read plainly, NetChoice faces one "if": Will Skrmetti enforce a statute passed with an abundantly obvious purpose to be applied against "social media companies" when Skrmetti has

already said that NetChoice's members are not in compliance with that statute? On the whole, we cannot say that NetChoice's members' injury, which must include the chilling effect of likely enforcement, is "speculative or theoretical." *D.T.*, 942 F.3d at 327 (citation omitted).

Resisting this conclusion, Skrmetti relies on his assertion that "no immediate enforcement is possible." Appellee Skrmetti's Br. at 19. The Act's enforcement mechanism usually requires that, "at least ten (10) days before instituting legal proceedings," Skrmetti must "give notice to the person against whom proceedings are contemplated and give such person an opportunity to present reasons why such proceedings should not be instituted." Tenn. Code § 47-18-108(a)(2). In Skrmetti's view, this "notice requirement dooms NetChoice's demand for immediate relief" especially because Skrmetti "disavows any intention of skipping the notice period for NetChoice's identified members." Appellee Skrmetti's Br. at 19–20.

We read the statutory text differently. Nothing requires Skrmetti to give *any* meaningful consideration of the respondent's reasons for not instituting proceedings. Section 47-18-108(a)(3) requires that Skrmetti "certify that the division of consumer affairs complied with § 47-18-5002(2)," which in turns mandates that the division allow the respondent "an opportunity to respond, within a reasonable time, to the division with, if appropriate, a proposal to resolve the complaint." *Id.* § 47-18-5002(2). But beyond that, we see nothing that binds the division's or Skrmetti's subsequent actions: "Upon receiving a response, the division *may* share the response with the complainant and *may* facilitate additional communication between the [respondent] identified in the complaint and the complainant in an effort to encourage a mutually agreeable resolution." *Id.* (emphasis added). And this whole procedure may be waived if Skrmetti "determines that the purposes of [Tennessee's Consumer Protection Act] will be substantially impaired by delaying legal proceedings." *Id.* § 47-18-108(a)(3). Although he has disavowed waiving § 47-18-108(a)(2)'s notice period, Appellee Skrmetti's Br. at 20, Skrmetti has *not* disavowed waiving the § 47-18-5002(2) procedures.

Nor would the respondent necessarily be absolved of its past offenses even if it promised to come into immediate compliance. *See* Tenn. Code § 47-18-108(b)(3) ("The court may also order payment to this state of a civil penalty . . . . In determining the amount of a civil penalty, the court may consider the defendant's participation in the complaint resolution process

described in § 47-18-5002(2), and the defendant's restitution efforts prior to the initiation of an action pursuant to subdivision (a)(1), in addition to any other factors . . . ."); Cary Silverman & Jonathan L. Wilson, *State Attorney General Enforcement of Unfair or Deceptive Acts and Practices Laws: Emerging Concerns and Solutions*, 65 U. Kan. L. Rev. 209, 269 n.33 (2016) (positing that "[a] handful of . . . states [including Tennessee] require the state [attorney general] to contact a business before filing a [unfair-or-deceptive-acts-and-practices law] enforcement action, but permit the [attorney general] to seek civil penalties even if the business offers to immediately address the concern"). In other words, the notice period is little comfort to NetChoice's members, which face a Hobson's choice: (1) incur unrecoverable costs to comply with a potentially unconstitutional statute or (2) risk severe penalties, no matter their response to Skrmetti's notice letters. For the purposes of our credible-threat analysis, the notice period functions as the beginning of the enforcement action rather than a prelude to it.

