UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| NETCHOICE,<br><br>Plaintiff,<br><br>v.<br><br>JONATHAN SKRMETTI,<br><br>Defendant. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | NO. 3:24-cv-01191<br><br>JUDGE RICHARDSON |

**MEMORANDUM OPINION**

In this action, Plaintiff, NetChoice, challenges Tennessee House Bill 1891 (2024) (the "Act"), codified at Tenn. Code Ann. § 47-18-5701 *et seq.* The Act took effect on January 1, 2025. (Doc. No. 78 at 2). In pertinent part, the Act requires "social-media companies to verify the ages of their prospective account holders and, if a prospective account holder is a minor, obtain parental consent before allowing the minor to become an account holder." *NetChoice, LLC v. Skrmetti*, No. 25-5660, 2026 WL 2546423, at *1 (6th Cir. Aug. 28, 2026).

Pending before the Court is the motion to dismiss (Doc. No. 91, "Motion") filed by Defendant, the Tennessee Attorney General and Reporter (who is sued in his official capacity only).[1] Via the Motion, Defendant makes several different motions to dismiss various of Plaintiff's claims, as set forth below; each such motion applies to some of Plaintiff's claims but not others.[2]

[1] As noted herein, the Motion reflects and encompasses *several different* motions to dismiss, rather than just a single motion. Also of note, Defendant's memorandum in support of those motions is incorporated within the Motion, and some references herein to the "Motion" are actually references to the memorandum in support of the Motion.

[2] Notably, the Motion does not seek the dismissal of *all* of the claims asserted by Plaintiff in the amended, and operative, complaint (Doc. No. 88, "Amended Complaint") in this action.

Defendant first moves pursuant to Rule 12(b)(1) to dismiss the as-applied claims challenging the Act that Plaintiff brings on behalf of its members, for lack of (associational) standing. (Doc. No. 91 at 7-13). Defendant then moves pursuant to Rule 12(b)(1) to dismiss Plaintiff's claim challenging the Act as unconstitutionally vague, as being unripe. (Doc. No. 91 at 13-14).[3] Finally, Defendant moves pursuant to Rule 12(b)(6) to dismiss Plaintiff's claim challenging the Act as unconstitutionally vague, for failure to state a claim. (Doc. No. 91 at 15-17). Plaintiff has filed a response (Doc. No. 95, "Response") in opposition to the Motion. Defendant has filed a reply (Doc. No. 98, "Reply") in further support of the Motion.[4]

For the reasons described herein, the Motion (Doc. No. 91) will be **GRANTED IN PART** and **DENIED IN PART**.

## BACKGROUND[5]

Below, the Court first provides a review of the procedural and factual background of this action. The Court then reviews the claims in the Amended Complaint, and the grounds for dismissal of (some of) those claims that Defendant has asserted via the Motion.

### 1. Procedural Background

Plaintiff commenced this action on October 3, 2024, by filing the original complaint (Doc. No. 1). On the same day, Plaintiff filed a motion for a preliminary injunction (Doc. No. 8,

---

[3] As discussed below, the Court discerns that Defendant's challenge asserts a lack of *prudential* ripeness rather than a lack of *constitutional* ripeness.

[4] At the Court's direction (Doc. No. 108), Plaintiff and Defendant filed respective supplemental briefs (Doc. Nos. 112, 113). The Court has considered these supplemental briefs in its adjudication of the Motion.

[5] When citing a page in a document filed by one of the parties, the Court endeavors to cite to the page number ("Page __ of __") added by the Clerk's Office as part of the pagination process associated with Electronic Case Filing if such page number differs from the page number originally provided by the author/filer of the document. In addition, where the Amended Complaint is cited herein without including a paragraph symbol, the citation is not to a paragraph number but rather to a page that contains the cited content outside the boundaries of any paragraph.

"Preliminary Injunction Motion"). Via the Preliminary Injunction Motion, Plaintiff "requests entry of a preliminary injunction order prohibiting Defendant from enforcing the Act against NetChoice's covered members, and such other and further relief the Court deems necessary and proper." (Doc. No. 8 at 1).[6]

This case was initially assigned to Chief Judge Campbell but was reassigned to the undersigned following the recusal of Chief Judge Campbell on January 15, 2025. (Doc. No. 47). While Chief Judge Campbell was still presiding, the Act went into effect—on January 1, 2025—without any decision on the Preliminary Injunction Motion.

Then, two days after Chief Judge Campbell's recusal and 16 days after the Act went into effect, Plaintiff filed a motion for a temporary restraining order (Doc. No. 48, "TRO Motion"), whereby Plaintiff sought to restrain Defendant from enforcing the Act. (Doc. No. 48-5 at 1). On February 14, 2025, the Court denied the TRO Motion. (Doc. No. 58).

The Court then denied the Preliminary Injunction Motion (Doc. No. 8) via an order (Doc. No. 79, "Denial Order") on June 18, 2025. The Court's denial of the Preliminary Injunction Motion was premised on the Court's conclusion that Plaintiff had not sufficiently shown irreparable harm, as required for the issuance of a preliminary injunction. (Doc. No. 78 at 27). Plaintiff then appealed the Denial Order to the Sixth Circuit, (Doc. No. 83), and the appeal was styled as *NetChoice, LLC v. Jonathan Skrmetti*, No. 25-5660 (6th Cir.) (hereinafter "*NetChoice* Appeal").

While the *NetChoice* Appeal was ongoing, Plaintiff filed the Amended Complaint (Doc. No. 88), which became (and remains) the operative complaint in this action. Defendant then filed the instant Motion.

---

[6] Numerous filings were submitted respectively either in support of or in opposition to the Preliminary Injunction Motion. (Doc. Nos. 8-1 through 8-4, 9, 26, 27-29, 30, 30-1 through 30-43, 31, 31-1 through 31-23, 34, 34-1, 35, 37, 40, 40-1, 56, 56-1, 62, 62-1, 63, 63-1, 64, 65, 66, 66-1, 67, 68, 68-1, 69, 69-1, 70, 71, 75, 75-1, 76, 77, 77-1, 112, 113).

On August 28, 2026, a divided panel of the Sixth Circuit issued its decision in the *NetChoice* Appeal (Doc. No. 107, "*NetChoice* Appeal Decision").[7] Due to the panel majority's view that this Court had erred in not finding that Plaintiff had established irreparability of injury in the absence of a preliminary injunction, the Sixth Circuit vacated the Denial Order and remanded the case for further consideration of the Preliminary Injunction Motion consistent with that decision. On September 21, 2026, the mandate was issued with respect to the *NetChoice* Appeal. (Doc. No. 111).

**2. Factual Background**

In reviewing the factual background of this action, the Court discusses first the content of the Act and then the allegations that Plaintiff has made in the Amended Complaint.

a. The Act

Given that Plaintiff challenges both particular provisions of the Act and the Act as a whole (Doc. No. 88 at 33), the Court below sets forth the Act (which is composed of six sections) verbatim in its entirety.

The Act took effect on January 1, 2025. (Doc. No. 88 at ¶ 47). The first section of the Act, codified at Tenn. Code Ann. § 47-18-5701, provides that "[t]his part is known and may be cited as the 'Protecting Children from Social Media Act.'"

The second section of the Act, codified at Tenn. Code Ann. § 47-18-5702, provides definitions. That section provides in full:

> As used in this part, unless the context otherwise requires:
>
> (1) "Account holder" means a person who has an account or profile to use a social media company's platform, with such account or profile having been created on or after January 1, 2025;

[7] To be clear, Docket No. 107 is the location on *this Court's* docket of an informational copy of the *NetChoice* Appeal Decision issued by the *Sixth Circuit*.

(2) "Content":

(A) Means text, image, or video; and

(B) Does not include interactive gaming or educational entertainment;

(3) "Interactive computer service":

(A) Means an information service, as defined in 47 U. S. C. § 153, information system, or information access software that:

(i) Provides or enables access by multiple users to a computer server; and

(ii) Provides access to the internet; and

(B) Includes an internet service, an internet system, a website, an internet application, and an internet portal;

(4) "Minor" means an individual who is:

(A) Known or reasonably believed by a social media platform to be under eighteen (18) years of age;

(B) Not emancipated; and

(C) A resident of this state;

(5) "Parent" means the parent, guardian, or person who has custody of, or person who has caregiving authority over, the minor;

(6) "Person" means an individual or entity;

(7) "Post" means content that an account holder makes available on a social media platform for other account holders and users to consume;

(8) "Social media company" means a person that is an interactive computer service and that provides a social media platform;

(9) "Social media platform":

(A) Means a website or internet application that:

(i) Allows a person to create an account; and

(ii) Enables an account holder to communicate with other account holders and users through posts; and

(B) Does not include:

(i) A broadband internet access service, as defined in 47 CFR § 8.1(b);

(ii) An email service;

(iii) An internet service, internet application, or website:

(a) That consists primarily of content that is not generated by account holders, but rather is preselected by the service, application, or website provider; and

(b) For which interactive functionality is incidental to, directly related to, or dependent upon, the preselected content described in subdivision (9)(B)(iii)(a);

(iv) Online shopping, if the interaction with other account holders or users is predominantly limited to the ability to send, receive, request, or settle funds, comment on transactions, display goods for sale, engage as consumers about products and reviews, or post a wish list;
(v) An internet service, internet application, or website that primarily provides career development opportunities;
(vi) A cloud storage or cloud computing service;
(vii) An online service, application, or website in which interaction between users is predominately used for technical support, or limited to reviewing products offered for sale by electronic commerce or commenting on such reviews posted by other users; or
(viii) Peer-to-peer payment platforms, if the interaction with other users or account holders is generally limited to the ability to send, receive, or request funds and to like or comment on such transactions, or other functions that are focused on sending, receiving, requesting, or settling payments between users or account holders; and

(10) "User" means a person who consumes posts on a social media platform, but is not an account holder.

Tenn. Code Ann. § 47-18-5702. In its Amended Complaint, Plaintiff refers to Tenn. Code Ann. §§ 47-18-5702(2), (7)-(9) as the Act's "Central Coverage Definition," (*see e.g.,* Doc. No. 88 at 25), insofar as those provisions define the scope (i.e., the "coverage"), of the restrictions imposed via the Act. The Court does likewise herein.

The third section of the Act, codified at Tenn. Code Ann. § 47-18-5703, imposes restrictions on "social media compan[ies]," as defined in Tenn. Code Ann. § 47-18-5702(8), regarding age verification and parental consent. That section provides in full:

(a)

(1) A social media company shall verify the age of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder.

(2)

(A) If the individual is a minor, then the social media company must verify the express parental consent for the minor to become an account holder.
(B) A social media company shall prohibit a minor from becoming an account holder unless the social media company has the express

consent of the minor's parent to allow the minor to become an account holder.

(3) Once age and parental consent, if applicable, have been verified to confirm that an individual may become an account holder, then the social media company is not required to reverify the individual's age and parental consent, unless parental consent is revoked.

(b) A social media company shall allow a parent to revoke consent for a minor to become or continue as an account holder.

(c) A social media company or third party shall not retain personally identifying information that was used to verify age or parental consent.

Tenn. Code Ann. § 47-18-5703. Below, the Court refers to the restrictions imposed via Tenn. Code Ann. § 47-18-5703(a)(1) as the "Age-Verification Requirement" and to the restrictions imposed via Tenn. Code Ann. § 47-18-5703(a)(2) as the "Parental-Consent Requirement."

The fourth section of the Act, codified at Tenn. Code Ann. § 47-18-5704, imposes restrictions on "social media compan[ies]," as defined in Tenn. Code Ann. § 47-18-5702(8), related to parental supervision. That section provides in full:

A social media company shall provide a minor account holder's parent with means for the parent to supervise the minor's account. Such means must include options for the parent to view privacy settings on the account, set daily time restrictions, and implement breaks during which the minor cannot access the account.

Tenn. Code Ann. § 47-18-5704. The Court will refer to the restrictions imposed via Tenn. Code Ann. § 47-18-5704 as the "Parental-Supervision Requirement."