Skrmetti's remaining argument against a finding of imminent enforcement is that he has yet to enforce The Act. While this kind of reasoning *might* weigh against the likelihood of enforcement, *see Defending Educ.*, 158 F.4th at 742, the reason for Skrmetti's delayed enforcement is clearly the present litigation. In our view, a strategic *delay* in enforcement does not preclude a credible *threat* of enforcement. Consider the juxtaposition of this case with our holding in *Fischer II*. There, we affirmed the denial of a preliminary injunction in part because the absence of an ongoing election meant that the "the risk of chill [wa]sn't 'immediate.'" *Fischer II*, 78 F.4th at 868 (citation omitted). But we also said that "if an election loom[ed]" prior to the end of the litigation, the plaintiffs could "renew their request for preliminary relief then." *Id.* Skrmetti asks us to apply that logic here merely because he has chosen to stay his hand. *See* Appellee Skrmetti's Br. at 24; *see also Skrmetti*, 2025 WL 1710228, at *15 ("[I]f [Skrmetti] threatens or institutes enforcement actions pending the outcome of this litigation[,] . . . [NetChoice] may file another motion for preliminary injunction."). Perhaps if NetChoice's only asserted injury were the harm of actual enforcement, then this logic would hold. But NetChoice's members allege that The Act's imminent enforcement creates a chilling effect on their freedom of speech, and "[t]he value of a sword of Damocles is that it hangs—not that it drops." *First Choice Women's Res. Ctrs.*, 146 S. Ct. at 1127 (citation omitted).

Assuming NetChoice's First Amendment claims are correct on the merits (on which we express no opinion and which we leave to the district court for consideration), we hold that its members have demonstrated irreparable harm on that basis, at least sufficient to overcome our threshold irreparable-harm hurdle. We reach this conclusion based on NetChoice's members' alleged loss of free-speech rights, as well as the unrecoverable compliance costs asserted by some of its members. We need not address today whether the purported harm to third parties is properly considered at the preliminary-injunction stage under the irreparable-harm factor, the balance-of-the-equities factor, or at all. *See Skrmetti*, 2025 WL 1710228, at *7–9 (rejecting NetChoice's attempt to rely on alleged First Amendment harms to its member's users); *see also* Appellant NetChoice's Br. at 42–45; Appellee Skrmetti's Br. at 23–24.

## III.

For the foregoing reasons, we **VACATE** the district court's order denying NetChoice's motion for a preliminary injunction and **REMAND** for further consideration of that motion consistent with this decision.

## DISSENT

CLAY, Circuit Judge, dissenting. Plaintiff NetChoice, LLC (NetChoice), failed to carry its burden of demonstrating an imminent threat of irreparable harm that will befall its members without a preliminary injunction against enforcement of Tennessee's Protecting Children from Social Media Act, ch. 899, 2024 Tenn. Pub. Acts (codified at Tenn. Code § 47-18-57). I would affirm the district court's order denying NetChoice's motion for a preliminary injunction.

## I. BACKGROUND

"NetChoice is a national trade association of online businesses[,]" such as Meta, Google, Etsy, and VRBO, "that share the goal of promoting free speech and free enterprise on the Internet." Cleland Decl., R. 8-2, PageID #60. According to NetChoice, Members "publish, disseminate, display, compile, create, curate, and distribute a wide range of valuable and protected expression." *Id.* at PageID #61. For most members, users must have accounts in order to access certain content.

Tennessee is among several states that have become concerned about the adverse effects of social media on young people. Defendant Jonathan Skrmetti (Skrmetti), Tennessee's Attorney General, has presented evidence that social media is addictive, has negative effects on young people's body image, self-esteem, and mood, causes young people anxiety and depression, and exposes them to sexual exploitation. In an effort to mitigate those harms, Tennessee passed the Protecting Children from Social Media Act in 2024 (the Act), ch. 899, 2024 Tenn. Pub. Acts (codified at Tenn. Code § 47-18-57).

The Act imposes requirements that social media platforms must meet if they are to register accounts for minors. It defines "[s]ocial media platform" as "a website or internet application that: (i) Allows a person to create an account; and (ii) Enables an account holder to communicate with other account holders and users through posts[,]" but it excludes certain categories of sites. Tenn. Code § 47-18-5702(9). Under the Act, social media platforms must verify the age of anyone trying to create an account on the platform, verify parental consent

before opening new accounts for minors, and provide minor account holders' parents with tools to supervise their children's social media use. *Id.* §§ 47-18-5703–04.