The fifth section of the Act, codified at Tenn. Code Ann. § 47-18-5705, prescribes the Act's enforcement mechanism. That section provides in full:

(a) If the attorney general and reporter believes that a social media company is engaged in, has engaged in, or is about to engage in an act or practice prohibited by this part and that proceedings would be in the public interest, then the attorney general and reporter may:

(1) Conduct an investigation in the same manner as provided in § 47-18-106; and

> (2) Bring an action in the same manner as provided in § 47-18-108; in any such action, the attorney general and reporter may recover the penalties and other relief authorized under § 47-18-108.
>
> (b) The powers and remedies provided in this section are cumulative and supplementary to all other powers and remedies otherwise provided by law. The invocation of one (1) power or remedy in this part does not exclude or prohibit the use of another available remedy.

Tenn. Code Ann. § 47-18-5705. Finally, the sixth section of the Act, codified at Tenn. Code Ann. § 47-18-5706, provides limitations on waivers related to the Act. That section provides in full:

> (a) A waiver or limitation, or a purported waiver or limitation, of the following is void as unlawful and against public policy:
> (1) A protection or requirement provided under this part; and
> (2) The right to cooperate with the attorney general and reporter or another law enforcement agency.
>
> (b) A court, arbitrator, or tribunal shall not enforce or give effect to a waiver or limitation described in subsection (a), notwithstanding a contract or choice of law provision in a contract.

Tenn. Code Ann. § 47-18-5706.

b. Alleged Facts[8]

Plaintiff "is a District of Columbia nonprofit trade association for Internet companies." (Doc. No. 88 at ¶ 13). Plaintiff's "mission is to promote online commerce and speech and to increase consumer access and options via the Internet, while minimizing burdens that could prevent businesses from making the Internet more accessible and useful." (*Id.*). Plaintiff alleges that the Act regulates "at a minimum, services offered by the following NetChoice members: (1) Automattic, which owns and operates Tumblr; (2) Discord; (3) Dreamwidth; (4) Meta, which owns

[8] The facts herein are taken from the Amended Complaint. For purposes of the Motion, the facts in the Amended Complaint are accepted as true, except to the extent that they are qualified herein (as, for example, by "Plaintiff alleges") to denote that they are not being taken as true but instead are set forth merely to make clear what a party claims to be true. Throughout this opinion, the Court forgoes any such qualifiers for any fact that it is accepting as true, stating those facts without qualification even though it is aware that any such (alleged) fact ultimately might not prove to be true.

and operates Facebook, Instagram and Threads; (5) Nextdoor; (6) Pinterest; (7) Reddit; (8) Snap Inc., which owns and operates Snapchat; (9) X; and (10) YouTube." (*Id.* at ¶ 16). Although the foregoing is ostensibly merely a list of Plaintiff's *members* that Plaintiff alleges are subject to the Act, the Court also discerns that this list identifies the services (in the form of websites, web services, and/or apps) that Plaintiff alleges are subject to the Act. That is to say, Plaintiff is alleging that as far as services are concerned, Tumbler (run by Automattic), Discord (as in the service rather than the business entity of the same name that operates that service), Dreamwidth (as in the service rather than the business entity of the same name that operates that service), Facebook (run by Meta), Instagram (run by Meta), Threads (run by Meta), Nextdoor (as in the service rather than the business entity of the same name that operates that service), Pinterest (as in the service rather than the business entity of the same name that operates that service), Reddit (as in the service rather than the business entity of the same name that operates that service), Snapchat (run by Snap Inc.), X (as in the service rather than the business entity of the same name that operates that service), and YouTube (as in the service rather than the business entity of the same name that operates that service), are subject to the Act's restrictions. (*See also* Doc. No. 95 at 7 ("Here 'the pertinent facts in these cases are the same across the board,' as the First Amendment arguments raised in this lawsuit do not depend on any factual distinctions among the twelve specifically identified NetChoice member *websites* covered by this Act." (emphasis added))).

Defendant is the Tennessee Attorney General & Reporter. (*Id.* at ¶ 18). "Defendant has publicly pursued enforcement against some of NetChoice's members under other laws, advancing claims related to minors' online welfare." (*Id.*). Additionally, "Defendant has not disavowed

enforcement under the Act against any covered NetChoice member—including disavowing enforcement while this litigation is pending." (*Id.* at ¶ 19).[9]

Plaintiff's "covered members disseminate speech on their websites to adult and minor users, who use these services to engage in a wide variety of speech [allegedly] protected by the First Amendment." (*Id.* at ¶ 26). For instance:

> Discord enables people to create communities around online gaming. Dreamwidth allows users to share their writing, artwork, and innermost thoughts. "On Facebook, . . . users can debate religion and politics with their friends and neighbors or share

[9] When the Amended Complaint refers to a "covered member" (of Plaintiff) or a "member" (of Plaintiff), the Court discerns that the reference is to (and only to) members of Plaintiff who are (allegedly) subject to the Act that Plaintiff has listed in paragraph 16 of the Amended Complaint. (Doc. No. 88 at ¶ 16 ("Although the Act does not regulate all of Plaintiff's members, this Complaint refers to members with services that the Act regulates as 'members.'"); Doc. No. 95 at 15 (describing Plaintiff as bringing claims on behalf of ten specific members—i.e., the ten specific members listed in paragraph 16 of the Amended Complaint)). That is to say, the Court discerns that "covered member" and "member" as used in the Amended Complaint refers to (1) Automattic (which is indeed spelled this way); (2) Discord (as in the business entity rather than the service of the same name that it operates); (3) Dreamwidth (as in the business entity rather than the service of the same name that it operates); (4) Meta; (5) Nextdoor (as in the business entity rather than the service of the same name that it operates); (6) Pinterest (as in the business entity rather than the service of the same name that it operates); (7) Reddit (as in the business entity rather than the service of the same name that it operates); (8) Snap Inc.; (9) X (as in the business entity rather than the service of the same name that it operates); and/or (10) YouTube (as in the business entity rather than the service of the same name that it operates). Following the Amended Complaint, the Court will herein also use "covered member(s)" and "member(s)" to mean one or some combination of the foregoing entities.

Likewise, the Court discerns that when the Amended Complaint refers to a "covered website[]" (Doc. No. 88 at ¶ 23), "covered member website[]" (*id.* at ¶ 28), or "covered service[] (*id.* at ¶ 23), it is referring to the services (and only those services) allegedly covered by the Act that Plaintiff has listed in paragraph 16 of the Amended Complaint (Doc. No. 95 at 15 (describing Plaintiff as bringing claims on behalf of "on behalf of ten specific members operating twelve specific services"—i.e., the ten specific members listed in paragraph 16 of the Amended Complaint and the twelve specific services listed in paragraph 16 of the Amended Complaint)). In other words, the Court discerns that "covered website," "covered member website," and "covered service" as used in the Amended Complaint refers to: (1) Tumblr (run by Automattic); (2) Discord (as in the service rather than the business entity of the same name that operates that service); (3) Dreamwidth (as in the service rather than the business entity of the same name that operates that service); (4) Facebook (run by Meta); (5) Instagram (run by Meta); (6) Threads (run by Meta); (7) Nextdoor (as in the service rather than the business entity of the same name that operates that service); (8) Pinterest (as in the service rather than the business entity of the same name that operates that service); (9) Reddit (as in the service rather than the business entity of the same name that operates that service); (10) Snapchat (run by Snap Inc.); (11) X (as in the service rather than the business entity of the same name that operates that service); and/or (12) YouTube (as in the service rather than the business entity of the same name that operates that service). Following the Amended Complaint, the Court will herein also use "covered website(s)," "covered member website(s)," and "covered service(s)" to mean one or some combination of these services.

> vacation photos." *Packingham*, 582 U.S. at 104. Instagram allows people to post and view photos and videos, comment on them, learn about and advocate for the causes they care about, showcase their art or athletic talent, and hear from their local government officials. On Nextdoor, users can connect with neighbors, share local news, and borrow tools. Pinterest allows users to explore recipes, home decor, and more. On Reddit, users have access to hundreds of thousands of communities, endless conversation, and authentic human connection—with user-created and user-led communities on all manners of subjects. Snapchat is designed to allow users to have digital conversations with friends and family in ways that replicate real-life interactions. Threads provides a creative space where users can express their ideas in conversation with others, such as elected officials. Tumblr is a microblogging service that allows its users to discuss any topic, formatted to emphasize multimedia. On X (formerly Twitter), "users can petition their elected representatives and otherwise engage with them in a direct manner." *Id.* at 104-05. And YouTube endeavors to show people the world, from travel documentaries to step-by-step cooking instructions.

(*Id.* at ¶ 27). Likewise, "[a]ll of these covered member websites allow their users to create accounts and communicate with other users through posts," (*id.* at ¶ 29), and "[Plaintiff's] members require users to create an account before they can access some or all of the [allegedly] protected speech and functions available on their websites." (*Id.* at ¶ 30).

Additionally, Plaintiff's "members provide parents with tools and options to help monitor their minor children's activities." (*Id.* at ¶ 39; *see also id.* at ¶¶ 40, 42, 43). Likewise, Plaintiff's "members prohibit minors under 13 from accessing their main services (which are the services [allegedly] regulated by the Act here), although some offer separate experiences for users under 13 geared for that age group." (*Id.* at ¶ 44).

### 3. Plaintiff's Claims and the Motion

#### a. Plaintiff's Claims[10]

In the Amended Complaint, Plaintiff brings six counts, in one group of counts asserting claims challenging the Act, and in the other group of counts merely requesting particular types of relief. Specifically, the first group of counts is composed of Counts I through IV, which respectively set forth claims pursuant to 42 U.S.C. § 1983 ("Section 1983"). And the second group of counts is composed of Count V and Count VI, which respectively set forth requests for *relief* (rather than *claims*).

Via Count I, Plaintiff brings both a facial claim and an as-applied claim challenging the application of portions of the Act to its members and their services as identified in paragraph 16 of the Amended Complaint. (Doc. No. 88 at ¶¶ 75, 80-107).[11] Plaintiff challenges "all speech

---

[10] Plaintiff is asserting claims (seemingly solely) on behalf of its members and its members' users, rather than on behalf of itself. Plaintiff specifically alleges:

> 14. NetChoice has standing to bring its challenges on at least two grounds.
> 15. First, NetChoice has associational standing to challenge the Act, because: (1) some of NetChoice's members have individual standing to sue in their own right; (2) challenging the Act is germane to NetChoice's purpose; and (3) members' individual participation is unnecessary in this purely legal challenge, which can be resolved based on facts shared by all covered member websites. *See Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 342-43 (1977); *NetChoice, L.L.C. v. Fitch*, 134 F.4th 799, 804-05 (5th Cir. 2025); *Carr*, 2025 WL 1768621, at *4-6; *Yost*, 716 F. Supp. 3d at 548-50; *Uthmeier*, 2025 WL 1570007, at *6-9; *Reyes*, 748 F. Supp. 3d at 1118-19; *Paxton*, 747 F. Supp. 3d at 1029-31. []
> 17. Second, NetChoice has standing to assert the First Amendment rights of members' current and prospective users. *Virginia v. Am. Booksellers Ass'n*, 484 U.S. 383, 392-93 (1988); *Fitch*, 134 F.4th at 805-07; *Carr*, 2025 WL 1768621, at *6-7; *Yost*, 716 F. Supp. 3d at 550-51; *Uthmeier*, 2025 WL 1570007, at *9; *Paxton*, 747 F. Supp. 3d at 1031.

(Doc. No. 88 at ¶¶ 14, 15, 17).