If the Attorney General believes that a social media platform is or will soon be in violation of the Act "and that proceedings would be in the public interest," he may investigate the platform and bring an action in accordance with sections 47-18-106 and 108 of the Tennessee Code, respectively. *Id.* § 47-18-5705. Under those procedures, "[u]nless [he] determines in writing that the purposes of [the consumer protections statutes] will be substantially impaired by delay[,]" the Attorney General must give the suspected platform at least 10 days' notice and "an opportunity to present reasons why such proceedings should not be instituted." *Id.* § 47-18-108(a)(2). In enforcement actions, courts may issue orders and injunctions, award costs to the State, order damages, revoke business licenses or certificates in the event of "knowing and persistent violations[,]" impose civil penalties of up to $1,000 per violation, and, for each knowing violation of a court order or injunction, impose a civil penalty of up to $2,000 and other appropriate relief. *Id.* §§ 47-18-108(a)(5)–(c).

Before the Act took effect, on October 3, 2024, NetChoice filed a complaint against Skrmetti in his official capacity as Attorney General in the United States District Court for the Middle District of Tennessee under 42 U.S.C. § 1983 and 28 U.S.C. § 2201. NetChoice raised several claims, including that the Act's coverage definition unconstitutionally burdened Members' protected speech, that the age-verification requirement unconstitutionally burdened access to protected speech for adults and minors seeking to create accounts on Members' sites, and that the parental consent requirement unconstitutionally barred minors from accessing protected speech without parental consent.

NetChoice additionally moved for a preliminary injunction to enjoin enforcement of the Act against those of NetChoice's members that NetChoice alleged were covered by the Act. NetChoice stated that those members were Dreamwidth, Google (YouTube), Meta (Facebook and Instagram), Nextdoor, Pinterest, Snap Inc. (Snapchat), and X (collectively, the Members).[1]

[1]On appeal, NetChoice includes additional members, Automattic (Tumblr), Discord, and Reddit on its list and notes that it named those members in its August 13, 2025, amended complaint. NetChoice does not explain

In support, NetChoice argued that NetChoice's likelihood of success on the merits of its First Amendment claims should be the "determinative factor." Pl.'s Mem. Supp. Mot., R. 9, PageID #128. It further asserted that the Act would cause irreparable injuries to NetChoice and its Members by depriving them of First Amendment freedoms, chilling the speech of Members and their users, and imposing monetary penalties and compliance costs.

Skrmetti's opposition to NetChoice's motion contended that NetChoice had not shown it was likely to succeed on the merits of its claims and also that the district court could deny the motion solely on NetChoice's failure to show irreparable injury. Specifically, compliance costs could be recovered via money damages after litigation, NetChoice had not proven compliance costs, NetChoice could not rely on injuries to third parties, and the idea that the Act would chill speech was speculative.

The Act took effect on January 1, 2025, and over six months later, the district court denied NetChoice's motion for a preliminary injunction, holding that NetChoice had "failed to demonstrate that it (or indeed anyone) [would] suffer irreparable harm if the preliminary injunction [was] not granted." *NetChoice v. Skrmetti*, No. 3:24-CV-01191, 2025 WL 1710228, at *6, *15 (M.D. Tenn. June 18, 2025) (footnote omitted). It found that NetChoice did not face an imminent threat of enforcement and that neither harms to users nor Members' compliance costs could satisfy the irreparable injury requirement. *Id.* at *9–14. It denied the motion on the ground of irreparable injury alone, because that was an indispensable requirement for a preliminary injunction. *Id.* at *14. NetChoice appeals from that order.

## II. DISCUSSION

On appeal, NetChoice argues that it has established that irreparable injury will occur absent a preliminary injunction and that the district court should have analyzed the other preliminary injunction factors and granted relief. Skrmetti disagrees at every turn.

---

why its amendment adding those members to the complaint should allow it to reference those members, for the first time on appeal, in support of its preliminary injunction motion.