[11] The Sixth Circuit recently explained the difference between so-called "as-applied" and "facial" claims:

> The Supreme Court has long distinguished "facial" from "as-applied" constitutional claims. *See NetChoice*, 603 U.S. at 723–24, 144 S. Ct. 2383; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449–51, 128 S. Ct. 1184, 170 L.Ed.2d 151 (2008). These claims differ in the showing of unconstitutionality that a challenger must make to

regulations [that depend] on the Central Coverage [Definition].” (Doc. No. 88 at 19).[12] The challenge, in other words, is to the Age-Verification Requirement (i.e., Tenn. Code Ann. § 47-18-5703(a)(1)), the Parental-Consent Requirement (i.e., Tenn. Code Ann. § 47-18-5703(a)(2)), and the Parental-Supervision Requirement (i.e., Tenn. Code Ann. § 47-18-5704) as allegedly violative of the First Amendment of the United States Constitution.[13] (Doc. No. 88 at ¶¶ 93-95). The basis of this challenge seems to be that the Central Coverage Definition (allegedly) “[is] content-based

---

> succeed. *See Bucklew v. Precythe*, 587 U.S. 119, 138, 139 S. Ct. 1112, 203 L.Ed.2d 521 (2019). An as-applied claim requires a challenger to show only that a law violates the Constitution as applied to the *specific conduct* that the challenger seeks to undertake. *See, e.g.*, *FEC v. Wis. Right to Life, Inc.*, 551 U.S. 449, 456–57, 127 S. Ct. 2652, 168 L.Ed.2d 329 (2007) (Roberts, C.J., opinion). A facial claim, by contrast, requires a challenger to show that the law violates the Constitution in a *much broader set of fact patterns*. *See Wash. State Grange*, 552 U.S. at 449, 128 S. Ct. 1184. This broader theory seeks a holding that the law “could *never* be applied in a valid manner.” *Members of City Council of L.A. v. Taxpayers for Vincent*, 466 U.S. 789, 797–98, 104 S. Ct. 2118, 80 L.Ed.2d 772 (1984) (emphasis added).
>
> Facial claims themselves come in two varieties. Outside the speech context, these claims require a challenger to show that a law violates a constitutional right in all its potential applications. *See United States v. Hansen*, 599 U.S. 762, 769, 143 S. Ct. 1932, 216 L.Ed.2d 692 (2023); *United States v. Salerno*, 481 U.S. 739, 745, 107 S. Ct. 2095, 95 L.Ed.2d 697 (1987). That type of challenge is “hard to win.” *NetChoice*, 603 U.S. at 723, 144 S. Ct. 2383. But the Supreme Court's so-called “overbreadth” doctrine adopts an easier-to-meet test under the First Amendment to provide “breathing room” for speech. *Hansen*, 599 U.S. at 769–70, 143 S. Ct. 1932. A free-speech challenger can succeed on a facial overbreadth challenge by showing that a law “prohibits a substantial amount of protected speech” as compared to its “plainly legitimate sweep.” *United States v. Williams*, 553 U.S. 285, 292, 128 S. Ct. 1830, 170 L.Ed.2d 650 (2008); *see NetChoice*, 603 U.S. at 723–24, 144 S. Ct. 2383.

*Doe v. Burlew*, 165 F.4th 525, 529-30 (6th Cir. 2026).

[12] This quotation was taken from a header in the Amended Complaint. The capitalization has been altered by the Court.

[13] The Court is aware that challenges to state statutes that are ostensibly based on the First Amendment are technically based on the Fourteenth Amendment. That is, although parts of the First Amendment (including the Free Speech Clause) by their terms apply only to federal statutes, the First Amendment “applies to the States under the Due Process Clause of the Fourteenth Amendment,” *44 Liquormart, Inc. v. Rhode Island*, 517 U.S. 484, 489 n.1 (1996) (collecting cases), which by its own terms applies to the States. *See* U.S. Const. amend. XIV, § 1. But herein, the Court will take the (not uncommon) approach of speaking of free speech rights as First Amendment rights while omitting any reference to the Fourteenth Amendment.

and speaker-based." (*Id.* at ¶ 85). And so, the theory goes, the Age-Verification Requirement, the Parental-Consent Requirement, and the Parental-Supervision Requirement, predicated as they are on the Central Coverage Definition—which is, as just mentioned, allegedly "content-based and speaker-based" are: (i) subject to strict scrutiny; and (ii) unconstitutional when subjected to strict scrutiny. (*Id.* at ¶¶ 91-107).

Via Count II, Plaintiff brings a facial vagueness claim challenging the Act.[14] (Doc. No. 88 at ¶¶ 108-17). Like in Count I, Plaintiff specifically challenges "all speech regulations [that depend] on the Central Coverage Definition."[15] (*Id.* at 25). Plaintiff specifically alleges that the Central Coverage Definition is unconstitutionally vague under the First Amendment and the Fourteenth Amendment's Due Process Clause[16] because (according to Plaintiff) it "fails to provide necessary notice." (*Id.* at ¶ 111). So, the theory seems to go that, because (according to Plaintiff) the Central Coverage Definition is unconstitutionally vague, the Act's restrictions, i.e., the Age-Verification Requirement, the Parental-Consent Requirement, and the Parental-Supervision Requirement, dependent as they are on the terms defined in the Central Coverage Definition, are invalid. (*Id.* at ¶¶ 115-17).

Via Count III (as in Count I) Plaintiff brings both a facial claim and an as-applied claim challenging the application of portions of the Act to its members and their services as identified in

---

[14] Although the Amended Complaint is not the picture of clarity on this point, the Court discerns that via Count II Plaintiff is bringing solely a facial (rather than both a facial and as-applied) vagueness claim. (*See also* Doc. No. 88 at ¶ 78 ("Here, a facial vagueness challenge is proper because 'there is no reason to believe one social media company is better suited than another to understand [the Act's] vague terms.' *Paxton*, 747 F. Supp. 3d at 1031.")). The Court's confidence in its interpretation of Count II is bolstered by the briefing on the Motion wherein Defendant states that Plaintiff "does not appear to bring as-applied vagueness claims" (Doc. No. 91 at 11), and where Plaintiff affirmatively states that it "does *not* bring an as-applied vagueness challenge." (Doc. No. 95 at 29 n.3).

[15] This quotation was taken from a header in the Amended Complaint. The capitalization has been altered by the Court.

[16] As indicated above in a footnote, the Fourteenth Amendment's Due Process Clause applies to the States.

paragraph 16 of the Amended Complaint. (Doc. No. 88 at ¶¶ 75, 118-28). This time, Plaintiff challenges the Age-Verification Requirement (i.e., Tenn. Code Ann. § 47-18-5703(a)(1)) in particular. Plaintiff alleges that the Age-Verification Requirement is violative of the First Amendment. Plaintiff specifically asserts that the Age-Verification Requirement "independently triggers [(i.e., triggers irrespective of the Central Coverage Definition or any other provision of the Act)], and cannot satisfy, any form of heightened First Amendment scrutiny." (Doc. No. 88 at ¶ 119). Plaintiff also alleges that the Age-Verification Requirement "triggers strict scrutiny because it relies on the Act's [C]entral [C]overage [D]efinition," (*id.* at ¶ 123), and alternatively that the Age-Verification Requirement "independently triggers [(i.e., triggers irrespective of the Central Coverage Definition or any other provision of the Act)] strict scrutiny because it 'direct[ly] target[s] . . . fully protected speech.'" (*Id.* at ¶ 124). Additionally, Plaintiff alleges that the Age-Verification Requirement "is integral to the entire Act. Without this provision, no other provision in the Act could operate. The [A]ge-[V]erification [Requirement] is not severable and thus[, because the Age-Verification Requirement is invalid,] the entire Act is invalid." (*Id.* at ¶ 127).

Via Count IV (as with Count I and Count III), Plaintiff brings both a facial claim and an as-applied claim challenging the application of portions of the Act to its members and their services as identified in paragraph 16 of the Amended Complaint. (Doc. No. 88 at ¶¶ 75, 129-42). This time, Plaintiff challenges the Parental-Consent Requirement (i.e., Tenn. Code Ann. § 47-18-5703(a)(2)) in particular. Plaintiff alleges that the Parental-Consent Requirement is violative of the First Amendment (as applied to the States by the Fourteenth Amendment). Plaintiff specifically asserts that the Parental-Consent Requirement "independently triggers [(i.e., triggers irrespective of the Central Coverage Definition or any other provision of the Act)], and cannot satisfy, any form of heightened First Amendment scrutiny." (Doc. No. 88 at ¶ 130). Plaintiff also alleges that

the Parental-Consent Requirement "triggers strict scrutiny because it relies on the Act's [C]entral [C]overage [D]efinition," (*id.* at ¶ 135), or alternatively that the Parental Consent Requirement "independently triggers [(i.e., triggers irrespective of the Central Coverage Definition or any other provision of the Act)] strict scrutiny." (*Id.* at ¶ 136). Of note, via this particular count, Plaintiff does not assert that the (alleged) invalidity of the Parental-Consent Requirement somehow renders the Act as a whole, or the rest (or any) of the Act's other restrictions, invalid.

Via Count V (Doc. No. 88 at ¶¶ 143-45) Plaintiff requests an "an injunction prohibiting Defendant from enforcing the Act and all the challenged provisions of the Act against Plaintiff and its members." (*Id.* at ¶ 145). And finally, via Count VI (*id.* at ¶¶ 146-53) Plaintiff seeks numerous declarations as to the invalidity of the Act as a whole, and particular portions of the Act. (*Id.*).[17]

b. Defendant's Arguments for Dismissal

Via the Motion, Defendant seeks dismissal of some (though not all)[18] of Plaintiff's claims. In particular, Defendant moves pursuant to Rule 12(b)(1) to dismiss (for lack of associational standing) the as-applied claims challenging the Act that Plaintiff brings on behalf of its members. (Doc. No. 91 at 7-13). Defendant also moves pursuant to Rule 12(b)(1) to dismiss (for lack of ripeness) Plaintiff's claim challenging the Act as unconstitutionally vague. (Doc. No. 91 at 13-14). Finally, Defendant moves pursuant to Rule 12(b)(6) to dismiss (for failure to state a claim) Plaintiff's claim challenging the Act as unconstitutionally vague. (Doc. No. 91 at 15-17).

---

[17] Notably, "declaratory and injunctive relief are remedies, not causes of action." *Cruz v. Cap. One, N.A.*, 192 F. Supp. 3d 832, 838 (E.D. Mich. 2016). *See also Meadow v. Nibco, Inc.*, No. 3-15-1124, 2016 WL 2986350, at *8 (M.D. Tenn. May 24, 2016) ("Defendant argues that Plaintiffs' causes of action for declaratory and injunctive relief must be dismissed because declaratory and injunctive relief are remedies, not causes of action. Defendant is correct."). So, the Court treats Count V and Count VI not as asserting particular claims, but merely as serving as requests for particular types of relief.

[18] Specifically, Defendant does *not* move to dismiss Plaintiff's facial claims challenging the Act that were brought in Counts I, III, and IV.

## LEGAL STANDARD

Because Defendant has raised bases for dismissal both under Rule 12(b)(1)[19] and under Rule 12(b)(6),[20] the Court reviews below the standards for dismissal under both rules.

**1. Rule 12(b)(1)**

Rule 12(b)(1) "provides for the dismissal of an action for lack of subject matter jurisdiction." *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). "Subject matter jurisdiction is always a threshold determination." *Am. Telecom Co. v. Republic of Lebanon*, 501 F.3d 534, 537 (6th Cir. 2007).

Motions to dismiss under Rule 12(b)(1) are categorized as either facial or factual attacks. *Gentek Bldg. Products, Inc. v. Sherwin-Williams Co.*, 491 F.3d 320, 330 (6th Cir. 2007) (citing *Ohio Nat. Life Ins. Co. v. United States*, 922 F.2d 320, 325 (6th Cir. 1990)). A facial attack challenges the sufficiency of the complaint's allegations, requiring the district court to take the allegations as true. *Id.* If the complaint establishes federally cognizable claims, jurisdiction exists.

---

[19] Arguments for dismissal raised on the bases of a (purported) lack of standing and lack of ripeness are appropriately raised pursuant to Rule 12(b)(1). *See e.g., Doe v. State of Tennessee*, No. 3:24-CV-00777, 2025 WL 2813887, at *3 (M.D. Tenn. Sept. 30, 2025) ("A motion to dismiss for lack of standing is properly characterized as a motion to dismiss for lack of subject-matter jurisdiction under Federal Rule of Civil Procedure 12(b)(1)."), *opinion vacated in part on reconsideration sub nom. Doe 1 v. State*, No. 3:24-CV-00777, 2026 WL 2129941 (M.D. Tenn. Jan. 28, 2026); *Probus v. Tindell*, No. 3:23-CV-P592-JHM, 2024 WL 1288231, at *2 (W.D. Ky. Mar. 26, 2024) ("Because the question of ripeness is jurisdictional, a motion to dismiss based on ripeness 'is more appropriately considered as a Rule 12(b)(1) motion to dismiss for lack of subject matter jurisdiction' rather than a Rule 12(b)(6) motion for failure to state a claim." (quoting *Hockman v. Schuler*, No. 07-CV-14268, 2009 WL 1585826, at *2 (E.D. Mich. June 5, 2009))); *Aerojet Rocketdyne, Inc. v. Int'l Union, United Auto., Aerospace & Agric. Implement Workers of Am.*, No. CV 17-5122 PSG (SKX), 2017 WL 9500948, at *3 (C.D. Cal. Nov. 27, 2017) ("Ripeness, which includes both constitutional and prudential considerations, is addressed under Rule 12(b)(1).").