### A. Standard of Review

This Court reviews a district court's order denying a motion for a preliminary injunction for abuse of discretion. *Int'l Union of Painters & Allied Trades Dist. Council No. 6 v. Smith*, 148 F.4th 365, 370 (6th Cir. 2025) (citing *Wonderland Shopping Ctr. Venture Ltd. P'ship v. CDC Mortg. Cap., Inc.*, 274 F.3d 1085, 1097 (6th Cir. 2001)). A court abuses its discretion when it "relies on clearly erroneous findings of fact, applies the wrong legal standard, misapplies the correct legal standard when reaching a conclusion, or makes a clear error of judgment." *Pickett v. City of Cleveland*, 140 F.4th 300, 307 (6th Cir. 2025) (quoting *Young v. Nationwide Mut. Ins. Co.*, 693 F.3d 532, 536 (6th Cir. 2012)). The "standard is deferential," *City of Pontiac Retired Emps. Ass'n v. Schimmel*, 751 F.3d 427, 430 (6th Cir. 2014) (per curiam), and we will find an abuse of discretion only if we have a "'definite and firm conviction' that such an error occurred." *Pickett*, 140 F.4th at 307 (quoting *Young*, 693 F.3d at 536). "[W]e review the underlying legal analysis de novo and factual findings for clear error." *EOG Res., Inc. v. Lucky Land Mgmt., LLC*, 134 F.4th 868, 874 (6th Cir. 2025) (citing *James B. Oswald Co. v. Neate*, 98 F.4th 666, 672 (6th Cir. 2024)).

### B. Analysis

Preliminary injunctions constitute extraordinary relief that require a "clear showing" that a movant is entitled to one. *EOG Res.*, 134 F.4th at 874. We consider four factors when deciding whether to grant a preliminary injunction:

> (1) whether the moving party has shown a likelihood of success on the merits; (2) whether the moving party will be irreparably injured absent an injunction; (3) whether issuing an injunction will harm other parties to the litigation; and (4) whether an injunction is in the public interest.

*Kentucky v. Biden*, 57 F.4th 545, 550 (6th Cir. 2023) (quoting *Vitolo v. Guzman*, 999 F.3d 353, 360 (6th Cir. 2021)). The burden is on the movant to justify the injunction. *Moms for Liberty-Wilson Cnty. v. Wilson Cnty. Bd. of Educ.*, 155 F.4th 499, 508 (6th Cir. 2025) (quoting *Am. C.L. Union Fund of Michigan v. Livingston Cnty.*, 796 F.3d 636, 642 (6th Cir. 2015)). Generally, in the Sixth Circuit, the four preliminary injunction factors are not prerequisites but rather

considerations for balancing. *Liberty Coins, LLC v. Goodman*, 748 F.3d 682, 690 (6th Cir. 2014).

But even with "the strongest showing on the other three factors[,]" a party cannot "eliminate the irreparable harm requirement." *D.T. v. Sumner Cnty. Schs.*, 942 F.3d 324, 326–27 (6th Cir. 2019) (quoting *Friendship Materials, Inc. v. Mich. Brick, Inc.*, 679 F.2d 100, 105 (6th Cir. 1982)). An "imminent and irreparable injury" is "indispensable" to justify "grant[ing] relief *now* as opposed to at the end of the lawsuit." *Id.* at 327 (citing *Friendship Materials*, 679 F.2d at 103); *see also EOG Res.*, 134 F.4th at 883–84 ("Irreparable harm is the core of the preliminary injunction, as we and the Supreme Court have made clear before."); *Fischer v. Thomas*, 78 F.4th 864, 868 (6th Cir. 2023) ("These four components are often described as factors to be balanced. But the irreparable harm requirement is 'indispensable.'" (quoting *Sumner Cnty. Schs.*, 942 F.3d at 326–27)). The irreparable injury required for a preliminary injunction "'must be both certain and immediate,' not 'speculative or theoretical.'" *Sumner Cnty. Schs.*, 942 F.3d at 327 (quoting *Mich. Coal. of Radioactive Material Users, Inc. v. Griepentrog*, 945 F.2d 150, 154 (6th Cir. 1991)). Irreparable injury must be "likely . . . ." *Moms*, 155 F.4th at 513; *see also Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20, 22 (2008) ("Our frequently reiterated standard requires plaintiffs seeking preliminary relief to demonstrate that irreparable injury is *likely* in the absence of an injunction." (citations omitted)).