[20] Arguments for dismissal raised on the basis of a (purported) failure to state a claim are, axiomatically, raised pursuant to Rule 12(b)(6). *ACT, Inc.. v. Worldwide Interactive Network*, No. 3:18-CV-186, 2020 WL 12574239, at *29 (E.D. Tenn. Mar. 10, 2020) ("Failure to state a claim is traditionally raised in a motion pursuant to Federal Rule of Civil Procedure 12(b)(6), and dismissal of claims is appropriate under Rule 12(b)(6) when a pleading fails to state a plausible claim for relief.").

*Id.* A factual attack, by contrast, raises a factual controversy regarding whether subject-matter jurisdiction exists, and no presumptive truthfulness applies to the complaint's allegations when a court resolves a factual attack. *Id.* In such cases, the court may weigh conflicting evidence, including affidavits, and documents, or even conduct a limited evidentiary hearing, to determine the factual predicate for jurisdiction. *Id.*; *Nichols v. Muskingum Coll.*, 318 F.3d 674, 677 (6th Cir. 2003). Here, the Court is faced with a facial attack on its subject-matter jurisdiction.[21]

That raises the question of what documents or filings (if any) the Court may consider outside of the Amended Complaint in resolving these facial attacks. As the undersigned just recently observed, in considering a motion to dismiss that brought a facial attack under Rule 12(b)(1), the Court "may consider the [complaint] and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the [motion to dismiss] so long as they are referred to in the [complaint] and are central to the claims contained therein." *City of Murfreesboro, Tenn., v. BFI Waste Systems of Tenn.*, LLC, No. 3:22-CV-00605, 2026 WL 2807005, at *6 (M.D. Tenn. Sept. 18, 2026).

**2. Rule 12(b)(6)**

For purposes of a motion to dismiss under Fed. R. Civ. P. 12(b)(6), the Court must take all factual allegations in the complaint as true. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). To survive a motion to dismiss, a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face. *Id.* A claim has facial plausibility when the plaintiff

---

[21] The Motion (and the memorandum incorporated therein) is inexact as to whether Defendant is bringing a facial or a factual challenge to the Court's subject-matter jurisdiction. Nevertheless, the Court concludes, based on a review of the briefing on the Motion, that Defendant is bringing a facial challenge to the Court's subject-matter jurisdiction.

The Court's conclusion on this point is buttressed by Plaintiff's Response, where Plaintiff states that "Defendant's 12(b)(1) motion to dismiss (the as-applied First Amendment claims for lack of standing) is a 'facial'—as compared to 'factual'—attack on NetChoice's standing" (Doc. No. 95 at 10), an assertion which Defendant does nothing to dispute in his Reply (Doc. No. 98).

pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged. *Id.* Threadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. *Id.* When there are well-pleaded factual allegations, a court should assume their veracity and then determine whether they plausibly give rise to an entitlement to relief. *Id.* at 679. A legal conclusion, including one couched as a factual allegation, need not be accepted as true on a motion to dismiss, nor are mere recitations of the elements of a cause of action sufficient. *Id.* at 678; *Fritz v. Charter Twp. of Comstock*, 592 F.3d 718, 722 (6th Cir. 2010), *cited in Abriq v. Hall*, 295 F. Supp. 3d 874, 877 (M.D. Tenn. 2018). Moreover, factual allegations that are merely *consistent* with the defendants' liability do not satisfy the claimant's burden, as mere consistency does not establish *plausibility* of entitlement to relief even if it supports the *possibility* of relief. *Iqbal*, 556 U.S. at 678.

In determining whether a complaint is sufficient under the standards of *Iqbal* and its predecessor and complementary case, *Bell Atl. Corp. v. Twombly*, 550 U.S. 544 (2007), it may be appropriate to "begin [the] analysis by identifying the allegations in the complaint that are not entitled to the assumption of truth." *Iqbal*, 556 U.S. at 680. This can be crucial, as no such allegations count toward the plaintiff's goal of reaching plausibility of relief. To reiterate, such allegations include "bare assertions," formulaic recitation of the elements, and "conclusory" or "bald" allegations. *Id.* at 681. The question is whether the remaining allegations—factual allegations, *i.e.*, allegations of factual matter—plausibly suggest an entitlement to relief. *Id.* If not, the pleading fails to meet the standard of Federal Rule of Civil Procedure 8 and thus must be dismissed pursuant to Rule 12(b)(6). *Id.* at 683.

Of note, Fed. Rule of Civ. P. 12(d) states that "[i]f, on a motion under Rule 12(b)(6) or 12(c), matters outside the pleadings are presented to and not excluded by the court, the motion

must be treated as one for summary judgment under Rule 56. All parties must be given a reasonable opportunity to present all the material that is pertinent to the motion." However, there is an exception to this Rule: "[w]hen a court is presented with a Rule 12(b)(6) motion, it may consider the Complaint and any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to defendant's motion to dismiss so long as they are referred to in the Complaint and are central to the claims contained therein." *Bassett v. Nat'l Collegiate Athletic Ass'n*, 528 F.3d 426, 430 (6th Cir. 2008). *See also Doe v. Ohio State Univ.*, 219 F. Supp. 3d 645, 652-53 (S.D. Ohio 2016) ("when a document is referred to in the pleadings and is integral to the claims, it may be considered without converting a motion to dismiss into one for summary judgment." (quoting *Commercial Money Ctr., Inc. v. Ill. Union Ins. Co.*, 508 F.3d 327, 335–36 (6th Cir. 2007))); *Blanch v. Trans Union, LLC*, 333 F. Supp. 3d 789, 791-92 (M.D. Tenn. 2018) ("Documents attached to the motion to dismiss briefing may be considered part of the pleadings if they were incorporated into the complaint by reference and are central to the plaintiff's claim.").

## DISCUSSION

The Court now turns to evaluating the Motion. Generally, "federal courts [ ] must decide jurisdictional issues before considering merits issues." *Jones v. Sexton*, No. 3:23-CV-01033, 2025 WL 3000203, at *9 (M.D. Tenn. Oct. 24, 2025). Thus, below, the Court first addresses Defendant's arguments for dismissal pursuant to Rule 12(b)(1) because these arguments implicate the Court's subject-matter jurisdiction. The Court then addresses, if necessary (i.e., if Plaintiff's vagueness claim survives Defendant's 12(b)(1) challenge), Defendant's arguments for dismissal pursuant to Rule 12(b)(6).

### 1. Associational Standing

In Counts I, III, and IV Plaintiff brings—in addition to facial claims challenging the Act—so-called as-applied claims challenging various provisions of the Act. With respect to its as-applied claims, Plaintiff specifically challenges the application of portions of the Act to Plaintiff's members and their services identified in paragraph 16 of the Amended Complaint. (Doc. No. 88 at ¶¶ 75, 80-107, 118-42; *see also* Doc. No. 95 at 12 ("Here, NetChoice's as-applied claims contend that the Act is unconstitutional 'to the extent' it regulates NetChoice's identified members' services—and it seeks only an injunction preventing the Act's enforcement against those services.")).

As also noted earlier, Plaintiff asserts in the Amended Complaint that it has standing to bring its claims on the basis of so-called associational standing. (Doc. No. 88 at ¶ 15).[22] And via the Motion, Defendant asserts that Plaintiff lacks associational standing to bring as-applied claims on behalf of its members, meaning that Plaintiff's as-applied claims[23] challenging the Act (brought via Count I, Count III, and Count IV) must be dismissed.[24] Given this particular challenge, the

---

[22] The Court discerns that Plaintiff is relying on associational standing (at least in part, insofar as Plaintiff also asserts that it has standing "to assert the First Amendment rights of members' *current and prospective users*." (Doc. No. 88 at ¶ 17 (emphasis added))), for *all* of the claims (both as-applied and facial) in the Amended Complaint. However, Defendant moves to dismiss, on the basis of a lack of associational standing, *only* Plaintiff's as-applied claims challenging the Act.

[23] As the undersigned recently explained, standing must be established "both on a plaintiff-by-plaintiff and a claim-by-claim basis." *Lucy v. Skrmetti*, No. 3:26-CV-00998, 2026 WL 2742357, at *8 n.24 (M.D. Tenn. Sept. 16, 2026). That is to say, it is appropriate for Defendant to raise the issue of standing as to Plaintiff's standing for some (but not all) of the claims that it asserts.

[24] As noted earlier, in the Amended Complaint, Plaintiff asserts that it also has standing "to assert the First Amendment rights of members' *current and prospective users*." (Doc. No. 88 at ¶ 17 (emphasis added)). Notably, Plaintiff, outside of an off-hand reference in its Response to asserting the rights of Plaintiff's members' users, (Doc. No. 95 at 16 ("That is especially true from the perspective of members' users, whose rights NetChoice can also raise.")), does not seem to rely on standing based on its members' *users* in opposing Defendant's arguments for dismissal of the as-applied claims challenging the Act for lack of standing. Instead, Plaintiff relies (solely) on the notion that it has standing to bring its as-applied claims on the basis of *associational standing* vis-à-vis Plaintiff's *members*. And so, the Court will evaluate Plaintiff's

Court first reviews general principles regarding associational standing, then evaluates associational standing as applied to this particular case.

a. Associational Standing Generally

An association, organization, or other group has standing to sue on behalf of its members (i.e., has associational standing)[25] when three requirements are met: (1) "its members would otherwise have standing to sue in their own right"; (2) "the interests at stake are germane to the organization's purpose"; and (3) "neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit." *Am. Canoe Ass'n, Inc. v. City of Louisa Water & Sewer Comm'n*, 389 F.3d 536, 540 (6th Cir. 2004) (quoting *Friends of the Earth, Inc. v. Laidlaw Env't Servs. (TOC), Inc.*, 528 U.S. 167, 181 (2000)). *See also Hunt v. Wash. State Apple Advert. Comm'n*, 432 U.S. 333, 343 (1977) (similar).

Here, the parties do not dispute that Plaintiff has adequately alleged the first two requirements of associational standing. (Doc. No. 95 at 21 ("Defendant does not contest NetChoice's associational standing under the first two, jurisdictional prongs of the associational-standing analysis. Nor could he.")). And the Court does not *sua* sponte discern grounds for dispute.[26] And so, the question of whether Plaintiff has sufficiently alleged associational standing

---

standing as to its as-applied claims solely through an evaluation of whether Plaintiff has *associational standing* vis-à-vis Plaintiff's *members*.

[25] Of note, associational standing is sometimes known as representative standing. *Children's Health Def. v. United States Food & Drug Admin.*, No. 21-6203, 2022 WL 2704554, at *2 (6th Cir. July 12, 2022) ("An organization can satisfy Article III's standing requirements by suing on its own behalf, called 'organizational standing,' or by suing on behalf of its members, called 'associational' or 'representative' standing.").

[26] Of note, with respect to the first requirement of associational standing—i.e., that the association's members have standing to sue in their own right—the Sixth Circuit has held that:

> Mindful that "standing is not dispensed in gross," *Lewis v. Casey*, 518 U.S. 343, 358 n.6, 116 S. Ct. 2174, 135 L.Ed.2d 606 (1996), we hold today what necessarily follows from converging lines of precedent: just as an individual "must demonstrate standing for each

(so as to avoid dismissal under Rule 12(b)(1) of its as-applied claims challenging the Act) depends on whether Plaintiff has sufficiently alleged the third requirement of associational standing.