NetChoice asserts two kinds of irreparable injuries from the Act: First Amendment harms and unrecoverable compliance costs. NetChoice's First Amendment theory of irreparable injury is twofold. First, NetChoice argues that Member Nextdoor has "stopped disseminating fully protected speech to minors in Tennessee[,]" depriving both Nextdoor and those minors of their First Amendment rights.[2] Pl.'s Br. 26. Second, NetChoice argues that all Members face a "Hobson's choice" between continually violating the Act and subjecting themselves to liability or obeying an allegedly unconstitutional law throughout the litigation. *Id.* at 27.

---

[2]During the pendency of this appeal, another Member, Dreamwidth, announced that it would restrict access for new users under 18 years of age because of the Act. But NetChoice has not explained how a fact occurring after the district court denied the preliminary injunction should affect our review of that decision. And, in any event, the argument would fail for Dreamwidth for the same reasons that it fails for Nextdoor.

Each of those injuries could theoretically be irreparable, but NetChoice has not clearly shown that any of them is imminent with respect to its Members in this case. Putting aside the question of whether NetChoice may rely on alleged First Amendment injuries to nonparties (minors who wish to access Nextdoor) to justify an injunction on behalf of its Members, NetChoice is correct that the deprivation of First Amendment freedoms constitutes an irreparable injury. *Brown v. Yost*, 133 F.4th 725, 737–38 (6th Cir. 2025) (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)). The deprivation, however, must still be imminent for a movant to obtain a preliminary injunction, because "the purpose of a preliminary injunction is 'simply to preserve the status quo' during the litigation process." *Moms*, 155 F.4th at 514 (quoting *United States v. Edward Rose & Sons*, 384 F.3d 258, 261 (6th Cir. 2004)).

Similarly, the U.S. Supreme Court has recognized that a "Hobson's choice" between obeying a law that one believes to be unconstitutional or subjecting oneself to continuous liability under that law may constitute an irreparable injury. *Morales v. Trans World Airlines, Inc.*, 504 U.S. 374, 381 (1992). But a statute imposes that choice only when the government actually threatens enforcement. *Id.* In a pre-enforcement "'first strike' [suit] to prevent a State from initiating a suit of its own, the prospect of state suit must be imminent" to "suppl[y] the necessary irreparable injury." *Id.* at 382 (citing *Public Serv. Comm'n of Utah v. Wycoff Co.*, 344 U.S. 237, 240–241 (1952)). If a state officer is not "*threatening and [] about to commence proceedings,*" courts would face the task of "determin[ing] the constitutionality of state laws in hypothetical situations where it is not even clear the State itself would consider its law applicable." *Id.* (quoting *Ex parte Young*, 209 U.S. 123, 156 (1908)).

Skrmetti is not threatening or about to commence enforcement actions under the Act. In fact, he "disavows any intention of skipping the notice period for NetChoice's identified members." Def.'s Br. 20. Therefore, if Skrmetti were to choose to enforce the statute against a Member, he would provide at least 10 days' notice and "an opportunity to present reasons why such proceedings should not be instituted." Tenn. Code § 47-18-108(a)(2). NetChoice or the notified Member could choose to file another motion for a preliminary injunction at that point.

NetChoice argues that the district court inappropriately imported the test from *Christian Healthcare Ctrs., Inc. v. Nessel*, 117 F.4th 826 (6th Cir. 2024), which is meant to assess the

credibility of an enforcement threat in the context of standing. NetChoice correctly describes the posture of *Nessel*, but the district court candidly acknowledged that it was using the factors out of context because they were "instructive . . . ." *Skrmetti*, 2025 WL 1710228, at *10. As the district court observed, the *Nessel* factors are helpful in thinking through the threat of enforcement for preliminary injunction purposes. The injury standards for standing and for an injunction are similar, and to the extent they differ, the standard for equitable relief is higher. *See O'Shea v. Littleton*, 414 U.S. 488, 494–499 (1974) (explaining that the actual injury required for Article III standing must be "real and immediate" and not "conjectural" or "hypothetical" and noting that, even if the Court were to find an actual injury occurred, it "would firmly disagree . . . that an adequate basis for equitable relief against petitioners had been stated" (citations omitted)); *Griepentrog*, 945 F.2d at 154 ("In evaluating the degree of injury, it is important to remember that '[t]he key word in this consideration is irreparable. Mere injuries, however substantial . . . are not enough.'" (alteration in original) (quoting *Sampson v. Murray*, 415 U.S. 61, 90 (1974))). If the threat of enforcement is not credible enough to create an Article III injury, then, *a fortiori*, it is not sufficient to cause an irreparable injury necessitating a preliminary injunction.