As an initial matter, the Court notes that the third requirement of associational standing is "a prudential standing requirement, not a constitutional requirement." *Doe*, 2025 WL 2813887, at *5 (quoting *Dayton Area Chambers of Commerce v. Becerra*, 2024 WL 3741510, at *6 (S.D. Ohio Aug. 8, 2024) (citing *United Food and Com. Workers Union Loc. 751 v. Brown Grp., Inc.*, 517 U.S. 546, 555 (1996))). As a mere "prudential" rather than "constitutional" standing requirement, the third requirement is a "rule[] of 'judicial self-governance' that 'Congress may remove . . . by *statute*.'" *United Food*, 517 U.S. at 558 (emphasis added) (citations omitted). But Congress apparently has not done so, and so the Court must treat the third requirement as exactly that—a *requirement*—even though it is deemed merely "prudential."

Ordinarily, that requirement—i.e., that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit—is met where an association "seeks prospective or injunctive relief for its members." *United Food*, 517 U.S. at 546. *See also Neighborhood Action Coal. v. City of Canton, Ohio*, 882 F.2d 1012, 1017 (6th Cir. 1989) ("The complaint . . . seeks injunctive relief, which would not require participation by the individual members because any injunctive relief granted would inure to the benefit of all members of the

---

> claim he seeks to press" *and* "for each form of relief sought," *DaimlerChrysler Corp. v. Cuno*, 547 U.S. 332, 352, 126 S. Ct. 1854, 164 L.Ed.2d 589 (2006), so too must an association that relies upon an individual member for standing purposes. *See Summers v. Earth Island Inst.*, 555 U.S. 488, 493, 498, 129 S. Ct. 1142, 173 L.Ed.2d 1 (2009) (holding an organization must "establish[ ] that at least one identified member had suffered or would suffer harm").

*Waskul v. Washtenaw Cnty. Cmty. Mental Health*, 900 F.3d 250, 253 (6th Cir. 2018). That is to say, an association may bring claims (or seek relief) only on behalf of those of its members that would *independently* have standing to bring such claims or seek such relief. At this juncture of the case (on a motion to dismiss brought pursuant to Rule 12(b)(1)), the Court discerns (and, as noted above, Defendant does not dispute) that Plaintiff has sufficiently alleged that its covered members have standing to bring the as-applied claims (and relief sought thereto) raised by Plaintiff on their behalf.

association actually injured."); *Sandusky Cnty. Democratic Party v. Blackwell*, 387 F.3d 565, 574 (6th Cir. 2004) ("[t]he individual participation of an organization's members is not normally necessary when an association seeks prospective or injunctive relief for its members." (internal citations and quotation marks omitted)). The same principle holds true when an association seeks declaratory relief for its members. *Fednav, Ltd. v. Chester,* 547 F.3d 607, 615 (6th Cir. 2008) (individual participation not required because organization sought declaratory judgment, and not individualized damages).[27]

However, merely because an association seeks injunctive or declaratory relief does not necessarily mean that the third requirement for associational standing is satisfied. *See Nat'l Ass'n of Letter Carriers, AFL-CIO v. U.S. Postal Serv.*, 604 F. Supp. 2d 665, 670 (S.D.N.Y. 2009) ("Even when an association requests equitable relief, however, the third prong of the [associational standing] test is not automatically satisfied."). This makes sense, because "the fact and extent of the injury [might] give[] rise to [] claims for injunctive [or declaratory] relief [that] would require individualized proof or where the relief requested would require the participation of individual members in the lawsuit." *NorCal Tea Party Patriots v. I.R.S.*, No. 1:13-CV-341, 2014 WL 3547369, at *4 (S.D. Ohio July 17, 2014) (quoting *Nat'l Ass'n of Letter Carriers*, 604 F. Supp. 2d at 670).

[27] By contrast, where an association seeks "individualized damages that only a member could obtain," then the third requirement will tend to be unsatisfied. *Fednav, Ltd,* 547 F.3d at 615. But that principle is inapplicable here because Plaintiff does not seek any damages, let alone individualized (i.e., member-specific) damages. Notably, to say that the instant case does not involve individualized damages claims is not to say that it does not involve (or require) individualized *proof*.

Beyond these general principles, an additional consideration warrants examination given the nature of the arguments raised by Defendant in the Motion:[28] the vitality (or lack thereof) of associational standing in the context of an association bringing as-applied claims on behalf of its members. In the context of those types of claims (i.e., as-applied claims) raised in the aforementioned types of circumstances (i.e., raised by associations relying on associational standing to assert those claims on behalf of its members), federal courts often have found the third requirement for associational standing unsatisfied. *See e.g., N.Y.S. NOW v. Pataki*, 261 F.3d 156, 171 n.4 (2d Cir. 2001) (examining associational standing and observing that the as-applied due process claim was properly dismissed for lack of associational standing because "[s]uch a challenge would plainly require examination of facts specific to each claimant"); *Ass'n of Christian Schs. Int'l v. Stearns*, 362 F. App'x 640, 643-44 (9th Cir. 2010) (examining associational standing in the context of claims brought under the "Free Speech, Free Exercise, Establishment, and Equal Protection Clauses" and noting that plaintiff lacked "associational standing to assert as-applied claims on behalf of its member schools that are not parties to this lawsuit" because "[t]he plaintiffs' as-applied claims and the relief they seek, although equitable in nature, both require 'individualized proof' specific to each rejected course and the school that offered it."). This case law is understandable; after all, as-applied claims assert that "the contested 'law is unconstitutional as enforced against [an individual or entity]' based on the discrete facts in the case." *United States v. Kovacic*, No. 1:23CV535, 2025 WL 815430, at *2 (N.D. Ohio Mar. 12, 2025) (quoting *United States v. Hostettler*, 2024 WL 1548982, *3 (N.D. Ohio, Apr. 10, 2024)), *appeal dismissed*, No. 25-3787, 2026 WL 922755 (6th Cir. Feb. 24, 2026). *See also Burlew*, 165 F.4th at 529 ("An as-applied

[28] In particular, Defendant seems to be arguing that associational standing is regularly lacking—due to the non-satisfaction of the third requirement—in cases where a plaintiff association brings as-applied claims, and in particular as-applied *First Amendment* claims, on behalf of its members. (Doc. No. 91 at 7-13).

claim requires a challenger to show only that a law violates the Constitution as applied to the specific conduct that the challenger seeks to undertake." (citing *Wis. Right to Life, Inc.*, 551 U.S. at 456-57)) So, it is understandable that in the context of as-applied claims, the participation of individual members of an association in the lawsuit is sometimes necessary insofar as the adjudication of these types of claims can require the Court to examine "facts specific to each [of the association's members, thereby requiring those members participation in the lawsuit]," *Pataki*, 261 F.3d at 171 n.4, and involve (or require) "individualized proof." *Stearns*, 362 F. App'x at 644.

Unsurprisingly, as-applied *First Amendment* claims brought by associations (who are relying on associational standing) face the same headwinds as other as-applied claims raised by associations (who are relying on associational standing). As the Third Circuit explained in a case involving as-applied claims that implicated the First Amendment's strict-scrutiny framework and were raised by associations relying on associational standing:

> An as-applied claimant "asserts that the acts of his that are the subject of the litigation fall outside what a properly drawn prohibition could cover." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482, 109 S. Ct. 3028, 106 L.Ed.2d 388 (1989); *see also Tineo v. Att'y Gen.*, 937 F.3d 200, 210 (3d Cir. 2019) (explaining that an as-applied equal protection challenge turned on the plaintiff's "particular circumstances at hand"). Strict scrutiny does not change the individualized inquiry required for an as-applied claim: An "as-applied attack" to a content-based restriction contends that a law's "application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010); *see also Telescope Media Grp. v. Lucero*, 936 F.3d 740, 754 (8th Cir. 2019) ("In an as-applied challenge ..., the focus of the strict-scrutiny test is on the actual speech being regulated, rather than how the law might affect others who are not before the court."). Under strict scrutiny, [the associations'] as-applied claims still require an individualized inquiry for each association member.

*Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408, 422 (3d Cir. 2020).

But that is not to say that an association raising as-applied claims (predicated on alleged violations of the First Amendment or other constitutional provisions) and relying on associational

standing can *never* satisfy the third requirement of associational standing. Even under those circumstances, that requirement potentially can be satisfied. For instance, just recently in *NetChoice v. Murrill*, 812 F. Supp. 3d 594 (M.D. La. 2025), a district court concluded that the plaintiff (the same plaintiff as the plaintiff herein (Plaintiff)) had satisfied the third requirement of associational standing when bringing an as-applied First Amendment claim on behalf of its members challenging a Louisiana state law that "impose[d] broad restrictions on threshold access to regulated websites." *Murrill*, 812 F. Supp. 3d at 630. The district court reasoned that the third requirement of associational standing was met in those circumstances because the plaintiff's claims "[could] be proven [] without fact-intensive-individual inquiry [that would necessitate the participation of individual members of the association]." *Id.* at 629 (citation omitted). And in recently affirming in part a district court's issuance of a preliminary injunction, the Ninth Circuit found that the plaintiff in that case (who was, again, Plaintiff) had made out a likelihood of success on the merits as to (some) of its as-applied First Amendment claims challenging a provision of a California state law regulating that plaintiff's members. *NetChoice, LLC v. Bonta*, 152 F.4th 1002, 1014-17 (9th Cir. 2025) ("[W]e conclude that NetChoice is likely to prevail on the merits of its challenge to the . . . provision as applied to its members."). That likelihood of success on the merits necessarily includes a likelihood of establishing standing (including, necessarily, a likelihood of establishing the third requirement of associational standing).[29]

Likewise, in a finding that was affirmed recently by the Eleventh Circuit, a district court found that a plaintiff association—which had brought as-applied First Amendment claims on behalf of its members—had sufficiently established the third requirement of associational standing

---

[29] To be clear, the Ninth Circuit did not expressly address standing in the context of these particular claims, but its decision as to likelihood of success on the merits nevertheless is suggestive of the reality that in any particular case, an association raising as-applied claims potentially can satisfy the third requirement of associational standing.

in the context of a request for a preliminary injunction. *Computer & Commc'ns Indus. Ass'n v. Uthmeier*, 826 F. Supp. 3d 1358, 1374 (N.D. Fla. 2025) (observing that "[t]he questions this Court must answer—whether the challenged law implicates the First Amendment, whether it is content based or content neutral, and whether it is narrowly tailored to further a significant government interest—can all be answered without reference to the intricacies of each [member's] platform's operation[.]"); *aff'd in part, vacated and rev'd in part on other grounds,* No. 25-11881, 2026 WL 3071065 (11th Cir. Oct. 14, 2026).

That is all to say that in some contexts, for instance where a challenged law "imposes broad restrictions on threshold access to regulated websites" such that an association plaintiff's claims "can be proven [] without fact-intensive-individual inquiry [that would necessitate the participation of individual members of the association]," *Murrill*, 812 F. Supp. 3d at 629-30, an association plaintiff can satisfy the third requirement of associational standing when bringing as-applied claims on behalf of its members. *See Computer & Communications Indus. Ass'n v. Paxton*, 747 F. Supp. 3d 1011, 1030-31 (W.D. Tex. 2024) (finding associational standing where association plaintiffs brought an "as-applied [First Amendment] challenge on behalf of their members" because the challenged law "imposes relatively uniform requirements on all Plaintiffs' covered members.").

The upshot is that three principles guide the Court's analysis of whether Plaintiff's factual allegations plausibly suggest the satisfaction of the third requirement of associational standing. First, the third requirement for associational standing is generally met where an association seeks injunctive or declaratory relief on behalf of its members. *Fednav*, 547 F.3d at 615. Second, there is an (arguable) principle that when an association plaintiff is bringing an as-applied claim on behalf of its members, it fails to meet the third requirement of associational standing. *See e.g.,*

*Pataki*, 261 F.3d at 171 n.4; *Stearns*, 362 F. App'x 640, 643-44. Finally, there are exceptions to the second principle, namely in the contexts that the Court explained in the immediately preceding paragraph. *See e.g., Murrill*, 812 F. Supp. 3d at 629-30; *Paxton*, 747 F. Supp. 3d at 1030-31.

b. Application

As to the sole disputed requirement of associational standing, i.e., the third requirement, the Court finds that its satisfaction has been plausibly suggested via the factual matter alleged in the Amended Complaint. And so the Court find that dismissal under Rule 12(b)(1) of Plaintiff's as-applied claims is unwarranted.