> The *Nessel* factors that inform whether an enforcement threat is credible include:
>
> (1) "a history of past enforcement against the plaintiffs or others"; (2) "enforcement warning letters sent to the plaintiffs regarding their specific conduct"; (3) "an attribute of the challenged statute that makes enforcement easier or more likely, such as a provision allowing any member of the public to initiate an enforcement action"; and (4) the "defendant's refusal to disavow enforcement of the challenged statute against a particular plaintiff."

117 F.4th at 848 (quoting *Online Merchs. Guild v. Cameron*, 995 F.3d 540, 550 (6th Cir. 2021), *abrogated on other grounds by FDA v. All. for Hippocratic Med.*, 602 U.S. 367 (2024)). Refusal to disavow enforcement against a specific plaintiff for specific conduct is stronger evidence of a credible threat than general expressions of intent to enforce the law. *Id.* at 850 (first citing *Davis v. Colerain Township*, 51 F.4th 164, 174 (6th Cir. 2022); and then quoting *McKay v. Federspiel*, 823 F.3d 862, 869 (6th Cir. 2016)).

The *Nessel* factors weigh against finding that irreparable injury is imminent. NetChoice has not shown that Tennessee has enforced the Act or sent enforcement letters to any Member. NetChoice alludes to Skrmetti's enforcement of a similar law against a Member but does not explain why that fact has any bearing on Skrmetti's intentions with respect to this Act. The Act does not contain a private right of action making enforcement more likely.

The only factor weighing in favor of NetChoice is that Skrmetti has refused to disavow enforcement of the Act generally, but NetChoice has not presented any explicit comment by Skrmetti that he will not disavow enforcement against a particular Member for particular conduct. NetChoice argues that the "State has not suggested that the newly enacted law will not be enforced, and [there is] no reason to assume otherwise . . . ." Pl.'s Br. 37 (first alteration in original) (quoting *Virginia v. Am. Booksellers Ass'n, Inc.*, 484 U.S. 383, 393 (1988)). It cites Skrmetti's statements from a January 3, 2025, filing, which conceded that the Act was in effect and that Skrmetti would "not agree to 'stay enforcement' of this valid statute passed by Tennessee's elected representatives." *Id.* at 39 (quoting Def.'s Resp. Mot. Ascertain Status, R. 43, PageID #1856). NetChoice further notes Skrmetti's accusation in the same filing that Members were not complying with the Act. NetChoice ignores, though, the portions of that filing signaling that Skrmetti does not intend to pursue immediate enforcement. Skrmetti called "enforcement against NetChoice's members . . . speculative and remote[,] . . . requir[ing] a separate legal proceeding [that] generally could not be filed [without] notice, an opportunity to respond, and a chance to resolve the issue." Def.'s Resp. Mot. Ascertain Status, R. 43, PageID #1856. The weight that the disavowal factor lends to NetChoice is minimal at best.

The First Amendment injuries that NetChoice alleges on behalf of its Members (and even their users)—namely, chilled speech and the Hobson's choice—are contingent on the Members' apprehension of enforcement. Without it, Members may proceed with business as usual. Because the threat of enforcement is speculative and insufficiently imminent in this case, Members' modification of their own practices does not qualify as an irreparable injury to justify the extraordinary relief of a preliminary injunction.