As an initial matter, the Court notes that in this action, Plaintiff seeks (aside from an award of attorney's fees) *only* declaratory and injunctive relief. (Doc. No. 88 at 33). As noted above, the third requirement of associational standing—i.e., that neither the claim asserted nor the relief requested requires the participation of individual members in the lawsuit—is ordinarily met where an association seeks injunctive or declaratory relief for its members. *United Food*, 517 U.S. at 546; *Fednav*, 547 F.3d at 615. As discussed above, the ordinary outcome does not always obtain, because an association does not automatically satisfy the third requirement merely because it seeks injunctive or declaratory relief. *See, e.g., Nat'l Ass'n of Letter Carriers*, 604 F. Supp. 2d at 670 ("Even when an association requests equitable relief, however, the third prong of the [associational standing] test is not automatically satisfied.").

Asserting that the ordinary outcome does not obtain here, Defendant argues that Plaintiff has not sufficiently alleged the third requirement of associational standing for the purposes of its as-applied claims (brought in Counts I, III, and IV) challenging the Act. In so arguing, Defendant asserts that "as-applied challenges usually violate the third requirement [for associational standing]—that 'neither the claim asserted nor the relief requested requires the participation of

individual members.'" (Doc. No. 91 at 8 (quoting *Harris v. McRae*, 448 U.S. 297, 321 (1980))). As the Court noted above, it is true that federal courts frequently find that the third requirement to establish associational standing represents an insurmountable hurdle to an association asserting associational standing attempting to bring as-applied claims. However, that is not to say that the third requirement for associational standing can *never* be met in circumstances such as these. Indeed, as the Court explained above, where a challenged law "imposes broad restrictions on threshold access to regulated websites" such that a plaintiff's claims "can be proven [] without fact-intensive-individual inquiry [that would necessitate the participation of individual members of the association]," *Murrill*, 812 F. Supp. 3d at 629-30, an association plaintiff can satisfy the third requirement of associational standing when bringing as-applied claims. *See also Paxton*, 747 F. Supp. 3d at 1030-31 (finding associational standing where association plaintiffs brought an "as-applied [First Amendment] challenge on behalf of their members" because the challenged law "imposes relatively uniform requirements on all Plaintiffs' covered members.").

Here, the Court finds that the Act "imposes broad restrictions on threshold access to regulated websites," *Murrill*, 812 F. Supp. 3d at 630, and "imposes relatively uniform requirements on all [of Plaintiff's] covered members," *Paxton*, 747 F. Supp. 3d at 1031, such that Plaintiff's claims "can be proven [] without fact-intensive-individual inquiry [that would necessitate the participation of individual members of the association]." *Murrill*, 812 F. Supp. 3d at 629.[30]

To begin with, each of the Act's challenged restrictions—that is, the Age-Verification Requirement, the Parental-Consent Requirement, and the Parental-Supervision Requirement—

[30] Of note, Plaintiff seems to contemplate proving its claims via a "sampling of evidence from its members." (Doc. No. 95 at 19 (quoting *Ass'n of Am. Physicians*, 627 F.3d at 551- 52)). At this juncture, the Court declines to opine on the propriety of this approach. And the Court limits its conclusions herein to finding that Plaintiff had adequately alleged the third requirement of associational standing so as to avoid dismissal of its as-applied claims pursuant to Rule 12(b)(1) on that basis.

apply to "social media compan[ies]" as defined by Tenn. Code Ann. § 47-18-5702(8). Second, the Age-Verification Requirement, the Parental-Consent Requirement, and the Parental-Supervision Requirement impose uniform requirements on these social media companies. The Age-Verification Requirement requires categorically that a "social media company . . . verify the age of an individual who attempts to become an account holder, at the time the individual attempts to become an account holder." Tenn. Code Ann. § 47-18-5703(a)(1). The Parental-Consent Requirement requires categorically that social media companies "verify the express parental consent for the minor to become an account holder" and that these social media companies "prohibit a minor from becoming an account holder unless the social media company has the express consent of the minor's parent to allow the minor to become an account holder." Tenn. Code Ann. § 47-18-5703(a)(2). And the Parental-Supervision Requirement mandates that these social media companies "provide a minor account holder's parent with means for the parent to supervise the minor's account. Such means must include options for the parent to view privacy settings on the account, set daily time restrictions, and implement breaks during which the minor cannot access the account." Tenn. Code Ann. § 47-18-5704. In other words, the Act "imposes broad restrictions on threshold access to regulated websites," *Murrill*, 812 F. Supp. 3d at 630, and "imposes relatively uniform requirements on all [of Plaintiff's] covered members," *Paxton*, 747 F. Supp. 3d at 1031, such that Plaintiff's claims "can be proven [] without fact-intensive-individual inquiry [that would necessitate the participation of individual members of an association]." *Murrill*, 812 F. Supp. 3d at 629. In these circumstances, the Court finds that Plaintiff has met the third requirement of associational standing to bring as-applied claims challenging the Age-

Verification Requirement, the Parental-Consent Requirement, and the Parental-Supervision Requirement.[31]

---

[31] Defendant seems to argue that the mere fact that Plaintiff has requested injunctive relief based on its as-applied claims challenging the Act renders associational standing's third requirement unmet (irrespective of the *nature* of the as-applied claims). (Doc. No. 91 at 9). Defendant so argues because (according to Defendant):

> Under the logic of associational standing, courts award a declaration or injunction to the association and that relief is then "shared by all [members] in equal degree." *Warth v. Seldin*, 422 U.S. 490, 515 (1975). But a successful as-applied challenge justifies relief only for the plaintiff who proved the as-applied claim. *E.g., Thomas v. Bright*, 937 F.3d 721, 727 (6th Cir. 2019), *abrogated on other grounds by Austin v. Reagan Nat'l Advert. of Austin*, 596 U.S. 61 (2022); *see Moody*, 603 U.S. at 758 (Thomas, J., concurring) ("Assuming a court adheres to traditional remedial limits, a successful as-applied challenge [by a particular plaintiff] prevents [only] application of the statute against that plaintiff."). Especially after *Trump v. CASA*, injunctions cannot be "broader than necessary" by covering nonparties or plaintiffs who lack their own standing and meritorious claim. 145 S. Ct. 2540, 2562-63 (2025). An injunction that runs to the association is, by definition, overbroad when the association wins only an as-applied claim. The relief would protect the association (which lacks an as-applied claim itself) and all its members (even those who lack standing or who have no valid as-applied claim). Courts cannot use "associational standing" as a "'backdoor' way to grant a universal injunction." *AAPS*, 13 F.4th at 541. And even if an association could get an injunction that protects only some of its nonparty members, that kind of individualized relief lacks the efficiencies of associational standing and thus violates Hunt's third, prudential prong. *See Ass'n of Christian Schs. Int'l v. Stearns*, 678 F. Supp. 2d 980, 985 (C.D. Cal. 2008), *aff'd*, 362 F. App'x at 644.

(Doc. No. 91 at 9). Although compelling on first glance, this argument is unpersuasive. The Sixth Circuit has recognized that it is perfectly appropriate for an association to seek injunctive relief on behalf of its members, and that such relief does not somehow require the individual participation of those members in the lawsuit. Why? Because "any injunctive relief granted would inure to the benefit of all members of the association actually injured." *Neighborhood Action Coal. v. City of Canton, Ohio*, 882 F.2d 1012, 1017 (6th Cir. 1989). It is unclear whether the Sixth Circuit meant to say that the injunctive relief sought by an association on behalf of its members can inure to the benefit of all members who have an Article III injury or instead would inure only to those members that have *both* suffered an Article III injury *and* have a valid claim (as-applied or otherwise) in their own right. This question, and the distinction that it reflects, are cognizable because whether a party has suffered an Article III injury and whether a party has a valid claim are two separate (though sometimes related) inquiries, *see e.g. Stewart v. Martin*, 143 F.4th 675, 682-83 (6th Cir. 2025) ("Our court has continually observed the distinction between standing and causes of action. . . . [and] we [have] explained that even if a plaintiff lacks a cause of action, he might still have a redressable injury sufficient to satisfy Article III."), such that a plaintiff might have suffered an Article III injury while not having a valid claim.

With that said, for the purposes of the instant case clarity on this question is unnecessary for a handful of reasons. First, Plaintiff has sufficiently alleged at this stage that Plaintiff's covered members (that is, the ten entities listed in paragraph 16 of the Amended Complaint) would have standing in their own right to challenge the Act (and thus necessarily would have suffered an Article III injury). Second, the Court would enjoin some (or all) of the Act on the basis of Plaintiff's as-applied claims only to the extent that the Act

(in part or in full) is in fact unconstitutional as applied to a particular covered member. Put another way, the Court would enjoin some (or all) of the Act as to one of Plaintiff's covered members only to the extent that that covered member actually had a valid as-applied claim to challenge the Act. Further, Plaintiff explicitly requests injunctive relief only as to the ten members (and twelve services) listed in paragraph 16 of the Amended Complaint (Doc. No. 88 at ¶ 16, 33 (requesting an order "enjoining Defendant and his agents, employees, and all persons acting under their direction or control from taking any action to enforce the Act or the challenged portions of the Act against Plaintiff or its members"); Doc. No. 95 at 20 ("NetChoice's as-applied claims seek declaratory and injunctive relief for only twelve specific *regulated* [services] covered by this Act.")). Indeed, just as Plaintiff states in its Response:

> At bottom, NetChoice's request for injunctions for its members' twelve regulated services would ensure the "injunctions" here would not "be 'broader than necessary' by covering nonparties or plaintiffs who lack their own standing and meritorious claim." Mot.9 (quoting *Trump v. CASA*, 145 S. Ct. 2540, 2562-63 (2025)).

(Doc. No. 95 at 20). That is to say, Plaintiff contemplates obtaining injunctive relief to its covered members on the basis of its as-applied claims in precisely the circumstances outlined by the Court in this footnote—i.e., only as to those covered members who both have standing on their own and would have also have a meritorious as-applied claim. In other words, if there were an injunction issued in this action enjoining the Act (or any part of it) on the basis of Plaintiff's as-applied claims, such an injunction would be framed to enjoin enforcement of the Act (in whole or in part) only as to the covered members (in addition to their covered services) listed in paragraph 16 of the Amended Complaint that both have standing on their own and likely would have a meritorious as-applied claim if they brought an independent claim. And any such injunction decree would specifically identify the covered members (and covered services) to which it applied and would eschew any language suggesting that the injunction run in favor of the entirety of Plaintiff's membership, let alone the whole world.

Further, the Court fails to see how the Court granting injunctive relief only as to some of Plaintiff's members (i.e., those members covered by the Act and listed in paragraph 16 of the Amended Complaint and those members' websites also listed in paragraph 16 of the Amended Complaint) would somehow lack "the efficiencies" of associational standing. After all, the alternative would be for each of these members to bring its own suit, which strikes the Court as profoundly inefficient.

That leads the Court to one final topic: the contours of Plaintiff's as-applied claims challenging the Act. Those contours are somewhat imprecise. To define them, the Court first will note some basic principles regarding as-applied claims generally. As one district court recently noted:

> Generally, a facial challenge raises constitutional defects as to the terms of the statute itself, independent of its application to a plaintiff's particular set of circumstances. *See United States v. Playboy*, 529 U.S. 803, 834 n.3, 120 S. Ct. 1878, 146 L.Ed.2d 865 (2000) (Scalia, J., dissenting). By contrast, an as-applied challenge is focused on whether the statute's application to a plaintiff's actual or proposed conduct is unconstitutional.