Similarly, the Members need not incur compliance costs absent a threat of enforcement. Even if they did, the record is not clear enough to persuade us that the injury exists. NetChoice

cites declarations by representatives of two of the original seven Members for whom NetChoice sought an injunction. The Head of Customer Experience at Nextdoor stated that creating age verification and parental consent processes would "come[] at a compliance cost to Nextdoor that is not insignificant[,]" that "process[ing] identity documentation for every new Tennessee user . . . would greatly surpass [Nextdoor's] average revenue per user[,]" and that "the compliance costs of building the parental supervision tools . . . and parental-consent processes . . . would dwarf [Nextdoor's] possible revenue per user in [the] market." Pai Decl., R. 8-3, PageID #81–83. A co-owner of Dreamwidth stated that company could not "comply with the Act without making significant, sweeping changes to the site that [it does] not have the resources to make[,]" Paolucci Decl., R. 8-4, PageID #89, that compliance would require more staff, which Dreamwidth lacks "the financial capabilities to add[,]" *id.*, and that the Act would "require [Dreamwidth] to spend money far in excess of [its] available budget . . . to comply[,]" *id.* at PageID #98.

Even if enforcement were imminent, all of those statements are too general and vague to show that Nextdoor and Dreamwidth, let alone all the Members, face a compliance cost burden. In fact, NetChoice tells us that Nextdoor and Dreamwidth have already opted to prohibit minors from creating accounts rather than build parental consent and supervision infrastructure. Nextdoor's and Dreamwidth's elimination of the accounts that would require compliance measures would seem to contradict those entities' claims of harm from compliance costs.

In its reply brief, NetChoice emphasizes that "*all* members would need to spend additional funds[,]" citing a declaration by NetChoice's General Counsel and Director of Strategy Initiatives. Pl.'s Reply 12. But that is not exactly what the declaration says. The cited portion states, generally, that "*[m]ost* websites do not have compliance mechanisms in place" already, that the "parental consent-requirement will prove costly and difficult for NetChoice members to implement" and that "[d]esigning and maintaining comprehensive systems to comply with the Act will be extremely costly, time-consuming, and resource-intensive." Cleland Decl., R. 8-2, PageID #68 (emphasis added). Assuming that the declaration did mean to convey that all NetChoice members would suffer the costs, "[w]e typically do not entertain arguments raised for the first time in the reply brief." *Johnson v. Genovese*, 924 F.3d 929, 937 (6th Cir.

2019) (citing *United States v. Galaviz*, 645 F.3d 347, 362 (6th Cir. 2011)). And even if we did, the declaration's assertions are too conclusory and broad to make a clear showing that each Member would bear compliance costs without a preliminary injunction.

NetChoice may be correct that compliance costs hypothetically would be unrecoverable due to sovereign immunity and therefore irreparable. *Cf. Biden*, 57 F.4th at 556 (holding that unrecoverable compliance costs may constitute irreparable injury and that federal sovereign immunity made the costs at issue unrecoverable ). But the compliance costs on the record in this case are too vague to justify interim relief anyway. NetChoice has not clearly shown that the Members would suffer an irreparable injury of compliance costs absent a preliminary injunction.

Likewise, even accepting, *arguendo*, that NetChoice could have relied on irreparable injuries to third parties, which it has not shown, NetChoice has not met its burden of clearly showing any irreparable injury would come to pass without a preliminary injunction.

## CONCLUSION

Because irreparable injury is a crucial prerequisite for a preliminary injunction, the district court did not abuse its discretion by denying NetChoice's motion on that basis alone. Having failed to demonstrate an imminent threat of irreparable harm, there is no need to remand to have the district court further consider the preliminary injunction factors, as the majority is determined to do. I would therefore affirm the district court's order. I respectfully dissent.

UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT

No. 25-5660

NETCHOICE, LLC,

Plaintiff - Appellant,

v.

JONATHAN THOMAS SKRMETTI, in his official capacity as the Tennessee Attorney General & Reporter,

Defendant - Appellee.

**FILED**
Aug 28, 2026
KELLY L. STEPHENS, Clerk

Before: BATCHELDER, CLAY, and RITZ, Circuit Judges.

# JUDGMENT

On Appeal from the United States District Court
for the Middle District of Tennessee at Nashville.

THIS CAUSE was heard on the record from the district court and was argued by counsel.

IN CONSIDERATION THEREOF, it is ORDERED that the district court's denial of NetChoice's motion for a preliminary injunction is VACATED, and the case is REMANDED for further consideration of the motion consistent with the opinion of this court.

**ENTERED BY ORDER OF THE COURT**

Kelly L. Stephens

Kelly L. Stephens, Clerk