*Loc. 8027, AFT-N.H., AFL-CIO v. Edelblut*, 651 F. Supp. 3d 444, 454 (D.N.H. 2023). And as another district court noted just two years ago:

> "Facial and as-applied challenges differ in the extent to which the invalidity of a statute need be demonstrated." As-applied attacks challenge a set of rules in a statute, a subset of the statute's applications, or application of the statute to a specific set of facts. A "statute may be invalid as applied to one state of facts and yet valid as applied to another." An as-applied challenge is the proper vehicle to challenge a statute if a "claimed statutory defect applies to a sub-category of the people affected by the law." Thus, for as-applied

Defendant's arguments to the contrary are unavailing. Defendant relies on two out of circuit cases—*Free Speech Coal., Inc. v. Att'y Gen. United States*, 974 F.3d 408 (3d Cir. 2020) and *NetChoice v. Bonta*, 761 F. Supp. 3d 1202 (N.D. Cal. 2024), *aff'd in part, rev'd in part and remanded sub nom. NetChoice, LLC v. Bonta*, 152 F.4th 1002 (9th Cir. 2025)—for the notion that

---

> challenges, the petitioner must demonstrate "partial . . . invalid[ity]," such that a "statute may . . . be declared invalid to the extent that it reaches too far, but otherwise [is] left intact."

*United States v. Roberts*, 710 F. Supp. 3d 658, 663 (D. Alaska 2024) (footnotes omitted). (The reference here probably should have been to a "category of people affected by the law" rather than a "sub-category of people affected by the law." The reference here is to a group of people affected by the law, which means a *category* of people affected by the law; a category of people affected by the law may be a *sub-category* of *all* people (with the *category* of people being "people affected by the law," and the *sub-category* of people being the category within the category of all people affected by law), but it is a *category* of people affected by the law). And as the Ninth Circuit has stated, "the facial versus as-applied distinction is relevant when a claimed statutory defect applies to a [category] of the people affected by the law." *Isaacson v. Horne*, 716 F.3d 1213, 1231 (9th Cir. 2013). That is to say, an as-applied claim will be a challenge to a particular statute's application to a specific set of facts or conduct, or the application of the statute to a specific category of individuals or entities affected by a particular statute.

In the Amended Complaint, Plaintiff alleges with respect to its as-applied claims that "[a]t a minimum, the Act is invalid to the extent it regulates 'social media' websites, including as applied to [Plaintiff's] members' regulated services identified in ¶ 16." (Doc. No. 88 at ¶ 76). And Plaintiff seems to reiterate this particular framing in its Response, where it states, "[a]s explained in NetChoice's First Amended Complaint, 'the Act is invalid to the extent it regulates 'social media' websites, including as applied to [Plaintiff's] members' regulated services' identified by NetChoice: (1) Discord; (2) Dreamwidth; (3) Facebook; (4) Instagram; (5) Nextdoor; (6) Pinterest; (7) Reddit; (8) Snapchat; (9) Threads; (10) Tumblr; (11) X; and (12) YouTube. *Id.* ¶¶ 12, 76." (Doc. No. 95 at 9-10). Yet, just as Defendant states in its Reply (Doc. No. 98 at 3), any challenge to the Act "to the extent" it regulates "social media companies" would seem to constitute a facial challenge to the Act insofar as the Act's restrictions—i.e., the Age-Verification Requirement, the Parental-Consent Requirement, and the Parental-Supervision Requirement—by their terms restrict (only) social media companies. However, Plaintiff also frames its as-applied claims in terms of a challenge to the Act "'to the extent' it regulates NetChoice's identified members' services—and it seeks only an injunction preventing the Act's enforcement against those services." (Doc. No. 95 at 12). And this framing is supported by other allegations in the Amended Complaint where Plaintiff states that it is bringing "a challenge to [the Act's] provisions as applied to the members and services identified in ¶ 16." (Doc. No. 88 at ¶ 75).

Given this reality, the Court will (in Plaintiff's favor) construe Plaintiff's as-applied claims as challenging the Act to the extent it is applied to Plaintiff's covered members and these covered member's covered services. In other words, the Court treats Plaintiff's as-applied claims as challenging the Act's application to the set of facts or conduct unique to Plaintiff's covered members (and their respective covered services), or alternatively the Act's application to Plaintiff's covered members as a particular category of social media companies (with characteristics that distinguish those social media companies from social media companies that fall outside of that category, such as, hypothetically and for example, social media companies devoted exclusively to pornographic themes or criminal associations).

Plaintiff's members need to participate in this action with respect to Plaintiff's as-applied claims challenging the Act such that Plaintiff has not adequately alleged the third requirement of associational standing as to these claims. (Doc. No. 91 at 9-11). This reliance is unavailing.

In *Free Speech Coal*., the Third Circuit considered—among other things—as-applied First Amendment claims brought by associations on behalf of their members. The Third Circuit found a lack of associational standing, based on non-satisfaction of the third requirement of associational standing. The Third Circuit reasoned:

> An as-applied claimant "asserts that the acts of his that are the subject of the litigation fall outside what a properly drawn prohibition could cover." *Bd. of Trs. of State Univ. of N.Y. v. Fox*, 492 U.S. 469, 482, 109 S. Ct. 3028, 106 L.Ed.2d 388 (1989); *see also Tineo v. Att'y Gen.*, 937 F.3d 200, 210 (3d Cir. 2019) (explaining that an as-applied equal protection challenge turned on the plaintiff's "particular circumstances at hand"). Strict scrutiny does not change the individualized inquiry required for an as-applied claim: An "as-applied attack" to a content-based restriction contends that a law's "application to a particular person under particular circumstances deprived that person of a constitutional right." *United States v. Marcavage*, 609 F.3d 264, 273 (3d Cir. 2010); []. Under strict scrutiny, [the associations'] as-applied claims still require an individualized inquiry for each association member.
>
> That [the associations'] individual members work in many different facets of the adult film industry illustrates our conclusion. [One association] highlights that it has "about 800 members" who engage in producing and distributing sexually explicit depictions, ranging from directors, producers, writers, cameramen, and lighting technicians, to sellers of sexually explicit depictions farther down the "stream of commerce." Pls. Br. 40 (quotation marks omitted). And [another association] emphasizes that its "some 400" photographers take sexually explicit photographs across a "broad range of genres." *Id.* Given the diversity of circumstances presented by [the associations'] membership, "facts matter, and what may be narrowly drawn and the least restrictive means" for one association member "will not necessarily be so" for another. *Marcavage*, 609 F.3d at 288; *see also Ayotte v. Planned Parenthood of N. New Eng*., 546 U.S. 320, 329, 126 S. Ct. 961, 163 L.Ed.2d 812 (2006) ("It is axiomatic that a statute may be invalid as applied to one state of facts and yet valid as applied to another." (quotation marks omitted)). [The associations'] as-applied claims require individualized inquiry, and the two associations therefore lack standing to bring those claims on behalf of their members.

*Free Speech Coal., Inc.*, 974 F.3d at 422. But unlike the plaintiffs in *Free Speech Coal.*, Plaintiff does not allege a "diversity of circumstances" between Plaintiff's covered members (or the covered services)[32] that would lead to the kind of inquiry (like that facing the Third Circuit in *Free Speech Coal.*) that necessitates the participation of individual members of Plaintiff in this lawsuit. As alleged by Plaintiff in the Amended Complaint (and accepted as true by the Court for purposes of the Motion), the "covered member websites allow their users to create accounts and communicate with other users through posts," (Doc. No. 88 at ¶ 29), and Plaintiff's "members require users to create an account before they can access some or all of the [allegedly] protected speech and functions available on their websites." (*Id.* at ¶ 30). In other words, the present case lacks the circumstances leading the Third Circuit to conclude in *Free Speech Coal.* that plaintiff associations lacked associational standing—i.e., that the association plaintiffs' members were too different from one another, thereby requiring their individual participation as to any as-applied claims brought on their behalf.

As for *NetChoice v. Bonta*, Defendant's reliance on that case likewise is unavailing. In that case, it is true, the district court found that a plaintiff association (in that case, again, Plaintiff) lacked associational standing—based on the non-satisfaction of the third requirement for associational standing—to bring an as-applied First Amendment claim challenging a particular portion of a California statute. The district court found in pertinent part:

> To have associational standing, NetChoice must show that "(a) its members would otherwise have standing to sue in their own right; (b) the interests it seeks to protect are germane to the organization's purpose; and (c) neither the claim asserted nor the

[32] That is not to deny that there might be a divergence of circumstances between Plaintiff's covered members and some *other* social media companies. But to the extent that there is such a divergence, that supports the notion that Plaintiff is in fact bringing as-applied claims challenging the Act on behalf of (and to the extent that the Act regulates) the ten covered members identified in paragraph 16 of the Amended Complaint (as opposed to *other* social media companies subject to the Act). *See Isaacson*, 716 F.3d at 1231 ("the facial versus as-applied distinction is relevant when a claimed statutory defect applies to a [category] of the people affected by the law").

> relief requested requires the participation of individual members in the lawsuit." *Hunt*, 432 U.S. at 343, 97 S. Ct. 2434. There is little question that NetChoice meets the first two requirements. It is on the third requirement that its as-applied challenges fail. Challenges to SB 976's personalized feed provisions require deep factual inquiries into how a particular social media feed works. *Supra* Section III.B.1.a. In other words, each separate as-applied challenge on behalf of each separate NetChoice member requires its own "ad hoc factual inquiry." *Ass'n of Christian Schs. Int'l v. Stearns*, 678 F. Supp. 2d 980, 986 (C.D. Cal. 2008) (citation omitted), *aff'd*, 362 F. App'x 640, 644 (9th Cir. 2010) (need for "individualized proof" defeats associational standing). For the Court to adjudicate these as-applied claims, it is therefore necessary for NetChoice's individual members to participate in this lawsuit, at the very least for the purpose of conducting discovery into how each of those members' feeds work. So, the Court finds that NetChoice lacks associational standing to raise as-applied challenges to SB 976's personalized feed provisions and **DENIES** a preliminary injunction on that basis.

*Bonta*, 761 F. Supp. 3d at 1230-31. Here, by contrast, nothing in the Act's challenged provisions—i.e., the Age-Verification Requirement, the Parental-Consent Requirement, and the Parental-Supervision Requirement—indicates to the Court that there would need to be any sort of "deep factual inquiries" into how Plaintiff's members (or the covered services) "work[]." So, this case is unhelpful to Defendant's efforts to show a lack of associational standing based on the third requirement of associational standing being unmet. [33]

---

[33] To the extent that Defendant argues that the discovery that may/will be required in this action shows that this action will necessitate Plaintiff's members' participation, thereby defeating Plaintiff's attempt to satisfy the third requirement of associational standing, this argument is unavailing. On this point, Defendant argues:

> That this case will require NetChoice's members to participate is not hypothetical. [Associational standing's] third [requirement] exists in part because, when claims turn on the individual circumstances of members, the "association lacks 'detailed records'" needed to prove its absent members' claims. *Free Speech Coal.*, 974 F.3d at 421. And here, NetChoice has no documents or facts about its members' individual websites. *See Bonta*, 761 F. Supp. 3d at 1230-31. As NetChoice recently told this Court, its cases challenging other state laws have required "third-party subpoena[s]" of its members. Doc.90 at 1, 7. The discovery in those cases has involved depositions of "Meta, Snap Inc., and Nextdoor," among others. Doc.90 at 4. Tennessee likewise plans to subpoena NetChoice's individual members—members who are large, well-lawyered corporations that can resist those subpoenas in their home courts, requiring Tennessee to litigate motions to quash either here or even in other jurisdictions. Doc.89 at 6-7. That mess is the exact opposite of the "'administrative convenience and efficiency'" that associational standing is supposed to confer. *Free Speech Coal.*, 974 F.3d at 421.

Summing up, the Court finds that Plaintiff has adequately alleged the third requirement of associational standing as to Plaintiff's as-applied claims challenging the Act. And, given that there is no dispute that Plaintiff has adequately alleged the first two requirements to establish associational standing, the Court concludes that Plaintiff has adequately alleged associational standing for purposes of bringing its as-applied claims challenging the Act. Accordingly, the Court will not grant the Motion as to its request for dismissal of Plaintiff's as-applied claims challenging the Act on the basis of a (purported) lack of associational standing.

**2. Ripeness**

Having dispensed with Defendant's first argument for dismissal of part of the Amended Complaint on the basis of Rule 12(b)(1), the Court now turns to Defendant's second asserted basis for dismissal pursuant to Rule 12(b)(1): that Plaintiff's (facial) vagueness claim, which is asserted in Count II, is unripe.

As noted above, via Count II Plaintiff specifically asserts that the Central Coverage Definition is unconstitutionally vague in violation of the First and Fourteenth Amendments because it "fails to provide necessary notice." (Doc. No. 88 at ¶ 111). So, as the Court explained above, the theory underlying Count II seems to be that because (according to Plaintiff) the Central Coverage Definition is unconstitutionally vague, then the Act's restrictions (i.e., the Age-

---

(Doc. No. 91 at 12). This particular argument is not cognizable, because it asks the Court to go beyond those documents—i.e., the Amended Complaint, any exhibits attached thereto, public records, items appearing in the record of the case and exhibits attached to the Motion so long as they are referred to in the Amended Complaint and are central to the claims contained therein—that the Court may appropriately evaluate in considering a Rule 12(b)(1) facial challenge to its subject-matter jurisdiction.

Likewise, Defendant's argument, made in its supplemental briefing (Doc. No. 113), that a settlement agreement entered into with Meta shows that the third requirement for associational standing is not met (*id.* at 3) is also unavailing insofar as the argument asks the Court to consider a document—a settlement agreement with Meta (Doc. No. 113-1)—that the Court may not appropriately evaluate in considering a Rule 12(b)(1) facial challenge to its subject-matter jurisdiction.

Verification Requirement, the Parental-Consent Requirement, and the Parental-Supervision Requirement)—dependent as they are on terms defined in the Central Coverage Definition—are invalid. (*Id.* at ¶¶ 115-17).

Regarding the basis of Defendant's challenge here—a (purported) lack of ripeness—the Sixth Circuit recently explained:

> "[T]he ripeness doctrine traditionally incorporates both constitutional and prudential elements." *Kiser*, 765 F.3d at 606. The constitutional elements of ripeness encompass traditional parts of the standing inquiry: namely, whether a plaintiff "is threatened with 'imminent' injury in fact." *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 128 n.8, 127 S. Ct. 764, 166 L.Ed.2d 604 (2007) (quoting *Lujan*, 504 U.S. at 560, 112 S. Ct. 2130); *accord Susan B. Anthony List*, 573 U.S. at 158–59, 134 S. Ct. 2334. If a case is "dependent on 'contingent future events that may not occur as anticipated, or indeed may not occur at all,' " it is not constitutionally ripe. *Trump v. New York*, 592 U.S. 125, 131, 141 S. Ct. 530, 208 L.Ed.2d 365 (2020) (per curiam) (quoting *Texas v. United States*, 523 U.S. 296, 300, 118 S. Ct. 1257, 140 L.Ed.2d 406 (1998)).
>
> On the other hand, prudential ripeness, although closely related, has been called into question in recent years. *See, e.g., Susan B. Anthony List*, 573 U.S. at 167, 134 S. Ct. 2334 (commenting on the questions surrounding "the continuing vitality of the prudential ripeness doctrine"); *Lexmark*, 572 U.S. at 126, 134 S. Ct. 1377 (recognizing that prudential standing doctrines are "in some tension with our recent reaffirmation of the principle that a federal court's obligation to hear and decide cases within its jurisdiction is virtually unflagging" (internal quotation marks and citations omitted)). Nonetheless, this court as well as other circuits have continued applying the doctrine particularly when important future intervening events, such as impending regulatory action, will clarify the dispute or obviate the need for weighing in on contingencies. *See Nat'l Rifle Ass'n of Am. v. Magaw*, 132 F.3d 272, 291–92 (6th Cir. 1997) ("We believe a federal court should not intervene and determine whether a statute enacted by Congress is unconstitutionally vague on its face before the agency with rulemaking authority has had an opportunity to interpret the statute."); *see also, e.g., Bellion Spirits, LLC v. United States*, 7 F.4th 1201, 1209 (D.C. Cir. 2021) (considering whether claim was prudentially ripe post-*Lexmark*, and concluding claim was "fit for judicial decision because ... 'judicial intervention' would not 'inappropriately interfere with further administrative action' " (quoting *Ohio Forestry Ass'n, Inc. v. Sierra Club*, 523 U.S. 726, 733, 118 S. Ct. 1665, 140 L.Ed.2d 921 (1998))). Prudential ripeness is concerned with (1) whether a claim is fit for judicial review; and (2) the hardship to the parties. *Kiser*, 765 F.3d at 607 & n.2.

*Carman v. Yellen*, 112 F.4th 386, 400-01 (6th Cir. 2024). Here, Defendant argues:

> There is yet another justiciability problem with NetChoice's facial vagueness challenge: It is not "ripe," given that its arguments turn on hypothetical applications to hypothetical platforms before Tennessee's authorities have implemented the Act. *Carman v. Yellen*, 112 F.4th 386, 401-04 (6th Cir. 2024); *Holder*, 561 U.S. at 24-25. As in *Carman*, "there is considerable uncertainty over whether any of plaintiffs' alleged vagueness issues will come to pass," especially since they do not identify a platform for which there is any real ambiguity as to whether the Act's provisions apply to it. 112 F.4th at 402. This Court should likewise decline to "opine generally on [the Act's] constitutionality" in the absence of a non-hypothetical, actual scenario in which the Act's applicability to a website is unclear. *Id.*; *see also Wash. State Grange*, 552 U.S. at 450 (declining to "go beyond the statute's facial requirements and speculate about 'hypothetical' or 'imaginary' cases").

(Doc. No. 91 at 14-15). Although Defendant is not clear on this point, the Court discerns that Defendant is asserting that what is lacking is prudential—rather than constitutional—ripeness. The Court so discerns largely on the basis of the predominant case relied on in Defendant's argument, namely *Carman*, wherein the Sixth Circuit discussed ripeness largely in terms of its *prudential* form. *Carman*, 112 F.4th at 401 n.3 ("We hold that plaintiffs' vagueness challenge is not fit for review on essentially prudential grounds but explain why plaintiffs' arguments concerning ripeness more generally do not call for a different result.").

Importantly, prudential ripeness (and for that matter constitutional ripeness) is assessed on a "claim-by-claim, rather than case-by-case, basis." *Revitalizing Auto Communities Env't Response Tr. v. Nat'l Grid USA*, No. 5:18-CV-1267, 2020 WL 2404770, at *7 (N.D.N.Y. May 12, 2020), *vacated and remanded on other grounds*, 10 F.4th 87 (2d Cir. 2021). And crucially, prudential ripeness is not a doctrine that *divests* the Court of jurisdiction. Instead, prudential ripeness is a doctrine that permits "dismissal of jurisdictionally sound cases for practical reasons" that ultimately persuade the court to decline to exercise jurisdiction and dismiss accordingly. *SW Nashville EB Owner, LLC v. Metro. Gov't of Nashville & Davidson Cnty.*, 187 F.4th 807, 812 (6th Cir. 2026).

In any event, Plaintiff offers no riposte in response to the ripeness arguments made by Defendant in the Response. Indeed, Plaintiff does not even acknowledge Defendant's ripeness arguments. This is fatal to Plaintiff's claim challenging the Act as unconstitutionally vague, just as Defendant argues in the Reply. (Doc. No. 98 at 3 ("Finally, NetChoice does not respond to Tennessee's separate argument that NetChoice's facial vagueness claim is not ripe. Mot.12-13. This justiciability problem alone warrants dismissal.")). Indeed, federal courts regularly hold that when a plaintiff declines to address a defendant's ripeness argument, that argument is conceded. *See e.g., 1940 Carmen, LLC v. City of Los Angeles*, No. 220CV06772ODWEX, 2021 WL 3406648, at *4 (C.D. Cal. Aug. 4, 2021) ("As Plaintiffs fail to oppose Defendants' ripeness arguments, the Court may treat the failure as Plaintiffs' waiver or consent."); *Garcia-Hernandez v. Loya Ins. Co.*, No. 2:26-CV-01248-CDS-EJY, 2026 WL 2593976, at *4 (D. Nev. Sept. 1, 2026) ("Because the plaintiffs fail to provide points and authorities related to ripeness, they essentially concede to the defendants' arguments. On this basis alone, I may grant the defendants' motions to dismiss."); *Melwood Horticultural Training Ctr., Inc. v. United States*, 151 Fed. Cl. 297, 309 (2020) ("In any event, failure to respond to the United States' ripeness arguments on the merits can be construed as a concession of the issue."); *Dialysis Patient Citizens v. Azar*, No. 20-CV-1664 (TSC), 2021 WL 184318, at *6-7 (D.D.C. Jan. 19, 2021) (treating ripeness as "conceded" where plaintiffs did not respond to ripeness argument raised by defendants in motion to dismiss).

Given these circumstances, the Court will treat Defendant's (prudential) ripeness argument for dismissal as conceded by Plaintiff. Accordingly, the Court will decline to exercise jurisdiction over Count II of the Amended Complaint (and the facial vagueness claim therein challenging the Act), and Count II of the Amended Complaint (and the facial vagueness claim asserted therein) will be dismissed without prejudice.

Given that the Court will dismiss Count II of the Amended Complaint (and the facial vagueness claim asserted therein) on the foregoing basis, the Court should not and will not consider whether Count II (and the facial vagueness claim asserted therein) is subject to dismissal under Rule 12(b)(6) for failure to state a claim.

CONCLUSION

The Motion (Doc. No. 91) will be **GRANTED IN PART** and **DENIED IN PART**. The Motion will be **GRANTED** to the extent that it seeks the dismissal of Count II of the Amended Complaint (and the facial vagueness claim asserted therein) due to a lack of prudential ripeness, and Count II of the Amended Complaint (and the facial vagueness claim asserted therein) will be dismissed without prejudice on the basis of the Court declining to exercise jurisdiction over that count (and claim). The Motion will be **DENIED** in all other respects.

The Court also wishes briefly to address the pending Preliminary Injunction Motion. As the Court noted above, on August 28, 2026, the Sixth Circuit issued the *NetChoice* Appeal Decision (Doc. No. 107), therein vacating the Denial Order, and remanding for further consideration of the Preliminary Injunction Motion consistent with the Sixth Circuit's decision in the *NetChoice* Appeal Decision.[34] However, since the filing of the Preliminary Injunction Motion (on October 3, 2024): Plaintiff has filed an amended complaint (i.e., the Amended Complaint); the Court has (herein and in the accompanying order) dismissed Plaintiff's vagueness claim challenging the Act; there have been numerous developments in the case law surrounding First Amendment challenges to state laws like the Act; and, the Court discerns, there have likely been numerous factual developments relevant to this action.

[34] Although the Court had previously resolved the Preliminary Injunction Motion via the Denial Order, the Preliminary Injunction Motion is, necessarily, once again pending for the Court's adjudication given the Sixth Circuit's decision in the *NetChoice* Appeal Decision.

In these circumstances, the Court will **DENY** the Preliminary Injunction Motion (Doc. No. 8) as moot. Such denial is, unsurprisingly, without prejudice to Plaintiff filing a renewed motion—which takes into account any and all changes in circumstances that have occurred since the filing of the Preliminary Injunction Motion—that seeks preliminary injunctive relief enjoining enforcement of the Act. If, as the Court expects, Plaintiff files such a motion, Defendant shall have fourteen (14) days to file a response in opposition to the motion. Plaintiff shall then have seven (7) days in which to file an optional reply to Defendant's response. The Court will adjudicate any such renewed motion for preliminary injunctive relief expeditiously and consistent with the Sixth Circuit's decision in the *NetChoice* Appeal Decision—and in particular the Sixth Circuit's findings with respect to Plaintiff's showing of irreparable harm.[35]

An appropriate accompanying order will be entered.[36]

Eli Richardson

ELI RICHARDSON
UNITED STATES DISTRICT JUDGE

[35] Of note, in its consideration of any such renewed motion for preliminary injunctive relief, the Court will not consider the papers filed in support of the (original) Preliminary Injunction Motion, the TRO Motion, or the Motion. So, if the parties wish for the Court to consider a legal argument, case law, or factual circumstances, they should highlight (and otherwise offer support for) those legal arguments, case law, and factual circumstances in their briefing on (and other papers submitted in connection with, such as exhibits) the renewed motion for preliminary injunctive relief.

[36] Finally, the Court wishes to commend the parties in this action. The legal issues raised by this action are, to the say the least, complex. The parties (and specifically their counsel) have done a praiseworthy job briefing and presenting the relevant issues for the Court's consideration.